1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

ERIC D. SIMPLE,                          )
                                         )
                Plaintiff,               )     **ORIGINAL**
                                         )
        -vs-                             )   Case No. 04-1305
                                         )
WALGREEN COMPANY, an Illinois            )
Corporation,                             )
                                         )
                Defendant.               )

    THE DEPOSITION of ERIC D. SIMPLE, the Plaintiff

herein, called by the Defendant for examination in the

above-entitled cause, pursuant to the provisions of the

Federal Rules of Civil Procedure and the Rules of the

Supreme Court thereof, taken before Jennifer E. Johnson,

CSR, RMR, CRR, License No. 084-003039, a Notary Public in

and for the State of Illinois, at 411 Hamilton Boulevard,

Suite 1932, in the City of Peoria, County of Peoria, and

State of Illinois, on the 29th day of November, A.D. 2005,

commencing at 10:36 a.m.

Eric Simple v. Walgreen Co.

2

```
 1     APPEARANCES:

 2
           NILE J. WILLIAMSON, ESQUIRE
 3         Attorney at Law
           411 Hamilton Boulevard, Suite 1926
 4         Peoria, Illinois  61602
           (309) 677-5950
 5             On Behalf of the Plaintiff.

 6
           HINSHAW & CULBERTSON, L.L.P.
 7         BY:  L. LEE SMITH, ESQUIRE
           Attorney at Law
 8         456 Fulton Street, Suite 298
           Peoria, Illinois  61602
 9         (309) 674-1025
               On Behalf of the Defendant.

10

11     ALSO PRESENT:

12
           RACHEL B. ABLIN, ESQUIRE
13         Senior Attorney
           Walgreen Company
14
           Michael A. Palmer
15
           Jennifer Simple
16

17

18

19

20

21

22

23

24
```

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**3**

INDEX
PAGE

WITNESS:

ERIC D. SIMPLE

Direct Examination by Mr. Smith          4
Cross-Examination by Mr. Williamson      186
Redirect Examination by Mr. Smith        192

EXHIBITS:

SIMPLE 1                          50
    (4/30/05 Supervision Visit Notes)
SIMPLE 2                          58
    (Letter to M. Palmer from E. Simple)
SIMPLE 3                          91
    (5/16/04 letter to L. Rodriguez
     from E. Simple)
SIMPLE 4               102
    (Group of e-mails)
SIMPLE 5               107
    (Group of e-mails)
SIMPLE 6               109
    (EXA Performance Review, 5/22/02)
SIMPLE 7               112
    (EXA Performance Review, 2003)
SIMPLE 8               112
    (EXA Performance Review, 3/16/04)
SIMPLE 9               121
    (Plaintiff's Answers to Interrogatories)
SIMPLE 10              170
    (Group of e-mails)
SIMPLE 11              181
    (Charge of Discrimination)
SIMPLE 12              195
    (7/7/04 letter to M. Palmer from E. Simple)

---

**4**

1          (Witness sworn.)
2          MR. SMITH: For the record, state this is the
3    deposition of Eric Simple, case of Simple versus Walgreen
4    Company.
5          ERIC D. SIMPLE,
6    called as a witness, after being first duly sworn, was
7    examined and testified upon his oath as follows:
8          DIRECT EXAMINATION
9    BY MR. SMITH:
10         Q.  Would you state your name, please?
11         A.  Eric Dwayne Simple.
12         Q.  Mr. Simple, what is your address?
13         A.  1305 Plantation Lane, Bloomington, Illinois,
14   61—
15         MR. WILLIAMSON: Speak up a little bit.  You
16   have a soft voice.
17         A.  Oh, okay.  1305 Plantation Lane, Bloomington,
18   Illinois.
19         Q.  How long have you lived at that address?
20         A.  Since May of '02.
21         Q.  Where did you live prior to May of '02?
22         A.  727 West Orlando, Apartment B, Normal,
23   Illinois.
24         Q.  In what period did you live at that address in

---

**5**

1    Normal?
2          A.  I lived at that address from September '97
3    until I moved to the Plantation Lane.
4          Q.  Okay.  Where did you live before September
5    of 1997?
6          A.  720 – no, 713, Apartment B, West Orlando.  I
7    stayed there like four months.  Then we moved.
8          Q.  In '97 you lived at that apartment?
9          A.  Yeah.  From like April of '97 to September
10   '97, four months.
11         Q.  Okay.  And I understand that you attended
12   college at Illinois State University in Normal; is that
13   correct?
14         A.  Yes, sir.
15         Q.  And do you have a bachelor's degree from that
16   institution?
17         A.  Bachelor's degree, yes.
18         Q.  In what year did you receive your bachelor's
19   degree?
20         A.  May of '94.
21         Q.  In what field or subject did you receive your
22   degree?
23         A.  Speech communications.
24         Q.  During the time after you graduated from ISU

---

**6**

1    in, I think you said, May of 1994, did you -- where did
2    you live from May of '94 to the apartment address that you
3    gave us in '97?
4          A.  In '97?  May of '94, I was living on Prospect
5    Avenue.  I can't remember the address.  That's in
6    Bloomington.  In October of '94, we moved to Lincoln
7    Square Apartments.  That's the location I was staying at
8    when I first applied with Walgreens, and I stayed there
9    until ninety -- until moving to Orlando.  I can't remember
10   those addresses, but it was Lincoln.
11         Q.  So, for the entire time since you've graduated
12   from ISU, you have lived in either Normal or Bloomington,
13   Illinois, correct?
14         A.  Yes.
15         Q.  When did you first move to Bloomington-Normal?
16         A.  I got here August the 2nd, 1989.  I received
17   an athletic scholarship to ISU.
18         Q.  In what sport?
19         A.  Football.
20         Q.  Did you play football for ISU?
21         A.  Yes, sir.
22         Q.  Now, you went to work for the Walgreen Company
23   in 1995; is that correct?
24         A.  April.

---

Eric Simple v. Walgreen Co.

7

1      Q.   Where -- did you work anywhere after
2 graduating from ISU and starting to work with Walgreen?
3      A.   After ISU, sir, yes, I worked at Jewel Osco.
4      Q.   Where?
5      A.   I worked at two locations. I worked at the
6 Jewel Osco Oakland Avenue, and I worked at the Jewel Osco
7 on College Avenue.
8      Q.   What was your position there?
9      A.   I was a baker; I was a cashier; I was an
10 overnight stocker, and -- but different points in time.
11 The last position I held there was the baker.
12      Q.   How did you come to work for Walgreen Company?
13      A.   Walgreens routinely recruits at ISU, and I met
14 Mr. Tom Truphone (phonetic) at ISU.
15       MR. WILLIAMSON: Spell that.
16      A.   I don't know how to spell his last name now.
17 He was the manager at the Normal store at the time. And I
18 met him at the ISU job fair.
19      Q.   Was this while you were a student at ISU, or
20 was this after you graduated?
21      A.   After I graduated.
22      Q.   And did you apply then for a management
23 trainee position?
24      A.   No, Mr. Truphone asked me for my resume. And

8

1 when he saw my resume -- his wife, at the time, was
2 working at the Jewel Osco that I worked at. And he
3 forwarded my resume to the district office.
4      Q.   You were hired then in April of 1995; is that
5 correct?
6      A.   April 26th, 1995.
7      Q.   And were you hired as a management trainee?
8      A.   Management trainee, yes, sir.
9      Q.   Which -- in which store did you first work as
10 a management trainee?
11      A.   New Lenox, Illinois.
12      Q.   And is that in the district that is Mr. Mike
13 Palmer's -- Michael Palmer's district?
14      A.   At that time it was, but since then the
15 districts have split, and I think that store is now part
16 of the Joliet district.
17      Q.   When you were working at the New Lenox store,
18 did you commute from Normal or Bloomington?
19      A.   Yes, sir, I commuted 22 months; 100 miles one
20 way.
21      Q.   Did you spend the nights closer to the store,
22 or did you drive back and forth every day?
23      A.   Drive back and forth most of the time, but
24 occasionally -- as assistants, you have to close or open.

9

1 So, every few times when I closed and opened, I stayed in
2 a hotel or I either went to Chicago, stayed with a
3 relative, a future relative or friends.
4      Q.   Where did you go to high school?
5      A.   Texas.
6      Q.   Where in Texas?
7      A.   Columbia High School in West Columbia, Texas.
8      Q.   Where -- what part of Texas is that?
9      A.   Gulf Coast. About 45 miles, 50 miles
10 southwest of Houston.
11      Q.   So, it's between Houston and Corpus Christi or
12 that --
13      A.   Yeah. Victoria, Corpus Christi area.
14      Q.   Were you recruited then to play football at
15 ISU? Is that how you came from Texas to ISU?
16      A.   Yes, sir.
17      Q.   Now, at the time you were working as a
18 management trainee -- or is that also known as an MGT --
19      A.   Correct.
20      Q.   -- position at New Lenox, were you married?
21      A.   Not when I first started. But in the process
22 of being up there, I became married.
23      Q.   Are you currently married?
24      A.   Yes, sir.

10

1      Q.   What is your wife's name?
2      A.   Jennifer Simple.
3      Q.   And she's in the room here with us today?
4      A.   Yes, sir.
5      Q.   When were you married?
6      A.   June 14th, 1996.
7      Q.   At the time you married, was your wife
8 employed?
9      A.   At the time I married, my wife -- no, she
10 wasn't.
11      Q.   And is she employed now?
12      A.   Yes.
13      Q.   And that is for State Farm Insurance; is that
14 correct?
15      A.   State Farm Insurance.
16      Q.   When did she go to work for State Farm
17 Insurance?
18      A.   September 14th, 1998.
19      Q.   I understand you worked at the New Lenox store
20 until March of 1997; is that correct?
21      A.   March 5th, 1997.
22      Q.   Then you, after that, went to work at the
23 Walgreen store on North Main Street in Normal; is that
24 right?

Eric Simple v. Walgreen Co.

11

1    A. Yes.
2    Q. What was your position there at the store?
3    A. MGT.
4    Q. Same position as you had at the New Lenox
5    store?
6    A. Yes.
7    Q. Was that a transfer that you requested
8    yourself?
9    A. Yes.
10    Q. Why?
11    A. Why? 'Cause I had made it known that I would
12    prefer to be in that market, in the Bloomington-Normal
13    area at that time. And in the midst of commuting, I had a
14    couple car accidents, and the financial burden of gas,
15    going back and forth, starting to take a toll on me.
16    Q. How long had you wanted to move back to the
17    Normal market?
18    A. I made that known early on, when I was at New
19    Lenox, that I knew that there were stores in the area; and
20    if an opening came up, I would like to be considered to go
21    back down there.
22    Q. When you started and were hired at Walgreens,
23    was it made known to you that the only opening was at the
24    New Lenox store?

12

1    A. Yes.
2    Q. So, that's why you took -- had this 100-mile
3    commute every day, because that was the only opening?
4    A. That was the only opening, and I took that
5    because at the time I felt Walgreens was a great place to
6    start my career.
7    Q. Now, then, you became management trainee at
8    the Normal store. And how long did you work at that
9    store?
10    A. I worked at that store from May 05, '97, to
11    probably about April '98, and I went to the Oakland Avenue
12    store.
13    Q. And that's at Oakland Avenue and Veterans
14    Parkway in Bloomington?
15    A. Bloomington, correct.
16    Q. Was that a voluntary transfer, or was that a
17    transfer made at the company's request?
18    A. Well, Walgreens -- Mr. Palmer -- routinely
19    moves assistants around for training experience and to get
20    the experience of working in different stores. Each store
21    has their own volume, own budget control, different
22    clients, different customer base, so it all plays into the
23    training to be a better manager.
24    Q. And as I understand the management progression

13

1    at Walgreens, a person comes into the company, starts out
2    as a management trainee and then becomes -- or an MGT then
3    becomes an executive assistant manager or EXA, then store
4    manager; is that correct?
5    A. That's correct.
6    Q. Is there any -- at that time when you started
7    as a management trainee, was there any time limitation put
8    on how long somebody would be a management trainee or an
9    executive assistant?
10    A. At the present time, I think it's like 24
11    months -- two years. But when I started, it was a little
12    longer because the training process was entirely
13    different. Now everything's online. So, the tests that
14    you take and the skills they require you to do, you can do
15    those online and know your answers immediately.
16        When I started, everything was in a book, a
17    pamphlet. So, you'd have to do your tests, have your
18    manager sign off on it, send them to Corporate. If you
19    miss one or two, they have to send it back to you. So,
20    the process in itself was much longer.
21        There would be times when you would have a
22    test sent to Corporate, and by the time it got back to
23    you, it could be up to four and five months. Then you
24    have to sit, fill it out, send it back to show that you

14

1    corrected it, and then finally you would be through with
2    that phase.
3    Q. So, were there tests that you had to pass in
4    order to go from the MGT classification to go to the EXA
5    or executive assistant manager classification?
6    A. There are several tests.
7    Q. You said at that time there were written tests
8    that you had to take and send them in and come back and so
9    forth?
10    A. (Witness nods head.)
11    Q. Okay. And you took those written tests?
12    A. Yes.
13    Q. And at some point, you passed the written
14    tests and then became eligible to become an executive
15    assistant manager, correct?
16    A. Yes.
17    Q. Okay. When was that?
18    A. I was actually eligible around August of '97,
19    and I could have been a candidate for the '98 -- the class
20    of '98, which at that time Mr. Palmer would go around and
21    talk to all the potential EXA candidates, give them a
22    little interview, math test. At that time, it was three
23    candidates -- myself, Mr. Walden and Mr. Masters.
24    Mr. Walden was chosen. That's Mr. Billy Walden and Mike

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

15

1  Masters. Those two candidates was chosen over myself. In
2  that time is when Mr. Palmer moved me to Mr. Kenneth
3  Hadley's store on Oakland Avenue.
4      Q.  And that was still as an MGT?
5      A.  Still as an MGT in '98.
6      Q.  And was there -- in going from the MGT to an
7  EXA spot, those are chosen by the district manager?
8      A.  Those are -- the final analysis is made by a
9  district manager, but it's upon recommendation of your
10  store manager --
11      Q.  Okay.
12      A.  -- and your performances.
13      Q.  Now, you worked as a -- I think you said you
14  were at the point where you were at the Oakland Avenue
15  store in Bloomington, and you said you went there in
16  spring of '98?
17      A.  '98.
18      Q.  And how long did you stay there?
19      A.  Until April of '99.
20      Q.  Where did you go then?
21      A.  I went back to the Normal store, but I went
22  back as an EXA.
23      Q.  And that's on North Main Street, Normal?
24      A.  North Main Street.

16

1      Q.  Was there a course that you had to take in
2  order to become an EXA?
3      A.  There's a EXA class, called ADSM, Advanced
4  Drugstore Management, which is -- was three sections, and
5  you did stuff like operation statements; you learned about
6  issues and training, developing employees, payroll, budget
7  control, reviewing people, positive and negative criticism
8  or positive reinforcements, and discrimination issues,
9  such as harassment, so on.
10      Q.  Where was this course taught that you took?
11      A.  Eastland Suites, Bloomington, Illinois.
12      Q.  And how many other people participated in the
13  course? I mean how many other EXA candidates or EXAs
14  participated?
15      A.  It was two districts then -- Illinois South,
16  which was Mr. Terry Harper's district at the time and
17  Mr. Palmer's Illinois North. So, I would say probably
18  anywhere from 15 to 20 people in there, estimate.
19      Q.  And did you take that course immediately
20  before becoming an EXA or after becoming an EXA?
21      A.  Like you're officially EXA when you graduate,
22  but upon entering the course you're coded as an EXA. It's
23  up to you to maintain your EXA credentials and write the
24  state by passing the courses, doing all your required

17

1  assignments.
2      Q.  Now, after you became an EXA, you went back to
3  the Main Street store in Normal, correct?
4      A.  (Witness nods head.)
5      Q.  And who was your -- who was the store manager
6  at that time?
7      A.  Mr. King was there for two days, and he moved
8  to the Main Street store in Bloomington. And Mr. Ron
9  LaTour (phonetic) came over from Peoria somewhere. I
10  don't know where.
11      Q.  Was he the store manager then for some period
12  of time?
13      A.  For the entire six months that I was there --
14  six or five months that I was there.
15      Q.  Who is your immediate supervisor as an EXA or
16  executive assistant manager?
17      A.  Store manager.
18      Q.  Who does your performance appraisals or
19  evaluations?
20      A.  The store manager and the district manager.
21      Q.  How often are performance evaluations done?
22      A.  Yearly.
23      Q.  Any particular time of the year?
24      A.  They generally are given to us in February,

18

1  have to be done by March, I think. They're generally
2  complete by the end of April.
3      Q.  Is that for everyone as far as EXAs or all at
4  the same time?
5      A.  All management.
6      Q.  How long were you an EXA at the Main Street
7  store in Normal?
8      A.  From April '99 to September of '99.
9      Q.  And did you then become an EXA at another
10  store?
11      A.  Yes.
12      Q.  Where was that?
13      A.  I went back to the Oakland Avenue store.
14      Q.  Why did you go back to the Oakland Avenue
15  store?
16      A.  Mr. Palmer -- as I said earlier, Mr. Palmer
17  moves assistants and EXAs around for training purposes,
18  development purposes. And it was also known that the
19  store manager at that time, Mr. Hadley, was appreciative
20  of my work.
21      Q.  Is that the store manager at the Oakland
22  store?
23      A.  At that time was Mr. Hadley.
24      Q.  What's his first name?

19

1    A. Kenneth Hadley.
2    Q. How long were you at the Oakland Avenue store
3  as an EXA?
4    A. I was there from September of '99 to April
5  '02.
6    Q. And were you transferred then to another
7  store?
8    A. 24-hour store, the Veterans/G.E. Road store in
9  Bloomington, Illinois.
10   Q. By this time -- by going to the Veterans
11  Parkway store at G.E. Road, that was the third store in
12  Bloomington-Normal that you had worked, correct?
13   A. Correct.
14   Q. At that time, how many Walgreen stores were
15  there in the Bloomington-Normal area?
16   A. At that time?
17   Q. Yes.
18     MR. WILLIAMSON: In the district or
19  Bloomington-Normal?
20  BY MR. SMITH:
21   Q. Just Bloomington-Normal. In either
22  Bloomington or Normal.
23   A. Five considered Bloomington-Normal because the
24  Bloomington-Normal market is considered Pontiac as well.

20

1    Q. And so the five -- we've talked about the one
2  on North Main in Normal, the one on Oakland Avenue in
3  Bloomington, the one on Veterans Parkway and G.E. Road in
4  Bloomington. What are the other -- were the other two
5  stores at that time in Bloomington-Normal?
6    A. You said the one on North Main in Bloomington?
7    Q. Right.
8    A. The one on Oakland in Bloomington, the one on
9  G.E. Road in Bloomington, the one on North Main in Normal,
10  and Pontiac. That's five.
11   Q. Was there one -- another one on Main Street at
12  that time, either Main Street in Normal or Bloomington
13  other than the one on North Main?
14   A. Yeah, they're both on North Main. One's in
15  Bloomington, and one's in Normal.
16   Q. So, there are two on Main?
17   A. Yes, there's two on Main. That's five.
18   Q. Just so we can distinguish between -- see, the
19  one that you worked at was 1101 North Main?
20   A. In Normal.
21   Q. In Normal. Then there is one on Main Street
22  in Bloomington?
23   A. 1110, I think.
24   Q. So, the Normal -- Main Street, Normal; Main

21

1  Street, Bloomington; and then there is Oakland; Veterans
2  Parkway and G.E. Road, that's four; then the one in
3  Pontiac is five?
4    A. Yes.
5    Q. Now, I think you said now there are six?
6    A. There are six now.
7    Q. Where's the other -- where's the sixth store?
8    A. Fort Jesse Road.
9    Q. That's just off of Veterans Parkway?
10   A. Veterans Parkway.
11   Q. That's Normal?
12   A. That's Normal, yes.
13   Q. When did that sixth store open?
14   A. This year, in August. Late August, if I'm
15  correct.
16   Q. After you were transferred to the Veterans
17  Parkway/G.E. Road store, I think you said that was in
18  April of —
19   A. '02.
20   Q. -- '02, who was your store manager at that
21  store at that time?
22   A. Miss Leanne Turley.
23   Q. How long did you work as an EXA at the
24  Veterans Parkway/G.E. Road store?

22

1    A. A little over two years.
2    Q. So, that would be until about April of 2004?
3    A. Yes.
4    Q. And then were you transferred from that store
5  to another store in Bloomington?
6    A. Yes.
7    Q. Where?
8    A. The Main Street store, across from Illinois
9  Wesleyan, which would be the 1110 store.
10   Q. That's the one -- the Main Street, Bloomington
11  store?
12   A. Bloomington store, yes.
13   Q. Is that before you worked at the Main Street,
14  Normal store, right?
15   A. Yes.
16   Q. How long did you work as an EXA at the North
17  Main Street in Bloomington store?
18   A. Eight months, till December the 10th.
19   Q. Okay. And then after December, did you become
20  a management trainee again?
21   A. Yes.
22   Q. And was that at your request?
23   A. Yes.
24   Q. Why did you request the transfer to a

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

23

1  management trainee position?
2       A.  At that point, I saw that Walgreens or
3  Mr. Palmer didn't view me as just a good manager.  I was
4  viewed as a good black manager that was capable of
5  handling certain stores, with certain criterias.  And I
6  felt like I gave my all to this company, and at this point
7  I wanted to continue to work for the company because,
8  although I had been done a grave injustice, I still liked
9  what I was doing.
10      Q.  Now, as management trainee -- that was the job
11 that you held at Walgreens between '95 and -- was it '99,
12 correct?  So, you were four years essentially as a
13 management trainee?
14      A.  Four years.
15      Q.  And now, in going back to the MGT or
16 management trainee position, were you doing the same sort
17 of duties that you were doing as a management trainee
18 before?
19      A.  Yes.
20      Q.  Now, how long have you -- since returning to
21 the management trainee position in December of '04,
22 approximately a year ago, which stores or store have you
23 worked at?
24      A.  The Veterans Parkway store, G.E. Road.

24

1       Q.  That was the same store where you worked for
2  Miss Turley; she was a store manager then, correct?
3       A.  Yes.
4       Q.  Is she still the store manager at that store?
5       A.  No, she isn't.
6       Q.  Who is currently the store manager?
7       A.  Mr. Rod Oard.
8       Q.  Is that O-r-r?
9       A.  O-r-a-d (sic).  Or O-a-e-r-d (sic).
10      Q.  Oard?
11      A.  Oard, yes.
12      Q.  When did he become the store manager at the
13 Veterans Parkway store?
14      A.  May of '05.
15      Q.  So, did you work for Ms. Turley between
16 December of '04 and May of '05?
17      A.  Yes.
18      Q.  And then you've worked for Mr. Oard as store
19 manager from May of this year till the -- till the present
20 times, correct?
21      A.  Yes.
22      Q.  Is there a particular shift that you have
23 worked as an MGT or management trainee?
24      A.  That's the 24-hour store, and I have been

25

1  working the overnight shift.
2       Q.  What time do you start on that shift?
3       A.  10 p.m.
4       Q.  You work until when?
5       A.  8.
6       Q.  Has that -- do you work a five-day-a-week
7  schedule, or what is your schedule?
8       A.  That's a seven-day, seven-day off.  My work
9  week begins Saturday night at 10 p.m. and ends Saturday
10 morning the next week at 8 a.m.
11      Q.  Did you request that shift?
12      A.  Yes.
13      Q.  Was there a particular reason why you -- why
14 you requested the overnight shift?
15      A.  Yes.
16      Q.  Why?
17      A.  Because at the present position I was in, EXA.
18 that's a position that supposedly proceeded to a store
19 manager.  And at that point in time, I saw how Walgreens
20 had viewed me.  And I felt that Walgreens only saw me in a
21 particular situation, a particular store, and I felt like
22 that I didn't want to continue to stay in this position
23 because if I stayed in this position, upon not accepting
24 the store manager position and Mr. Palmer keep coming to

26

1  be about the same type of store position, it would have
2  felt like I was in a position where I didn't know what I
3  wanted.  But I knew what I wanted.  I just felt like I
4  wasn't given a fair opportunity to achieve what I wanted.
5       But at the same time, I still liked working
6  for the company and liked what I was doing and had a
7  family to support.  So, I didn't feel like just because
8  things weren't offered to me in the same light of others
9  that I should just up and walk away.
10      Q.  Okay.  And I think that really goes more to
11 your decision to request or to seek reassignment to the
12 MGT position, and my question was really more about you.
13 I think you said that you requested the night shift, the
14 shift from 10 p.m. to 8 a.m.  And was there any particular
15 reason why you requested that shift as opposed to a
16 daytime shift?
17      A.  Well, because as a daytime assistant, you work
18 -- especially as an EXA, you're scheduled for 44 hours a
19 week, but normally you work more; and there are times,
20 particularly this time of the season, you work six days a
21 week.  And the schedule changes back and forth, and I had
22 given Walgreens a lot.  I drove to New Lenox for 22
23 months, never opened the store late; and I was very
24 prompt, very efficient, and did everything that was asked

Eric Simple v. Walgreen Co.

27

1  and even went above and beyond.
2       At this point in time, I knew that the
3  seven-on, seven-off shift was a consistent shift. I would
4  know my hours, and it would allow me to seek further
5  education, if that was a choice, or to spend more time in
6  the community, which I have chosen.
7       Q. Now, you have two children, I understand?
8       A. Yes.
9       Q. Okay. And what are their names and dates of
10 birth?
11      A. Erika Janese Simple.
12      Q. How do you spell Erika?
13      A. E-r-i-k-a.
14      Q. She's 8 years old?
15      A. She's 10. Her date of birth is December 23rd,
16 1994.
17      Q. And you have a son then?
18      A. Yes, sir. Darius Davon Simple.
19      Q. And what is his age?
20      A. He's 7. January 13th, 1998.
21      Q. Now, you said that one of the reasons I
22 understand you took the overnight position was so that you
23 — if you chose to go back to school you would be able to
24 fit that into your schedule; is that right?

28

1       A. Correct.
2       Q. Have you returned to school?
3       A. Not yet.
4       Q. And you are apparently contemplating that?
5       A. I've been coaching. I said I also wanted to
6  give back to the community. I've coached flag football,
7  soccer and volleyball over at Game Time Gym and the soccer
8  league in the Bloomington-Normal community.
9       Q. Have you applied to any colleges or
10 universities to return to school?
11      A. Not yet.
12      Q. What are you thinking about courses of study
13 that you would pursue if you did return to school?
14      A. Probably athletic training or either get a
15 master's in speech communication. In fact, I was already
16 accepted to grad school at ISU upon taking the job at
17 Walgreens.
18      Q. When was that; back -- was that back in '95?
19      A. '95.
20      Q. Now, you said that you've coached soccer and
21 flag football and maybe some other things?
22      A. Volleyball.
23      Q. Volleyball. Is that for your children's
24 teams, or is that other teams?

29

1       A. My children's teams and a buddy of mine's
2  team.
3       Q. So, the overnight schedule gives you the
4  flexibility to do that kind of thing with your kids, is
5  what I understand you're saying?
6       A. Yes.
7       Q. Now, was it your expectation when you became
8  an EXA that you would eventually go into and become a
9  store manager?
10      A. Yes.
11      Q. Would it be correct to say that even when you
12 started at Walgreens that it was your ambition to become a
13 store manager?
14      A. Yes.
15      Q. Or perhaps even higher position?
16      A. Yes.
17      Q. Okay. Did you have any conversation with
18 anybody in Walgreens management at the time you became an
19 MGT or during the period in which you were an MGT as to
20 how long you would serve as an EXA before becoming a store
21 manager?
22      MR. WILLIAMSON: So we're going back to '97?
23 BY MR. SMITH:
24      Q. Yes, in that period of time '95 to '97, in

30

1  that period of time.
2       A. How long it would be?
3       Q. Yes. How long -- let me rephrase the question
4  this way.
5       Were you told by anyone how long you would
6  serve either as an MGT before becoming an EXA or you were
7  told how long you would serve as an EXA before becoming a
8  store manager?
9       A. Well, in my interview with Mr. Palmer, he told
10 me that -- before I even accepted the job that within five
11 years there's a chance that you could be a store manager.
12      Q. That's five years from, from starting?
13      A. From the day I walked in the store on
14 April 26th, 1995.
15      Q. You said you could be within five years,
16 right, but that doesn't assume a particular amount of time
17 as an MGT or a particular amount of time as EXA, correct?
18      A. No.
19      Q. Did you have any -- were you told anything
20 more specific as to how long you would serve in either of
21 those positions?
22      A. No.
23      Q. And Mr. Palmer, Mike Palmer, was -- has been
24 the, you said, the district manager the entire time that

**31**

1  you worked for Walgreens?
2      A.  Yes.
3      Q.  Even though you worked originally at the New
4  Lenox store, and that was in his district at the time?
5      A.  Yes.
6      Q.  And that district, is that now known -- this
7  district where you work now is now known as the Illinois
8  North district?
9      A.  Yes. It's been Illinois North the entire
10  time.
11      Q.  Okay.  Sometimes there have been other stores
12  that have been in it, but --
13      A.  In and out, but it's always been Illinois
14  North.
15      Q.  Bloomington-Normal, Pontiac, that's always
16  been in this district, correct?
17      A.  Yes.
18      Q.  Now, at some point -- actually, in your
19  answers to interrogatories you said that in November 2001
20  you were offered a store manager's position at the store
21  on Court Street in Kankakee, Illinois, correct?
22      A.  Yes.
23      Q.  Who offered you that position?
24      A.  Mr. Mike Palmer.

**32**

1      Q.  And at that time, November of 2001, you were
2  working at the Oakland Avenue store in Bloomington,
3  correct?
4      A.  Yes.
5      Q.  Who was your store manager at that time, at
6  the time November of 2001?
7      A.  Mr. Billy Walden.
8      Q.  You declined the position at -- the store
9  manager's position at the Court Street store in Kankakee,
10  correct?
11      A.  Yes.
12      Q.  Would this have been a significant increase in
13  income for you?
14      A.  Individually, yes.  Collectively as a family,
15  no, because at that time I was making 36,600 base.
16  Mr. Palmer approached me with a 43,900 which is a little
17  over $7,000 increase, but in order for me to accept that I
18  would have to lose my wife's salary completely.
19      Q.  Let's go back to the salary you were making as
20  an EXA working at the Oakland Avenue. I think you said
21  you were making a base of around 36,000 approximately?
22      A.  At that time, 36,600.
23      MR. WILLIAMSON:  This is in '01?
24  BY MR. SMITH:

**33**

1      Q.  This is in '01, correct.  And did you receive
2  a bonus in addition to the base salary?
3      A.  My bonus in '01, yes.
4      Q.  Okay.  How was the bonus calculated?
5      A.  The bonus calculated for EXAs is there's a
6  base of three -- at that time.  I know now it's $300 a
7  month. It wasn't 3 then.  But there's a base, and you get
8  a .005 percent on increase of total sales and a .005 on
9  the increase in net sales.
10      Q.  Okay.  So, as the -- you have a base of 300 a
11  month in the bonus?
12      A.  Now.
13      Q.  Now.  Okay.  May have been something different
14  then?
15      A.  It was a little lower then, in other words.
16      Q.  And then you could get more based upon whether
17  the sales at the store go up?
18      A.  Compared to last year, yes.
19      Q.  Compared to the previous year's.  Okay.  And
20  did you receive a bonus from Walgreen in 2001?
21      A.  Yes.
22      Q.  Approximately how much was it?
23      A.  Let's see. '05 was -- '04 -- wait, ' 05 --
24  $31,157 (sic).

**34**

1      Q.  So, the bonus you received was almost as much
2  as your base salary; is that right?
3      A.  Right.
4      Q.  Because I think you said you made about 36
5  something, and then your bonus was 31?
6      A.  No, 3,100 -- my math. $3,157. I'm sorry.
7  $3,157. I'm sorry.
8      MR. WILLIAMSON:  Again, for '01.
9  BY MR. SMITH:
10      Q.  This is for '01.
11      A.  '01.
12      Q.  I think you said the position -- the store
13  manager's position that you were offered in Kankakee was
14  going to have a base of --
15      A.  43,900.
16      Q.  -- 43,900.  And then was there also going to
17  be a bonus that you would be eligible to receive at that
18  store as a store manager?
19      A.  Yes.
20      Q.  Okay.  Was that the same computation on the
21  bonus as the EXA bonus, or was it computed differently?
22      A.  I don't know exactly how the store managers'
23  bonuses are computed.  I know it's based on sales and
24  increase and those facts, but I think Mr. Palmer told me

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

35

1  at that time the base in that store was 5500, 56.
2      Q.  When he said the base in that store was --
3      A.  $5,500.
4      Q.  So, it would be --
5      A.  Up to that manager to increase his bonus --
6      Q.  Okay.
7      A.  -- based on his performance.
8      Q.  So, you would have received a -- if you had
9  taken the job, you would have received the base of, I
10  think you said, 43 something, then at least 5,000 in
11  bonus?
12      A.  Possibly.  Possibly.
13      Q.  Possibly more?
14      A.  Possibly less.
15      Q.  Possibly less.  Okay.  And did I understand
16  you that you decided not to take that job, was it -- and
17  what were the reasons again you decided not to take it?
18  Was it entirely because of the distance, or were there
19  other factors?
20      A.  No.  I decided not to take that job because I
21  -- one, Mr. Palmer and Walgreens knew that I did not want
22  to relocate.  Mr. Palmer told me that I would have to
23  relocate to accept that job.
24      I also was aware of certain factors

---

36

1  surrounding that store because, as I stated earlier, I
2  worked in the New Lenox, Illinois, store, which is up in
3  that area, so I would see the other stores back and forth
4  to that store.
5      Also, one of the previous managers of that
6  store, Mr. Bob Becker, was my first EXA.  So, I was aware
7  of things surrounding that store, such as the social --
8  that store was located in a socioeconomically-challenged
9  neighborhood.  That store catered more to
10  African-American, lower-income minorities.  That store had
11  -- was one of the two highest stores with shrink in the
12  district.
13      MR. WILLIAMSON:  Do you want to define shrink?
14  BY MR. SMITH:
15      Q.  Yes.
16      A.  Shrinkage is -- Walgreens has some KPI factors
17  -- key performance indicators -- which determines how much
18  money that store should be making as a gross profit and
19  actual how much that store is making as a gross profit.
20  And the shrinkage margin is what you actually make.  And
21  say if that store is supposedly making 33,500 and that
22  store is only making 27, that's a 4 percent shrink.
23  Whether it's internal, external, that's a 4 percent.
24  Walgreen wants you to be within 2.  That store was one of

---

37

1  the highest two as far as gaps.
2      Q.  Okay.
3      A.  So, I also was aware that store had a brick
4  thrown in one of its windows.  So, all those factors would
5  ultimately affect my earning potential and my finances.
6      And as I stated earlier, Mr. Palmer offered me
7  43,900.  And to accept it, I would have to lose my wife's
8  salary altogether.
9      Another deciding factor of me not taking that
10  store was my present manager, Mr. Billy Walden, at the
11  time had informed me about three stores that I would
12  probably be a likely candidate for.  At the time, he
13  thought it was Western, the store in Peoria, which was a
14  store he even himself declined.
15      Now, at the time of that conversation, the
16  import of that conversation was the fact that he declined
17  the store himself, and it didn't affect advancement of his
18  career.
19      So, I feel like if I'm performing at this
20  level, and I'm the number-one candidate in the district if
21  I continue to perform at this level, why wouldn't I be a
22  candidate for something later on?
23      Q.  Okay.  So I understand what, what you mean by
24  shrink, it sounds like it could -- that if the performance

---

38

1  was not what it was projected to be because of --
2  shoplifting might be one factor causing shrink, correct?
3      A.  Correct.
4      Q.  And then -- or employee, internal thefts --
5      A.  True.  Correct.
6      Q.  -- might be another factor causing shrinkage.
7  Is there anything else that would figure in or constitute
8  shrink other than those two things?
9      A.  Turnover because of training employees, that
10  causes shrink.  Sales itself.
11      Q.  Okay.
12      A.  If the money's not there, there's no sale.
13      Q.  Okay.  So, shrink is really where, where the
14  reality is less than the -- what's expected of the store?
15      A.  Right.
16      Q.  And you said that you had believed or -- that
17  the Kankakee store had a lot of shrink in it?
18      MR. WILLIAMSON:  He didn't believe it.  He
19  said he knew it was one of the top two stores.
20      A.  I knew it.
21      Q.  How did you know that?
22      A.  Walgreens has an operating statement that
23  comes out every month, so you know how each store's doing
24  each month.  That tells you.  And as I stated before, one

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**39**

1  of the prior managers was my first EXA, and he was a
2  manager of that store, Mr. Bob Becker.
3      Q.  Okay.  Now, in the northern -- or North
4  Illinois district, there are how many or were how many
5  stores at this time, 2001?
6      A.  2001?
7      Q.  Yes.  Approximately?
8      A.  Approximately, I would say probably 28.
9      Q.  And I assume that the stores are not all
10 equally profitable?
11     A.  Correct.
12     Q.  They do not all have equal shrink, correct?
13     A.  Yes.
14     Q.  Would it be correct to assume that when you
15 were starting out as going from the EXA position to a
16 store manager's position, you are probably not going to go
17 into one of the most profitable stores in the district?
18     MR. WILLIAMSON:  You're asking him to
19 speculate on --
20     MR. SMITH:  I'm asking him what his --
21     MR. WILLIAMSON:  -- Walgreens' hiring
22 practices for managers?
23     MR. SMITH:  No, let me rephrase the question.
24 BY MR. SMITH:

---

**40**

1      Q.  What was your understanding as an EXA getting
2  ready to become a store manager -- hoping to become a
3  store manager as to what level of store you would be able
4  to go into in terms of store profitability or store
5  shrink?
6      MR. WILLIAMSON:  Again, just so I'm not
7  getting confused here, is there a suggestion that
8  Walgreens publishes a policy, formal or informal, as to
9  the level of a first manager's job?
10 BY MR. SMITH:
11     Q.  No, I'm just asking as far as what was his
12 expectation.  What did you expect, what type of level of
13 store that you would go into when you became a store
14 manager?  Does that -- do you understand what I mean?
15     I'll try to refine it a little more.
16     A.  Yeah.
17     Q.  I think you agreed that out of -- there are 25
18 stores in the district.
19     MR. WILLIAMSON:  28.
20 BY MR. SMITH:
21     Q.  28.  And at this time that they would not all
22 have the same or --
23     A.  Right.
24     Q.  -- be close in terms of profitability?

---

**41**

1      A.  Uh-huh.
2      Q.  There would be some -- I think you said maybe
3  the Kankakee store would be down towards the bottom,
4  perhaps Western in Peoria might be towards the bottom
5  maybe.  Other stores might be -- say the one store you
6  worked at on Veterans Parkway, that would be towards the
7  top?
8      A.  Right.
9      Q.  Correct?
10     A.  Well, to answer --
11     Q.  Did you have an expectation as to, Okay, I
12 would be eligible, and I could go into any of these
13 stores, or did you have the expectation that you would go
14 into one of the lower stores in terms of profitability?
15     A.  Well, as far as my personal expectation?
16     Q.  Yes.
17     A.  I probably wouldn't have thought I would have
18 gotten one of the highest stores, but that would be
19 misleading, too, because the first store I worked in was a
20 million dollar store.  So, it wasn't a training store that
21 I came in as the MGT.
22     Q.  That was the New Lenox store?
23     A.  That was the New Lenox store.
24     Q.  So -- but as a manager, it would have been --

---

**42**

1  did you -- so, you thought -- I don't want to put words in
2  your mouth, but did you have the notion or the idea that
3  any of those stores would be --
4      A.  No, as I said --
5      Q.  -- a likely candidate?
6      A.  -- I didn't think I would have been put in the
7  highest store, but as an MGT, the first store I went in
8  was a million dollar store.  I didn't go into a training
9  store as an MGT.
10     Q.  So, were you formally interviewed by anyone in
11 connection with that Kankakee store opening?
12     A.  Which one?
13     Q.  The position -- the store manager's position
14 that you turned down in November of '01, there was an
15 offer of a position.  Were you interviewed by Mr. Palmer
16 or anybody else in connection with that -- before it was
17 offered to you?
18     A.  No, I wouldn't call it an interview.  An
19 interview is something where you go in, and there's a
20 chance you might get that store.  When I walked in that
21 store basically Mr. Palmer told me the opportunity, the
22 operation was mine.
23     Q.  Okay.  Now, the next store I understand --
24 well, were you offered a store manager's position for the

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

43

1  Western Avenue store in Peoria?
2       MR. WILLIAMSON:  Which Western Avenue store?
3  There's a new one.  You're talking about the old one.
4  BY MR. SMITH:
5       Q.  Mr. Williamson is right.  There's a new store
6  on Western Avenue in Peoria, up near Jumer's.  I don't
7  know if you know the area or not.  But what I'm talking
8  about is the former store -- Walgreens store on Western
9  near Howett, at the bottom of the hill.
10      Were you offered a store manager's position at
11  that -- what I will call the old Western Avenue store?
12      A.  Is there a date that you're asking me?
13      Q.  Yes, approximately November of 2002.
14      A.  No.
15      Q.  Okay.  Was there some discussion with you
16  about that position?
17      A.  No.
18      Q.  Okay.  Have you ever been offered the Western
19  Avenue store manager's position?
20      A.  April 30th, 2004.
21      Q.  Was there ever any discussion that you had, if
22  not an actual offer, but at least a discussion about your
23  interest in the Western Avenue -- the old Western Avenue
24  store prior to April of '04?

44

1       A.  No.
2       MR. WILLIAMSON:  I think he can put in the
3  record the actual address, Lee, of what you're referring
4  to as the old store so we can avoid confusion.
5       A.  1300.
6       Q.  Okay.
7       MR. WILLIAMSON:  1300 South Western?
8       A.  Western Avenue.
9       Q.  That's Store 1300, isn't it?  600 South
10  Western Avenue?
11      A.  Oh, yes, 600, yes.  Store 1300.  Got it
12  backwards.
13      Q.  Now, you did say you were offered that
14  position as the store manager at the Store Number 1300,
15  600 South Western in April of 2004, correct?
16      A.  Yes.
17      Q.  Who offered you that position?
18      A.  Mr. Mike Palmer.
19      Q.  Where were you working at the time?
20      A.  I was working with Mr. King in the North Main
21  store in Bloomington.
22      Am I still speaking loud enough?
23      Q.  Were you an EXA at that time?
24      A.  Yes.

45

1       Q.  Did you accept that position, the store
2  manager at Store Number 1300 on Western Avenue?
3       A.  No.
4       Q.  Why not?
5       A.  There are a number of reasons why I didn't
6  accept that position.
7       Q.  Will you explain what those are --
8       A.  Yes.
9       Q.  -- or were?
10      A.  Yes.  In no particular hierarchy, but all
11  relevant nevertheless.  First and foremost, when
12  Mr. Palmer approached me about that store, the whole
13  demeanor of the approach was different than the first.  He
14  approached me in the store and wanted to know basically
15  within 15 minutes if I was going to accept that store.
16      When he approached me about the first store in
17  his office, there was no one around but me and Mr. Palmer.
18  This time, nothing was said or done without Mr. King as a
19  witness.
20      MR. WILLIAMSON:  What's that person's full
21  name?
22      A.  Mr. Gary King.
23      Q.  Okay.
24      A.  Uh-huh.  Now --

46

1       Q.  Go ahead.  That was -- is that the reason, the
2  way it was offered to you?  Is that a factor in your
3  decision not to accept it?
4       A.  Yes, that's one factor.
5       Q.  Okay.  What were the others?
6       A.  The other factors were Mr. Palmer's demeanor.
7  As I see you pulling out that sheet right there --
8       Q.  Uh-huh.
9       A.  -- it proves to me that Mr. Palmer, the way he
10  handled the situation with Mr. King around, it was obvious
11  that Mr. Palmer felt like it was more of a -- to offer me
12  this store at this time was more like to shut me up
13  because at this point in time I had already gone to the
14  EEOC and made a complaint, but yet I hadn't had anyone
15  take my complaint serious within the Walgreens Company.
16  No one did any investigation; no one had done anything to
17  make a response to my concerns.
18      But the first time I see Mr. Palmer is to
19  offer me a store, a store with eery similarities to the
20  first store he offered me -- lower socioeconomic
21  neighborhood, predominantly African-American, lower
22  incomes.  This store, along with the other store, had the
23  highest two shrinks in the district, which would
24  ultimately affect my earnings potential.

Eric Simple v. Walgreen Co.

47

1    Mr. Palmer told me that if I took that store I
2    probably could commute, but if I commuted something would
3    suffer, either my home life or my -- or my work life.
4    Meaning that if -- as a new store manager, he said I would
5    be slow, which is understandable; I probably would. And
6    if I left on time to spend time with my family, the store
7    would suffer. But if I left early to get home and
8    continue my family life, my store would suffer, so --
9    Q.  Is that what he said, or were these your
10   thoughts?
11       A.  That's what Mr. Palmer said.
12       Q.  Okay.
13       A.  That's Mr. Palmer.  Now, if he was sincerely
14   serious about me having this store, at some point in time
15   in that interview he would inform me that, Mr. Simple,
16   even though I think you're ready for this store and this
17   operation, let me let you know that in 16 months this
18   store's probably going to be closing and combining with
19   another store; therefore, a manager may be out of a
20   manager position.
21       He didn't even -- I was not informed that in
22   the meeting.
23       Q.  Did you know this at that time?
24       A.  Yes.

48

1    Q.  Okay.  How did you know it?
2    A.  Well, in the Walgreens World, which we get
3    monthly, they've already stated it takes about 24 months
4    to put up a store.  As a district manager, Mr. Palmer
5    should be aware of a store being open within 16 months
6    because he has to make plans; he has to make moves.
7    There's a planning procedure.
8       I was aware of that because, as I said, the
9    district used to include the Joliet market.  There are
10   people in this district that are no longer in this
11   district, Illinois North, that now work in Corporate. So,
12   I still know those people as well.
13       Q.  Are there any --
14       A.  Also --
15       Q.  I'm sorry.  Go ahead.  These are other reasons
16   why you declined the position?
17       A.  Uh-huh.
18       Q.  Okay.  What are the other reasons?
19       A.  Also, at this point in time, I knew from the
20   type of store operations that Mr. Palmer was directing me
21   to and saying that I was -- had the experience and the
22   performance to work in, to qualify for these stores; but
23   just six months ago, my performance was not good enough
24   for another store.  So, it led me to believe and it was

49

1    obvious that I was only being thought at as a certain area
2    of store.
3       Also, at this time when Mr. Palmer approached
4    me about this store, I had already told the EEOC that he
5    would approach me about this store.  As stated earlier,
6    Mr. Walden had informed me of the three stores that I
7    would probably be a good fit for -- those three stores
8    being the one that I was already offered, the Kankakee
9    store, 2001; this store; and the other store in Normal,
10   North Main, which already has an African-American store
11   manager, the only one in Mr. Palmer's 16 years as a
12   district manager.
13       Q.  Are those all the reasons that, that -- have
14   we touched now on all the reasons that you declined the
15   Western Avenue store manager's position?
16       A.  Yes.
17       Q.  When did you file your charge with the EEOC?
18       A.  February 12th, 2004.
19       Q.  So, the --
20       MR. WILLIAMSON:  And he may be thinking when
21   he signed it.  He may be thinking --
22       MR. SMITH:  Okay.
23       MR. WILLIAMSON:  -- when he sent it.  It may
24   not be the file stamp on the charge.

50

1    BY MR. SMITH:
2    Q.  The approximate date was?
3    A.  February '04.
4    Q.  So, the offer of the store manager's position
5    on Store Number 1300 on Western was a couple months or
6    more after you filed your charge of discrimination with
7    the EEOC?
8    A.  Right.  A month after I filed and a month
9    after Walgreens answered my complaint to the EEOC.
10   Q.  Now, you had made some reference to a document
11   I have before me here which I will mark as Deposition
12   Exhibit Number 1.
13       And these are some notes that are dated 4/30,
14   April 30th, 2004, Supervision Visit Notes.  Have you seen
15   these notes before?
16       A.  Yes.
17       Q.  When did you first see them?
18       A.  Sometime this summer.
19       Q.  As part of the discovery that was turned over?
20       A.  Part of the discovery.
21       Q.  Okay.  You did not make these notes, correct?
22       A.  No.
23       Q.  Okay.  These notes relate to -- it says,
24   M. Palmer -- Mike Palmer, I'm assuming -- offered

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

51

1  promotional or promo opportunity to Mr. Eric Simple as MGR
2  -- manager -- at 600 South Western in Peoria. E. Simple
3  declined, stating the following reasons:  Felt he could
4  not -- what is that -- reasonably balance family and work
5  obligations with the commitment.  And it goes on to say --
6  says, Offered relocation at company expense and declined.
7        Does that mean that -- or did that occur in
8  the conversation, that Mr. Palmer offered some company
9  assistance to pay for your relocating --
10       A.  No.
11       Q.  -- for that position?
12       A.  No.
13       Q.  He did not do that?
14       A.  No.
15       Q.  You're saying that is inaccurate, that there
16  was never any offer of -- to help or to assist you in
17  relocating?
18       A.  No, there was never any.
19       Q.  Next point under there, it says, Suggested a
20  midpoint location and unwilling.
21       I'm assuming that means that he suggested that
22  you might be able to live somewhere between Bloomington
23  and Peoria?
24       A.  Yes.

52

1        Q.  Did he do that?
2        A.  Yes, but --
3        Q.  You were unwilling to do that?
4        A.  I told Mr. Palmer that that would defeat the
5   purpose because now I'm driving however many miles to
6   Peoria, my wife's driving back to Bloomington, and my kids
7   are in school in the middle.
8        Q.  So, you meant that you wouldn't have enough
9   time with your family.  Is that what you're saying?
10       A.  I meant that --
11       Q.  What's that?
12       A.  I told him that me driving and now my wife
13  driving back and forth, and a family of four, that that
14  would defeat the purpose because financially it wasn't a
15  sound decision.
16       Q.  Okay.  When you say "defeat the purpose," you
17  mean -- I'm not sure I'm following you there.
18       A.  He said move so I can be closer.
19       Q.  Right.
20       A.  But yet now she's further, and we're further
21  away from the kids, and we're -- the financial burden is
22  still greater because we're both commuting and going back
23  and forth.  And it was not a good, sound, financial
24  decision for a family of four that's a household sustained

53

1   on two incomes.
2        Q.  Okay.  Now, the last point there says, I
3   informed that the commute was acceptable, and he still
4   declined the offer.
5        Can you tell me what he said on that point?
6   Was that that you said you would commute from Bloomington,
7   he said that was acceptable, or is that -- is that what
8   that --
9        A.  Well, he said the commute would be acceptable.
10  But that's when he put the twist on that, as a new store
11  manager, the commute would probably put a strain on either
12  your workload or your family load.
13       Q.  Okay.
14       A.  So, yes, he said that, but he followed with
15  like, There's going to be an either/or if you get in this
16  situation, Mr. Simple.
17       Q.  As I understand the conversation, he was
18  saying that this -- he wasn't withdrawing the offer if you
19  commuted, correct?
20       A.  No.
21       Q.  Okay.  He said you could commute.  He said --
22  if I understand the conversation -- that these could be
23  problems because you're going to have to be spending a lot
24  of time in the store as a new manager?

54

1        A.  Correct.
2        Q.  And you said, Even if I can commute, I don't
3   want the job, correct?
4        A.  Yes.
5        Q.  Now, were you -- other than the Kankakee
6   position -- store manager's position and the Western,
7   Store Number 1300, 600 South Western Avenue store
8   manager's position, have you ever been offered any other
9   store managers' positions for Walgreens?
10       A.  No.
11       Q.  Have you ever been offered a store manager's
12  position for the Main Street store which is, I understand,
13  currently closed, but the store that was located on Main
14  Street in Peoria?
15       A.  No.
16       Q.  So, your testimony is that --
17       MR. WILLIAMSON:  Just for clarification, do
18  you know the address of the old Main Street store in
19  Peoria?
20       THE WITNESS:  I think it's 1529 West Main.  Or
21  was it Store 1529?
22  BY MR. SMITH:
23       Q.  I have it in the record.  Let me see if I can
24  find it.

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

55

1    A.  It was either Store 1529 or address 1529.  I
2  don't --
3        MR. WILLIAMSON:  Let's go off the record.
4        (A discussion was held off the record.)
5        MR. SMITH:  I believe it's 1109 West Main
6  Street.
7        THE WITNESS:  Store Number 1529.
8        MR. WILLIAMSON:  Thanks.
9        THE WITNESS:  Okay.
10  BY MR. SMITH:
11    Q.  So, the -- so we're absolutely clear on this,
12  the only two stores you've been offered, the one in
13  Kankakee and the one on Western Avenue and that's -- the
14  entire time you've been employed at Walgreens, those are
15  the only two?
16    A.  Yes.
17    Q.  Have you ever turned down an offer to be
18  considered for a store manager's position?
19        MR. WILLIAMSON:  What do you mean?
20  BY MR. SMITH:
21    Q.  Okay.  Has anyone ever from Walgreens ever
22  said to you, We have a -- words to the effect of, "Okay.
23  We have a store manager's position open in a store.  Would
24  you like to be considered for that position?" and you have

---

56

1  said no?
2    A.  Are you saying has Mr. Palmer asked me?
3    Q.  Either Mr. Palmer or anyone in management at
4  Walgreens?
5    A.  Once.
6    Q.  Okay.  Where was that?  Where was that store?
7    A.  Kankakee, Court Street store, 2003, November.
8    Q.  And with whom did you have that conversation?
9    A.  This was a -- that, as you see, was a month
10  after Miss Leanne Turley's statement to me about the
11  Pontiac store in October '03.  She called me, and she told
12  Miss Crittendon, African-American female EXA at the time,
13  that, For the record -- this is how she said it:  For the
14  record, I need to know if you are interested in the Court
15  Street store in Kankakee.
16    Q.  Who said that?
17    A.  Miss Leanne Turley.
18    Q.  Where did this conversation take place?
19    A.  In the Veterans store.
20    Q.  And was there anything leading up to this
21  conversation, or did she just come up, and this is the
22  first thing she said to you?
23    A.  That's the first thing she said to me.
24    Q.  Okay.  What did you say in response?

---

57

1    A.  I asked her what did she mean by that, for the
2  record.
3    Q.  What did she say?
4    A.  She said, By law I'm obligated to let you know
5  that there may be an opening on the Court Street store.
6    Q.  What was the rest of the conversation?  What
7  did you say, and what did she say?
8    A.  I said, That's a store that I've already been
9  offered.
10    Q.  Was there any further conversation on that
11  store?
12    A.  No.  Well, she said, I didn't think you would
13  be interested, and that was the extent of it.
14        MR. SMITH:  Let's take a brief break here.
15        MR. WILLIAMSON:  Yes, I was going to say,
16  actually my secretary is gone from twelve until one.  I
17  was going to ask if we could -- in five minutes if we
18  could break for lunch anyway so I can discuss some things
19  with her?
20        MR. SMITH:  Oh, okay.  That's fine.
21        MR. WILLIAMSON:  Just come back here at one?
22        MR. SMITH:  Yes.  Or -- yes, about a quarter
23  till one.  That's an hour.
24        MR. WILLIAMSON:  Sure.  All right.

---

58

1        (Whereupon, a recess was taken.)
2  BY MR. SMITH:
3    Q.  Mr. Simple, before we took our lunch break, I
4  was asking you about store managers' positions which you
5  had been either offered or perhaps asked to apply for.
6        And I want to hand you Deposition Exhibit
7  Number 2.  This is a letter that -- it's not signed, but
8  it does have your name at the bottom.  I believe it was
9  turned over to us by your attorney in discovery.
10        And have you seen this before?
11    A.  Yes.
12    Q.  Okay.  And did you, in fact, write this
13  letter, or were you the author of this letter?
14    A.  Yes.
15    Q.  Okay.  And it's addressed to Mike Palmer,
16  Walgreen district manager?
17    A.  Yes.
18    Q.  And it says, Dear Mr. Palmer, Per our
19  conversation earlier today, I am responding to your offer
20  for me to apply for a store management opportunity in the
21  Plainfield, Illinois.
22        And, in fact, does this refresh your
23  recollection as to some discussion that you --
24    A.  Yes.

---

Knight Reporting Service, Ltd.
309-637-0700

59

1    Q.  -- had with Mr. Palmer regarding the store
2  manager's position at the Plainfield Walgreen store?
3    A.  Yes.
4    Q.  Okay.  And what was the conversation that you
5  had with Mr. Palmer regarding the Plainfield store
6  manager's position?
7    MR. WILLIAMSON:  Maybe you can indicate when
8  it was as well.
9  BY MR. SMITH:
10    Q.  Yes.  When did that conversation occur?
11    A.  This conversation occurred in the first week
12  of April.
13    Q.  Okay.  And what was said and by whom?
14    A.  I received a phone call at Mr. King's store,
15  the North Normal -- the North Main store in Bloomington,
16  and it was from Mr. Palmer, informing me that Mr. Walsh,
17  which is the Joliet district of this store -- if you're
18  not aware, it's not even in Mr. Palmer's district,
19  Illinois North district.
20    And Mr. Washburn -- Walsh, excuse me, was
21  running short on good manpower and was wondering if I was
22  interested in interviewing.  So, this was particularly
23  interviewing for that opportunity.  But he told me, Before
24  you interview or put your name in the hat, if you're going

60

1  to be in it, you have to relocate for this position.
2    Q.  That's for the position at the Plainfield
3  store?
4    A.  Yes.  But this was all just to interview.
5    Q.  Right.
6    A.  It wasn't as though this was my opportunity.
7    Q.  And what was -- and your response was as set
8  forth in this letter, which is Deposition Exhibit
9  Number 2?
10    A.  My response on the phone was, I appreciate it,
11  to be considered, but I find this odd that I'm never good
12  enough for anything in this district, in this market, but
13  that you would put my name in the hat to go to someone
14  else's district.  How is it that I'm good enough for
15  someone else but not good enough for my own district?
16    And as Mr. Palmer has known and Walgreens has
17  known that I did not want to relocate.
18    Q.  So, if I understand, your response was you did
19  not want to be even considered for the store manager's
20  position in Plainfield: is that right?
21    A.  According to Mr. Palmer's stipulations, he
22  told me what I had to be willing to do just to be
23  considered, yes.
24    Q.  Okay.  And those stipulations, in order to be

61

1  considered, were that you were going to have to relocate
2  from your residence in Bloomington, correct?
3    A.  Correct.
4    Q.  That's something you were unwilling to do at
5  that time; is that right?
6    A.  Correct.
7    Q.  Do you know how far it is from your residence
8  in Bloomington to Plainfield, approximately?
9    A.  I know it's further than Joliet.
10    Q.  Okay.
11    A.  It's to the north of Joliet.
12    Q.  Okay.  You state in here, I indicated to
13  you -- this is apparently to Mr. Palmer -- that my
14  ultimate goal is to become a store manager, but I was
15  willing to wait for opportunities in this market so I
16  would not have to relocate my family.  As I indicated
17  before, my household is maintained on two incomes.
18    Now, when -- was this letter written in
19  April 2004?
20    A.  This letter was written around April, right
21  after Mr. Palmer made the phone call.
22    Q.  Okay.  And there's a reference in there, it
23  says, I have been with Walgreens almost 9 years on
24  April 26th, 2004.  So, I assume it was probably a short

62

1  time after that or around that time?
2    A.  Yes, right around that time.
3    Q.  Okay.  Was it your position as of that time
4  that you would not consider taking a store manager's
5  position outside of the five stores in the
6  Bloomington-Normal or six stores in Bloomington-Normal or
7  the one store in Pontiac?
8    A.  No.
9    Q.  Okay.  You would consider other positions
10  outside?
11    A.  Anything that was conducive to me commuting.
12  Why wouldn't I take a store manager's position and drive a
13  distance?  I started out with the company driving
14  100 miles one way for $9.26 an hour.
15    Q.  Well, as of this time, as of April 2004 or
16  really at any time during the year 2004 or in this year,
17  2005, what stores would you have been willing to accept
18  the store manager's position at?
19    A.  Any store offered to me that was conducive to
20  me commuting or in the Bloomington five stores in
21  Bloomington-Normal.
22    Q.  When you say -- I'm sorry.  I didn't mean to
23  cut you off.  When you say -- did you finish your
24  statement?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

63

1    A.  Yes, any store prior to what went out in
2  April -- I mean October '03.
3    Q.  When you say any store that was conducive to
4  your commuting, I'm not sure that I understand what you
5  mean by that.  Could you be specific as to, to which
6  stores in either the Illinois North district or, for that
7  matter, any other district would you consider or did you
8  consider conducive to your commuting?
9    A.  Any store in Peoria would have been drivable
10  for me.  In fact, there was store managers that did the
11  opposite, drove from Peoria to Bloomington.  So, any store
12  that would have been offered to me.
13    Q.  So, the -- when we talked before the lunch
14  break about the store on Western that you had declined
15  that had been offered to you, I think at least had been
16  offered to you twice, is that --
17    A.  Once.
18    Q.  Once?
19        MR. WILLIAMSON:  The old store.
20  BY MR. SMITH:
21    Q.  The old Western Avenue store.  Are you -- are
22  you saying -- is it your testimony that the commuting
23  distance was not the reason you turned down the store?
24    A.  No.  I'm saying to you that prior to what took

---

64

1  place in October that I would have taken any store offered
2  to me in which I could have driven.
3    Q.  Okay.  Stop there for a second.  You say
4  October of '03.  That's when you were not chosen to be the
5  store manager at the Pontiac store, correct?
6    A.  Yes.
7    Q.  Okay.  So, up to that time, if I'm
8  understanding you here, up to October 2003, are you saying
9  that you would have accepted the store manager's position
10  at any of the Peoria stores?
11    A.  Yes, because up until that time there was no
12  reason for me to feel or believe that I was being
13  discriminated against.
14    Q.  And then was that change in your, your
15  attitude or your views after October 2003?
16    A.  Yes.
17    Q.  Okay.  And what was that change?
18    A.  I was viewed solely as a good black
19  African-American store manager that only fit certain
20  criteria of stores, and that was proven to me on
21  October -- I mean on April 30th, 2004, with the second and
22  only other store that I was approached with.
23    Q.  And when you were offered in April 2004, you
24  were offered the -- what I will call the old Western

---

65

1  Avenue store, Store Number 1300, that -- being offered
2  that store manager's position changed your attitude also?
3    A.  No, it was -- just proved to me that
4  everything that had been said to me and had been done to
5  me was done with a reason.
6    Q.  After that happened, April of 2004 when you
7  were offered the old Western Avenue store, was there a
8  change in what stores you were willing to accept as a
9  store manager's position?
10    A.  Was there a change?  Yes.
11    Q.  Yes.  And what was that change?
12    A.  At that point in time, I realized how I was
13  viewed and what I was viewed for.  So, at that point in
14  time, I realized that I was only viewed, like I said
15  before, as a good African-American store manager that
16  would fit certain criteria stores.
17        Now, to ask me about stores that I hadn't been
18  offered and apparently had no intention of being offered
19  and to have you -- to have you want me to answer that, I
20  can't because I wasn't offered those stores and didn't
21  have any intent of being offered those stores.
22    Q.  Okay.  I'm trying to follow you here.  I think
23  you said as -- up to October 2003, you would have accepted
24  a store manager's position at any store in the district

---

66

1  which would have been within commuting distance; is that
2  correct?
3    A.  Yes.
4    Q.  Okay.  And then after this period between
5  October and then April -- October 2003, April 2004, I have
6  the sense here that if we imagine that there are these 20
7  stores, that now the number is smaller, there's a reduced
8  number of stores that you were then willing to be a store
9  manager at, correct?
10    A.  No, the number's still the same because
11  there's the same amount of stores I can drive to
12  regardless if it was before October 23rd -- I mean October
13  '03 or after October '03.
14    Q.  I don't mean to be difficult.  So, are you
15  saying that the number of stores that you were considered
16  didn't change from either before or after you were denied
17  the Pontiac store job?
18    A.  No, it was the same amount in Peoria.  There
19  was the same amount in Bloomington-Normal.
20    Q.  There were the same amount of stores?
21    A.  Yes.
22    Q.  But I'm saying what you would have been
23  willing to accept, was it fewer now after -- as a result
24  of what happened with the Pontiac store?

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

67

1      A. No.
2      Q. Okay. Well, Exhibit Number 2, Deposition
3   Exhibit Number 2 indicates that you were not interested in
4   being considered with -- for the Plainfield store,
5   correct?
6      A. Correct.
7      Q. And that was because, if I understand it, you
8   were considered a manager only for black stores?
9          MR. WILLIAMSON: That's in a different
10  district.
11     A. That's in a different district.
12     Q. But you were -- you indicated to Mr. Palmer
13  and in this letter and in a phone conversation, I guess,
14  that you did not even want to be considered for that
15  position?
16     A. According to Mr. Palmer's stipulations, for me
17  to even be considered for an interview for this position
18  was that I had to be willing to relocate. It wasn't a
19  store conducive to me commuting.
20     Q. Were there any other stores other than the one
21  in Plainfield in which someone with Walgreens offered you
22  the opportunity to be considered for it or suggested that
23  you may want to be considered for it?
24     A. When? Any period or --

68

1      Q. At any period -- any period since you became
2   an EXA.
3      A. Other than the first of November '03 which
4   Miss Turley told me, by law --
5      Q. That was the one --
6      A. That, yes, and this one, Mr. Palmer.
7      Q. And the one Miss Turley had mentioned to you,
8   that was the Kankakee store, correct?
9      A. Yes. Court Street store in Kankakee.
10     Q. And I thought I recalled your testimony was
11  that she said, For the record --
12     A. Uh-huh.
13     Q. -- are you -- are you interested in that
14  store?
15     A. Yes, which was odd.
16     Q. Okay. You said, "which was odd"?
17     A. Which was odd that she even approached me.
18  She didn't -- she didn't tell me that about the Pontiac
19  store in October '03.
20     Q. Okay. We've talked kind of around the Pontiac
21  store manager's position. Let's address that directly
22  now.
23         How did you become aware -- or when did you
24  first become aware of the store manager's position at the

69

1   Pontiac store?
2      A. October 2nd, Wednesday, it was my day off.
3   Miss Turley called me in the office and told me that the
4   Pontiac store was being -- is open, but unfortunately
5   you're not going to get it. Mr. Palmer is going to go
6   with Miss Jonland.
7      Q. Miss Jonland, you said? Melissa Jonland?
8      A. Miss Jonland. And it's not that you're not
9   ready for the Pontiac store; it's that Pontiac is not
10  ready for you because, as a black male, you will surely
11  fail in that store. Sales would suffer.
12         And I said, I can't believe this, Miss Turley,
13  that Walgreens would make a decision based on that.
14         And she said, Yes. And she said,
15  Unfortunately, it's true, but actually, Mr. Palmer,
16  Walgreens is doing you a favor because with Walgreens you
17  only get one shot, one opportunity.
18         And I asked her, I said, Will Mr. Palmer tell
19  me this himself?
20         She said, Probably not because, you know, he
21  don't talk to assistants the way he talks to store
22  managers.
23     Q. And this was a conversation you had on the
24  phone with Mr. --

70

1      A. This was in the store.
2      Q. You said it was your day off?
3      A. It was my day off. As EXAs you work -- you're
4   salaried, so there are times when you go in on your day
5   off to do scheduling. This particular day was a warehouse
6   day, so I stopped in and helped on warehouse.
7      Q. At the time you had this conversation with
8   Leanne Turley, she was the store manager at the store on
9   Veterans Parkway where you were the EXA, correct?
10     A. Yes.
11     Q. Did you know that there was an opening for the
12  store manager's position in Pontiac at the time
13  Miss Turley had this conversation?
14     A. No.
15     Q. So, she was the one who informed you both that
16  there was an opening there in the Pontiac store for a
17  store manager's position and that you weren't going to get
18  the job, correct?
19     A. Actually, she wasn't really informing it was
20  open. She was telling me it was opened and already
21  closed, who got it.
22     Q. Had you ever had any conversations with her
23  about the Pontiac store manager's job before that
24  conversation you've just described?

Eric Simple v. Walgreen Co.

71

1    A.  No.
2    Q.  Now, you've described the conversation that
3  you had with Miss Turley at the store on, I think you
4  said, October 2nd.  Was there anything else said while you
5  were at the store that day with her about the Pontiac
6  store manager's job?
7    A.  I asked her how -- Are you sure?  This can't
8  be true.  And she gave me a nod, like yes, this is true.
9    Q.  Was anyone else present during your
10  conversation with her?
11    A.  Not at that time.  But later it was Mr. Lane
12  and I and her.  And then another time it was in the
13  stockroom, and it was me, her and Miss Culbertson and
14  another assistant was in and out, and Miss Hadley was in
15  and out.
16    Q.  And is this all on October 2nd?
17    A.  All on the 2nd and 3rd.
18    Q.  So, the first conversation -- the one that you
19  testified to earlier about that you were not going to get
20  the job, that Miss Jonland was going to get it, was
21  anybody present during that conversation?
22    A.  Yes.
23    Q.  Who?
24    A.  I'm not for sure who was in and out because

72

1  the office setup in that store is the lockers are right
2  next to it.  So, people were in and out of the lockers.
3  So, by the time I got out of the conversation, pretty much
4  it was common knowledge in the store.  Everybody knew.
5    Q.  And those people that you mentioned?
6    A.  Miss Hadley, Mr. Lane, Miss Culbertson.
7    Q.  Anybody else?
8    A.  Who else worked that day.  Who else was in
9  that store.  Miss Crittendon worked in that store, Sonia
10  Crittendon that day.  And Jackie Banks.  Do you have
11  Jackie Hadley on there?
12    Q.  Hadley, yes.
13    A.  Steve Shoob; he's no longer with the company.
14    Q.  How do you spell his last name?
15    A.  I don't remember.
16    Q.  Steve Shoob?
17    A.  Steve Shoob.  I don't --
18    Q.  Okay.  So, they may have heard at least parts
19  of the conversation between you --
20    A.  Yes.
21    Q.  -- and Miss Turley?
22    A.  Yes.
23    Q.  Okay.  Did you have a -- did you leave then
24  after this conversation?

73

1    A.  No, I continued to put up stock for a little
2  while longer.  Then I left.
3    Q.  Did you come back to the store later that day?
4    A.  No.
5    Q.  Okay.  Did you have a telephone conversation
6  with Miss Turley later that day?
7    A.  Yes.
8    Q.  Where were you during the telephone
9  conversation?
10    A.  In my home.
11    Q.  Why did you call her?
12    A.  I called Miss Turley back because when my wife
13  got home, I told her, I said, You're not going to believe
14  what happened today and what was said to me.  And I went
15  in detail, told her what was said.
16    And she said, No, you must have misunderstood
17  that.  That couldn't have been said to you.
18    I said, Yes, it was.
19    She said, Well, would you call her back and
20  make sure you understood what she said?
21    I said, There's no need to, I said, but I'll
22  call just to show you what was said to me.
23    Q.  Okay.  So, you called Ms. Turley then at the
24  store?

74

1    A.  Uh-huh.
2    Q.  The Walgreens store?
3    A.  Yes, to confirm and make sure that what was
4  said to me was correct.
5    Q.  Was your wife on the line at the time you
6  called?
7    A.  Not at the initial time of the conversation.
8    Q.  Okay.  So, tell me, starting with the phone
9  conversation, what was said and who said what.  You
10  called, asked for Ms. Turley at the store?
11    A.  Yes.
12    Q.  All right.  And then what was said?
13    A.  I asked Miss Turley again, How could this be
14  true?
15    And she said yes.  And she basically told me
16  again what was said.  You know, maybe not as in grave
17  detail at that point in time, but she said, Yes, race
18  played a factor.
19    And I asked her again, Will Mr. Palmer tell me
20  this himself?
21    She said, No.
22    Q.  Then at some point, did your wife either
23  listen in on the line or pick up another phone or somehow
24  did she become a party to the telephone conversation?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

75

1    A.  Obviously sometime during the conversation she
2 picked up the phone because she could hear it in my voice
3 and just couldn't believe it.  When, I don't know.
4    Q.  Okay.  Did you tell Miss Turley that your wife
5 was going to be picking up the phone?
6    A.  No.  I didn't know my wife was going to pick
7 up the phone.
8    Q.  When did you find out that your wife had
9 picked up the phone?
10    A.  After the conversation was over, she was
11 probably more mad than I was at that time, disappointed
12 and shocked, saying, I can't believe it.
13    Q.  Do you know if a recording was made of that
14 conversation?
15    A.  No.
16    Q.  You don't know if one was made, or there was
17 not one made?
18    A.  No.  There was not one made.
19    Q.  Okay.  Do you know if -- well, did you make
20 any notes of the telephone conversation?
21    A.  No.  There's no need to make notes.
22    Q.  Did your wife make any notes of the telephone
23 conversation?
24    A.  No.

76

1    Q.  How long did the telephone conversation that
2 you had with Miss Turley on that day last?
3    A.  Roughly?
4    Q.  Yes.
5    A.  10.  10 minutes tops, maybe 15.
6    Q.  Did you have another conversation with
7 Miss Turley the next day, October 3rd, I guess?
8    A.  Yes.
9    Q.  Where was that conversation?
10    A.  In the stockroom.
11    Q.  At the store there on Veterans Parkway?
12    A.  Yes.
13    Q.  Who was present in that conversation?
14    A.  Just Miss Turley and I.
15    Q.  And what was said and by whom in that
16 conversation?
17    A.  She basically -- I was getting off, getting
18 ready to go.  And she asked me was I doing okay?
19    I said, no, this was the hardest day that I've
20 ever had at Walgreens.
21    And she said, I understand, Eric, and I
22 don't -- can't blame you for being upset or mad or
23 disappointed, that things aren't right and that's just the
24 way that society is.  Pretty much, you know, it was --

77

1 but, you know, that things will work out for you.
2    Q.  What did you say, if anything?
3    A.  I told her that it's -- I told Miss Turley,
4 that still doesn't make it right.  Even if Walgreens felt
5 that Pontiac was that way, it doesn't make it right for
6 Walgreens to make a decision for me.  Two wrongs doesn't
7 make a right, and something has to be changed.  Either
8 something has to change or Mr. Simple has to make a
9 change.
10    Q.  Did you -- is that all, the entire
11 conversation you had on that day with Miss Turley?
12    A.  (Witness nods head.)
13    Q.  Is that a yes?
14    A.  Yes.
15    Q.  Okay.  Did you speak with Mr. Palmer about the
16 Pontiac store manager's position and your not getting that
17 position on that day or any time in October of 2003?
18    A.  The first Thursday in October, yes.
19    Q.  Okay.  And where was that conversation?
20    A.  That was in my house on the phone.
21    Q.  Okay.  You called him?
22    A.  Yes.
23    Q.  So, this would have been approximately what
24 date?

78

1    A.  Thursday, October the 3rd.
2    Q.  Did you call him in his office or cell phone?
3    A.  I called the district office.
4    Q.  Okay.  And what was said in that conversation?
5    A.  I started the conversation with Mr. Palmer,
6 saying that I had some concerns about my future and the
7 moves that had been made.
8    And Mr. Palmer said, What moves?
9    I said, There's only been one move.  I said,
10 That's the move that has really got me concerned about my
11 future.
12    And Mr. Palmer said, Obviously you thought
13 about this and gives this consideration to make this call.
14 What's on your mind?
15    And I told him that I felt like I was being
16 passed over, and I couldn't understand some of the things
17 that had happened.  For instance, in my EXA class, the
18 first person got a store was a Mr. John Hutton -- Hudson
19 -- or Jim Hudson.  I know it's Mr. Hudson.  He was
20 dismissed from EXA classes for not doing his projects and
21 not turning his homework in on time.  Of course, he's a
22 white male.  He was the first one out of that class to get
23 a store, and it wasn't one of those lower economic stores
24 that you mentioned.

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

79

1    Q.  Okay.
2    A.  So, I was concerned about that.
3       MR. WILLIAMSON:  Which one was it?
4       THE WITNESS:  It was the Bourbonnais store,
5    which he remained store manager of that store until
6    November of 2003 which he was suddenly demoted, so --
7    Q.  Is that also -- is that a Kankakee store?
8    A.  That's the Kankakee store.
9    Q.  Okay.
10   A.  Okay?
11   Q.  Do you know when he got that store manager's
12   position?
13   A.  He was the first one to get it.  He probably
14   got -- I don't know exactly when he got it, but he was the
15   first one out of our class and didn't even complete the
16   class, but he got the store.
17   Q.  And you mentioned this to Mr. Palmer in your
18   conversation?
19   A.  I mentioned that to Mr. Palmer in that
20   conversation.
21   Q.  That was on October 3rd?
22   A.  That was on October 3rd.
23   Q.  What else did you say in the conversation?
24   A.  I also mentioned to Mr. Palmer about, How is

80

1    it that it took me 22 months to get down here from the New
2    Lenox store to be down here, and Mike Masters, who no
3    longer works with this company, became an assistant in May
4    of '97 -- May of '97, that's the Chicago market.
5    Mr. Palmer had him back down here by October '97, and he
6    was going to EXA classes in March of '98.  And I asked,
7    How come Mike Masters had passed me like that?
8       MR. WILLIAMSON:  And his race was what?
9       THE WITNESS:  White.
10   BY MR. SMITH:
11   Q.  And did Mr. Palmer respond to you regarding
12   Mr. Masters?
13   A.  No, he continued to let me talk.
14   Q.  Okay.  Who else did you mention?
15   A.  Mentioned to Mr. Palmer that I find it strange
16   that every time I ask how I'm doing and all my promotion
17   evaluation reviews -- excuse me, evaluation reviews are
18   always excellent, in good standing, and I'm always right
19   there, right there ready for the store, just keep
20   performing at my operational standards, but every time an
21   opportunity comes available, I'm not the one.  I'm always
22   passed over.
23       Mr. Palmer asked me what, Well, Mr. Simple, do
24   you feel like I'm stringing you along?

81

1    Q.  What did you say?
2    A.  And I said, No, sir, I'm not understanding.
3    And I said, I'm also concerned as a nine-year employee how
4    come Miss Jonland, who's only been in management four
5    years total and had worked in two stores, under two
6    managers, outshined me in every area to get that store.
7    And I asked him that how -- What area did she outshine me
8    in?
9    Q.  What did he say?
10   A.  He basically asked me -- he basically told me
11   was I questioning his authority as a decision-maker?
12       I said, No, sir, I feel like as a nine-year
13   employee I need to find out what I need to do to make sure
14   that I'm where I need to be.
15       He told me to, Ask your store manager.
16       I said, I already done that.  Now I'm going
17   through the open-door policy, chain of command, and I'm
18   asking you.
19       And he said, Well, she outshines you in market
20   appeal.
21       So, I asked him, when he said that, The way it
22   was said to Mr. Simple is, Mr. Simple is ready for
23   Pontiac, but Pontiac is not ready for Mr. Simple.
24       He said, Are you playing the race card?

82

1    I said, No, sir, I'm not.  I'm asking the
2    question.
3       And I proceeded to tell him what was told to
4    me.  And he said, No, sir, I do not operate that way.  And
5    he went on to say, The decision is made.  I've made my
6    decision.  I'm not changing it.  In fact, I'm offended at
7    the length of this conversation.
8       I said, Well, I'm sorry to offend you, but I
9    feel like I have a right to ask you that as a nine-year
10   employee about -- when I have concerns about my future.
11       And then he went on to say that, Obviously
12   you're not comprehending -- your brain is not
13   comprehending this.  How would you know?
14       I went on to tell him also in that
15   conversation that I worked in that Pontiac store, which I
16   had a couple of days; I had filled in.  I told him I had
17   worked in that store, and I saw some of the areas in which
18   that store needed help.
19       And he asked me, Do you feel like that you
20   know as much as I know about that store?
21       I said, No, sir, but as a manager, my job is
22   to be able to go in an operation and see some areas that
23   needs to be improved on.
24       The conversation ended, and I told him I still

Knight Reporting Service, Ltd.
309-637-0700

83

1 didn't feel like I had the answers that I needed, and I
2 would have to go elsewhere.
3     Q.  When you say you would have to go elsewhere,
4 what did you mean?
5     A.  The open-door policy.  I proceeded to call
6 Mr. Dave Gloudeman three times.  No one ever returned my
7 calls.
8     Q.  Did you talk to anyone else at Walgreens
9 about -- in management at Walgreens about your not getting
10 the Pontiac store manager's position?
11     A.  Actually, at that point in time I didn't have
12 to talk to anyone else.  People were asking me how did I
13 feel about it and how could I still be coming to work
14 every day.
15     Q.  Who said that?
16     A.  Several managers.
17     Q.  And these were managers in what stores?
18     A.  In the entire market.  I had Mr. Walden call
19 me one time, ask me was I mad at him?
20     No.  Why?  Do I have a reason to be mad at
21 you, Mr. Walden?
22     I had Miss Crittendon, the other assistants
23 asking me how I felt about what happened.
24     Q.  Now, that happened in -- these conversations

84

1 either with Miss Turley or Mr. Palmer happened in October
2 of 2003, and between -- other than the conversations
3 you've had with the other managers that you've mentioned,
4 did you have any other conversations with anybody in
5 management at Walgreens prior to your filing your charge
6 of discrimination, I believe it was February of 2004?
7     A.  No, no one ever returned my call.
8     Q.  Do you know what role, if any, Ms. Turley
9 played in the decision to fill the store manager's
10 position at the Pontiac store in October 2003?
11     A.  Yes.
12     MR. WILLIAMSON:  You mean other than
13 Mr. Palmer asking Mr. Simple to consult with Ms. Turley
14 regarding that decision?
15 BY MR. SMITH:
16     Q.  Let me rephrase it.  What I'm referring to is
17 you first -- when you first became aware of the store
18 manager's position being open or a change in the store
19 manager's position, as far as the occupant of the store
20 manager's position at Pontiac, it had already been filled,
21 it sounds like?
22     A.  Yes.
23     Q.  All right.  Now, do you know in -- somebody
24 had to make the decision to fill that position with

85

1 Ms. Jonland in this case.  Do you know what role
2 Ms. Turley played, if any, in selecting Ms. Jonland?
3     A.  Yes.
4     Q.  Okay.  What is that?
5     A.  Well, as I stated earlier, they move managers
6 around for training purposes.  And Mr. Palmer, the
7 district manager, only sees the assistants maybe three,
8 four times a year.  So, he goes off what those managers
9 ultimately say to an extent, but also the final decision
10 is left up to one person and that's Mr. Palmer.
11     Q.  So, are you saying that Mr. Palmer was the
12 person who made the decision as to who filled that store
13 manager's position at Pontiac?
14     A.  I'm saying he made the final decision but, as
15 stated by Walgreens themselves, based on the input of
16 managers.
17     Q.  The input of managers, is that the input from
18 the evaluations that are done by the store managers of the
19 EXAs?
20     A.  Supposedly, yes.
21     Q.  Okay.  So, would it be correct to say that
22 your understanding was that Mr. Palmer was the
23 decision-maker, but among the information he considered in
24 making that decision was the -- were the performance

86

1 evaluations done by the store managers, including
2 Ms. Turley?
3     A.  And their -- obviously their vocal opinion as
4 well.
5     Q.  Do you know if Mr. Palmer consulted with
6 Miss Turley about you and your abilities prior to
7 selecting Miss Jonland for the Pontiac store manager's
8 position?
9     A.  No, I don't know.
10     Q.  The statements that Ms. Turley made to you on
11 October the 2nd, October 3rd, were these statements of her
12 opinion as to why the decision was made?
13     MR. WILLIAMSON:  You know, what good does it
14 do to ask him to speculate whether it's her opinion or
15 not?
16     MR. SMITH:  Okay.
17 BY MR. SMITH:
18     Q.  Let me rephrase the question then.  Other than
19 completing the performance appraisals or in providing
20 information to Mr. Palmer, would it be accurate to say
21 that Ms. Turley, as far as you know, did not have any
22 other influence in making the decision or how the decision
23 should be made to fill the Pontiac store manager's
24 position?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

87

1     A. No, it wouldn't be accurate to say that.
2     Q. Okay. In what way do you think she had other
3 influence in making the decision as to how to fill the
4 Pontiac store manager's position?
5     A. Unfortunately, by me not being a store
6 manager, I can't say what other ways. You're asking me to
7 assume, and I -- I've never been a store manager so I
8 don't know how Mr. Palmer talks to store managers or how
9 store managers talk to Mr. Palmer.
10     Q. Okay. You just don't know what she may have
11 said or may have done or what she would be called on to,
12 in the way of information, provide Mr. Palmer in that
13 decision; is that right?
14     A. I don't know what detailed information, no.
15     Q. Okay.
16     MR. WILLIAMSON: This is not a break, just
17 consider it a pause.
18     MR. SMITH: Okay.
19     (A pause was had in the record.)
20 BY MR. SMITH:
21     Q. After October 2003, were there any other store
22 managers' jobs in the Illinois North district that came
23 open that you believed you were qualified for?
24     A. Well, I believe I was qualified for all the

88

1 stores, but to know if any came open, I wouldn't know
2 because there's not been a posting system.
3     Q. Walgreens does not have a system where they
4 post the store managers?
5     A. The posting system was implemented April 1st,
6 2004.
7     Q. So, after April 2004, you did become aware of
8 stores managers' positions that were open?
9     A. Only one.
10     Q. Okay. And what was that?
11     A. The store Mr. Palmer approached me about.
12     Q. That was the one on -- Store Number 1300 on
13 Western Avenue in Peoria, the old Western Avenue store?
14     A. Yes.
15     Q. Okay. Now, between October 2003 and
16 April 2004, were there any other store openings -- store
17 manager openings in the district of which you became
18 aware?
19     A. No.
20     Q. There were or you just didn't become aware of
21 them?
22     A. I don't know if there were because I wasn't
23 aware of it because there was no posting system.
24     Q. Well, do you know generally who the store

89

1 managers are in the district?
2     A. In my market is Bloomington and Normal and
3 Pontiac. I don't know all the store managers in Peoria.
4     Q. Okay. And you didn't know of any in
5 Bloomington-Normal or Pontiac that changed between
6 October 2003 and April 2004, correct?
7     A. Yes, correct. I didn't know.
8     Q. They stayed the same?
9     A. I wouldn't know. There was no posting so how
10 would I know if something came open if there was no
11 posting, and I was never approached or even interviewed
12 about something like that?
13     Q. But in those six stores, you would know,
14 wouldn't you, if now instead of John Doe being the store
15 manager --
16     A. You said the Illinois North district.
17     Q. I'm confining it now just to the stores in --
18 the six stores we've talked about, Bloomington-Normal and
19 Pontiac. Did those -- did the store managers' position
20 change --
21     A. No.
22     Q. -- after October '03?
23     A. No.
24     Q. Okay. And you don't know, if I'm

90

1 understanding you, as far as other stores throughout the
2 district whether those changed or not?
3     A. No.
4     Q. The store managers' positions changed or not
5 is what I meant.
6     Okay. Did you consult internally with anyone
7 at Walgreens as far as any EEO type person prior to filing
8 your charge with the EEOC?
9     A. Any EEO person?
10     Q. Yes. I mean, were you aware of any policy
11 Walgreens had as far as discrimination?
12     A. The company policy for discrimination?
13     Q. Yes, yes.
14     A. On the mission statement I was aware of that
15 policy.
16     Q. And did you contact anybody with Walgreens
17 after --
18     A. I tried the open-door policy, which is my
19 immediate supervisor, Miss Leanne Turley; then Mr. Palmer,
20 the district manager; then Mr. Gloudemans. After not
21 receiving a phone call from Mr. Gloudemans, I didn't take
22 it any higher.
23     Q. And you filed your charge with the EEOC -- and
24 let me show you what has been marked as Deposition Exhibit

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

91

1 Number 3.
2        Is Deposition Exhibit Number 3 a letter you
3 wrote to Mr. Louis Rodriguez of the EEOC?
4        A.  Yes.
5        Q.  And was Mr. Rodriguez an investigator with the
6 EEOC in the Chicago office?
7        A.  Yes.
8        Q.  How did you come to write this letter?
9        A.  Mr. Rodriguez wanted me to send him a brief --
10 of my career -- a brief assessment of my career and what
11 had happened.
12       Q.  Okay.  And did you -- did you send this either
13 by mail or by fax to Mr. Rodriguez, and did you have any
14 conversation with him about it?
15       A.  I had some conversation with Mr. Louis
16 Rodriguez, yes.
17       Q.  Did you write this letter?
18       A.  Yes.
19       Q.  As far as you know, is everything in it
20 accurate?
21       MR. WILLIAMSON:  Other than the date of the
22 Pontiac store opening?
23       MR. SMITH:  I'm not sure where you're
24 referring to.

---

92

1        MR. WILLIAMSON:  The last paragraph, second
2 page.
3        A.  Yep.  There might be some dates in here wrong,
4 but --
5        Q.  Your counsel has directed your attention there
6 to the last paragraph on page two.  "October 10, 2003, is
7 the reasons" --
8        A.  Yeah.
9        Q.  Okay.  Is that date wrong?
10       A.  That date is wrong.
11       Q.  Now, on page two of the letter, the first full
12 paragraph, it says, "The first site of a real problem was
13 in 2001 when rumors of me being a good candidate or per
14 Mr. Palmer a good fit for only three stores in the
15 district.  The three stores were 600 South Western Avenue,
16 Peoria, 1700 East Court Street, Kankakee, and 1101 North
17 Main, Normal, Illinois."
18       Now, did anybody tell you that these three
19 stores that you mentioned here were the only stores that
20 would be a good fit for you?
21       A.  Yes.
22       Q.  Who told you that?
23       A.  That's when I told you Mr. Billy Walden
24 initially thought Western was going to be offered to me.

---

93

1 And one of the reasons why I declined the Court Street
2 store in Kankakee, Mr. Walden thought at the time Western
3 was going to be a store that I was approached with.  And
4 he himself had turned that store down.
5        Q.  Who had turned that store down?
6        A.  Mr. Billy Walden.
7        Q.  So, Mr. Walden -- when did Mr. Walden tell you
8 this?
9        A.  He had became the store manager in that store
10 in October '01, so sometime in that October, November
11 range, prior to me being offered the Kankakee store on
12 November 14th, 2001.
13       Q.  Now, the 1101 North Main store, Normal, is
14 that a store that you considered to have a lower-income
15 ethnic market, African-American?
16       A.  Yes.
17       Q.  You make a reference in that same paragraph to
18 the 1101 North Main, Normal, store manager position
19 becoming available, and you say that someone else was
20 selected for that position.  Who was it that was selected
21 for that position?
22       A.  Mr. Dones.  He's also African-American.
23       Q.  On the next page of the letter, the
24 next-to-last paragraph, there is a -- you said you made

---

94

1 the complaint -- I'm assuming that means the EEOC charge
2 -- February 12, 2004, and since then no one at Walgreen,
3 not even Human Resources, have responded to my complaint.
4        Had you contacted someone at Human Resources
5 in Walgreens?
6        A.  No.
7        Q.  Did you -- did you expect someone from Human
8 Resources to respond?
9        A.  No.
10       Q.  Okay.  Why did you make that statement, that
11 "not even Human Resources have responded to my complaint"?
12       A.  Because as a Fortune 500 company like
13 Walgreens, any time you have an open-door policy, I'm sure
14 someone in the company would like to investigate an issue
15 when they have concerns.
16       I'm aware of four less incidents in the
17 district that have had people -- investigations a lot
18 sooner than this one.
19       Q.  In the last -- on the last page you state that
20 Mr. Palmer has discriminated against you from the time you
21 started your career with Walgreens, especially in
22 October 2003.
23       We've talked about your not being chosen for
24 the Pontiac store manager's position in October 2003.

---

# Eric Simple v. Walgreen Co.

## 95

1  What are the other events which you contend are evidence
2  of discrimination by Mr. Palmer or Mr. Walgreens -- excuse
3  me, by Mr. Palmer or Walgreens Company against you?
4      A.  Aside from the Pontiac operation?
5      Q.  Yes.
6      A.  There's differential treatment and
7  consideration amongst me and my white peers.  For
8  instance, EXAs not completing classes but getting stores.
9          MR. WILLIAMSON:  Do you want to give names
10  when you say that?
11  BY MR. SMITH:
12      Q.  Yes.
13      A.  Mr. John Hudson -- Jim Hudson.
14      Q.  And Mr. Hudson, I think you've testified, was
15  sometime in -- was it 2001 or -- what year was it that he
16  was --
17      A.  It was 2001.  I know it was the Bourbonnais
18  store.
19      Q.  And you contend that you were more qualified
20  than he was?
21      A.  Yes.  I completed the course.
22      Q.  And it's your belief that he did not complete
23  the EXA course?
24      A.  He was dismissed from class.  I was in the

## 96

1  class.  Yes.
2          MR. WILLIAMSON:  He, he testified that he had
3  not completed the course at the time he was given the
4  Bourbonnais job.  May have completed it afterwards.
5      A.  Yeah.  Well, maybe -- I don't know.  He didn't
6  complete the course with us in the core requirement time.
7  He was not in our graduation class.
8      Q.  He wasn't in your class, but --
9      A.  But yet he got a store before everybody in
10  that class, who completed the class.
11      Q.  But are you saying he had not completed the
12  EXA course when he was assigned to the Bourbonnais store?
13      A.  I don't know that.
14      Q.  All you know is that he didn't complete the
15  class when you did?
16      A.  In the requirement time allotted.
17      Q.  In the requirement time?
18      A.  Allotted.
19      Q.  It's possible he may have gone at a later date
20  and completed the class?
21      A.  Possible.
22      Q.  You don't know, is what I'm saying?
23      A.  Right.
24      Q.  Okay.  What are the --

## 97

1      A.  Other differential treatment.
2      Q.  -- other differential treatment other than
3  Mr. Hudson?
4      A.  Other white managers, my co-peers, making
5  derogatory and racial comments to co-workers and
6  subordinates, continuing to advance in the company, such
7  as Miss Melissa Johnson -- Miss Melissa Jonland herself.
8      Q.  Okay.  What is it that she said?
9      A.  She told another EXA, called her -- should I
10  say it or --
11          MR. WILLIAMSON:  Yes, you have to say it.
12      A.  She called her a fucking foreign bitch.
13  Mr. Pat (sic) Haller --
14          MR. WILLIAMSON:  You need to indicate when
15  that happened.
16      A.  Oh, that happened in Miss Leanne Turley's
17  store office in front of others.
18      Q.  When was that, approximately?
19      A.  The date I can't actually remember.  '01.
20      Q.  Were you employed in that -- in Miss Turley's
21  store at that time?
22      A.  I was employed in Mr. Walden's store at that
23  time.
24      Q.  Okay.  So, you didn't -- did you observe this,

## 98

1  the incident where -- or the statement made by
2  Miss Jonland allegedly?
3      A.  No.
4      Q.  You heard about it; is that what --
5      A.  From the person herself.
6      Q.  The person who Ms. Jonland allegedly directed
7  these comments to?
8      A.  Yes.
9      Q.  Okay.  Who was that?
10      A.  Shashri Mishra.
11          MR. WILLIAMSON:  Can you do any help on the
12  spelling?
13          THE WITNESS:  No, I don't know how to spell
14  her name.
15  BY MR. SMITH:
16      Q.  Shashri Mishra?
17      A.  Uh-huh.
18      Q.  Now, explain --
19      A.  And there's --
20      Q.  Okay.  Let's talk about -- explain to me how
21  this resulted in treatment somehow -- some negative,
22  adverse treatment against yourself.
23      A.  How that, that --
24      Q.  Yes.  How did whatever Ms. Jonland --

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

99

1    A.  Ms. Jonland is a young lady who was employed
2  at the Pontiac store, in which I was told that race played
3  a factor in me not getting it.  But with that comment, it
4  shows that she attributes the same beliefs that was made
5  against me.
6    Q.  Okay.  But Ms. Jonland was the person who was
7  selected for the Pontiac store manager's position?
8    A.  Miss Jonland was the person who was making
9  comments like that, yet she's continually advancing.
10    Q.  Okay.  And are you saying that these comments
11  by Ms. Jonland being known somehow indicates -- what?
12    A.  Differential treatment.
13    Q.  Different treatment by whom?  By the company?
14    A.  By Mr. Palmer.
15    Q.  Okay.  What other examples of differential
16  treatment were you referring to in your letter to the
17  EEOC?
18    A.  As I said earlier about Mike Masters, took me
19  22 months to get down here when there were numerous
20  occasions when openings came up, but I drove from Normal
21  to New Lenox 22 months.
22    Q.  And that was --
23    A.  Mike Masters was --
24    Q.  Right.

100

1    A.  -- brought back down here within five months.
2  He's white.
3    Q.  That's back in '96 and '97?
4    A.  '98.
5    Q.  '98?
6    A.  Well, actually became an assistant May of '97.
7  He was back down here in October of '98.  I mean '97.
8    Q.  You were back in Normal in '97, correct?
9    A.  Correct, but it took me 22 months to get down
10  here.  Took Mike Masters five.
11    Q.  Okay.
12    A.  And in that 22 months, there were several
13  openings.
14    Q.  So, your dispute with -- regarding the Mike
15  Masters incident is he got back down here to Normal from
16  the northern area in five months, and it took you 22
17  months?
18    A.  And he went to the EXA class within a year.
19    Q.  Okay.  And that was -- when did he go to the
20  EXA class?
21    A.  March of '98.
22    Q.  '98.  You didn't make any complaint internally
23  at Walgreens about Mr. Masters, did you?
24    A.  No, not at the time.

101

1    Q.  What are the other examples, if any, of what
2  you perceive to be differential treatment or the other
3  incidents of differential treatment?
4    A.  Differential in pay treatment.
5    Q.  I'm sorry?
6    A.  In pay between myself and the white
7  counterparts.
8    Q.  Oh, in pay?  Okay.  Who are you comparing
9  yourself to?
10    A.  When I initially asked to be on overnight
11  shift, I spoke to Mr. Palmer about being an EXA on the
12  overnight shift.  He said that he couldn't do that, that
13  alone would be discrimination, if he paid me as EXA.  And
14  I know of a white EXA in the Chicago area who works
15  overnight shift and continues to get bonus as all the
16  other EXAs.  Her name's Christine Bower.
17    Q.  And is that in another district, not the
18  Illinois North district?
19    A.  It's Walgreens in another district.
20    Q.  Okay.  Another district for Walgreens.  Okay.
21  Her name is?
22    A.  Christine Bower.
23    Q.  Bower.  And she is an EXA?
24    A.  EXA.

102

1    Q.  Who's working overnight shift?
2    A.  Working overnight shift.  So, even though
3  Mr. Palmer told me that, I continued to take -- said I
4  would still take the overnight shift.  And he told me in
5  order to be on overnight shift, he would have to pay me
6  that as a new hire.
7    MR. WILLIAMSON:  Christine Bower's race is
8  what?
9    THE WITNESS:  White.
10  BY MR. SMITH:
11    Q.  I'm going to hand you what's marked as
12  Deposition Exhibit 4 which is in regard to the overnight
13  position.  And we talked a little bit about this, I think,
14  this morning, that you had said -- I'm sorry?
15    A.  Did you want me to continue on that prior
16  question?  There's more to it.
17    Q.  As far as the differential treatment?
18    A.  Differential pay, yes.
19    Q.  Okay.  Yes, let's talk on -- this is just
20  differential pay for the -- for the MGP -- MGT night
21  position?
22    A.  Yeah.
23    Q.  Okay.  Go ahead.  Continue on, as far as what
24  you perceived as differential treatment.

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

103

1    A.  He told me he would have to pay me that as a
2  new hire, someone coming in straight off the street. I
3  asked him if my nine years of service wouldn't be added to
4  it. He said, No, sir.
5       I said, So, you mean to tell me my nine years
6  of service mean nothing?
7       He said, I would have to pay you as a new
8  hire.
9       So, I asked him, Is there any time you've ever
10 paid anybody more than what that position rate requires?
11      He said, No.  And I know for a fact that a
12 Mr. Greg Pensky, a white male assistant, went from
13 assistant to head cashier.  At the time, the head cashier
14 position was $6.45 an hour.  Mr. Pensky was paid $10 an
15 hour at that position, well over 55 percent more than that
16 starting rate.
17 Q.  Is Mr. Pensky white?
18 A.  Yes, he's white.
19 Q.  What store does he work?
20 A.  He no longer works for Walgreens.
21 Q.  In what store did he work?
22 A.  Oh, he worked at Mr. King's store, the North
23 Main Street store in Bloomington.
24 Q.  Now, I handed you there Deposition Exhibit

104

1  Number 4.
2       Is there anything else in that regard to that
3  pay differential dispute?  I didn't want to cut you off in
4  your testimony there.
5  A.  No, but there's more to what --
6  Q.  More incidents of differential treatment;
7  we'll go through those.  But I wanted to show you this
8  exchange of e-mails here which, I believe, relates to the
9  pay.
10      Looking at about the middle of Deposition
11 Exhibit 4, it's from Store 2177.  Is this an e-mail that
12 you originated?
13 A.  Yes.
14 Q.  And you sent it to Mike Palmer, Walgreens,
15 also Martise Scott.  Who is Martise Scott?
16 A.  He's an LPS, loss prevention specialist.
17 Q.  Why did you send this to him?
18 A.  Because prior to this e-mail, there was a
19 meeting between me -- myself, Mr. Palmer, Mr. Scott and
20 Mr. King.  This meeting was the first meeting of any sort
21 concerning the incident that took place in October '03.
22 And in that meeting, I had asked Mr. Palmer about working
23 the overnight as an EXA.  And so since Mr. Scott was a
24 part of that meeting, I sent it to him as well.

105

1  Q.  Okay.
2       MR. WILLIAMSON:  Can we go off the record a
3  second?
4       MR. SMITH:  Sure.
5       (A discussion was held off the record.)
6       MR. WILLIAMSON:  Let's go back on the record.
7  I just wanted to make sure I wasn't misreading it.  When
8  we were off the record, I said that it did not appear to
9  me that Mr. Simple is sending an e-mail to anybody on this
10 exhibit, although there may be e-mails to Mr. Simple.
11 BY MR. SMITH:
12 Q.  Can you answer that?  Is this an e-mail from
13 you?  In about the middle or maybe two thirds of the
14 way --
15 A.  I sent one like this to Mr. Palmer, but all
16 this other stuff on here I have no knowledge of.  I don't
17 know if this is something Mr. Palmer copied together on
18 top of mine.  But I sent something like that.
19      MR. WILLIAMSON:  You sent what, though?
20      THE WITNESS:  This portion down here one time.
21      MR. WILLIAMSON:  Tell Mr. Smith for the record
22 what your e-mail is because it says Gene Slade at the
23 bottom of this because the paper's been cut off.
24 A.  Yeah, this one is our conversation.  I'm still

106

1  needing information.
2  Q.  Hold on.  Let me -- let's do this.  Why don't
3  I draw a box around -- this part, is that your e-mail
4  right there (indicating)?
5  A.  Yes.
6  Q.  Okay.  Let me draw a box around that.  That is
7  the e-mail that you sent, correct?
8  A.  Yes.
9  Q.  Okay.  It says that you needed some additional
10 information, that you were interested in the manager's
11 position on the overnight shift, you were asking for the
12 hourly wage?
13 A.  Yes.
14 Q.  Correct?
15      And then at the top of the box that I have
16 drawn in, there is an e-mail to you from -- is that from
17 Mr. Palmer or someone else?
18 A.  Yes, I --
19 Q.  Who is it from; do you know?  Can you tell who
20 it's from?
21 A.  I believe that's from Mr. Palmer.
22 Q.  It's addressed to you?
23 A.  Yes.
24 Q.  He's informing you of the -- of the pay rate?

Eric Simple v. Walgreen Co.

---

### 107

1    A.  Yes.
2    Q.  Okay.  That's 14 -- it says overnight MGT
3  position would start at 14.90 an hour with next rate
4  review 12 months from the date of position code change?
5    A.  Yes.
6    Q.  It goes on from there.  Okay.  That was sent
7  in response to your e-mail that has the box there on
8  Deposition Exhibit 4, correct?
9    A.  Yes.
10   Q.  Okay.  Now, was 14.90 an hour, was that a pay
11 cut from what you were making as an EXA?
12   A.  Yes.
13   Q.  And you, you were asking that -- what, that
14 you not take a pay cut?
15   A.  Yes, I was asking -- excuse me, correct.  Yes.
16   Q.  Okay.  Let me show you here the next
17 Deposition Number 5.  Is Exhibit Number 5 another
18 e-mail that you sent?
19   A.  Yes.
20   Q.  Oh, I'm sorry.
21   A.  I'm sorry.  I didn't know you --
22   Q.  I didn't hear your answer.
23   A.  I didn't answer.  I didn't hear it.
24   Q.  You were asking for an additional $2.70?

### 108

1    A.  No, I wasn't asking for an additional.  I was
2  inquiring if I worked nine years, would that be considered
3  at all in times of service?  And if it would, at those
4  increases, would it be possible that my wages would be
5  17.60?  Not asking for more.  I was inquiring why wouldn't
6  my nine years be calculated in.
7    Q.  You thought, based upon your experience, you
8  should have received this additional amount which would
9  have raised your hourly wage to 17.60?
10   A.  Somewhere in that area, yes.
11       MR. WILLIAMSON:  $17.60.  You said 70.
12 BY MR. SMITH:
13   Q.  Oh, I meant -- if I misspoke, I meant --
14 obviously it says $17.60.
15       What were you then ultimately paid?
16   A.  By the time I took the position, which was in
17 December '04, it was up to 15.20, which was four months
18 later.  So, I don't know if an increase had come down or
19 what, but it was a 30-cent increase so I'm assuming that
20 increase had come down.  But it was still that of a new
21 hire, someone off the street.
22   Q.  So, you were still making less than you were
23 making as an EXA, correct?
24   A.  Yes.

### 109

1    Q.  Okay.  And this was a transfer that you
2  requested, correct?
3    A.  I initially wanted to be an EXA, but when I
4  was told I couldn't be in that position, I continued on
5  with this.
6    Q.  Even though you -- knowing that it was going
7  to be paying less than you were making as an EXA?
8    A.  Yes.
9    Q.  And you could have continued on as an EXA
10 rather than go to the overnight position, correct?  I
11 mean, no one was --
12   A.  Mr. Palmer said no, I couldn't be an EXA on
13 the overnight shift.
14   Q.  No, you couldn't be an EXA on the overnight
15 shift, but you could have continued on at this time, in
16 2004, as an EXA on the day shift, correct?
17   A.  No.  After -- yes.
18   Q.  Yes.  Okay.  No one was making you go to
19 the -- it was not an involuntary transfer to the overnight
20 shift?
21   A.  No.
22   Q.  Show you what is marked as Deposition Exhibit
23 Number 6.  Is this a report -- performance review for you
24 for the period ending May 22nd, 2002?

### 110

1    A.  Yes.
2    Q.  And as I look at this, on the upper half of
3  the first page of Deposition Exhibit 6, it says EXA Self
4  Rating in certain performance areas.  And is that a rating
5  that comes from or did come from you?
6    A.  Yes.
7    Q.  And then the Manager Rating there to the right
8  of that, would I be correct in assuming then that that is
9  the rating that comes from your store manager at the time
10 of the review?
11   A.  Yes.
12   Q.  Is this reviewed with you personally by the
13 store manager?
14   A.  This?  They are supposed to, but this was not
15 reviewed by the store manager or anyone.
16   Q.  Okay.  It's not signed, right?
17   A.  No, it's not.
18   Q.  Is there a signed copy somewhere that you
19 have?
20       MR. WILLIAMSON:  I don't think so.
21   A.  I don't think so, no.
22   Q.  Do you get a copy of this in the normal
23 procedure?  Does the review process include your signing
24 the review?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

111

1    A.  There's no consistency with this, within the
2    district.  For instance, one of the reasons probably why I
3    wasn't given this with Mr. Walden was because by the time
4    this came out, I was already in another store.  But, yes,
5    it should be gone over by every EXA and at least the
6    district manager.
7        Q.  Do you know if this particular performance
8    review, Deposition Exhibit 6, was that reviewed with you
9    by Mr. Walden?
10    A.  No.  I was not working in Mr. Walden's store
11    when this came out.
12    Q.  Have you seen this before, this review?
13    A.  No.  I mean, I've seen it to do it, but I
14    didn't see the final.
15    Q.  Okay.  You saw it as far as completing your
16    own?
17    A.  Yes.
18    Q.  Okay.
19        MR. WILLIAMSON:  I'm gathering from your
20    questions that Walgreens did not have a signed copy of
21    this exhibit?
22        MR. SMITH:  Not that we've been able to
23    locate, but -- or at least that I've been able to locate.
24    BY MR. SMITH:

112

1    Q.  I'm going to hand you now Exhibit Number 7,
2    which is Executive Assistant Performance Review.  This has
3    your name.  As far as the period at the top, it indicates
4    2003, but there's no month or day that's completed.  Have
5    you seen this before?
6    A.  2003.  Yes, I've seen this before.
7    Q.  Was it reviewed with you by your store manager
8    at the time, Leanne Turley?
9    A.  Yeah.
10    Q.  Would it -- this review have occurred sometime
11    about a year from the prior review; therefore, in about
12    April or May of 2003?
13    A.  Yes.
14    Q.  You completed the self rating on this
15    performance review yourself?
16    A.  Yes.
17    Q.  I'm going to show you now Deposition Exhibit
18    Number 8.  This is a performance review for the 12-month
19    period ending May (sic) 16, 2004.  And from the second
20    page of Exhibit Number 8, it appears that your store
21    manager at that time was also Ms. Turley?
22    A.  Yes.
23    Q.  And did she review this performance review
24    with you at about the time that is stated there on page

113

1    two, around March 16, 2004?
2    A.  No.
3    Q.  When did she -- did she perform a review?
4    A.  She never.  No one performed a review on this
5    one.
6    Q.  Have you seen this before?
7    A.  Yes.
8    Q.  When did you see it first?
9    A.  Mr. King at the time, Mr. King was -- I was at
10    Mr. King's store, and he gave me this.
11    Q.  So, it was -- you were --
12    A.  But he didn't -- he didn't perform the review
13    and go over it with me.  He just gave it to me.
14    Q.  When were you transferred from Miss Turley's
15    store to Mr. King's store?
16    A.  Probably March or April.
17    Q.  Okay.  So, about the time the review would
18    have been done, that's when you transferred stores, right?
19    A.  Yes.
20    Q.  Okay.  So, do you know, was this review done
21    by Ms. Turley?
22    A.  Yes.  This was done by Ms. Turley.
23    Q.  But by the time they got around to giving it
24    to you, you had already transferred stores, so Mr. King

114

1    gave it to you?
2    A.  He didn't give it to me.  He handed it to me.
3    Q.  Handed it to you.  That's what I mean.  He
4    just physically gave it to you?
5    A.  Yes, he physically gave it to me.
6    Q.  On the first page of Deposition Exhibit
7    Number 8 --
8    A.  First page.  Okay.
9    Q.  Yes.
10        MR. WILLIAMSON:  First page is page three --
11        MR. SMITH:  Yes.
12        MR. WILLIAMSON:  -- for whatever reason on
13    that.
14        MR. SMITH:  It has the Bates stamp WAL 80 at
15    the bottom.
16    BY MR. SMITH:
17    Q.  But under Additional Comments it states, "I
18    still feel I am ready for a store manager opportunity.  In
19    fact, I know I am better prepared now than I was when I
20    was offered the Court Street store 2148 on 11/14/01.  All
21    I have done is grown as a person and manager since.  But
22    all I hear is that I am ready, there just isn't anything
23    open for me, at least not in this area.  It's just tough
24    for me to believe that since I became an EXA in '99 there

Eric Simple v. Walgreen Co.

115

1  have been nearly 2,000 new store managers, and I am not
2  one."
3         Are those your comments?
4     A.  Yes.
5     Q.  Okay.  When you made a reference to 2,000 new
6  store managers, to what were you referring?  What area?
7     A.  The company -- I'm saying that the company has
8  grown that much, and I haven't moved at all.  That's what
9  I was referring to.  I'm not -- I'm --
10    Q.  You're not suggesting there were --
11    A.  I'm not saying that all 2,000 was for me.  But
12 I'm just saying, the company has grown by 2,000 stores.
13        MR. SMITH:  Let's take a break for a few
14 minutes, five or ten minutes.
15        (Whereupon, a recess was taken.)
16 BY MR. SMITH:
17    Q.  Okay.  Mr. Simple, we were discussing, I
18 believe, the -- I don't know if you finished talking about
19 the differential treatment that you believe that you had
20 suffered and you referred to in your letter to the EEOC in
21 May of 2004.
22        What are the other areas of differential
23 treatment that you are claiming?
24    A.  Where was I at?

116

1     Q.  Okay.  You talked about -- make a list here.
2  I think you mentioned Jim Hudson as far -- you mentioned
3  other -- another EXA who had been transferred or another
4  employee had been transferred back to this district.  You
5  mentioned the differential pay or what you -- or your
6  inability to get the EXA pay on the night shift.
7         What are other -- what are the other areas in
8  which you claim that you have been discriminated against,
9  given differential treatment?
10    A.  Differential treatment in forms of a white
11 male EXA in the district, Mr. Ryan Thomas having numerous
12 counts of sexual harassment issues, but continuing to
13 advance up the company.
14    Q.  Where does Ryan Thomas work?
15    A.  He works at the 24-hour G.E. Road store right
16 now.
17    Q.  Okay.  Is he an EXA there?
18    A.  He's an EXA.
19    Q.  How long has he been an EXA?
20    A.  Either '01 or '02.  I don't know.  I know it
21 was after me.
22    Q.  And you say that he has been promoted despite
23 having allegations or statements made that he's engaged
24 in --

117

1     A.  Promoted --
2     Q.  -- harassing conduct?
3     A.  Promoted and continuing to keep his position
4  after still making them, once being promoted.
5     Q.  Is he currently an EXA?
6     A.  Yes.
7     Q.  What are the harassing or is the harassing
8  conduct in which you are stating that he has engaged?
9     A.  I don't know the full details, but with other
10 female co-workers in the stores.  In fact, there was a
11 time when he was even going around saying he couldn't work
12 in certain stores because of incidents that had happened
13 in those stores.
14    Q.  Is this sexual harassment or racial harassment
15 that we're talking about in regards to Ryan Thomas?
16    A.  Sexual.
17    Q.  So, your allegation is that he -- he's a white
18 male?
19    A.  Uh-huh.
20        MR. WILLIAMSON:  You need to say yes.
21    A.  Yes.
22    Q.  He has engaged in sexually-harassing conduct
23 but has not been terminated or disciplined and has been,
24 in fact, promoted?

118

1     A.  He made some before he was promoted.  And
2  since he's been promoted, he's continued to make some.
3     Q.  And you have -- have you observed yourself any
4  of this harassing -- allegedly harassing conduct?
5     A.  No.
6     Q.  So, what is your -- is your basis for your
7  knowledge?
8     A.  Himself.
9     Q.  He has said what?
10    A.  "I can't work in this store because I got in
11 trouble again, Simple.  I can't go to that store because
12 this happened."
13        In fact, he's just been moved to this store
14 because of an incident that just happened.
15    Q.  How is the treatment that he -- Ryan Thomas
16 has received -- you're somehow comparing yourself to that
17 conduct?  I'm not quite following you.
18    A.  It all breaks the policy that Walgreens has
19 against sexual harassment and discrimination.
20        Now, I'm not saying that is a part of my
21 discrimination issue, but I'm saying with this on his
22 record, he (sic) still continuing to advance is a problem.
23    Q.  Okay.  Are you saying that you have been given
24 less favorable treatment than Mr. Thomas in some way?

# Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**119**

1    A. I wouldn't know because I don't have a sexual
2 harassment charge against me.
3    Q. Okay. Well, I'm just trying to understand why
4 it is that or how it is that you believe that the conduct
5 or the treatment that Walgreens has given to Ryan Thomas
6 is evidence of discrimination against you.
7    A. I'm -- because Ryan Thomas is continued to
8 allow to advance with issues like that on his market
9 (sic).
10    Mr. Palmer once told me that every time you do
11 something negative, it's a chink in your armor as a
12 manager. There are no chinks in my armor as a manager,
13 but yet I'm continuing to be marketed or a good fit
14 because of my performance and my skills for certain
15 stores. But there are no chinks in my armor, and I see
16 all these other people with chinks in their armor, but
17 they continue to advance in their careers and move forward
18 without any limitations.
19    Q. But Mr. Thomas has not been promoted to a
20 store manager's position, has he?
21    A. Nor have I. No, sir.
22    Q. Okay. And how long has Mr. Thomas been an
23 EXA?
24    A. I don't know.

**120**

1    Q. Okay. So, if I understand what you're saying,
2 Mr. Thomas continues on as an EXA despite what you believe
3 are incidents of sexual harassment, and no disciplinary
4 action has been taken against him as far as you know; and
5 you, on the other hand, have not been promoted so there's
6 some differential treatment. Is that what you're saying?
7    A. No, I'm just saying differential treatment is
8 that he's continuing to advance at a rapid pace, whereas
9 my advancement opportunities are limited because of the
10 color of my skin.
11    Q. From what position to what position has
12 Mr. Thomas rapidly advanced?
13    A. Mr. Thomas went from a photo clerk to MGT to
14 EXA.
15    Q. In what period of time?
16    A. Four, maybe five years.
17    Q. And do you know how long he's been an EXA?
18    A. Probably quicker than that, now that I think.
19    Q. Okay. Do you know how long he's -- how long
20 Mr. Thomas has been an EXA?
21    A. No, sir.
22    Q. And you think the time that he -- from when he
23 first started to work as a photo clerk to becoming an EXA
24 is, you say, four or five years?

**121**

1    A. I thought you were talking about from the time
2 he went from a photo clerk. I don't know when Mr. Thomas
3 started.
4    Q. Okay. What are the other incidents of
5 differential treatment that you were referring to or that
6 you -- in your letter to the EEOC or that you otherwise
7 claim?
8    A. Well, what I got on there? Differential
9 treatment. Those are pretty much it. But obviously I'm
10 not the only one who feels that Walgreens has some
11 diversity issues within the company in light of the events
12 that took place this June, pending class action lawsuit
13 against Walgreens stating and citing some of the same
14 things that I have cited the whole year prior.
15    Q. And you're referring to the class action suit
16 that's pending down in federal court in East St. Louis?
17    A. Yes.
18    Q. Are you a member of the class of plaintiffs in
19 that suit?
20    A. No, sir.
21    MR. WILLIAMSON: Nor has he ever been a
22 member.
23 BY MR. SMITH:
24    Q. We're at 9 here now. I'm going to hand you,

**122**

1 Mr. Simple -- I believe these are your answers to
2 interrogatories that we have been provided. You have seen
3 these before, I take it?
4    A. Yes.
5    Q. Okay. Now, I notice that the interrogatories
6 are actually signed by your former attorney, Don Jackson.
7 Have you had an opportunity to review these
8 interrogatories for -- answers to interrogatories for
9 accuracy?
10    A. Yes.
11    Q. Okay. Are they accurate?
12    A. Yes.
13    MR. WILLIAMSON: Uhm -- (Counsel shakes head.)
14    A. Oh, no.
15    MR. WILLIAMSON: You know, I just want to
16 preface by saying that, I mean, there are opinions and
17 subjective statements in the answers, and Mr. Jackson
18 signed them; and we don't want to suggest that Mr. Simple
19 formulated any of the substance of the answers. I mean,
20 he gave him background information.
21    Am I making myself clear?
22    MR. SMITH: Okay. Well, I'll go through them,
23 and maybe if there are things that --
24    MR. WILLIAMSON: Probably the best way to do

123

1  it.
2        MR. SMITH: All right.
3  BY MR. SMITH:
4        Q.  Looking at interrogatory number one, just take
5  a moment to read that, if you would, because I'll ask you
6  if it's, to the best of your knowledge, accurate and
7  complete.
8        Have you read it, Mr. Simple?
9        A.  Yes.
10       Q.  I think in your testimony earlier today we had
11  also talked -- as far as management jobs you've been
12  offered by Walgreens that we also talked about a later
13  offer of the Kankakee store, manager's position in 2004,
14  correct?
15       A.  No, sir.
16       Q.  We did not?
17       A.  I wasn't offered a position, no.
18       Q.  Okay.  Well, this -- your answer to
19  interrogatory number one says you were offered a
20  management position at the Kankakee store on Court Street
21  in Kankakee, and then you were -- in April 2004 you were
22  also offered a position in Store 1300 at 600 South Western
23  in Peoria?
24       A.  Yes, I was offered this store.  I thought you

124

1  said later in 2004.
2        Q.  Was there another time in 2004 --
3        A.  No.
4        Q.  -- when you were offered the Kankakee store
5  position?
6        A.  No, this was the last position.  I thought you
7  were saying later.
8        Q.  Okay.  So, this is accurate and complete?
9        A.  Yes.  These are the only two stores.
10       Q.  Okay.  Take a look at interrogatory number two
11  and your answers to that.  I would assume there's a
12  typographical error in the address you have there?
13       A.  Oh, yeah, that's Plantation.
14       Q.  Other than that error, is that accurate and
15  complete?
16       A.  Yes.
17       Q.  Same thing for number three?
18       A.  Yes.
19       Q.  Take a look at interrogatory number four and
20  the answers there.  Is that accurate and complete?
21       A.  Yes, she works for State Farm, but they moved
22  her from number two.
23       Q.  Okay.  She no longer works at that address?
24       A.  No, sir.

125

1        Q.  Does she work at another address in
2  Bloomington?
3        A.  In Bloomington.
4        Q.  Okay.  That's irrelevant really, what the
5  address is.
6        The other information is accurate and
7  complete?
8        A.  Yes.
9        Q.  Look at interrogatory number five and your
10  answer and tell me if that's accurate and complete.
11       A.  Yes.
12       Q.  Now, number six, I want to ask you some
13  specific questions about your answers there.  You were
14  asked to identify employees of Defendant who have
15  knowledge of the conduct alleged in your complaint and
16  identify the nature of his or her knowledge.
17       The first person you identify is Diane Leslie,
18  L-e-s-l-i-e.  Now, you state in there that Ms. Leslie
19  worked with yourself and Melissa Jonland.  At what store
20  did she work?
21       A.  What do you mean, at what store did she work
22  with me or --
23       Q.  Well, did she work with you and Ms. Jonland at
24  the same store, or did she work with you at one time and

126

1  then Miss Jonland at another time?
2        A.  Yeah, that's -- she can't work with us at the
3  same, but yet she's worked with us both at different
4  locations.
5        Q.  And Ms. Leslie is white?
6        A.  Yes.
7        Q.  Okay.  Now, you say in here that she was never
8  counseled by Mike Palmer, I assume --
9        A.  Yes.
10       Q.  -- to consider moving to Chicago, Atlanta,
11  Washington, D.C., Philadelphia or Dallas for better
12  opportunities.
13       Were you yourself counseled by Mr. Palmer to
14  consider moving to those cities?
15       A.  Yes.
16       Q.  And when did that statement -- when was that
17  statement made by Mr. Palmer?
18       A.  On more than one occasion, but the most recent
19  one was September '03 and Store 5188, Veterans Parkway and
20  G.E. Road.
21       Q.  And what was the context -- can you give me
22  the complete statement the first time that Mr. Palmer made
23  that statement?  What was said in the statement by you and
24  by Mr. Palmer?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

127

1      A.  The first time?
2      Q.  Yes.  I think you said he did it more than
3  once.
4      A.  I don't remember the first time.  I remember
5  the most recent time, and that was what I told you,
6  September '03, and Store 5188, Veterans Parkway,
7  Bloomington-Normal.
8      Q.  Okay.  Was anyone else present besides
9  yourself and Mr. Palmer?
10     A.  Ms. Leanne Turley.
11     Q.  And were you talking -- was he talking about
12  opportunities for you?
13     A.  Yes.
14     Q.  And what did he say specifically?
15     A.  He asked me, Mr. Simple, are you still
16  interested in being a store manager?
17        Yes, I am.
18        How do you feel about it?
19        I feel good.  How do you feel?
20        You're doing a great job.  Miss Turley is
21  appreciative.
22     Q.  That's what Mr. Palmer said?
23     A.  That's what Mr. Palmer said.  Doing a great
24  job.  Miss Turley is appreciative of your work, and I

128

1  appreciate what you're doing.  You're doing a good job.
2  Keep it up.  And I'd like to get you an opportunity, like
3  to get you an opportunity where you can do more for
4  Walgreens and do more for yourself, but I don't have
5  anything for you right now.  But there's plenty of growth
6  opportunities in Philadelphia -- he named those cities --
7  Chicago area, all cities in urban areas.
8        I said, Well, that's fine, but there's nothing
9  here?
10        No, sir.
11        That's what I asked, Is there nothing here?
12        No, sir, Mr. Simple.  Not right now.  I just
13  don't have any growth going on right now.
14        And so he told me about all those markets
15  which are pretty much, well, inner-city markets.
16     Q.  So, did you interpret this somehow to be a
17  racially-motivated statement, that there were better
18  opportunities in these cities that you have listed here?
19     A.  No, I didn't take it at that point in time.  I
20  had no reason to at that point in time.
21     Q.  Later did you take it as a racially-motivated
22  statement?
23     A.  Later I realized they could have been leaning
24  toward that fact for the simple fact that as of April --

129

1  as of May this year, Walgreens had 194 district managers;
2  12 of them are black.  All the districts are in Chicago,
3  Houston, St. Louis, Atlanta, New Orleans, Philadelphia,
4  and in those type of markets.  And the majority of the
5  store managers are also located in those markets.
6      Q.  Would you agree that there has been more
7  growth for Walgreens stores in some of these cities that
8  Mr. Palmer was mentioning as compared to the Illinois
9  North district or the Bloomington-Normal area?
10     A.  Yes, I would agree, but Mr. Palmer only made
11  those comments to myself and other black managers, not to
12  the Diane Leslies or Jessica Culbertsons or the Brian
13  Jacksons, who are all white assistants.
14     Q.  Are you saying then that Mr. Palmer made those
15  comments to black EXAs -- African-American EXAs, that
16  there are more opportunities in these other districts,
17  other areas, and he did not make those same comments to
18  white EXAs?
19     A.  According to the statements by those
20  individuals, yes.
21     Q.  And those individuals being Miss Leslie and
22  who else?
23     A.  Sonia Crittendon, Jessica Culbertson, who was
24  MGTs, never heard that statement made.  Brian Jackson, a

130

1  white male MGT, never had those statements made to him as
2  well.  Sam Lane, white EXA, never had those statements
3  made to him.
4      Q.  At the time, you did not take the statement
5  that he was making to you at that time, being September
6  of 2003, you did not take that statement as being a
7  racially-motivated statement, however?
8      A.  No, I had no reason to.
9      Q.  Now, the second person you list here under
10  your answers to interrogatory number six is that of Sonia
11  Crittendon.  And did you work at the same store any time
12  as Miss Crittendon?
13     A.  Yes.
14     Q.  What store was that?
15     A.  5188.
16     Q.  That's the Veterans Parkway store?
17     A.  Veterans Parkway store.
18     Q.  You say in here that Miss Crittendon, who was
19  African-American, felt that if she would continue to be
20  working for Walgreens she would only be considered for
21  stores that catered to African-Americans.
22        Did she make that statement to you?
23     A.  Yes.
24     Q.  When did she make that statement to you?

Knight Reporting Service, Ltd.
309-637-0700

131

1    A. After — excuse me. After what was said to me
2  in October '03 once, and after the events that took place
3  on April 30th where Mr. Palmer approached me about the
4  Western store in Peoria.
5    Q. She's no longer employed by Walgreens?
6    A. Not to my knowledge, no.
7    Q. Where does she work now?
8    A. I don't know where she's employed now.
9    Q. Do you know where she lives?
10   A. She's in Chicago now.
11   Q. When was the last time you talked with her?
12   A. Oh, I couldn't give an exact date. Couple
13 months.
14   Q. Do you have any written statement from her?
15   A. No, sir.
16   Q. Do you have a telephone number for her?
17   A. Not now. I can get a number for her. No.
18   Q. You said you last talked to her a couple
19 months ago?
20   A. Yes.
21   Q. About what?
22   A. Our kids go to the same schools. Her husband
23 -- ex-husband is a barber, so we talked about life.
24   Q. Okay. So, she lives in Chicago?

132

1    A. Yes.
2    Q. Her kids and her ex-husband live in --
3    A. Bloomington.
4    Q. -- Bloomington. Did she leave the employment
5  of Walgreens to become a realtor?
6    A. She was in realtor -- real estate. I don't
7  know if she left because of that or she left because of
8  what happened to me. I don't know. But she was doing
9  real estate.
10   Q. Okay. And she -- did she tell you that
11 Mr. Palmer told her to consider moving out of the district
12 to Chicagoland and Washington, D.C., Philadelphia, Dallas,
13 for better opportunities?
14   A. Yes.
15   Q. You also state here that she's witnessed the
16 discriminatory practices with other African-Americans
17 within the district. To what are you referring?
18   A. Incident that took place with Mr. Theo Eddins.
19   Q. Okay. And Mr. Theo Eddins is mentioned next.
20 What was that incident?
21   A. On the overnight shift, Mr. Eddins had a
22 situation with a customer, come in about some rolls of
23 film, and he was told a certain price because Walgreens
24 has two sets for one price. The gentleman assumed it was

133

1  like two rolls for that one price, but it's two sets per
2  roll.
3       When Mr. Eddins refused to sell him the price
4  -- sell them at that price, told him to come back and talk
5  to Miss Turley. The guy was pretty upset with Mr. Eddins,
6  and Mr. Eddins said he couldn't give them to him at that
7  price.
8       But when he talked to Miss Turley the very
9  next day -- or a couple days later he came in and pretty
10 much did the same thing with Miss Turley. Miss Turley
11 asked him to leave. The guy ended up calling the district
12 office or going higher up with the situation, felt he was
13 owed an apology.
14      He came in one night to try to get Mr. Theo to
15 apologize, and Theo thought the guy was coming in to
16 apologize to him -- Mr. Eddins, should I say, thought the
17 guy was coming to apologize to him. So, he didn't
18 apologize. He waited for the guy. When it was found out
19 that he -- the guy assumed he was going to apologize,
20 which Mr. Eddins had no idea because of being on overnight
21 shift; sometimes you don't know everything because of the
22 breakdown in communication.
23      So, when he refused to apologize, he went
24 back. And Theo still wouldn't apologize. And Mr. Palmer

134

1  wanted Mr. Eddins to apologize. And Theo, after being
2  told by Miss Turley, his immediate supervisor and store
3  manager and Human Resources that he had done something
4  wrong, that he refused to apologize.
5       So, that was doing -- early in the summer. A
6  few months later --
7    Q. Summer of what year are we talking about now?
8    A. It would have to have probably been '04.
9       A few months later, Miss Turley received a
10 phone call from Mr. Palmer and told -- and she was told to
11 tell Mr. Theo when he came in -- Mr. Eddins, when he came
12 in that night, that if he didn't apologize by his shift at
13 a.m. in the morning for him to basically turn in his paper
14 when he had done nothing wrong.
15      Now, at the same time, as I mentioned the
16 differential treatment, there's issues going on like that,
17 and those guys are continually able to advance. In this
18 situation, Mr. Eddins did nothing wrong, but yet he's told
19 if he don't apologize, he's going to lose his job.
20   Q. Was he, in fact, disciplined?
21   A. No.
22   Q. Is he still employed by Walgreens?
23   A. Mr. Eddins has left Walgreens.
24   Q. When did he leave Walgreens?

Eric Simple v. Walgreen Co.

Eric Simple<br>11/29/2005

---

### 135

1   A. He left in May of '05, this year.
2   Q. Where is he employed now?
3   A. He's a school teacher.
4   Q. In Bloomington-Normal?
5   A. Yes.
6   Q. Do you know if his leaving Walgreens had
7   anything to do with the incident that you have summarized
8   here or testified to today?
9   A. Yes, combination of that and other things.
10  Q. When you say "other things," what are you
11  referring to?
12  A. Well, he's a full-time school teacher so he
13  didn't need the job at Walgreens. And he coaches Pee Wee
14  football. So, after seeing what happened to me and what
15  was about to happen to him, he had no desire.
16  Q. Next person listed is Jessica Culbertson, and
17  you reference here that she has knowledge of the comments
18  -- "racial comments made to me by Leanne Turley." Is
19  this -- is she one of the persons that overheard the
20  conversation between Miss Turley and yourself in
21  October 2003?
22  A. No, she didn't hear it. Miss Turley told her
23  herself.
24  Q. Okay. There's some conversation that

---

### 136

1   Ms. Turley had with Jessica Culbertson?
2   A. Yes.
3   Q. Okay. What was Jessica Culbertson's position
4   at the store?
5   A. MGT.
6   Q. What is it that you're contending Ms. Turley
7   told Ms. Culbertson in regard to, as you put here, the
8   racial comments?
9   A. That race was a factor in me not getting the
10  Pontiac store.
11  Q. That's what Miss Culbertson told you?
12  A. Yes.
13  Q. And based on what Ms. Turley told
14  Ms. Culbertson?
15  A. Yes.
16  Q. Okay.
17  A. She asked Miss Turley personally, and
18  Ms. Turley told her, yeah.
19  Q. What is it that Miss -- specifically what did
20  Miss Culbertson tell you that Ms. Turley said, and when
21  did she -- when did Ms. Culbertson tell you this?
22  A. She just -- she didn't tell me the details of
23  the conversation. She just told me, "Simple, you're
24  right. I can't believe it." And --

---

### 137

1   Q. That's what Miss Culbertson said to you?
2   A. That's what she told me.
3   Q. When did she tell you that? When did
4   Miss Culbertson tell you that?
5   A. All of this took place in October, November
6   '03.
7   Q. Okay.
8   A. When everything was right there in front of
9   everyone.
10  Q. You're saying Miss Culbertson told you that
11  Leanne Turley told her that, yes, race was a factor in the
12  decision not to hire you for the Pontiac store manager's
13  position?
14  A. I'm saying she told me that race was a factor.
15  She didn't tell me detail what was said. She just told me
16  that, "Simple, you're right. Race was a factor."
17  Q. That Miss Culbertson told you this?
18  A. Yes.
19  Q. So, she did not say that it came from
20  Miss Turley?
21  A. It came from Miss Turley. She didn't tell me
22  exactly what Miss Turley said, but she approached
23  Miss Turley and asked her herself.
24  Q. Okay. Miss Culbertson approached Ms. Turley

---

### 138

1   and asked her, and --
2   A. I don't know.
3   Q. You don't know what it was that Ms. Turley
4   told Ms. Culbertson?
5   A. No.
6   Q. You just know what Ms. Culbertson told you,
7   which is just the general statement that race was a
8   factor?
9   A. Yes. Yes.
10  Q. Okay. Next person listed is Damon Clayton,
11  and it says Mr. Clayton is an African-American assistant
12  manager. Is that an EXA, or is that an MGT?
13  A. He was an MGT.
14  Q. And he has since moved to Dallas. Is he still
15  employed by Walgreens?
16  A. No.
17  Q. When did he leave the employment of Walgreens?
18  A. This year, summer sometime. I don't know
19  exactly.
20  Q. Where does he live now?
21  A. Dallas.
22  Q. Now, you state here that he was -- Mr. Clayton
23  was counseled by Mr. Palmer to move out of the district to
24  Chicagoland, Washington, D.C., or Philadelphia for better

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**139**

```
1   opportunities. Was his conversation the same as what you
2   have testified that you were told by Mr. Palmer, or is it
3   a different conversation?
4        A.  In general, the same.
5        Q.  When was the last time you talked to
6   Mr. Clayton?
7        A.  Two weeks ago.
8        Q.  Did you talk about this case?
9        A.  No.  Talked about his son.
10       Q.  Do you know, is Mr. Clayton a party to the or
11  a member of the class -- in the class action suit that's
12  pending in East St. Louis?
13       A.  Not to my knowledge.
14       Q.  Do you know any members of the class in the
15  class action suit pending in East St. Louis?
16       A.  No.
17       Q.  Next person you have listed here is Brian
18  Jackson.  Is Mr. Jackson currently employed by Walgreens?
19       A.  Yes.
20       Q.  At what store?
21       A.  He's in St. Louis.
22       Q.  He formerly worked in this district?
23       A.  Yes.
24       Q.  At what store?
```

**140**

```
1        A.  He worked at the Veterans store in
2   Bloomington, and he worked at the North Main store in
3   Normal, and he worked at Oakland at one point in time in
4   Bloomington.  And I'm not for sure if he worked with
5   Mr. King on North Main, but I know he worked at three
6   other stores in Bloomington.
7        Q.  So, he worked with you and Ms. Jonland at one
8   or more of those stores?
9        A.  Yes.
10       Q.  Okay.
11       A.  Oh, he worked at the Pontiac store as well.
12       Q.  When did he work at the Pontiac store?  Was
13  that after Ms. Jonland was in that store manager?
14       A.  After Ms. Jonland was the store manager.
15       Q.  I'm sorry.  Where does he work now?
16       A.  St. Louis.
17       Q.  What's his position there?
18       A.  I'm not for sure if he's an MGT or EXA or if
19  he's doing something down there.  I know he works for
20  Walgreens.
21       Q.  When was the last time you talked with
22  Mr. Jackson?
23       A.  Probably September, right before -- September.
24       Q.  Before he -- that was about the time he left?
```

**141**

```
1        A.  No, he left in -- earlier this year.  Like
2   maybe May, April.  I'm not for sure.  But I talked to him
3   in September.
4        Q.  You talked to him in September of this year?
5        A.  It was this year.
6        Q.  And he left this district in April or May of
7   this year?
8        A.  Yeah.
9        Q.  Do you know why Mr. Jackson left this
10  district?
11       A.  His wife is a pharmacist, and she was
12  transferred down to the St. Louis area.  She went to
13  school there.
14       Q.  The next person you have listed is Jafar
15  Rakim.  Is that --
16       A.  Rakim.
17       Q.  Rakim.  Is that the way it's pronounced?
18       A.  Yes.
19       Q.  What position did Mr. Rakim have at Walgreens?
20       A.  Pharmacy tech.
21       Q.  What stores did he work at or store?
22       A.  He worked at North Main in Bloomington under
23  Mr. King and Veterans Parkway and G.E. Road under
24  Ms. Turley.
```

**142**

```
1        Q.  You state here that -- says Mr. Rakim can also
2   present other evidence of race-based discrimination at
3   Walgreens.  To what are you referring?
4        A.  He had a situation in the pharmacy with
5   himself, that happened to him in which there was a mishap
6   on the schedules.  I don't know the whole detail.
7            One of the pharmacist people told him one
8   thing, and the other pharmacy guy -- the communication
9   wasn't spread correctly, and so he assumed that he didn't
10  have to work.  And then when he didn't show up, he was
11  terminated.
12           And when he went to the pharmacy manager to
13  find out what was the situation, he told him to talk to
14  Ms. Leanne Turley.
15           And when he talked to Ms. Turley, who was the
16  store manager over everything, she told him that it was
17  Craig's decision, and he could not be rehired.
18           When he talked to Craig, Craig said it was up
19  to Ms. Turley because she's the store manager, which she
20  is because, as the store manager, you're over the entire
21  store.
22           But, unfortunately, he didn't even know he was
23  terminated until after, upon graduating from ISU -- which
24  is while this took place that he's moving back and forth
```

Knight Reporting Service, Ltd.
309-637-0700

143

1  to Chicago. He had went into the store up there to try to
2  get his job back up there, because he was moving back to
3  Chicago, and was found out that he couldn't be rehired
4  because they had terminated him down here.
5          And the manager up there told him all he had
6  to do was talk to the manager down here about the
7  situation.
8      Q.  Okay. He was terminated, but he did not know
9  he was terminated?
10     A.  No, because he was moving as a student. If
11 you're a student, you live in one town and go to school.
12 Upon graduating, he went home. Okay? Now, the day he was
13 supposed to work, the one manager told him he didn't have
14 to work because school was out, and he had graduated; he
15 was moving. So, when he moved to Chicago, after he got
16 his stuff up there, he went to his store to transfer some
17 days later; and when he went in there to transfer, he
18 found out that he was decoded.
19     Q.  He thought he had quit because the school year
20 was over?
21     A.  No.
22     Q.  Oh.
23     A.  He was told by one of the pharmacy managers
24 that he did not have to come to work that day.

144

1      Q.  When you said one of the pharmacy managers
2  told him he didn't have to come to work that day it was
3  because, according to what Mr. Rakim thought, school was
4  over and --
5      A.  They had the shift covered, and they were
6  fine.
7      Q.  Okay. And that he would not be coming back to
8  work anymore at that store?
9      A.  No, because he -- yes.
10     Q.  That's what he thought, right?
11     A.  Yes, because he wasn't going to live there.
12 That was his last day.
13     Q.  So, he goes back to Chicago where he's from --
14     A.  From.
15     Q.  -- and wants to go back to work at a Walgreens
16 store there, correct?
17     A.  Correct.
18     Q.  And then they say, You've been fired?
19     A.  You've been decoded. He's like, What?
20         Well, they pull up the code, whichever it is,
21 termination code, non-rehirable code, told him where it
22 came from. So, he went back down here to find out what
23 had happened.
24     Q.  And so he came back down here and was told

145

1  what you've said?
2      A.  Uh-huh. Yes.
3      Q.  And this is -- how is this evidence of race
4  discrimination?
5      A.  How?
6      Q.  Yes.
7      A.  There are several employees, particularly in
8  the pharmacy -- he was the only black pharmacy tech at the
9  time. There are several pharmacy techs who have missed
10 days of work and didn't show up without a pharmacist's
11 knowledge or consent and still have remained -- maintained
12 to keep their jobs.
13     Q.  So, you're saying he was comparing himself --
14 or you or others compared himself to other pharmacy
15 technicians, and they were allowed to miss days and not be
16 fired, and he wasn't?
17     A.  Just purely no call, no shows, yes.
18         MR. WILLIAMSON: Other white pharmacy --
19     A.  Other white pharmacy techs.
20     Q.  When did this happen? When, when was it that
21 he was terminated? I assume the end of the school year?
22     A.  End of school year, so it had to be -- it was
23 perhaps '04. May '04.
24     Q.  2004? The last name you have listed here

146

1  under your answer number six is Janis Stewart. You state
2  that Miss Stewart is African-American. And is she still
3  employed by Walgreens?
4      A.  Yes.
5      Q.  At what store?
6      A.  5188, Veterans Parkway store, G.E. Road,
7  Bloomington.
8      Q.  What position does she hold there?
9      A.  She's a photo clerk now.
10     Q.  It's stated here that she's expressed interest
11 in becoming an assistant manager, and she has been told
12 that she wouldn't be considered for a management position
13 without a degree?
14     A.  Yes.
15     Q.  And you state here, A degree is not a
16 requirement to be promoted to management.
17         Do you know if recently Walgreens has changed
18 their requirements in regard to requiring management
19 personnel to have a degree?
20     A.  Recently, I think yes.
21     Q.  Okay. When did that change occur?
22     A.  I don't know for sure, but I looked in the
23 Walgreens World last week, and you have guys who started
24 with Walgreens in 1999 as MGTs and are currently -- been

Eric Simple v. Walgreen Co.

147

1   promoted to district managers and are attending the
2   University of Phoenix. And they're already district
3   managers.
4       So -- and then on the other overnight
5   position, in the store I work in right now, is Becky
6   Spencer, a white female, was promoted to overnight
7   position and has no degree.
8       Q. When was she promoted?
9       A. A year ago, two years ago. And Janis has
10  applied several times.
11      Q. So, if I understand what you're saying here in
12  this, that she was not allowed to become or promoted to
13  the MGT position on the basis that she did not have a
14  degree, but there are white employees who have been
15  promoted within management who do not have degrees?
16      A. Yes. And Miss Stewart was also told just to
17  even be a manager on overnight shift she would have to
18  work in other stores as a photo clerk -- she was told this
19  by Miss Leanne Turley -- just to see if she was worthy of
20  the management opportunity, whereas Miss Spencer was a
21  cashier on that overnight shift and went straight to
22  manager on that same shift.
23      Q. Number seven here, a rather long answer, but
24  take a look at that and tell me if that is accurate and

148

1   complete.
2       MR. WILLIAMSON: Since you've inquired about,
3   I think, every answer in here, you understand that his
4   verbal response is elongated and --
5       MR. SMITH: Right.
6       MR. WILLIAMSON: -- slightly different than
7   these, of course. And I guess we don't have to go through
8   and --
9   BY MR. SMITH:
10      Q. Okay. Yes, I will -- we have asked about, I
11  think, just about all these subjects on here. If there's
12  anything that is inaccurate, with the caveat that your
13  attorney made that, yes, we've gone into greater detail
14  about all of these subjects.
15      Is everything in --
16      A. Yes.
17      Q. -- response to answer number seven accurate
18  and complete, at least to the extent that it has not been
19  modified by your oral answers?
20      A. Yes. Uh-huh.
21      Q. Okay. I don't know if I asked you that in
22  number six as far as --
23      A. Number six.
24      Q. -- all of the -- is number six, where you list

149

1   all the individuals there, are there any other
2   individuals, whether they are current employees, past
3   employees or otherwise, who would have knowledge of the
4   conduct alleged in your complaint?
5       A. Nick Resser.
6       Q. Nick Resser?
7       A. Uh-huh.
8       Q. How do you spell that?
9       A. I think it's R-e-s-s-e-r.
10      Q. R-e-s-s --
11      A. -- e-r, uh-huh.
12      Q. Okay. Who is Mr. Resser?
13      A. He's a service clerk currently at the 5188
14  store, Bloomington, Illinois.
15      Q. What knowledge does Mr. Resser have about the
16  incidents you've alleged in your complaint?
17      A. Mr. Resser was told by Ms. Leanne Turley that
18  -- concerning African-Americans, Those people are lazy and
19  pretty much want something for nothing.
20      And when he told her (sic) that, he had no
21  idea that Mr. Resser had recently -- he's a white male --
22  had just recently gotten out of a relationship with a
23  black female, so he was pretty much offended by those
24  comments.

150

1       Q. Mr. Resser told you that this is what
2   Miss Turley said?
3       A. (Witness nods head.)
4       Q. Is that a yes?
5       A. Yes.
6       Q. Okay. And what were the statements again that
7   Ms. Turley supposedly made to Mr. Resser?
8       A. That those people --
9       Q. Those people?
10      A. There's a guy in our store, African-American,
11  named Oscar Sains (phonetic). He's a little slow. He, he
12  has a -- like dyslexia, and so sometimes he tends to do
13  things a little slower.
14      And I guess him and Oscar are good friends.
15  And one day Oscar must have been having a really difficult
16  day. And I guess Miss Turley had motioned and told Nick
17  that, Those people are typically lazy, and talking about
18  Oscar anyway. So, I guess Nick was, you know, working
19  with him; they're good friends. She said, Those people
20  are typically lazy and want something for nothing.
21      Q. When was it Miss Turley allegedly made this
22  statement to Mr. Resser?
23      A. Early this year, before she --
24      MR. WILLIAMSON: Early this year?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**151**

1  BY MR. SMITH:
2  Q. 2005?
3  A. 2005.
4  Q. And when did Mr. Resser tell you this?
5  A. Earlier this year.
6  Q. Okay. Right about the time it occurred or --
7  A. Right about the time it occurred. And there's
8  Jenny Hernandez.
9  Q. And Mr. Resser is still employed at that
10  station --
11  A. He's still employed.
12  Q. -- at that store, I mean?
13  A. At that store.
14  Q. Who was the next person?
15  A. There's Jenny Hernandez. She left on
16  maternity leave, but her and Miss Crittendon -- she's a
17  white female. Her, Miss Crittendon, Miss Culbertson and
18  Mr. Gray was told by Miss Turley that I was lazy, I was
19  only in it for a check, and that I didn't deserve the
20  Pontiac store anyway.
21  Q. Okay. This is what Miss --
22  A. Miss Turley told them.
23  Q. Miss Hernandez told you?
24  A. Miss Hernandez, Miss Culbertson. All of them

---

**152**

1  are witnesses to that statement.
2  Q. Okay. And when did Miss Turley supposedly
3  make this statement?
4  A. In the summer of '04.
5  Q. What was the context in which she made this
6  statement?
7  A. Ironically, this statement was made right
8  after I had decided not to interview for the Plainfield
9  store. And I don't know how she found out I decided not
10  to interview for it, but she made that statement, along
11  with another statement that said I was stupid and dumb for
12  not taking the Plainfield store, which at the time I
13  thought it was just for an interview. So, somehow she had
14  prior knowledge that if I had interviewed for that store,
15  it was assumed by the comment she made that I was going to
16  get it.
17  Q. And I think you testified earlier you were not
18  interested in the Plainfield store, whether it had been
19  offered to you or not?
20      MR. WILLIAMSON: I don't think he said that.
21  A. I didn't say that. I said according to
22  Mr. Palmer's stipulation --
23  Q. You were being solicited to apply?
24  A. Yes. And according to the stipulation that he

---

**153**

1  made up-front, before I even applied, I was not
2  interested.
3  Q. And that was that you would have to move; that
4  was the stipulation that he made that caused you not to be
5  interested?
6  A. That I would have to relocate.
7  Q. Okay. You said that -- did you ask any of the
8  other persons, Mr. Gray or Miss Crittendon -- was
9  Miss Crittendon the other person?
10  A. I didn't have to ask.
11  Q. Why didn't you have to ask?
12  A. That information was volunteered by -- to me
13  by all of them.
14  Q. Okay. But I mean, they all told you this?
15  A. Yes.
16  Q. That Miss Turley had made that statement?
17  A. Her, yes.
18  Q. I'm not sure I understand that -- the content
19  of the statement. Was this a -- in your understanding of
20  the statement made by Miss Turley, was this a racial
21  statement, or was it a statement about you individually?
22  A. It was more of a statement, a retaliation
23  statement about me individually.
24  Q. Retaliation for what?

---

**154**

1  A. At this point, I had already filed my class
2  action -- my -- not class action. I had filed my lawsuit.
3  I had not filed my lawsuit, but I had already went to the
4  EEOC to file my complaint.
5  Q. Okay. Are you alleging that there was any
6  employment action taken against you in retaliation for
7  filing your charge of discrimination with the EEOC?
8  A. Yes.
9  Q. What is that?
10  A. These evaluations. The evaluation prior to
11  the EEOC complaint which took place, as you showed me in
12  one of your exhibits, in '03, shows that I rated very
13  highly. In fact, in that evaluation, which was six months
14  prior to the Pontiac operation opening, Walgreens rated
15  EXAs and MGTs in 17 categories, categories such as store
16  condition, store performance, training and development of
17  employees. In those 17 categories, I outscored in seven
18  categories. Miss Jonland got seven. We tied at seven.
19  She outscored me in only three. The same evaluation was
20  signed and dated by Mr. Palmer. There are no positive
21  reinforcements in this evaluation, nor are there any
22  constructive criticism.
23      Now, a year after my complaint to the EEOC,
24  Miss Turley dropped me lower. I went from rated to being

---

Knight Reporting Service, Ltd.
309-637-0700

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

155

1  a manager soon to only good enough for a lateral movement.
2  And the only thing that took place in between those times
3  is me filing the complaint to the EEOC and the statements
4  about race being a factor in me in determining that I
5  didn't get the Pontiac store.
6      Q.  Did you receive any reduced or either
7  reduction in your pay or a reduced increase in your pay as
8  a result of the performance appraisal in 2004?
9      A.  No, but that, that review showed -- according
10 to that review, if you don't know my work ethic or my work
11 performance, it says that Mr. Simple is doing this
12 (indicating) which ultimately will affect my earnings
13 potential.
14     Q.  Who else, other than the people you've named
15 in addition to those that are listed in your answer to
16 interrogatory number six, have knowledge of conduct
17 alleged in your complaint or knowledge of race
18 discrimination against you?
19     A.  Miss Jackie Hadley, which she's already --
20     MR. WILLIAMSON:  He means anybody that wasn't
21 listed.  New people.
22     A.  Oh, okay.  So, you're not just talking about
23 just on this.  Are you just talking about all together?
24     Q.  There are half a dozen or eight people listed

156

1  here.  You've also mentioned Nick Resser and --
2      A.  Okay.
3      Q.  -- Jenny Hernandez.  I'm just asking if
4  there's anyone else who has information that has been
5  relayed to you or that you are knowledgeable of regarding
6  conduct alleged in your complaint or discrimination --
7  race discrimination regards to you or others at Walgreens.
8      A.  Did I put -- did I tell you Jackie Banks on
9  there?  I already told you.
10     MR. WILLIAMSON:  Yes.
11     A.  Yes.  No, sir.
12     Q.  That's all of them?  So, we've completely
13 covered now your answer to interrogatory number six?  With
14 what you've supplemented here with your deposition
15 testimony, it's accurate and complete, correct?
16     A.  Yes.
17     Q.  Now, interrogatory number eight asks you to
18 describe and identify the monetary amount of the damages
19 you have allegedly suffered due to discrimination, and you
20 state that you have -- you stand to lose a total of
21 approximately $2.5 million.  And then you go on and
22 estimate that, of this amount, $2 million is wages that
23 will be lost due to the denial of a management position
24 with the company.

157

1      How have you arrived at that figure of $2
2  million?
3      A.  I arrived at that figure because I took the
4  two -- average of Miss Jonland's pay rate, plus her bonus,
5  and Miss Turley, which was just -- not the highest in the
6  district, but the highest in the Bloomington-Normal area
7  and my immediate supervisor who made these comments to me,
8  the racial comments.
9      So, I took their two averages and came out to
10 about 97,000, times'd that by 20.  No raises included, nor
11 vacation included, times that by 20.  Then -- which is --
12 I can't remember exactly what it was.  Then I took
13 2 percent of that because that's what you can put in
14 profit sharing.  And on the average the last couple of
15 years, the matching profit sharing is 3 -- has been $3.27
16 at an annual return of 8.74 percent.
17     So, when I averaged all that out, raises not
18 even included, I just did a flat, what their salaries was
19 this year when I did that, and times'd it out.  And it's
20 roughly at $2 million, $2.1 million.
21     Q.  Okay.  Do you know how much Ms. Jonland earned
22 as the Pontiac store manager in 2004?
23     A.  In 2004?
24     Q.  Yes.

158

1      A.  In 2004, I said $48,000 plus 6.5 -- $6,500
2  bonus.
3      Q.  So, it would be approximately 55,000?
4      A.  55,000.
5      Q.  And how do you know that?
6      A.  Well, when Mr. Palmer approached me about the
7  Western store, he said, As store manager, your base would
8  be $48,000.  That was April 4th.  Miss Jonland had only
9  been a manager since October '03.
10     Q.  So, your assumption was that what Ms. Jonland
11 earned at Pontiac would be about the same as you would
12 have earned at the -- at the Store Number 13 (sic) on
13 Western Avenue if you had accepted that job?
14     A.  I did it off of those figures with Western
15 because -- not Western, but with Pontiac.
16     Q.  But you knew what the Western Avenue salary
17 was going to be for the store manager there, didn't you?
18     A.  No, I didn't know.  I just knew 48 was the
19 base.
20     Q.  You knew that from Mr. Palmer?
21     A.  Yes.
22     Q.  You knew 48 was the base, and there would be a
23 bonus --
24     A.  Yes.

Eric Simple v. Walgreen Co.

---

159

1    Q. -- which you assumed was going to be about
2    $6,000?
3    A. Actually, Western would have been less than
4    that because it's based on sales and increase, and Western
5    sales are lower than Pontiac sales.
6    Q. So, how much would the -- in your estimate,
7    how much would the bonus have been at Western?
8    A. I, I don't know.
9    Q. Less than 6,000?
10   A. If they're based on sales and volume and
11   Peoria's -- I mean, Pontiac store sales are higher and the
12   volume's greater; there's not as much shrink. So, yes,
13   the Pontiac bonus would be more than the Western.
14   Q. And you don't -- do you have any estimate as
15   to how much more it would be than the Western?
16   A. No. And what I went with was a base. So, no.
17   Q. So, you estimated that the base for Pontiac
18   was going to be the same as the Western and that the bonus
19   would be more than it would be at Western, which you
20   estimated at $6,000?
21   A. Right.
22   Q. Now, you've also listed here a lost benefits
23   estimate of 197,000 and future benefits from a profit
24   sharing?

---

160

1    A. Yes.
2    Q. Okay. And how did you calculate that?
3    A. At the 2 percent.
4    Q. Okay.
5    A. This is a breakdown for where the 2 million
6    come from. This is a part of that.
7    Q. Oh, the 197 is a part of the 2 million?
8    A. Yes.
9    Q. Okay. It says out-of-pocket expenses and/or
10   attorney's fees, $25,000 cost to date. What is that
11   25,000? Is that for out-of-pocket costs or attorney's
12   fees?
13   A. Out-of-pocket costs for the attorney. 10,9
14   (sic) for Mr. Jackson and --
15   Q. 10,900?
16   A. Yes. And 7,500 for Mr. Williamson. And
17   that's not any court costs or anything.
18   Q. Okay. And your arrangement with
19   Mr. Williamson, is that on an hourly basis or contingency?
20        MR. WILLIAMSON: Well, we don't have to go
21   into any depth at this point because it's not relevant.
22   The 7500 is based on an hourly rate contract, $250 an
23   hour.
24        MR. SMITH: Okay.

---

161

1        MR. WILLIAMSON: That's not to say there isn't
2    a contingency, but the contingency is irrelevant at this
3    point.
4        MR. SMITH: All right.
5    BY MR. SMITH:
6    Q. Number ten asks you to describe any emotional
7    harm or mental suffering you allege to have suffered
8    through the discrimination occurring on October 2003.
9        MR. WILLIAMSON: The answer in interrogatory
10   number ten was prepared by Mr. Jackson.
11   BY MR. SMITH:
12   Q. Is there -- so, are you saying that's not your
13   answer, Mr. Simple?
14   A. There is some differences in there.
15   Q. Okay. Well, let me ask you first, Have you
16   sought and obtained the services of any counselor or
17   mental health professional?
18   A. Yes.
19   Q. Who is that?
20   A. At Carle Clinic in Bloomington.
21   Q. What type of counseling or mental health
22   support services have you sought?
23   A. Psychiatrist.
24   Q. Psychiatrist?

---

162

1    A. Uh-huh.
2    Q. Who is the -- tell me the name of the
3    psychiatrist.
4    A. I don't have her card on me off the top of my
5    head. I can --
6    Q. Male or female?
7    A. Female.
8    Q. When did you start seeing her?
9    A. I saw her in the summer of '04.
10       MR. WILLIAMSON: You don't know her name?
11       THE WITNESS: I don't have her card. I
12   can't --
13       MR. WILLIAMSON: But I mean you don't remember
14   either?
15       THE WITNESS: I don't remember. Yeah.
16       MR. WILLIAMSON: Would Jennifer remember that?
17       THE WITNESS: Do you remember?
18       MRS. SIMPLE: I may have it at home, but I
19   don't remember her name off the top of my head either
20   because we have several physicians at Carle Clinic; you
21   have pediatrics.
22       MR. WILLIAMSON: Okay.
23   BY MR. SMITH:
24   Q. Is it for counseling?

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

163

1    A. Yes.
2    Q. Okay. Is there any medication that has been
3    prescribed to you?
4    A. No.
5    Q. And you are -- are you continuing to see her?
6    A. No.
7    Q. Okay. When did you stop seeing her?
8    A. Toward the beginning of the fall I stopped
9    seeing her, I think.
10   Q. Fall of this year or last year?
11   A. Fall of last year.
12   Q. So, you started seeing the psychiatrist who
13   you do not recall the name of in the summer of '04 and
14   stopped seeing her in the fall of '04?
15   A. Yes.
16   Q. So, how many appointments?
17   A. I think we had three or four sessions.
18   Q. Why did you stop seeing her?
19   A. Because she told me that I was doing the right
20   thing, as long as I felt good about what I was doing and
21   if I felt what I was doing was right and the steps that I
22   had took and the procedures that I had used was the right
23   way to do things. I didn't lose my cool at work, although
24   it was frustrating and hard to go to work at times,

---

164

1    knowing that, you know, people are looking at you and
2    thinking that, Man, what's wrong with Simple? Why he
3    can't get a store?
4         And hearing things like, I can pass
5    Mr. Simple, or, Mr. Simple's never going to get a store.
6    Then you hear things. People asking you, "How many stores
7    you turn down?" as if there were so many. So, it was --
8    it was pretty hard and frustrating. But she said I was
9    dealing with it in the right way.
10        MR. WILLIAMSON: Why don't you send a medical
11   authorization. Even if they can't think of the name right
12   now, you can just simply make it to the Carle Clinic,
13   Mr. Simple will sign that and you can obtain it, the
14   records.
15        MR. SMITH: Okay.
16   BY MR. SMITH:
17   Q. Was it a referral that was made to the
18   psychiatrist from another physician, or did you just call
19   up Carle Clinic and ask to make an appointment with a
20   psychiatrist?
21   A. I called Carle Clinic to make an appointment.
22   Q. Was it -- the reason you did that was in
23   connection with a particular problem you were suffering?
24   A. Yes.

---

165

1    Q. And what was the problem that caused you to
2    see the psychiatrist?
3    A. I felt humiliated. I felt all sense of worth,
4    I had lost it. I felt that it was a slap in the face
5    because, unfortunately, we've become prisoners of our own
6    experience. And I didn't -- to me, discrimination was
7    what my father had told me, what he had talked about, and
8    I didn't experience that. So, when this happened it was
9    like, whoa.
10        MR. WILLIAMSON: And let me make another
11   comment. Since I was not Mr. Simple's attorney when the
12   production request was responded to or the interrogatories
13   were responded to, I did not have an opportunity to
14   designate this person as an expert witness, and I would
15   now reserve that opportunity pending your obtaining the
16   medical records and my further discussions with
17   Mr. Simple.
18        MR. SMITH: Okay.
19        MR. WILLIAMSON: And if that necessitates a
20   further discovery response, I will make it. This matter
21   has been simply overlooked up until this point in time.
22   BY MR. SMITH:
23   Q. Was the -- your decision to consult with a
24   psychiatrist, was that specifically in regard to your not

---

166

1    receiving the Pontiac store manager's job, or was it
2    something that was -- that occurred after that?
3    A. It was specifically based on what was said to
4    me and me being told that because of who I am, I'm not
5    good enough for something.
6    Q. Because of your race?
7    A. Yes, something I can't change.
8    Q. Are you seeking in this lawsuit to receive a
9    store manager's position?
10   A. No.
11   Q. Even if Walgreens came to you and said, "We
12   have a store manager's position open" you are not
13   interested in it?
14        MR. WILLIAMSON: He didn't say that.
15        MR. SMITH: Okay.
16        MR. WILLIAMSON: I explained to him that a
17   judge cannot realistically order Walgreens to designate a
18   store for Mr. Simple. We don't expect that as a remedy,
19   equitable or otherwise, and I'm sure that's the way (sic)
20   he's responding the way he is. I mean, he doesn't want to
21   speculate on what future offers would be coming down the
22   pike and how he would respond.
23   BY MR. SMITH:
24   Q. Well, I don't know if that's an objection to

---

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

167

1  the form of the question, but in any event, what I'm
2  asking is what is it you -- are you -- would you accept a
3  position as a store manager's job from Walgreens?
4       A.  No.
5       Q.  You would not?
6       A.  No.
7       Q.  Why not?
8       A.  First of all, after Walgreens has
9  discriminated against me, made me feel -- lose my
10 self-esteem and self-worth and only characterize me as
11 being good enough for certain stores, I have no desire to
12 put forth that effort that it takes to be a store manager.
13      Yes, I will admit it takes a great deal and a
14 great effort to be the store manager, which I was willing
15 to do.  I didn't want Walgreens to hand me something.  I
16 had deserved the right to be offered something.  And I
17 also had deserved the right from my experience, my
18 education, to have options which I exercised.
19      So, at this point, yes, I'm still willing to
20 work for Walgreens.  I love what Walgreens has done for me
21 and my family.  I love my job.  Walgreens is a great
22 company.  But Walgreens has some diversity issues that
23 need to be addressed from their hiring practices, their
24 promoting practices, their interviewing practices.  I

---

168

1  mean, Walgreens is a Fortune 500 company that lets one man
2  or female make a decision.  That alone leaves for
3  subjective biases and discriminatory or racial or sexual
4  issues when making a decision for a job as -- that details
5  as much responsibility as a store manager.
6       So, yes, I still would like to work at
7  Walgreens.  I've invested 11 years with Walgreens.  My
8  performance speaks for itself.  My attendance speaks for
9  itself.  And even after this situation on the shift that
10 I'm on, I'm continuing to work.  I'm continuing doing the
11 job.  In fact, I have trained managers still in the
12 position that I am in.
13      So, yes, I would still like to work for
14 Walgreens, but at this point I don't have the desire, the
15 drive to give what it takes to be a store manager.  And is
16 that fair to Walgreens?  No.  And it's definitely not fair
17 to Mr. Simple.
18      Q.  And the reason that you do not want to work as
19 a store manager or even apparently be considered for
20 employment as a store manager is because of what; the --
21      A.  Everything that has happened.
22      Q.  Everything that we've talked about as far as
23 what you consider to be --
24      A.  Everything that has happened.

---

169

1       Q.  -- racial discrimination?
2       A.  Racial discrimination.
3       MR. WILLIAMSON:  He's speaking at this point
4  in time, of course.
5       A.  At this point in time, yes.
6       Q.  Well, by your attorney's statement there, does
7  that assume that at some point in the future you may
8  decide that you want to be considered for a store
9  manager's position?
10      A.  At some point in time?
11      Q.  Yes.  Are you saying now the way you're -- the
12 way that you feel now, No, I don't think I ever want to be
13 considered for a store manager's position?
14      A.  If and when I see changes being made and
15 progress, which I have started to see, as for instance
16 this year, Mr. Palmer went around and gave every EXA their
17 evaluation.  As you see, mine here is just signed and
18 dated.
19      There's now a posting, online posting for
20 upper management positions, store manager's job.  I see
21 those changes being made.
22      Yes, if changes are made to correct the
23 diversity problem that Walgreens has, some issues that
24 they have, yes, I probably would possibly want to continue

---

170

1  and give back -- and give that effort that it takes to be
2  a store manager.
3       Q.  I'm sorry.  I didn't mean to cut you off
4  there.
5       A.  And you say if Walgreens offered me a store
6  manager position now.  As one of our famous presidents
7  said, The time to fix the roof is when it's not raining.
8  If Walgreens comes to me about a store now, I feel like
9  they're just trying to fix the roof after the rain.
10      Q.  When was it that you decided that you did not
11 want to work or be considered -- not to work as a store
12 manager or be considered for employment as a store manager
13 of Walgreens?
14      A.  Probably during the summer of last year.
15      Q.  2004?
16      A.  2004.
17      MR. WILLIAMSON:  Do you want to take five
18 minutes, touch base with my secretary before she leaves?
19      MR. SMITH:  Yes, let's take five minutes.
20      (Whereupon, a recess was taken.)
21 BY MR. SMITH:
22      Q.  Mr. Simple, I'm going to hand you Deposition
23 Exhibit Number 10, and this is a couple of e-mails, but --
24 maybe three e-mails all together here.  I'm not sure.  But

---

Eric Simple v. Walgreen Co.

---

171

1   I want to direct your attention to the part of the e-mail
2   -- and I'll draw a square around it -- that starts out,
3   Thank you, Mr. Palmer, for the personal e-mail.
4           And is that an e-mail addressed to Mike Palmer
5   from yourself?
6       A.  Yes.
7       Q.  Okay.  And the date at the top above what I've
8   circled there is 10/13/2004, 5:13 p.m.  The Subject, Re:
9   Promotional opportunity.
10          Did you write that middle portion, that first
11  paragraph that starts, Thank you, and the last line is,
12  Service is in our priority (sic)?
13      A.  Starting where you say?
14      Q.  Starting here.  Let me point it out to you.
15  Starting here, going down to that last line that ends,
16  "Service is our first priority."
17      A.  Right.
18      Q.  Okay.  Did you write that part?
19          MR. WILLIAMSON:  I continue to be confused by
20  the way you've done e-mails.  It looks to me like
21  Walgreens has taken e-mails they want together and put
22  them together.  And so when we get to an exhibit like
23  this, you're referring to 10/13/04 at the top, and I guess
24  this must be Mr. Palmer's response, yet his response

---

172

1   doesn't have the dates on it.  They've been intentionally
2   taken out.  Nor do they have the To and From portion.  And
3   it -- we've done this several times now.
4           I guess Mr. Simple can answer the portion of
5   the e-mail that he sent, but it's disturbing as an
6   exhibit.  Of course, it wouldn't be admissible in the
7   format that it's in.
8           THE WITNESS:  I didn't send it on the 10/13,
9   though.  But I didn't send this on 10/13.
10          MR. WILLIAMSON:  That goes without saying
11  because there's another e-mail at the top of the page.
12  BY MR. SMITH:
13      Q.  The only part I'm asking about is, as you
14  know, e-mails sometimes when they get forwarded on and
15  added comments to.  Let me see if I've got anything.
16          MR. WILLIAMSON:  Even on top, see, the dates
17  are all there.  It's only the bottom one that deletes the
18  dates and time.
19  BY MR. SMITH:
20      Q.  What I'm asking about, Mr. Simple, is one -- I
21  think actually maybe I cut it off here.  I think the date
22  of -- I would assume, tell me if I'm wrong -- the date of
23  your e-mail to Mr. Palmer is 10/13/2004?
24      A.  No.

---

173

1       Q.  That's not your e-mail date?
2       A.  Huh-uh.
3       Q.  Okay.  Did you -- the part there that says --
4   what's that?
5       A.  I don't think it is.  I --
6       Q.  Okay.  The part that says, "Thank you,
7   Mr. Palmer, for the personal e-mail.  I must say I'm very
8   surprised and pleased at the same time to see that you now
9   have an interview process to help you select store
10  managers when there is an open opportunity.  Of the nine
11  years that I've been with Walgreens, I have not know you
12  to open up an interview process like this.  This pleases
13  me to see your district making changes.  I, however, will
14  not be putting my name in the hat because I'm not willing
15  to relocate to Kankakee as I was not willing to do so in
16  November of 2001.  I also told you in our last meeting
17  after that after what had be stated to me about another
18  promotion opportunity (and why I was the right choice), I
19  was not interested in being a store manager at this point
20  in my career.  Thanks for the consideration.  Sorry this
21  is a few minutes late but as you are aware Mr. King is on
22  vac" -- vacation, I assume?
23      A.  Uh-huh.
24      Q.  -- "and I'm the only manager here tonight and

---

174

1   customer service is our first priority."
2           Okay.  Is that what you wrote to --
3       A.  Yes.
4       Q.  -- Mr. Palmer?
5       A.  Yes.
6       Q.  And was that about or on October 13, 2004?
7       A.  Yes.  I -- yes, it was late in '04.  I don't
8   know exactly.
9       Q.  Okay.  And the -- your reference there to
10  saying that you're not willing to relocate to Kankakee,
11  was that in connection with the Court Street store in
12  Kankakee?
13      A.  Yes.
14      Q.  Okay.  So, you were being offered either an
15  opportunity to be considered for that position or that
16  position, one or the other?
17      A.  Yes, the same store --
18      Q.  You turned it down in 2001?
19      A.  2001.  That's the same store with the same
20  socioeconomic makeup, which is pretty much catering to a
21  black neighborhood.
22      Q.  You were turning it down in 2004, October
23  of 2004, correct?
24      A.  I was turning down the opportunity to put my

---

## Eric Simple v. Walgreen Co.

### 175

1  name in the hat for the interview. I wasn't offered this
2  store.
3      Q. All right.
4      MR. WILLIAMSON: Mr. Smith, I'm not suggesting
5  anything untoward, but apparently Mr. Palmer is sending
6  this e-mail the same day because he says, I want you to
7  respond by 5:00.
8      MR. SMITH: Right.
9      MR. WILLIAMSON: So, he does respond at 5:13,
10 and I'm just -- I mean, there is no date on the bottom
11 e-mail, and I guess we're going to have to surmise that.
12     MR. SMITH: Right. And I will go back and see
13 if I can find one that has a date of Mr. Palmer's e-mail
14 to Mr. Simple.
15 BY MR. SMITH:
16     Q. But now in the part that you said you wrote
17 here, there's a reference to, "I also told you in our last
18 meeting that after what had be stated to me about another
19 promotion opportunity" --
20     A. That's the time.
21     Q. Okay. What is the other -- "another promotion
22 opportunity"? What was that?
23     A. The Pontiac store.
24     Q. Okay.

### 176

1      A. About race being a factor.
2      Q. Let me read this again. It says, "I also told
3  you that in our last meeting that after what had be stated
4  to me about another promotion opportunity (and why I was
5  the right choice)" --
6      A. That's supposed to be, "I also stated to you
7  in our last meeting what has been stated to me before
8  about another promotional opportunity," which was the
9  Pontiac store. The meeting in reference is the September
10 the 2nd meeting with myself, Mr. Palmer, Mr. Scott and
11 Mr. King when Walgreens came back with their findings of
12 the investigation about the statements -- the racial
13 statements made to me by Miss Turley.
14     That's when they came back and said yes --
15 Mr. Scott actually started the meeting saying, Yes, we
16 found out that Miss Turley said something similar to that
17 -- to that nature.
18     Q. Okay.
19     A. And in that meeting, I -- Mr. Palmer cut
20 Mr. Scott off and said, Yes, it was just a stupid,
21 ignorant comment.
22     And in that meeting I asked, Was there any
23 disciplinary action taken?
24     Mr. Palmer said, Well, of course, we don't

### 177

1  take people out back and shoot them in the head for making
2  comments like that, but she was written up and coached.
3      Q. Okay.
4      A. In that meeting, we continued to talk more
5  about the overnight position, and Mr. Palmer said, you
6  know, I'd really like to see you stay as an EXA.
7      And I said, I know I can do the job; I'd do it
8  well. But after what's been said to me and done to me in
9  the Pontiac store, and you continuing to approach me with
10 opportunities of the same nature, that only shows that I'm
11 good enough for a black neighborhood. You only view me as
12 a good black store manager, not a good manager. And every
13 time these opportunities come up, they the same three that
14 I have discussed and pointed out over and over that I
15 would be offered for.
16     Here again, we were back at the Court Street
17 store. And all those opportunities -- operations, should
18 I say, consist of the same makeup, the same meaning which
19 clearly shows to me at this point that I'm viewed for just
20 this type of store. I'm viewed for being a good fit for
21 this environment.
22     Q. That in your view is a black store is what
23 you're saying?
24     A. Yes. Lower socioeconomic stores with higher

### 178

1  African-American clientele.
2      Q. Okay. Now, in your reference here to "why I
3  was the right choice," is that a reference to why you --
4  in your view, you were the right choice for the Pontiac
5  store?
6      A. I meant this to be why I wasn't the right
7  choice.
8      Q. Oh, why I wasn't the right choice?
9      A. I was trying to type this because it's
10 already --
11     MR. WILLIAMSON: He still wants to know if
12 that's reference to the Pontiac store.
13     A. Yes. Why I wasn't the right choice.
14     Q. You meant to say "why I was not the right
15 choice"?
16     A. Yes. I was trying to get it in because it was
17 already late.
18     Q. One of the -- it sounds as though one of your
19 underlying beliefs is that the stores that you feel you
20 were being limited to, the three stores that you've
21 mentioned, North Main, Normal, Western -- what was the
22 third -- and the Court Street store in Kankakee, that
23 these were -- had a large African-American population in
24 their customer base, correct?

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

179

1      A.  Yes.
2      Q.  That's your assumption?
3      A.  That's not only mine, that's Walgreens'.
4      Q.  And is it your belief that they are also
5   low-income stores in terms of what the manager or, for
6   that matter, the EXA could make in terms of bonus?
7      A.  That's not my belief.  These are all documents
8   and facts in Walgreens' operating statement.  You can see
9   the sales, the volumes.  That's not a belief.  That's a
10  fact.  The numbers are on paper.
11     Q.  I'm saying, yes -- this is evidence that you
12  believe you have based on the facts, the papers, documents
13  that you have seen?
14     A.  Yes.
15     Q.  When I say "belief," I'm not saying it's
16  incorrect or anything.  I'm just saying, this is what you
17  believe based upon what evidence you have reviewed?
18     A.  Yes.
19     Q.  Okay.  Going back now, you said there was a
20  meeting on September the 2nd, 2004, between yourself,
21  Mr. Scott from Loss Prevention at Walgreens?
22     A.  Yes.
23     Q.  Miss Turley?
24     A.  No.

180

1      Q.  She was not there?
2      A.  Mr. King.
3      Q.  Mr. King?
4      A.  Those four, the same four who had the prior
5   meeting in August.
6      Q.  And Mr. -- was Mr. Palmer there?
7      A.  Yes.
8      Q.  Okay.  And this meeting was in connection with
9   your discussions with Mr. Palmer or Mr. Scott --
10     A.  Yes, about the --
11     Q.  -- about your not getting the Pontiac store?
12     A.  About the racial statements made to me.
13     Q.  And the racial statements made by Miss Turley?
14     A.  Miss Leanne Turley, yeah.
15     Q.  What was said in that meeting on September 2,
16  2004, and by whom?
17     A.  Mr. Scott started off the meeting by saying
18  that he had performed an investigation.  Yes, he had found
19  out that Miss Turley remembers saying something to that
20  nature, remembered that conversation.  She didn't remember
21  it to the extent of what she said, but she remembered
22  saying it, something to that nature.  And pretty much her
23  reason for saying it was that she knew I was upset and
24  hurt that I didn't get the Pontiac store.  So, she was

181

1   saying it in an effort to console me.  So --
2         MR. WILLIAMSON:  You said in September.  I
3   thought the Pontiac job didn't come up until October.
4         THE WITNESS:  It came up in October '03, but
5   finally --
6         MR. WILLIAMSON:  Oh.
7         THE WITNESS:  -- in September of '04 an
8   investigation.
9         MR. WILLIAMSON:  It's getting late myself.
10     A.  And also in that meeting, I asked Mr. Palmer,
11  after he stated that she made -- it was an idiot comment,
12  stupid comment, and we don't take people out back for
13  saying that, I asked him why would a store manager that I
14  worked so closely with and had been a store manager in the
15  district so long say something like that.
16     Q.  What did he say?
17     A.  He said, I don't know.  Like I said, stupid,
18  unprofound (sic) comment.
19     Q.  I didn't make copies of this, Mr. Simple, but
20  this, I believe, is -- it's marked as Deposition Exhibit
21  Number 11.
22         Is that the charge of discrimination that you
23  filed with the EEOC on about -- I believe the date of your
24  signature is February 12, 2004?

182

1      A.  That's my signature, yes, but that's -- the
2   way I typed it, yes.
3      Q.  I can't make out the date there.  Is that
4   sometime in February?  February something?
5      A.  Looks like 12th, it's stamped.
6      Q.  Did you file this in person or --
7      A.  Yes.
8      Q.  All right.  You went to the EEOC office in
9   Chicago?
10     A.  Yeah.
11     Q.  Okay.  Was there ever an amended charge of
12  discrimination, or did you file another charge of
13  discrimination with the EEOC?
14     A.  No.
15     Q.  Have you ever been in Mr. Palmer's office in
16  Peoria?
17     A.  Yes.
18     Q.  When were you in Mr. Palmer's office?
19     A.  November the 14th, 2001.
20     Q.  Why were you in his office on November 14,
21  2001?
22     A.  That was the first time for the Court Street
23  store.
24     Q.  Did he ask you to come to his office at that

Knight Reporting Service, Ltd.
309-637-0700

183

1 time?
2   A. His secretary called me.
3   Q. What did she say?
4   A. "Mr. Palmer wants to see you, Mr. Simple, in
5 the office."
6   Q. Okay. And at that time, it was the Kankakee
7 store or the Court Street store in Kankakee? Was that the
8 position that was offered to you?
9   A. That was the operation that was offered to me.
10   Q. Where were you working at that time of that
11 offer, November 14, 2001?
12   A. Oakland Avenue store in Bloomington.
13   Q. Did you discuss that offer with the store
14 manager at the Oakland Avenue store, the offer of the
15 Court Street in Kankakee store?
16   A. Discuss that offer?
17   Q. Yes. Did you tell the store manager at the
18 Oakland Avenue store that you had been offered the Court
19 Street store in Kankakee?
20   A. No. Not -- that day?
21   Q. Or about that time, within a few days of it.
22   A. Yes. He knew.
23   Q. Okay.
24   A. He probably knew I was going to be offered

184

1 that store before I did.
2   Q. Is that usually the way it has worked, that
3 the store manager where an EXA is employed is informed
4 that the EXA is going to be offered a position?
5   A. I wouldn't know for sure because, as I stated
6 earlier, I'm not a store manager, never have been. So, I
7 don't know exactly how Mr. Palmer's store managers speak
8 with each other.
9   Q. At the time you sought the night manager's
10 position, you were working at the Main Street store in
11 Bloomington, correct?
12   A. Yes.
13   Q. And your manager there was Mr. King?
14   A. Yes.
15   Q. Now, in going to the overnight manager's
16 position, you were -- in 2004, December 2004, you were
17 going to the position -- to a position in the store that
18 was managed by Miss Turley, correct?
19   A. Yes.
20   Q. Did you have reservations about going to work
21 for Ms. Turley in view of your prior experience with her?
22   A. No.
23   Q. Did you feel that Ms. Turley would be fair
24 with you as a store manager?

185

1   A. Well, in that particular situation, in that
2 position, I wouldn't have to see Ms. Turley that much.
3 Ms. Turley works 8 to 5, 5:30. I'm gone at 8, 8:30. I
4 don't come in till 10. So, I was there to do my job and
5 handle my responsibility and move on.
6   Q. She would be the person who would be doing
7 your performance reviews, though, correct?
8   A. Yes.
9   MR. SMITH: I have no other questions other
10 than I do wish to keep open the possibility of resuming
11 Mr. Simple's deposition in the event that the records from
12 Carle Clinic disclose information that we may want to ask
13 him about. But as I think you've indicated,
14 Mr. Williamson, we don't have -- through oversight, we
15 don't have those records so I can't ask him about them.
16   MR. WILLIAMSON: Is that Ms. Turley's two-page
17 statement?
18   MR. SMITH: One-page statement. There doesn't
19 seem to be a second page.
20   MR. WILLIAMSON: You never found the second
21 page?
22   MR. SMITH: Never found the second page. You
23 can inquire of witnesses about that, but --
24   MR. WILLIAMSON: Yes. I have a couple

186

1 questions.
2     CROSS-EXAMINATION
3 BY MR. WILLIAMSON:
4   Q. With respect to the Plainfield position, in
5 your experience at Walgreens, are management persons often
6 offered a position out of their district?
7   A. No.
8   Q. And do you know why that is?
9   A. Well, one is because to be in another district
10 -- district managers have seen those EXAs or those
11 assistants' performance up-personal, has pretty much
12 worked with them and watched them grow. So, there is not
13 any instances that I'm aware of where a district manager
14 will come and pull another EXA out of a market for a
15 store.
16   Q. And that's been true throughout the time
17 you've been at Walgreens?
18   A. Throughout the time. Back --
19   Q. Even after Walgreens started the policy of
20 posting for positions on April 1st, 2004?
21   A. When they started posting, that's up to that
22 EXA to post out, not for a manager to come in and pull him
23 out -- a district manager, should I say. The EXA has
24 to feel like he or she wants to relocate to that market.

Eric Simple v. Walgreen Co.

187

1 And then they take the steps to post out to another
2 district.
3 Q. Now, we spoke of the two stores in Peoria
4 between 2001 and 2005. Was there a third store on
5 Knoxville that you were interested in that Walgreens
6 operated?
7 A. Yes. And. in fact, like I stated earlier, any
8 store in Peoria I would have been interested in if
9 approached about it.
10 Q. But the store on Knoxville, do you know that
11 store number or address?
12 A. That's Store 3181 on Knoxville Avenue.
13 Q. That's relatively close to downtown, if I
14 recall?
15 A. Correct.
16 Q. There may be one on North Knoxville. This is
17 the one that would be six to eight blocks from downtown
18 Peoria?
19 A. Yes, on the left-hand side. Yeah.
20 MR. SMITH: Knoxville and McClure, I think.
21 BY MR. WILLIAMSON:
22 Q. That's probably quite close, Knoxville and
23 McClure.
24 A. Yes.

188

1 Q. Do you recall that?
2 A. Yes.
3 Q. Did that store come open for a manager's
4 position between 2001 and 2005?
5 A. In fact, that store became open in April '04.
6 But what happened was the Canton store manager was brought
7 in to that store, and the Western Avenue store manager
8 left that store and went out to Canton, which made Western
9 available in April for Mr. Palmer to approach me with.
10 Q. Were you ever asked about your availability
11 then for the store on Knoxville at any point in time,
12 whether it was April of 2004 or going back to 2001?
13 A. No.
14 Q. Is that a store that you're familiar with in
15 terms of the numbers?
16 A. Yes.
17 Q. In terms of their production?
18 A. Yes.
19 Q. Is that a store that would have met your
20 criteria throughout the period of time between 2001-2005
21 as to necessity of relocation, socioeconomic background,
22 the customer base, shrinkage rates and other things you've
23 talked about?
24 A. Yes.

189

1 Q. In other words, if you had been offered that
2 store, would you have taken it?
3 A. Yes.
4 Q. For that matter. if you had been offered the
5 Pontiac store, would you have taken it?
6 A. Yes.
7 Q. Are there any other stores between the period
8 of time of 2001 and 2005 that you would have taken had
9 they been offered to you other than the three that we've
10 discussed that you didn't want?
11 A. The Oakland Avenue store became open in 2001
12 of October, when Mr. Ken Hadley retired.
13 Q. And would you have taken that store?
14 A. Yes.
15 Q. And was it offered to you?
16 A. No.
17 Q. And as I understand it, up until the time that
18 the Plainfield store became open, you simply didn't know
19 of the openings because there was no ability within
20 Walgreens to understand which stores were open; is that
21 correct?
22 A. Correct, yes.
23 Q. And it's only after the posting procedure
24 became operative on April 1st of 2004 that you would know

190

1 in advance when a store opening became available?
2 A. Yes. And even with that, you have to go in
3 the computer and pull it up yourself. It's not like it's
4 posted out on there and put on a bulletin board or
5 anything. You would have to do the research yourself.
6 Q. Am I pronouncing this name correctly, Dave
7 Latimore?
8 A. Gloudemans? Is that Dave Gloudemans?
9 Q. Latimer?
10 A. Gloudemans.
11 Q. Oh, Gloudemans. With a G?
12 A. Yes.
13 Q. What is his position with Walgreens?
14 A. As before the time when these events were
15 occurring, he was Mr. Palmer's Regional VP.
16 Q. So, the reason you contacted him was that he
17 was a person directly over Mr. Palmer?
18 A. Yes.
19 Q. Mr. Smith asked you earlier about any internal
20 EEO procedures at Walgreens. Were you aware of such an
21 internal procedure?
22 A. No.
23 Q. Are you aware of one today?
24 A. No.

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

191

1    Q.  Is there some requirement or understanding in
2  your mind that you go to a particular person at Walgreens
3  to present complaints of discrimination?
4    A.  The open-door policy, which is you go to your
5  immediate supervisor, which at the time was --
6    Q.  Open door covers every different problem,
7  doesn't it?
8    A.  Every different problem.
9    Q.  With respect to discrimination problems within
10  Walgreens, is there any format or process that you're
11  aware of that you're supposed to make complaints about
12  discrimination within the Walgreens structure itself?
13    A.  The only open-door policy and 1-800 Loss
14  number which is the same thing. That's it.
15    MR. SMITH:  I'm sorry.  What was that, 1-800?
16    A.  1-800 No Loss, which is basically loss
17  prevention specialists.
18  BY MR. WILLIAMSON:
19    Q.  When you referred in the EEOC correspondence
20  to the Walgreens human rights department, what were you
21  referring to?  Where was the human rights department?
22    A.  The human resource department.
23    Q.  Human Resources.  I'm sorry.
24    A.  That's in the open-door policy, which is the

193

1  that position, is that a store that is not predominantly
2  African-American or has a -- does not have a large
3  African-American customer base?
4    A.  That's not in my district, so --
5    Q.  You don't know?
6    A.  -- I wouldn't know.
7    Q.  Okay.  When you went through the training for
8  promotion to EXA, the classes that you took and passed,
9  was -- I think you had testified that a part of that
10  training was for harassment, correct?
11    A.  Yes.
12    Q.  Was there also a part of that training for
13  discrimination claims?
14    A.  All the harassment charges fall in the same
15  thing, hostile work environment, yes.
16    Q.  All right.  And I think you said that --
17  something about in response to Mr. Williamson's questions
18  that people who had claims of harassment or hostile work
19  environment were to call 1-800 No Loss?
20    A.  I didn't say they were to claim.  I said
21  that's another option along with the open-door policy.
22    Q.  Oh, okay.  Is to call that number?
23    A.  You can.
24    Q.  And is that the -- that is an option that is

192

1  store manager, the district manager, regional, vice
2  president, senior operation VP, then at the very top is
3  Human Resources.  But I couldn't even get past the third
4  choice, who never returned my call.
5    Q.  Did Mr. Palmer ever give you any further
6  explanation as to why he had picked Mr. -- Ms. -- excuse
7  me for mispronunciation -- Jonland other than her
8  marketing skills?
9    A.  No.
10    Q.  In the evaluations that are done, three of
11  which were marked today, is there a specific reference to
12  marketing skills?  I think that would be 6, 7 and 8.  I
13  have run through the exhibits quickly, and I see no
14  reference to marketing process, skills or procedures in
15  any way.
16    A.  Huh-uh.
17    Q.  Is that the way you view the document?
18    A.  Yes.
19    MR. WILLIAMSON:  I think that's all I have
20  right now.
21    REDIRECT EXAMINATION
22  BY MR. SMITH:
23    Q.  In regard to the Plainfield Walgreens store
24  that you were -- was discussed with you about applying for

194

1  available to people, correct?
2    A.  That's an outside option.
3    Q.  When you say "outside option," what do you
4  mean?  Is that -- it's still within Walgreens, isn't it?
5    A.  No, that's the number you can use for
6  Walgreens, but that number is called -- is to keep your
7  identity not being disclosed.  There's no need for me to
8  keep my identity closed -- in closure.
9    Q.  Okay.  You've testified that Mr. Scott --
10  Martise Scott from the Loss Prevention of Walgreens
11  eventually came and interviewed you, interviewed
12  Miss Turley.  Was that as a result of a call that you had
13  made?
14    A.  I certified -- I sent Mr. Palmer a certified
15  letter in July after the fact.  And like I said, no one in
16  the district office, not Mr. Palmer or his secretary, not
17  Mr. Gloudemans, Mr. Palmer's boss, anyone seemed to have
18  any concern about my concerns, comments, and statements.
19    So, I sent Mr. Palmer a certified letter in
20  July, saying that I wanted to talk to him about concerns I
21  had with what had been done to me, what had been said to
22  me.  I had concerns with my evaluation of '03 and '04, the
23  differences in those two, and why was there such a great
24  difference.  And I said I didn't feel like Mr. King should

Eric Simple v. Walgreen Co.

Eric Simple
11/29/2005

---

**195**

1  give me that evaluation because Mr. King wasn't the one
2  who did the evaluation, although I was in his store at
3  that time.
4  　　And also at that time I had e-mailed
5  Mr. Palmer a couple times about concerns and maybe meeting
6  with him about my future, and several times Mr. Palmer
7  told me that he was unable to meet with me at that time
8  but continue performing at my operational standards, which
9  I did.
10  　Q.  I hand you Deposition Exhibit Number 12.  Is
11  that the letter you just referred to, I think the letter
12  that you sent to Mr. Palmer?
13  　A.  Yes.
14  　Q.  The letter is dated July 7, 2004.  Is that
15  your signature at the bottom of the letter?
16  　A.  Yes.
17  　　MR. WILLIAMSON:  Did I lose track of 11?
18  　　MR. SMITH:  No, I didn't make you a copy of
19  11. That's the charge of discrimination here.
20  　　MR. WILLIAMSON:  Oh, right.
21  BY MR. SMITH:
22  　Q.  And the – were you satisfied with the
23  investigation that Loss Prevention had done and that
24  Mr. Scott had done?

**196**

1  　A.  No.
2  　Q.  In what way were you not satisfied?
3  　A.  Well, I didn't – only thing I was given was
4  that brief briefing that they gave me.  I didn't see what
5  the investigation detailed; I didn't see what
6  Miss Turley's comments were; I didn't see any disciplinary
7  actions given to Miss Turley.  I was only told what they
8  were.  I had no idea that others were investigated and how
9  many others were investigated.  I didn't know how many had
10  stated that they knew or didn't know.  So, no, I wasn't
11  100 percent satisfied with the investigation.
12  　　I was happy to an extent that, after nine
13  months, something was finally done, at the force of my
14  hand by sending a certified letter.
15  　　MR. SMITH:  I have no further questions at
16  this time.
17  　　MR. WILLIAMSON:  Okay.
18  　　COURT REPORTER:  Signature?
19  　　MR. WILLIAMSON:  We'll waive signature.
20  　　(Whereupon, the deposition was concluded at
21  4:40 p.m.)
22
23
24

**197**

1  STATE OF ILLINOIS :
2  　　　　: SS
3  COUNTY OF TAZEWELL :
4
5  　　I, Jennifer E. Johnson, CSR, RMR, CRR, and
6  Notary Public in and for the County of Tazewell, State of
7  Illinois, do hereby certify that pursuant to notice, there
8  came before me on the 29th day of November, A.D. 2005, at
9  411 Hamilton Boulevard, Suite 1932, Peoria, Illinois, the
10  following named person, to wit:
11  　　　　ERIC D. SIMPLE,
12  the plaintiff herein, called by the defendant, who was by
13  me first duly sworn to testify to the truth and nothing
14  but the truth of his knowledge touching and concerning the
15  matters in controversy in this cause, and that he was
16  thereupon carefully examined upon his oath, and his
17  examination reduced to shorthand by means of stenotype and
18  thereafter converted to typewriting using computer-aided
19  translation by me.
20  　　I also certify that the deposition is a true
21  record of the testimony given by the witness, and that the
22  reading and signing of the deposition by the said witness
23  was expressly waived.
24  　　I further certify that I am neither attorney or

**198**

1  counsel for nor related to or employed by any of the
2  parties to the action in which this deposition is taken,
3  and further that I am not a relative or employee of any
4  attorney or counsel employed by the parties hereto or
5  financially interested in the action.
6  　　In witness whereof, I have hereunto set my hand
7  and affixed my notarial seal this 14th day of December,
8  A.D. 2005.
9
10
11
12
13
14
15  Jennifer E. Johnson, CSR, RMR, CRR
16  Illinois CSR #084-003039
17
18
19
20  　　"OFFICIAL SEAL"
21  　　JENNIFER E JOHNSON
22  NOTARY PUBLIC STATE OF ILLINOIS
23  COMMISSION EXPIRES 05/08/09
24

Knight Reporting Service, Ltd.
309-637-0700