1:04-cv-01305-MMM-JAG    # 48-4    Page 1 of 28

**Eric Simple v. Walgreen Co.**

E-FILED
Friday, 28 July, 2006 Leanne Turley 03 PM
Clerk, U.S. District Court, ILCD
11/30/2005

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

ERIC D. SIMPLE,                    )        **COPY**
                                   )
            Plaintiff,             )
                                   )
      -vs-                         )   Case No. 04-1305
                                   )
WALGREEN COMPANY, an Illinois      )
Corporation,                       )
                                   )
            Defendant.             )


    THE DEPOSITION of LEANNE TURLEY, a witness herein,

called by the Plaintiff for examination in the

above-entitled cause, pursuant to the provisions of the

Federal Rules of Civil Procedure and the Rules of the

Supreme Court thereof, taken before Jennifer E. Johnson,

CSR, RMR, CRR, License No. 084-003039, a Notary Public in

and for the State of Illinois, at 411 Hamilton Boulevard,

Suite 1926, in the City of Peoria, County of Peoria, and

State of Illinois, on the 30th day of November, A.D. 2005,

commencing at 10:09 a.m.

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

2

```
 1     APPEARANCES:

 2

       NILE J. WILLIAMSON, ESQUIRE
 3     Attorney at Law
       411 Hamilton Boulevard, Suite 1926
 4     Peoria, Illinois  61602
       (309) 677-5950
 5          On Behalf of the Plaintiff.

 6

       HINSHAW & CULBERTSON, L.L.P.
 7     BY:  L. LEE SMITH, ESQUIRE
       Attorney at Law
 8     456 Fulton Street, Suite 298
       Peoria, Illinois  61602
 9     (309) 674-1025
            On Behalf of the Defendant.

10

11     ALSO PRESENT:

12

       RACHEL B. ABLIN, ESQUIRE
13     Senior Attorney
       Walgreen Co.
14
       Michael A. Palmer
15
       Eric Simple
16
       Jennifer Simple
17

18

19

20

21

22

23

24
```

Knight Reporting Service, Ltd.
309-637-0700

Eric Simple v. Walgreen Co.

**3**

1                    I N D E X
                                    PAGE
2      WITNESS:
3         LEANNE TURLEY
4            Direct Examination by Mr. Williamson    4
5
6
7
8
9      EXHIBITS:
10        TURLEY 1                31
             (EXA Performance Review, 2003)
11        TURLEY 2                40
             (EXA Performance Review, 3/16/04)
12        TURLEY 3                51
             (Voluntary Statement by L. Turley)
13        TURLEY 4                67
             (9/2/04 statement)
14        TURLEY 5                79
             (Case Inquiry Report, 9/29/04)
15        TURLEY 6                83
             (District Manager's Report)
16
17
18
19
20
21
22
23
24

**4**

1                    (Witness sworn.)
2          MR. WILLIAMSON: Waive signature?
3          MR. SMITH: No, we'll reserve signature.
4          MR. WILLIAMSON: All right.
5          Normal stenographic stipulations, which means
6      we'll waive the necessity of calling the court reporter to
7      identify the transcript at trial or for use in the summary
8      judgments?
9          MR. SMITH: That's fine.
10             LEANNE TURLEY,
11     called as a witness, after being first duly sworn, was
12     examined and testified upon her oath as follows:
13             DIRECT EXAMINATION
14     BY MR. WILLIAMSON:
15         Q. Would you state your name, age and address for
16     me, please?
17         A. Leanne Turley. 42. 1228 East Grove Street in
18     Bloomington.
19         Q. Can you give me a brief, if not immodest,
20     history of your educational background?
21         A. High school graduate. Went to Illinois State
22     University, political science major, four years but never
23     graduated.
24         Q. And when did you stop going to Illinois State?

**5**

1          A. Approximately 1984, I believe, '85.
2          Q. I didn't write down what your age now is then.
3          A. 42.
4          Q. After you left Illinois State, did you have
5      any jobs before you began working at Walgreens?
6          A. No.
7          Q. So --
8          A. No, I started --
9          Q. 1984 you started working for Walgreens?
10         A. Started working for Walgreens in '85, March of
11     '85. I was still attending school at that time, so part
12     time.
13         Q. That was your first full-time job then,
14     Walgreens --
15         A. My first.
16         Q. -- after you got out of school, after you
17     graduated school?
18         A. Yes.
19         Q. Other than going to Illinois State, have you
20     taken any other types of classes or certificates of any
21     type as a result of your job or for any other reason?
22         A. Pharmacy technician certification.
23         Q. When did you do that?
24         A. Let's see. Probably originally in '98 or '99.

**6**

1          Q. And why did you get that particular
2      certificate?
3          A. Walgreens had requested that all store
4      managers be pharmacy technician certified.
5          Q. Obviously, that doesn't mean you're a
6      pharmacist?
7          A. No.
8          Q. What ability does that give you in terms of
9      being a store manager?
10         A. Makes you more familiar with the pharmacy. I
11     am a licensed pharmacy technician as well as being a
12     certified technician, so you do have more knowledge of the
13     pharmacy business in general.
14         Q. And Walgreens required all managers to do
15     that?
16         A. Yes.
17         Q. Was that just the North Illinois district?
18         A. No. That's the company.
19         Q. Throughout the country?
20         A. Yes.
21         Q. So, once you became a store manager after
22     1998, you were required to become a pharmacy assistance
23     technician?
24         A. I was already a store manager when they --

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

---

**7**

1  Q. I understand.
2  A. Okay.
3  Q. So, the policy was enacted after you became a
4  store manager?
5  A. Right. Yes.
6  Q. My question was if one became a store manager
7  after 1998, they would all be required --
8  A. Yes.
9  Q. -- by Walgreens to obtain that certificate
10 you've just discussed?
11 A. Yes.
12 Q. So, give again a brief history of your
13 employment with Walgreens in terms of the jobs you've had.
14 A. Began working as a cashier for Walgreens in
15 1985, and then I became a pharmacy technician for them
16 before going into management. Then I became a management
17 trainee, progressed to an EXA, and then was --
18 Q. What's a management trainee?
19 A. Assistant manager is the general term for it.
20 Q. Does that require any type of course
21 completion, to become a management trainee?
22 A. No. Through Walgreens, you mean?
23 Q. Yes.
24 A. No.

---

**8**

1  Q. Is an EXA above a management trainee on the --
2  A. Yes.
3  Q. -- chain at Walgreens?
4  A. Yes.
5  Q. What is an EXA?
6  A. An executive assistant manager is the title.
7  Q. What is the difference between that job and
8  the assistant manager job you previously discussed?
9  A. The assistant manager job is an
10 hourly-wage-paid job where you do punch a time clock, and
11 you are paid for 44 hours a week. As an EXA, it's a
12 salaried position where you are bonusable based on the
13 performance of the store. You cannot progress to an EXA
14 without completing some coursework through Walgreens.
15 It's the stepping stone to become a store manager.
16 Q. That was my next question. Can a management
17 trainee be promoted directly to the store manager?
18 A. No, sir.
19 Q. They must be an EXA first?
20 A. Yes, sir.
21 Q. Has that been true throughout the time you've
22 been at Walgreens?
23 A. Yes.
24 Q. Speaking of promotion to store manager?

---

**9**

1  A. Uh-huh.
2  Q. Again, when I ask you these questions, I'm
3  asking you from 1985 up until today.
4  A. Okay.
5  Q. Is there any written process or procedure in
6  force as to how one becomes a store manager within the
7  Walgreens corporation?
8  A. No. Once you are an EXA, then you are
9  considered promotable to management, to a store manager
10 position.
11 Q. My first question was, Is there any oral
12 policy or procedure in force as to how one determines
13 who's going to be a store manager at Walgreens?
14 A. There's -- I mean, there's the job description
15 of EXA, and there's a job description of a store manager,
16 and it's up to the district managers and the regional
17 managers to -- they make the decisions as to who is
18 promotable and who is promoted to store manager.
19 Q. So, you're not aware of any ongoing oral
20 policy or procedure as to how those promotions are going
21 to take place?
22 A. No, I think it depends on the situation.
23 Q. Are you aware of any ongoing written policy or
24 procedure as to how those promotions are going to take

---

**10**

1  place?
2  A. No.
3  Q. Does Walgreens have an affirmative action
4  plan?
5  A. Not that I'm aware of.
6  Q. Does Walgreens have an affirmative action
7  policy?
8  A. Not that I'm aware of.
9  Q. So, you're not aware of any written
10 affirmative action policy that's existed at Walgreens from
11 1985 up until today?
12 A. Not that I'm aware of.
13 Q. Never been posted, you've never been advised
14 of any such written policy?
15 A. No.
16 Q. When did you become aware that Eric Simple had
17 filed a charge of discrimination?
18 A. About three weeks ago.
19 Q. Three weeks ago?
20 A. Uh-huh.
21 Q. That would be first week in November --
22 A. Yeah.
23 Q. -- of 2005?
24 A. Roughly that time.

---

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

---

**11**

1    Q. And you never knew before that time?
2    A. No, sir.
3    Q. And how did you become aware of it three weeks
4    ago?
5    A. I was told that a deposition would take place
6    today, and I contacted Mr. Palmer to find out what the
7    deposition was in regards to.
8    Q. Who told you that?
9    A. Mr. Palmer had sent me an e-mail.
10    Q. And that communication took place
11    telephonically, I take it?
12    A. Via e-mail.
13    Q. And prior to that time, had you ever given any
14    statement or information to any other Walgreens employee
15    relating to job actions or job status of Eric Simple?
16    A. Yes.
17    Q. When would that have been?
18    A. I believe it was September of 2004.
19    Q. And to whom did you give such a statement?
20    A. Loss prevention specialist Martise Scott and
21    his, his superior, Ryan Harris.
22    Q. Did you subsequently see that report prepared
23    by Mr. Scott?
24    A. Yes.

---

**12**

1    Q. I'm not going to mark this as an exhibit yet,
2    but is this the first page of that report?
3    A. Oh. No, I have not seen that report. I'm
4    sorry.
5    Q. And this consists of six pages. In fact, I
6    don't have the first page.
7    A. Okay.
8    Q. So, you haven't seen that report?
9    A. No, I saw the statement that I -- that I had
10    written at that time.
11    Q. The voluntary statement --
12    A. Yes.
13    Q. -- dated -- we don't know the date on that
14    because it was two pages, wasn't it?
15    A. Yes.
16    Q. And we only have the first page?
17    A. Yes.
18    Q. Did you ever see the second page of that
19    statement?
20    A. No. I -- it appears from the statement that I
21    finished writing, so I think all I did on the second page
22    was probably draw a line through the lines on there and
23    then sign and date it, but I don't --
24    Q. Don't remember?

---

**13**

1    A. No.
2    Q. Okay. You're familiar with Melissa Jonland?
3    A. Yes.
4    Q. And how are you familiar with her?
5    A. She's worked for me as a MGT and also as an
6    EXA, and now she's --
7    Q. MGT, management trainee?
8    A. Yes, I'm sorry.
9    Q. And then as a what?
10    A. As an EXA.
11    Q. And for what period of time was that?
12    A. I don't know offhand. She worked for me as an
13    MGT when I -- when we opened the store in '99, and I --
14    she transferred out of my store perhaps in 2002 maybe. I
15    don't know the exact dates.
16    Q. Now, after she transferred out in 2002, did
17    she ever come back to work for you?
18    A. No.
19    Q. Where did she transfer to in 2002?
20    A. Store 2177 on Main Street in Bloomington.
21    Q. And she transferred to that store as an EXA?
22    A. Yes.
23    Q. When she transferred to that store, were you
24    involved in the transfer process?

---

**14**

1    A. Just, I mean, in terms of making it happen.
2    But I --
3    Q. How did you make it happen?
4    A. I mean, just in terms of the logistics of --
5    that the district manager makes all the decisions as to
6    placement of EXAs and MGTs in the stores.
7    Q. Does he do that in a vacuum?
8    A. No, he asks for managers' input on performance
9    and where they think people could be successful.
10    Q. So, he asked for your input on Melissa Jonland
11    as to her transfer as an EXA to the Main Street store in
12    2002?
13    A. He would have asked -- at the time -- I
14    believe at the time she transferred, it was when new EXA
15    classes were beginning. And so at that time, they
16    generally move a lot of members of management around in
17    the market, so it would have been not just a transfer of
18    one person but a transfer of a number of members of
19    management.
20    Q. Do you have any specific recollection as to
21    what Mr. Palmer may have said to you and what you may have
22    said to him regarding the transfer of Melissa Jonland in
23    2002?
24    A. No.

---

Knight Reporting Service, Ltd.
309-637-0700

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

15

1    Q. And I take it there's no written documentation
2  then of communication between yourself and Mr. Palmer
3  regarding any discussion of Melissa Jonland in 2002?
4    A. No.
5    Q. Is that customary?
6    A. Yes.
7    Q. It would be done orally?
8    A. Yes.
9    Q. And no record would be maintained as to it?
10   A. No.
11   Q. Did you make any negative comments about
12  Melissa Jonland to Mr. Palmer in 2002 regarding her
13  transfer to an EXA status at Store 2177?
14   A. Not that I recall.
15   Q. Did you advise Mr. Palmer that Ms. Jonland had
16  made a derogative comment to a fellow employee while she
17  was under your supervision when that transfer took place
18  in 2002?
19   A. I have no idea.
20   Q. You don't know whether you did or did not?
21   A. I don't recall ever -- I don't recall any
22  conversation in terms of Melissa Jonland transferring in
23  2002 other than -- I mean, we move assistant managers
24  around periodically, so it's a conversation that takes

16

1  place a lot. I don't recall any specifics.
2    Q. Did you recall that Ms. Jonland had an
3  incident while under your supervision where she made a
4  derogatory comment to a fellow employee who happened to be
5  Indian?
6    A. Yes.
7    Q. What was that comment?
8    A. I believe she called her a bitch.
9    Q. She called her a fucking foreign bitch?
10   A. I don't know that. I wasn't present at the
11  time that this --
12   Q. So, all you recall is that she called her a
13  bitch?
14   A. I believe that's what she had said.
15   Q. When did she do that?
16   A. I don't know the dates on that.
17   Q. I'm not asking you the day of the week. Did
18  she do it in 2001, do it in 2002?
19   A. I would -- I don't know. I --
20   Q. You do know she did it somewhere between 1999
21  and 2002; is that right?
22   A. I know it was after 2001 because I know that
23  the person was working at a store that didn't open until
24  2001, so it was sometime after January of 2001.

17

1    Q. And how did you learn of that incident?
2    A. I believe that the other employee filed a
3  complaint, and then it was --
4    Q. What was the name of the other employee?
5    A. Shashri Mishra.
6    Q. Any time you can help us with a spelling in
7  this deposition, we'd be happy.
8    A. S-h-a-s-h-r-i, I believe, M-i-s-h-r-a.
9    Q. So, the other employee filed a complaint. Did
10  she file that with you?
11   A. No.
12   Q. So, how did you learn that the incident
13  occurred?
14   A. I believe Loss Prevention came in and did an
15  investigation with Miss Jonland, and she probably told me
16  about it.
17   Q. So, did Loss Prevention interview you in the
18  investigation, or did Ms. Jonland simply tell you about
19  it?
20   A. I don't believe I was interviewed in that
21  investigation.
22   Q. Did you take any action against Ms. Jonland
23  once you found out about the incident?
24   A. I don't recall if there was anything that I

18

1  was asked to do on that or not.
2    Q. Did you have to get direction from other
3  people before you could take disciplinary action against
4  people under your employ at that point in time?
5    A. When there's a -- when there's an incident
6  filed like that, yes, I'm not direct -- I'm not directly
7  the person that would do anything because that's something
8  being investigated by others.
9    Q. So, you could not take any action against
10  Miss Jonland in that situation, to your knowledge?
11   A. No.
12   Q. Did you casually mention to her that she
13  probably shouldn't be calling a fellow employee a bitch
14  or --
15   A. Oh, yes.
16   Q. But that was the extent then of your
17  involvement with Ms. Jonland as a result of that incident?
18   A. To the best of my knowledge.
19   Q. Was that the only time you ever perceived that
20  Ms. Jonland might have some ethnic or racial response to
21  fellow employees?
22   A. I didn't view that as an ethnic or racial
23  response, and I've not seen an incident.
24   Q. So, your answer would be she didn't have any

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

---

**19**

1 other situation involving an ethnic or racial response
2 with a fellow employee to your knowledge?
3     A.  Right.
4         MR. SMITH: I'm going to object to the form of
5 that question. I think it's leading.
6         MR. WILLIAMSON: I don't think that's a proper
7 objection.
8         MR. SMITH: Objection to the form of the
9 question? Sure.
10        MR. WILLIAMSON: I don't think so.
11        MR. SMITH: Okay. Go ahead.
12 BY MR. WILLIAMSON:
13    Q.  You can answer.
14        THE WITNESS: Could you repeat the question,
15 please?
16        COURT REPORTER: So, your answer would be she
17 didn't have any other situation involving an ethnic or
18 racial response with a fellow employee to your knowledge?
19    A.  Not that I can recall.
20    Q.  And by "other situation," I'm referring to
21 other than the reference to bitch to that particular
22 individual?
23    A.  Okay.
24    Q.  And you don't recall any other incident then?

---

**20**

1     A.  Not that I can recall, no.
2     Q.  Did you bring up that incident to Mr. Palmer
3 when Ms. Jonland was promoted to the EXA position at Store
4 2177 in 2002?
5     A.  Miss Jonland wasn't -- she was already an EXA.
6 She was transferred to Store 2177. It was -- it was not a
7 promotion at that time; it was a transfer. And, no, I
8 would not have brought it up that I -- I can't see any
9 reason that I would have.
10    Q.  You did say earlier that the EXA pay is based
11 on the performance of the store, did you not?
12    A.  Yes.
13    Q.  Wasn't she being transferred to a store that
14 had bigger numbers in terms of performance so that she'd
15 be making more money in that transfer?
16    A.  No, actually, it was a store that had a lesser
17 performance.
18    Q.  So, if one were to characterize the incident,
19 the job action, maybe it was a demotion?
20    A.  I --
21    Q.  Is that correct?
22    A.  I don't believe that it was a demotion at all.
23 We transfer assistant managers and EXAs both so that they
24 can get different views of different operations, work with

---

**21**

1 different managers and different stores. It's -- they
2 have a base salary, and then the bonus is added onto that.
3         And you're not transferred based on -- I mean,
4 you tend to work in different stores regardless of the
5 bonus that you might -- may or may not receive at that
6 store.
7     Q.  Did Ms. Jonland ask for that transfer to your
8 knowledge?
9     A.  I don't believe so.
10    Q.  Did you ask that she be transferred?
11    A.  I don't believe so.
12    Q.  You don't know one way or the other?
13    A.  I don't believe that, that either of those
14 took place, but I don't --
15    Q.  You don't know?
16    A.  I don't know, no.
17    Q.  Do you recall when the occasion -- do you
18 recall the occasion when the Pontiac job -- manager's job
19 opened up?
20    A.  Yes.
21    Q.  When was that?
22    A.  October of 2003, I believe.
23    Q.  And in October of 2003, the manager for the
24 Pontiac store was picked; is that correct?

---

**22**

1     A.  I believe so.
2     Q.  Who was picked for that job?
3     A.  Miss Jonland.
4     Q.  And were you consulted at that point in time
5 or prior to that time as to whether she should be picked
6 for the manager's job at Pontiac?
7     A.  No.
8     Q.  Now, not by Mr. Palmer, not by anybody at
9 Walgreens then?
10    A.  No.
11    Q.  Was there any procedure or policy in place at
12 that point in time for notifying people that a manager's
13 job was opening up within the North Illinois district by
14 Walgreens?
15    A.  I believe that there's many times when there
16 is notification when an opening is coming; it's a known
17 opening. You know if a manager is going to retire, then
18 obviously there's going to be an opening. In that
19 particular case, it was a very sudden opening.
20    Q.  So, your answer is what?
21    A.  That in that case, there was no notification
22 to any Walgreen employees that an opening was going to be
23 taking place in the Pontiac store.
24    Q.  So, the opening took place, and someone was

---

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

23

1  picked?
2      A. Yes.
3      Q. Was there an interview process to your
4  knowledge?
5      A. No.
6      Q. And how do you know that?
7      A. I don't believe that there was one. The, the
8  promotion, I believe, took place fairly quickly. I
9  believe that —
10     Q. Did you speak with Jessica Culbertson,
11  regarding the Pontiac job, about race being a factor in
12  the selection process?
13     A. Not that I recall.
14     Q. So, you never said anything to Jessica
15  Culbertson about race being a factor?
16     A. Not that I recall.
17     Q. At any point in time did you ever make any
18  reference to any Walgreen employee regarding Mr. Simple's
19  race or his attributes, such as being lazy or the fact
20  that he was just at the job to make a paycheck? Have you
21  ever done that?
22     A. About Eric?
23     Q. Yes.
24     A. No.

24

1      Q. Have you ever said that to Sonia Crittendon?
2      A. No.
3      Q. Have you ever said that to — please excuse my
4  bad pronunciation — Jeannie Hernandez?
5      A. No.
6      Q. Jessica Culbertson?
7      A. No.
8      Q. You haven't said that to any Walgreens
9  employee?
10     A. I don't feel that way. No, I never would have
11  said that.
12     Q. Well, whatever you feel we're not likely to
13  get to in this deposition.
14        What I'm asking you is, Did you ever make any
15  such comments to any fellow Walgreen employee regarding
16  Eric Simple?
17     A. Regarding him being lazy and —
18     Q. Regarding him being lazy, just at the job to
19  get a paycheck, or any other racially-suggestive
20  statement?
21     A. No.
22     Q. Now, the Pontiac job came up in October, I
23  think, 3rd of '03 as you said; is that correct?
24     A. It was in October. I don't know the date.

25

1      Q. Did you have a discussion with Mr. Simple in
2  November of '03 regarding any other job?
3      A. Possibly.
4      Q. Let's ask specifically about the Kankakee
5  store manager's job. Did you have a discussion with him
6  in November of '03 about that job?
7      A. It's very possible.
8      Q. Why do you say "very possible"? Do you not
9  remember?
10     A. I know there was an opening in the Kankakee
11  store at that time, and I'm sure that I probably let Eric
12  know that Mr. Palmer was looking for EXAs that would be
13  interested in applying for it.
14     Q. Maybe this is just a matter of syntax —
15     A. Okay.
16     Q. — but when you start your answer by saying
17  "I'm sure that I probably" —
18     A. Okay.
19     Q. — it confuses me. What are you sure about?
20     A. I know that there was an opening in the
21  Kankakee market at that time. I know at some point Eric
22  and I had a conversation about it.
23     Q. Where did that conversation take place?
24     A. I have no idea.

26

1      Q. Was it by e-mail; was it in person?
2      A. I would assume in person. I don't recall ever
3  having any e-mail.
4      Q. Do you recall the approximate time of the
5  month in November when that conversation took place?
6      A. No, sir.
7      Q. Was there only one conversation?
8      A. I, I don't recall.
9      Q. Who else was present?
10     A. I have no idea.
11     Q. So, your recollection of this conversation is
12  not good?
13     A. No, it's not.
14     Q. Did you say to him during the course of that
15  conversation, "By law, I'm required to see if you are
16  interested in the Kankakee store"?
17     A. It doesn't sound like something I would say,
18  but —
19     Q. Could have said it, but you don't remember?
20     A. It doesn't sound like something I would say,
21  no.
22     Q. But you don't know because you don't remember
23  the conversation well enough?
24     A. Correct.

Knight Reporting Service, Ltd.
309-637-0700

Eric Simple v. Walgreen Co.

27

1    Q. Were you directed to have that conversation
2 with Mr. Simple by any other Walgreens employee?
3    A. I would imagine — and I'm, I'm going on kind
4 of the way things tend to be, that generally it is, you
5 know, Hey, there's going to be an opening here. You need
6 to all talk with your EXAs to see if they are interested
7 in that location.
8    Q. You mean you did this on your own?
9    A. No. I — like when there's going to be an
10 opening that is a known opening, a lot of times Mr. Palmer
11 will send an e-mail to the store manager saying, Speak
12 with your EXAs to see if anybody's interested in
13 relocating to Kankakee, in this case, for the opening.
14    Q. Did he send you an e-mail on the Kankakee job?
15    A. I don't recall, but that would be a normal
16 process.
17    Q. So, that was the general --
18    MR. SMITH: Are you going to let her finish
19 her answer, because I don't think she finished her answer.
20    A. That would be something that has happened in
21 the past, that is not unexpected. I don't know for
22 certain if there was in that particular case, but it would
23 be expected. It wouldn't be surprising.
24    Q. But you think Mr. Palmer sent an e-mail to all

28

1 the managers in the North Illinois district regarding the
2 Kankakee manager's job in November of 2003?
3    A. I believe that's possible, yes.
4    Q. That did not happen with the Pontiac job a
5 month earlier, as I understand it?
6    A. No, it did not.
7    Q. Do you know why?
8    A. I believe that the Pontiac job needed to have
9 management placed in there immediately. There was no time
10 to interview and speak with anybody interested in the
11 position. It needed to be done --
12    Q. Did Walgreens --
13    A. -- immediately.
14    MR. SMITH: Excuse me.
15    Q. -- interview her for the --
16    MR. SMITH: You're getting in a habit here.
17    MR. WILLIAMSON: You keep interrupting me, and
18 you're telling me I'm interrupting her.
19    MR. SMITH: You're interrupting --
20    MR. WILLIAMSON: I'm not perceiving it that
21 way. I'm perceiving you're interrupting my questions so I
22 can't ask her in a logical format.
23    MR. SMITH: I still hear Miss Turley talking
24 when you start your next question, so I just want to make

29

1 sure that she has finished her answer, because the end of
2 her answer does trail off a little bit. So, I just want
3 to make sure she has an opportunity to give you a complete
4 answer to your question.
5    MR. WILLIAMSON: I'm not hearing her talking
6 because, of course, I want her to answer the question,
7 so --
8    MR. SMITH: As we do. So, if you just give
9 her an opportunity --
10    MR. WILLIAMSON: I'm losing hearing, too, in
11 my old age so I don't profess to know for sure.
12    MR. SMITH: I'm sure it would --
13 BY MR. WILLIAMSON:
14    Q. Had you finished your last answer?
15    A. Yes.
16    Q. I thought so.
17    MR. WILLIAMSON: And what was my last
18 question?
19    COURT REPORTER: Do you know why?
20    Answer: I believe that the Pontiac job needed
21 to have management placed in there immediately. There was
22 no time to interview and speak with anybody interested in
23 the position. It needed to be done —
24    Question: Did Walgreens --

30

1    Answer: -- immediately.
2    Question: -- interview her for the --
3 BY MR. WILLIAMSON:
4    Q. Yes. Did Walgreens interview Ms. Jonland for
5 the Pontiac job then?
6    A. I know that Mr. Palmer met with her. I assume
7 it was an interview that -- while he offered her the
8 position.
9    Q. And did he interview more than one person for
10 the Pontiac job other than Ms. Jonland?
11    A. I don't believe so.
12    Q. Then in the Kankakee job, do you know if he
13 interviewed any persons for that particular manager's job?
14    A. I don't know.
15    Q. So, you do know that there was an interview
16 process for the Pontiac job, but it only included one
17 person and that was Ms. Jonland; is that correct?
18    A. I don't know if it was an interview or a job
19 offer. I wasn't present, you know, when he met with
20 Miss Jonland. I would assume that he was interviewing her
21 while he offered her the position, but I wasn't there.
22    Q. That's what I understood you to say. And then
23 with Kankakee you simply don't know if there was any
24 interview process that took place?

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

---

**31**

1    A. No.

2    MR. WILLIAMSON: I just didn't have time to

3    copy all the exhibits, so what I'm going to do on the ones

4    you already marked is re-use those.

5    MR. SMITH: That's fine. Sure.

6    MR. WILLIAMSON: I don't like to have the

7    confusion afterwards.

8    So, when you mark this, put a separate sticker

9    on so you can see both of them.

10    This will be Turley Exhibit Number 1.

11    (Whereupon, Turley Exhibit Number 1 was marked

12    for identification.)

13    MR. WILLIAMSON: Maybe you can hand that to

14    Mr. Smith before you look at it.

15    BY MR. WILLIAMSON:

16    Q. With respect to Turley Exhibit Number 1, would

17    you tell us what that document is, please?

18    A. Executive Assistant Performance Review.

19    Q. I'm going to refer to that as an evaluation.

20    A. Okay.

21    Q. Do you think that's a fair characterization?

22    A. Yes.

23    Q. And for what period of time does that exhibit

24    cover?

---

**32**

1    A. For 12-month period ending, but it doesn't

2    have the month or the date in 2003.

3    Q. In other words, can you tell the period of

4    time that it covers in 2003 from looking at the exhibit?

5    A. No.

6    Q. How often did store managers normally do

7    evaluations for Walgreens employees and specifically

8    EXAs --

9    A. Annually.

10    Q. -- in 2003, was going to be the end of that.

11    A. Oh, I'm sorry. Annually.

12    Q. And how long had it been done annually?

13    A. As long as I've been with the company.

14    Q. Was this the first evaluation that you

15    personally did for Mr. Simple?

16    A. I don't know when -- I don't know if this was

17    the one that was done at the beginning of 2003 or if this

18    is the one done at the end of -- would this have been the

19    12-month period ending at any time in 2003? I don't -- I

20    don't know.

21    Q. You don't know, and you don't remember --

22    A. No.

23    Q. -- from looking at the document?

24    A. I believe this is the first one, but I don't

---

**33**

1    know for sure.

2    Q. Now, when did Mr. Simple start working as an

3    EXA at your store?

4    A. Perhaps March or April maybe of 2003, I think.

5    Q. And what position did he hold -- when I say

6    "your store," which one is that, by the way?

7    A. Store 5188.

8    Q. And the address? You can give us the street.

9    A. G.E. and Veterans Parkway --

10    Q. Okay.

11    A. -- in Bloomington.

12    Q. That isn't the first store you've been a

13    manager at, is it?

14    A. No.

15    Q. What was the prior store?

16    A. I was a store manager in Bourbonnais, also

17    store manager in Joliet.

18    Q. But the only time that Mr. Simple ever worked

19    under you as a store manager was at the store you've just

20    described?

21    A. Yes. Yes, it was.

22    Q. Would you like to call that the G.E. store?

23    A. That works.

24    Q. And for what period of time was he working at

---

**34**

1    the G.E. store under your supervision?

2    A. He worked as an EXA for me, I believe, from

3    March -- probably around March or April of 2003 until

4    probably around the same time period of 2004. And then he

5    worked for me again as an MGT, I believe, starting in

6    December of 2004 up until I left the store in May of 2005.

7    Q. So, the initial period was about 12 months --

8    A. I believe it was about 12 months.

9    Q. -- that he worked as an EXA?

10    A. I believe so.

11    Q. And at the end of that 12 months, where was

12    Mr. Simple sent?

13    A. I believe he transferred to 2177.

14    Q. And again, what's the address of that store?

15    A. It's Main Street in Bloomington. I don't --

16    Q. When that transfer took place, did Mr. Simple

17    ask for the transfer; did you ask for the transfer; did it

18    come from someone else?

19    A. No, it would have been Mr. Palmer.

20    Q. So, that wasn't necessarily the wish of either

21    yourself or Mr. Simple?

22    A. Correct.

23    Q. It was simply at the direction of the district

24    manager?

---

35

1    A.  Correct.
2    Q.  And aside from the evaluations, what did you
3  observe as to Mr. Simple's capabilities as an employee
4  during that 12-month period of time?
5    A.  I believe that he was doing a good job and
6  that he was promotable to the -- he could be given a
7  chance to become a store manager.
8    Q.  Did he always come to work on time?
9    A.  Uh-huh.
10    Q.  Did he get along well with people?
11        You need to answer yes or no, by the way.
12    A.  Oh, sorry.  Yes.
13    Q.  Did he get along well with people?
14    A.  Yes.
15    Q.  Would you say that was one of his strengths?
16    A.  Yeah, I would.
17    Q.  Did he work the necessary overtime to perform
18  his job while he was under your supervision?
19    A.  He worked the -- yes.  I mean, they are
20  required to work 44 hours a week.  That was never an issue
21  at all whatsoever.
22    Q.  Is there any deficiency he had during that
23  12-month period of time that you would care to speak
24  about?

36

1    A.  I mean, everybody's got strengths and
2  weaknesses, but nothing that was a glaring deficiency, no.
3    Q.  Getting then to the evaluation.
4    A.  Uh-huh.
5    Q.  This is a form document that you have to make
6  your comments in accordance with the form and the rating
7  process; is that correct?
8    A.  Correct.  Uh-huh.
9    Q.  Would you tell us generally how you rated
10  Mr. Simple on that particular evaluation?
11    A.  I rated him as exceptional or above average.
12    Q.  And what is the top rating?
13    A.  Outstanding.
14    Q.  And exceptional/above average was the
15  second-to-top rating?
16    A.  Yes, it is.
17    Q.  How many total ratings were there?
18    A.  Five.
19    Q.  As I understand it -- and correct me if I'm
20  wrong -- unless you rate, as a manager, the EXA as
21  promotable, they're not going to be promotable to manager;
22  is that correct?
23    A.  I, I would say that would be correct as -- I
24  mean, if --

37

1    Q.  So, from the standpoint of what the manager
2  assesses an EXA --
3    A.  Uh-huh.
4    Q.  -- they can stop career advancement in its
5  tracks unless the evaluation states that the person is
6  promotable to a manager and, in fact, it even has a time
7  frame, does it not?
8    A.  And then the district manager also would
9  review.
10    Q.  I'm talking about the manager at this point.
11    A.  What I'm saying, though, is if a manager were
12  to state that a person was not promotable, the district
13  manager still has the opportunity to review that and say,
14  you know, We need to discuss this further or make changes,
15  from what I --
16    Q.  How do you know that?
17    A.  -- from what I know.
18    Q.  How do you know that?
19    A.  Well, because the district manager does have
20  to approve this.  There's a spot for his signature as
21  well.
22    Q.  Well, whether the district manager approves it
23  or not, there isn't any policy or procedure in force at
24  Walgreens, as you earlier stated, that would indicate

38

1  that, is there?
2        MR. SMITH:  I don't -- I think that misstates
3  maybe what she earlier stated.
4  BY MR. WILLIAMSON:
5    Q.  All right.  Let me go back with you then a
6  second.
7    A.  Okay.
8    Q.  You've indicated to me there isn't any policy
9  or procedure in place in writing or orally as to the
10  manner in which an EXA is to be promoted to a store
11  manager, and that's been true throughout the time you've
12  worked at Walgreens; isn't that correct?
13    A.  Okay.
14    Q.  Well, don't -- I don't want you to say okay.
15    A.  I mean --
16    Q.  I'm asking you --
17    A.  If you're -- are you saying -- then this is.
18    Q.  That's not what I'm saying.  I'm asking the
19  questions, and you're giving the answers.
20    A.  When I -- the original question --
21        MR. SMITH:  What's -- I'm not sure what the
22  question is, the pending question.
23        MR. WILLIAMSON:  I can re-ask you again.
24  BY MR. WILLIAMSON:

Eric Simple v. Walgreen Co.

39

1    Q.  Is there any oral or written policy in place
2  from 1985 up until 2005 whereby one can ascertain the
3  basis for promotion to an EXA to manager within Walgreen's
4  system?
5    A.  Okay.  Well, obviously, like you said, if
6  somebody is receiving a substandard performance on an
7  evaluation, then they are not going to be promoted.  I
8  didn't consider that a written policy as an evaluation.
9    Q.  All right.  And that's a fair assessment of
10  that --
11    A.  Uh-huh.
12    Q.  -- situation.  But you do understand, then,
13  that the manager of a store controls the career path of an
14  EXA to be promoted to manager within the Walgreens system;
15  is that correct?
16    A.  I believe it's a shared control between the
17  manager and the district manager.
18    Q.  Well, does the district manager do an
19  evaluation of an EXA such as you're looking at?
20    A.  They sign them, and they can make changes as
21  they -- as they feel are necessary.
22    Q.  I only saw where they sign them.
23    A.  I believe they can make changes as they feel
24  are necessary.

40

1    Q.  It says District Manager Approval; is that
2  correct?
3    A.  Yes.
4    Q.  Other than this evaluation, is there any other
5  written process whereby the standards of an EXA is judged
6  within the Walgreens system for promotion to manager?
7    A.  I don't believe so.
8    Q.  So, looking at that exhibit, Turley Exhibit
9  Number 1, would you say that you have evaluated Mr. Simple
10  as of that time as promotable to management jobs within
11  the Walgreen system?
12    A.  Yes.
13    Q.  And that was your intent, was it not?
14    A.  Yes.
15    MR. WILLIAMSON:  That's 2.
16    MR. SMITH:  Let me see that one.
17    (Whereupon, Turley Exhibit Number 2 was marked
18  for identification.)
19  BY MR. WILLIAMSON:
20    Q.  I want to give you an opportunity to look at
21  Turley Exhibit Number 2, but actually I wanted to ask you
22  some questions about another matter before we get to that.
23    A.  Okay.
24    Q.  But go ahead and glance at it if you like.

41

1    A.  Okay.
2    Q.  Now, sitting to your left is a lady named
3  Rachel Ablin; is that correct?
4    A.  Yes.
5    Q.  You know that individual?
6    A.  I've just met her.
7    Q.  You met her today?
8    A.  I met her on Monday.
9    Q.  Monday would be the 28th?
10    A.  Yes.
11    Q.  And that was the first time you've ever met
12  her?
13    A.  Yes.
14    Q.  She never conducted any company business with
15  you prior to that time?
16    A.  I don't believe so.
17    Q.  Never had any communication with her prior to
18  that time?
19    A.  I don't believe so.  I -- you know, we contact
20  Employee Relations occasionally on things, but I don't
21  recall a specific incident that I've communicated with
22  her.
23    Q.  And with respect to the company's response to
24  the charge of discrimination filed with Equal Opportunity

42

1  Employment Commission, Ms. Ablin did not contact you; is
2  that correct?
3    A.  That's correct.
4    Q.  And that's not something you're not sure of;
5  you're saying she did not contact you?
6    A.  At -- you mean when this whole --
7    MR. SMITH:  You're referring specifically --
8  were you referring specifically to the EEO charge?  Is
9  that what your question was?
10    MR. SMITH:  Yes.
11    MR. SMITH:  Okay.
12    A.  I was -- I was contacted, like I said, by
13  Mr. Palmer that there would be a deposition today.  I
14  believe somebody -- I believe he forwarded me or sent me
15  a, a copy of where to meet for the deposition that had
16  come from her office.
17    Q.  But at no point in time in the past did either
18  Ms. Ablin or any of her associates or representatives
19  contact you regarding the charge of discrimination that
20  Eric Simple had filed?
21    A.  No.
22    MR. SMITH:  If that's a repeat of the earlier
23  question, I think that's a change from your earlier
24  because I think you asked about Ms. Ablin before.  Is

**43**

1   that --
2      MR. WILLIAMSON: I've -- this question was
3   different, I agree.
4      MR. SMITH: Okay.
5      A. Not that I have any recollection of at all.
6      Q. Now, with respect to Turley Exhibit
7   Number 2 --
8      A. Uh-huh.
9      Q. -- is that another evaluation?
10      A. Yes, it is.
11      Q. It's in a different order, isn't it? That's
12   the way I got it.
13      A. Okay.
14      Q. I mean the pages.
15      A. Yes.
16      Q. Page three is the front, isn't it?
17      A. Uh-huh.
18      Q. Neither of these evaluations are signed, are
19   they?
20      A. No, they are not.
21      Q. Well, one has a signature on it -- one
22   signature on it?
23      A. Yes, one has Mr. Palmer's signature on it.
24      Q. But neither evaluation has either your

**44**

1   signature or Mr. Simple's, does it?
2      A. No, it does not.
3      Q. Is that the customary practice?
4      A. No, it is not. No, it is not.
5      Q. So, usually the evaluations are signed by both
6   the manager and the employee?
7      A. Yes.
8      Q. Have you ever seen signed copies of either of
9   those exhibits that were signed by either you or
10   Mr. Simple or both?
11      A. Could not say.
12      Q. Do you recall signing either of those two
13   evaluations?
14      A. I don't recall signing them, but I generally
15   sign all the evaluations that I do.
16      Q. So, would it be an extraordinary circumstance
17   for you not to sign an evaluation?
18      A. Yes.
19      Q. Do you maintain a personal file as to the
20   evaluations you've signed separate and apart from company
21   records?
22      A. No, sir.
23      Q. Either at your home or at the store?
24      A. At, at the store I would keep a file -- I'm

**45**

1   trying to recall. I don't believe that we do keep them
2   anymore on the evaluations, so I don't believe I do.
3      Q. You mean you did keep a file on the
4   evaluations?
5      A. With different technology changing and then
6   these are now all done online so that they are all stored
7   online now.
8      Q. What did you do with the evaluations you kept
9   in the past?
10      A. I did have a file in the store that I just
11   kept them in.
12      Q. What happened to that file?
13      A. May still well be there. It's not --
14      Q. At what store?
15      A. At Store 5188.
16      Q. So, you left that file at that store when you
17   left to take the new store?
18      A. Yes. If there was still one there, then it
19   was left there.
20      Q. And that file would have contained signed
21   evaluations?
22      A. Yes.
23      Q. Now, with respect to Turley Exhibit
24   Number 2 --

**46**

1      A. Uh-huh.
2      Q. -- did -- what period of time did that
3   evaluation cover?
4      A. Looks like a 12-month period ending 3/16/2004.
5      Q. You indicated that Mr. Simple only worked 12
6   months between 2003 and 2004, that it was between March
7   of 2003 and 2004; is that correct?
8      A. I told you that was to the best of my
9   recollection, yes.
10      Q. So, Exhibit Number 1, the first evaluation,
11   covered what period of that 12 months?
12      A. I don't know. It doesn't -- it says for
13   12-month period ending, and there's no month or date
14   listed. It just says 2003.
15      Q. So --
16      A. I would assume that that is for a 12-month
17   period that ended, I said, around March or April of 2003.
18      Q. Which is when he began?
19      A. Which is when the usual performance
20   evaluations are conducted, around the same time every
21   year.
22      Q. He began March of 2003 as an EXA at your
23   store?
24      A. I would like to see -- I don't know for sure.

Eric Simple v. Walgreen Co.

47

1  Can I see the record at all or no?
2      Q. Sure.
3      A. Okay. Okay. So, he began in 2002. Okay.
4      Q. March?
5      A. April, it says.
6      Q. So --
7      A. Okay.
8      Q. -- your recollection was simply --
9      A. Simply wrong.
10     Q. -- in error?
11     A. Yes.
12     Q. It was a year earlier?
13     A. Yes.
14     Q. So, Turley Exhibit Number 1 would have
15  represented the 12-month period between April of 2002 and
16  March of 2003?
17     A. Correct. Or I would assume that they were
18  done around March, yes.
19     Q. Now, the record Mr. Smith showed you indicated
20  that Mr. Simple stopped working at your store when?
21     A. In March of 2000-- or -- yeah, March of 2004.
22     Q. Turley Exhibit Number 2 then would be March
23  of 2003 through March of 2004. Is that a proper --
24     A. Yes.

48

1      Q. -- speculation as to the periods we're talking
2  about?
3      A. Yes.
4      Q. Now, did the evaluation that's represented by
5  Turley Exhibit Number 2 indicate that Mr. Simple had
6  improved, remained the same or digressed in his abilities
7  in your eyes as an EXA?
8      A. His overall rating is still the exact same,
9  exceptional or above average.
10     Q. So, you believe that the second 12 months for
11  Mr. Simple was as successful as the first 12 months in
12  terms of his capacity as an EXA at your store and under
13  your supervision as manager?
14     A. I believe he was still rated as above standard
15  in many performance areas, yes.
16        MR. WILLIAMSON: Maybe you could repeat the
17  question to her.
18        COURT REPORTER: So, you believe that the
19  second 12 months for Mr. Simple was as successful as the
20  first 12 months in terms of his capacity as an EXA at your
21  store and under your supervision as manager?
22  BY MR. WILLIAMSON:
23     Q. I think you can answer yes or no.
24     A. If you look at the evaluation, there are

49

1  things on there which I felt that he had slipped in his
2  performance.
3      Q. So, your answer would be no?
4      A. Would be no. Uh-huh.
5      Q. And in what areas had he slipped?
6      A. He seemed to not have the same drive, I would
7  say, that he had had in the past.
8      Q. That's sort of a subjective standard. Can you
9  elucidate a bit on what you mean?
10     A. Everything about evaluations is objective. I
11  mean --
12     Q. Subjective, you mean?
13     A. Or subjective, yes. That's a -- the best I
14  could say was that he didn't have the same drive to
15  accomplish things for either the store or to see his
16  personal accomplishments within the store that I felt he
17  had had before.
18     Q. Did he come to work at different hours during
19  the second 12 months?
20     A. I know -- I mean, I've never had a problem
21  with him working less than his scheduled hours. I
22  couldn't say.
23     Q. Did he get along just as well with people in
24  the second 12 months?

50

1      A. Yes, I believe so.
2      Q. Did he work the same number of hours the
3  second 12 months?
4      A. I couldn't say for sure.
5      Q. Because you don't know?
6      A. Correct.
7      Q. Did he perform the same tasks the second 12
8  months as he did the first 12 months?
9      A. I don't know if he had the same
10  responsibilities in that 12-month period exactly as he had
11  had in the same -- I mean with, with different personnel
12  there are oftentimes different delegations of
13  responsibility, so --
14     Q. Excuse me. You're the manager. Why wouldn't
15  you know if he had the same responsibilities?
16     A. Because crews -- when you have different
17  management teams working together, different people have
18  different responsibilities; and responsibilities change
19  all the time for everybody in the store.
20     Q. You mean you don't know?
21     A. And I don't know if he had the same exact
22  responsibilities for the second 12 months as he had for
23  the first 12 months, no.
24     Q. And you never inquired?

51

1    A. I never inquired?
2    Q. You don't know, so you must not have inquired?
3    A. No.
4    Q. If you didn't know and you didn't inquire, did
5 you feel you were fully capable of doing the evaluation
6 for the second 12 months?
7    A. Yes.
8        MR. WILLIAMSON: 3.
9        (Whereupon, Turley Exhibit Number 3 was marked
10 for identification.)
11       MR. WILLIAMSON: Hand that to Mr. Smith, too.
12 BY MR. WILLIAMSON:
13   Q. Would you tell us what Turley Exhibit Number 3
14 is, please?
15   A. It's a statement that I made in regards to a
16 statement that I had made to Mr. Simple.
17   Q. So, you made a statement to Mr. Simple?
18   A. Yes.
19   Q. When did you make the statement to Mr. Simple
20 that was the subject of that written comment?
21   A. I believe it was in October of 2003.
22   Q. Do you remember the exact day?
23   A. No.
24   Q. Do you remember where the statement was made?

52

1    A. No.
2    Q. Do you remember what time of week the
3 statement was made?
4    A. No.
5    Q. Do you remember if anyone else was present at
6 the time the statement was made?
7    A. No.
8    Q. What was the statement that you made?
9    A. Something to the effect of the fact that Eric
10 was not promoted to Pontiac and that the person that was
11 promoted was probably a better fit for the store and that
12 Pontiac was perhaps not ready to have a black store
13 manager.
14   Q. So, those are the words you remember saying to
15 Mr. Simple?
16   A. Something to that effect, yes.
17   Q. You must have made that statement to him after
18 the decision had been made for the Pontiac store manager?
19   A. Correct.
20   Q. So, it would have been after October 3rd of
21 2003?
22   A. Okay.
23   Q. No?
24   A. I don't know what day the Pontiac store

53

1 manager was promoted.
2    Q. If you don't agree with that, you can tell me.
3    A. No, I know it was in October of 2003. I don't
4 know the exact date.
5    Q. That wasn't my question. You know that the
6 Pontiac job was picked on October 3rd, 2003, don't you?
7    A. No, I do not. That's --
8    Q. Oh. Well, then that --
9    A. Okay.
10   Q. -- would be the reason you wouldn't know.
11   A. Uh-huh.
12   Q. So, you think you made the statement in
13 October of 2003?
14   A. Yes.
15   Q. And without regard to the date, you must have
16 said it to Mr. Simple after the decision had been made?
17   A. Yes.
18   Q. Who told you about the decision to hire the
19 Pontiac manager?
20   A. Mr. Palmer.
21   Q. And how did he do that?
22   A. He contacted me by phone to ask me to provide
23 management to that store for the next -- I believe it was
24 two days. Might have been a day or two days. To -- they

54

1 needed some management help up there. And then informed
2 me that Miss Jonland would be taking over the store as of
3 that -- you know, once that time period was over.
4    Q. Was that the first time in that month you'd
5 had a discussion with Mr. Palmer about the vacancy of the
6 manager's job in the Pontiac store?
7    A. Yes.
8    Q. So, your first opportunity to talk with
9 Mr. Palmer about it was when he told you the job selection
10 had already been made?
11   A. Yes.
12   Q. When you say "provide management," does that
13 mean you were to go up to the Pontiac store to work?
14   A. No, I was to send one of the assistant
15 managers or EXAs up to work.
16   Q. What about Miss Jonland? I mean, why would --
17 if she had already been picked, why wasn't she available
18 for those two or three days?
19   A. I believe she was on vacation at the time.
20   Q. And who did you pick to go to the Pontiac
21 store?
22   A. Mr. Lane went for two days, I believe.
23   Q. And as a result of that conversation, you then
24 made the statement to Eric Simple that you've already

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

55

1  described?
2      A.  Yes.
3      Q.  And why did you believe that?
4      A.  Because I, I -- why do I believe which part of
5  the statement? I mean --
6      Q.  Which part of the statement are we talking
7  about?
8      A.  The fact that he was not the right fit or the
9  fact that Pontiac wasn't ready --
10     Q.  Let's start with that one.
11     A.  Okay.
12     Q.  Why did you believe he was not the right fit?
13     A.  I didn't -- I said that -- throughout my
14  career, that's always been a statement that's been made.
15  You know, you try to get the right fit with a manager and
16  a store.
17          And I said to him perhaps he wasn't the right
18  fit, just meaning, you know, that's not my decision to
19  make; it's Mr. Palmer's decision to make as to what
20  manager's strengths and weaknesses go best with which
21  store. So, in that --
22     Q.  So, you were guessing on that part of the
23  statement?
24     A.  Yes.

56

1          MR. SMITH:  Again, I would allow -- ask the
2  witness be allowed to finish her answer.
3      A.  Yes, I was guessing on that.
4      Q.  Is there anything else to that?
5      A.  No.
6      Q.  And then the second part of the statement, why
7  did you believe that?
8      A.  A couple of reasons. One is I, I do think
9  Pontiac is more of a racist town, that -- that's just my
10  opinion from being in the town at all.
11          Secondly, I've got an EXA that's going to be
12  disappointed about not getting a store; you're trying to
13  make him feel better. And it was not the right thing to
14  say, but it's something I said.
15     Q.  Did you think that Mr. Simple was qualified to
16  be manager of the Pontiac store?
17     A.  Yes.
18     Q.  Had you told Mr. Palmer that?
19     A.  We had never discussed the Pontiac store.
20     Q.  In other words, when you say "qualified," you
21  probably believe Mr. Simple was qualified to be manager of
22  any store in the North Illinois region at that point in
23  time?
24     A.  No.

57

1      Q.  Some stores he'd be qualified for?
2      A.  Some stores he's qualified for. Some
3  stores --
4      Q.  And how would you distinguish which stores he
5  was qualified for?
6      A.  Generally by volume. You don't usually --
7      Q.  Please tell me what you mean by that.
8      A.  You don't generally place a new store manager
9  in a very high-volume location. You try to generally have
10  newer store managers or newly promoted store managers work
11  in lower-volume operations.
12     Q.  And you're saying that because you're a store
13  manager and have made such recommendations?
14     A.  No, I'm saying that's -- generally a new store
15  manager is not -- is not promoted into a very high-volume
16  location. It's not good business, and it's not a good way
17  for a new store manager to learn to be a store manager.
18     Q.  Again, this is your observations --
19     A.  Uh-huh.
20     Q.  -- or how did you arrive at that conclusion?
21     A.  Yes, that's observations.
22     Q.  Now, had you worked in Pontiac prior to that
23  time?
24     A.  No.

58

1      Q.  Had you lived in Pontiac?
2      A.  No.
3      Q.  How were you able to make the observations
4  that it's a racist town?
5      A.  It's just something I felt.
6      Q.  Did you drive through once or twice or --
7      A.  I've been in there; I've known people from
8  there.
9      Q.  How much contact have you had with the city of
10  Pontiac prior to October of 2003?
11     A.  Not a lot.
12     Q.  And then was that your personal opinion about
13  Pontiac being a racist town?
14     A.  Uh-huh.
15     Q.  Had you conveyed that to anyone else other
16  than Eric Simple?
17     A.  I don't recall.
18     Q.  You could have?
19     A.  I could have. Sure.
20     Q.  Did you feel that way about any other store in
21  the North Illinois district in terms of black managers?
22          MR. SMITH:  I'm not sure what -- I don't --
23  that's a vague question. Does she feel that way about any
24  other store?

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

59

BY MR. WILLIAMSON:
1 BY MR. WILLIAMSON:
2    Q.   Would you characterize any of the other 28
3 stores in the North Illinois district as not being ready
4 for a black manager in October of 2003 other than the
5 Pontiac store?
6    A.   Personally, my opinion?
7    Q.   Yes.
8    A.   Yes.
9    Q.   How many others?
10   A.   Two.
11   Q.   Which stores would those be?
12   A.   The two stores in Pekin.
13   Q.   And do you know the addresses?
14   A.   No.  I think they're both on Court Street.
15   Q.   And have either of the Pekin stores ever had
16 black managers?
17   A.   I don't know.  Not, not to my knowledge.
18   Q.   Again, and according to your personal opinion,
19 was Melissa Jonland as qualified, more qualified or less
20 qualified than Eric Simple to be a store manager in
21 October of 2003?
22   A.   More qualified.
23   Q.   And why would you say that?
24   A.   I believe that her work -- her drive, as I

60

1 said before, was stronger.  That she was -- from what I
2 had seen when she worked for me and what I had heard when
3 she was working at the other location, that she was
4 working and doing whatever it took for the store to
5 succeed and making a lot of very positive changes there.
6 And she --
7    Q.   Did you observe that Ms. Jonland was a person
8 who was affected by race and ethnic background of people?
9    A.   I'm sorry?
10   Q.   Did you observe that Ms. Jonland was a person
11 who was affected by the racial or ethnic background of
12 people?
13   A.   No.
14   Q.   So, other than the incident where she called
15 the fellow employee a fucking foreign bitch, you didn't
16 ever think that she had any type of response that was
17 ethnically or racially motivated; is that correct?
18        MR. SMITH:  I'm going to object to the form of
19 that question.  It assumes that that statement that you
20 just made was actually made.  I think there was an
21 allegation yesterday.  I don't know if there's any
22 testimony that establishes that statement was made.
23        MR. WILLIAMSON:  I'll correct my question.
24 BY MR. WILLIAMSON:

61

1    Q.   You don't think she said fucking foreign
2 bitch; you just think she said bitch.  Is that correct?
3    A.   That's what I was told.
4    Q.   And she was referring to an Indian lady, was
5 she not?
6    A.   Yes, she was.
7    Q.   You didn't think that that reference indicated
8 any type of ethnic or racial --
9    A.   No.
10   Q.   -- motivation or response on behalf of
11 Miss Jonland; is that correct?
12   A.   No, I did not.
13   Q.   And so that's why you're saying that you don't
14 think Miss Jonland was ethnically or racially responsive
15 to other people; is that correct?
16   A.   To my observation, that was correct.
17   Q.   The incident calling the other person a bitch
18 was just an isolated incident?
19   A.   As far as I can -- as far as I know.
20   Q.   You didn't do any investigation of that
21 incident and was not involved in it so you don't know the
22 exact language of what she called her?
23   A.   Correct.
24   Q.   And didn't care to do an investigation, I take

62

1 it?
2    A.   It wasn't my place to do an investigation.
3    Q.   Even though she was your employee?
4    A.   Correct.
5    Q.   Was there any other reason you thought
6 Ms. Jonland was more qualified in October of 2003 than
7 Eric Simple to have the Pontiac job other than she had
8 more drive and was white?
9        MR. SMITH:  Objection to that.  She never said
10 because she was white.
11 BY MR. WILLIAMSON:
12   Q.   Is Ms. Jonland white?
13   A.   Yes.
14   Q.   Well, you did indicate earlier that Mr. Simple
15 was black, and Pontiac wasn't ready for a black manager,
16 didn't you?
17   A.   It was my personal opinion.
18   Q.   I understand that.  But that must mean you
19 think Ms. Jonland was more qualified because she was
20 white?
21   A.   No, that's not true.  I thought that Eric
22 would not have been as happy in Pontiac with --
23   Q.   Because Pontiac wouldn't have been as happy
24 with him?

Eric Simple v. Walgreen Co.

### 63

1    A.  That's my feeling.
2    Q.  Can I see that statement again for a second?
3         MR. SMITH:  Do you want an extra copy?
4         MR. WILLIAMSON:  Yes, thanks.  I had it, and
5    I --
6    BY MR. WILLIAMSON:
7    Q.  How did you know Mr. Simple was very upset?
8    A.  How did I know he was upset?
9    Q.  Yes, ma'am.
10   A.  I could tell from speaking with him.
11   Q.  Was he -- I don't know what you mean when you
12   said that.
13   A.  Yeah, I, I don't recall if he was crying, but
14   he was near tears.
15   Q.  Near tears?
16   A.  Near tears, I would say.
17   Q.  And had he just learned that he didn't get the
18   Pontiac job?
19   A.  I believe so, yes.
20   Q.  So, it was clear to you he wanted the Pontiac
21   job?
22   A.  Yes.
23   Q.  Did he tell you that?
24   A.  I don't know if he told me.  I mean, it, it

### 64

1    didn't need to be said.
2    Q.  Who told him he didn't get the Pontiac job?
3    A.  I'm sure I did.
4    Q.  So, you're getting his immediate response to
5    that situation?
6    A.  Uh-huh.
7    Q.  That's a yes?
8    A.  Yes.  I'm sorry.
9    Q.  And he was near tears after he found out?
10   A.  I believe so.
11   Q.  You don't recall that anybody else was around?
12   A.  Not offhand.
13   Q.  I'm guessing that's probably something you
14   would have told him in private?
15   A.  That would be my guess.
16   Q.  Actually, he asked you why he didn't get the
17   promotion; is that correct?
18   A.  Sure.  Yes.
19   Q.  And that's when you said, I don't think
20   Pontiac is ready for a black manager?
21   A.  I don't think that that was -- I don't think
22   that it went like that, where he's, "Why didn't I get
23   promoted?"
24        "Pontiac's not ready for a black manager."

### 65

1         You know, I don't see it being stated in that
2    type of order.  It was not a one-sentence conversation.
3    Q.  Tell me how the conversation went.
4    A.  I think it went more along the lines of when
5    you're -- like I said, you're trying to discuss something
6    with an upset employee.  You're trying to, you know, say,
7    Hey, this is what happened.  I'm sorry it happened.  I
8    know you wanted it.  You worked hard for it, whatever,
9    but, you know, you probably wouldn't have been happy there
10   anyway.
11   Q.  You say it was well-known in this area that
12   some of the smaller outlying towns have some racist
13   tendencies.  Are you speaking about any town other than
14   Pontiac or Pekin?
15   A.  That's the two that have the bigger reputation
16   in the area that I know of.
17   Q.  Did Mr. Simple ever indicate to you that he
18   would have been uncomfortable being in Pontiac --
19   A.  No.
20   Q.  -- because he was a black male?
21   A.  No.
22   Q.  With respect to the statement -- I think
23   you've already said this -- you think that the second page
24   that we don't have doesn't contain any additional

### 66

1    information; it just contains the date and your signature?
2    A.  I believe so, yes.
3    Q.  And you've not seen the second page of this
4    statement --
5    A.  No.
6    Q.  -- since October of 2003?
7    A.  This statement wasn't given in October
8    of 2003.
9    Q.  I'm sorry.  When was it given?
10   A.  This statement was given --
11   Q.  In 2004?
12   A.  -- in 2004, yes.
13   Q.  What month?
14   A.  Probably August or September.
15   Q.  And since that time frame, you have not seen
16   the second page of the document?
17   A.  No, I have not.
18   Q.  Did you review Turley Exhibit Number 3 at some
19   point in time?  I mean, was it given to you again to look
20   at?
21   A.  On Monday when I met with Mr. Smith, I saw it
22   again.
23   Q.  But you never reviewed it after you initially
24   wrote it out?

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

67

1   A. No, I did not.
2   Q. And this is written out in your handwriting,
3   is it not?
4   A. Yes, it is.
5   MR. WILLIAMSON: This is 4.
6   (Whereupon, Turley Exhibit Number 4 was marked
7   for identification.)
8   MR. WILLIAMSON: Again hand that to Mr. Smith.
9   MR. SMITH: Got it.
10  BY MR. WILLIAMSON:
11  Q. When did you do Turley Exhibit Number 4 then?
12  A. It's dated September 2nd, 2004.
13  Q. Was it done on a separate day than Turley
14  Exhibit Number 3?
15  A. Yes.
16  Q. Why is that?
17  A. I believe that after I made the original
18  statement, then that was reviewed by Loss Prevention.
19  I -- this was a statement that I discussed with
20  Mr. Palmer. I don't know if -- I assume this went to
21  Employee Relations. I don't really know what the chain
22  was for it.
23  Q. Let me understand the sequence of events then.
24  A. Uh-huh.

68

1   Q. You voluntarily write out Turley Exhibit
2   Number 3?
3   A. Yes.
4   Q. That exhibit is reviewed by Loss Prevention
5   and, apparently, Mr. Palmer?
6   A. I don't -- I don't know who does -- I don't
7   know if Loss Prevention goes -- I believe that goes to
8   Employee Relations. I don't know if Mr. Palmer ever even
9   saw my statement.
10  Q. All right. Who told you to do Turley Exhibit
11  Number 4?
12  A. Mr. Palmer.
13  Q. So, Mr. Palmer must have seen --
14  A. Yeah.
15  Q. -- Turley Exhibit Number 3 because he told you
16  to revise the exhibit to indicate Turley Exhibit Number 4;
17  is that correct?
18  A. To revise it?
19  Q. Yes, ma'am.
20  MR. SMITH: Revise which one? So I understand
21  the --
22  BY MR. WILLIAMSON:
23  Q. Well, it's simple enough, isn't it? Turley
24  Exhibit Number 4 is an explanation of Turley Exhibit

69

1   Number 3; is that correct?
2   A. It's in addition to. It's not an explanation
3   of.
4   Q. Well, it was done after Exhibit Number 3?
5   A. Yes, it was.
6   Q. And after Mr. Palmer told you to do the
7   revision; is that correct?
8   A. This was not a revision.
9   Q. Well --
10  A. It's --
11  Q. What do you want to call it?
12  A. It is another statement.
13  Q. It's another statement?
14  A. It's not a revision.
15  Q. All right. We'll call it another statement.
16  The additional statement, the another statement, was done
17  at Mr. Palmer's direction; is that correct?
18  A. Yes.
19  Q. And after he looked at Turley Exhibit
20  Number 3; is that correct?
21  A. I believe he looked at Number 3.
22  Q. What did he tell you to do for the additional
23  statement that's represented by Turley Exhibit Number 4?
24  A. He came in and discussed with me what I --

70

1   what had taken place. He said he -- you know, I mean, he
2   said that this was something that -- was there anything in
3   this statement that I disagreed with, and I said no,
4   that's all true.
5   Q. So, this was --
6   A. So, I signed it.
7   Q. -- Mr. Palmer's statement?
8   A. I don't know who wrote this statement.
9   Q. He gave you that statement?
10  A. Yes.
11  Q. So --
12  MR. SMITH: For --
13  Q. It was already done before you saw it?
14  MR. SMITH: For the record --
15  Q. Is that correct?
16  MR. SMITH: Are you referring to Turley
17  Deposition Exhibit Number 4?
18  MR. WILLIAMSON: Of course.
19  A. Yes.
20  Q. So, when you're handed that exhibit, it's
21  already been done by somebody else; is that correct?
22  A. Yes.
23  Q. That isn't your statement at all then?
24  A. It was a statement that was reviewed with me.

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

71

1  with the following comments, yes.
2       Q.  Ma'am, you didn't do that statement then; is
3  that correct?
4       A.  It was discussed, yes.  But I did not --
5       Q.  Let me back up with you.
6       A.  I did not type this up.
7       Q.  You're testifying under oath in a federal
8  court proceeding.  Now, let me ask you again, Is it
9  correct that the language on that statement is not your
10 language at all; it was prepared for you before you even
11 saw it.  Yes or no?
12      MR. SMITH:  She never said that she did
13 prepare it.
14      MR. WILLIAMSON:  Mr. Smith, if you have an
15 objection, make it.  If you want to take the Fifth
16 Amendment, make it.  But I want her to answer the
17 question.
18      MR. SMITH:  You're attempting to browbeat the
19 witness here.  Just ask --
20      MR. WILLIAMSON:  I am asking a question in a
21 deposition --
22      MR. SMITH:  Just ask the question.
23      MR. WILLIAMSON:  -- and she's testifying under
24 oath.

72

1       MR. SMITH:  Just ask the question.
2  BY MR. WILLIAMSON:
3       Q.  Was that statement done by somebody else and
4  given to you and you were simply asked to attribute
5  yourself to the statement?
6       A.  I was asked to sign the statement.
7       Q.  And it had already been done; is that correct?
8       A.  Yes.
9       Q.  And you didn't do it, did you?
10      A.  No.
11      Q.  Can I see it again, please?
12      MR. SMITH:  Here.  Got an extra copy.
13 BY MR. WILLIAMSON:
14      Q.  Did it occur to you at any point in time to
15 tell Mr. Palmer it was inappropriate for him to amend your
16 original voluntary statement that's labeled Turley Exhibit
17 Number 3?
18      A.  No.
19      MR. SMITH:  I'm going to -- well, object to
20 the term "amend."  I don't think there's any statement
21 that it was amended.
22 BY MR. WILLIAMSON:
23      Q.  Why didn't Mr. Turley -- Mr. Palmer just sign
24 this statement if he was the one who did it?

73

1       MR. SMITH:  I would object to that.  It calls
2  for speculation by the witness.
3  BY MR. WILLIAMSON:
4       Q.  Oh, you don't know Mr. Palmer did it?
5       A.  No, I do not.
6       Q.  Somebody else could have done it?
7       A.  Yes.
8       Q.  He just delivered it to you; is that correct?
9       A.  That is correct.
10      Q.  Did he tell you that, You either sign this
11 statement or, or else?
12      A.  No, sir.
13      Q.  Did he make any threats to you about your job
14 if you didn't sign this statement?
15      A.  No, sir.
16      Q.  Paragraph one is a total misstatement of the
17 procedure at Walgreens, is it not?
18      MR. SMITH:  Did you say the one that's
19 numbered one?
20 BY MR. WILLIAMSON:
21      Q.  Paragraph one of Turley Exhibit Number 4 is a
22 total falsification of the procedure involved in picking a
23 manager at Walgreens, is it not?
24      A.  No, I don't believe so.

74

1       Q.  You earlier testified that the only written
2  basis that exists within Walgreens corporation to promote
3  an EXA to store manager was the evaluation done of that
4  EXA by the store manager; is that correct?
5       MR. SMITH:  I think -- objection.  I think
6  that misstates her prior testimony, but --
7  BY MR. WILLIAMSON:
8       Q.  What is your answer, ma'am?
9       A.  This does not say anything on here about a
10 written, written policy.  This says, As store manager,
11 promotions are a joint decision by district manager, Ops
12 V.P. and Senior Ops V.P.  It does not say that there's a
13 written policy.
14      Q.  I see what it says.  As store manager,
15 promotions are a joint decision by district manager, Ops
16 V.P. and Senior Ops V.P.  It was inappropriate for a store
17 manager to lend opinion as to why an individual may or may
18 not have been promoted.
19      Is that what it says?
20      A.  That is what it says.
21      Q.  Isn't that a falsification of what actually
22 takes place at Walgreens?
23      A.  No, sir.
24      Q.  Well, the only way that the district manager

**75**

1 can make a decision on a promotion of an EXA to store
2 manager is by viewing the evaluation being done on that
3 EXA by the store manager; is that correct?
4 　　A.　No, he also can view for himself during store
5 visits and when he sees how an operation is going.
6 　　Q.　Well, this statement then as to lend opinion
7 as to why an individual may or may not be promoted is
8 absurd because he's using your evaluation to make a
9 determination on what EXA should be promoted; isn't that
10 correct?
11 　　　　MR. SMITH:　I'm going to object to that
12 question. It's argumentative.
13 BY MR. WILLIAMSON:
14 　　Q.　Do you agree it's absurd to say that?
15 　　A.　I believe that you are misunderstanding what
16 is written here.
17 　　Q.　I'm not misunderstanding anything, ma'am.
18 　　A.　Yes, I believe you are.
19 　　Q.　You don't lend your opinion as store manager
20 to whether an EXA should be promoted to a manager within
21 the Walgreen system.　Is that what you're saying?
22 　　A.　No.　What I'm saying is that's not what this
23 statement is saying.　This statement is saying it was
24 inappropriate for myself to lend opinion to the individual

**76**

1 who was not promoted as to why he may or may not have been
2 promoted.　What this statement is saying was that it was
3 inappropriate for me to have talked to Mr. Simple about
4 why he may or may not have been.
5 　　Q.　You're certainly reading a lot into that
6 sentence, ma'am.
7 　　A.　That's how I read it when I signed it.
8 　　　　MR. SMITH:　That's not a question.
9 BY MR. WILLIAMSON:
10 　　Q.　The only documentation the district manager
11 uses in the Walgreens system is the written evaluation of
12 the store manager regarding the EXA.　I mean, if that's
13 not correct, tell me.
14 　　A.　All -- what I am telling you is when I signed
15 this statement, I signed this statement because I believed
16 that this said it was inappropriate for me to talk to
17 Eric.　That is how I took this statement as stating.
18 　　Q.　So, Turley Exhibit Number 4 then is somewhat
19 of a repudiation of you in terms of what you had done as a
20 store manager; is that true?
21 　　A.　Correct.
22 　　Q.　So, it's not so much an additional statement
23 of yours?
24 　　A.　Correct.

**77**

1 　　Q.　It's a comment in writing by Mr. Palmer that
2 you -- what you had done was inappropriate?
3 　　A.　I repeat, I don't know who wrote this.
4 　　Q.　So, maybe this reference to the additional
5 statement, all of that discussion was inappropriate
6 because that's really not what this document is.　Is that
7 again true?
8 　　　　MR. SMITH:　What --
9 BY MR. WILLIAMSON:
10 　　Q.　I mean, this isn't an additional statement
11 you're making about your discussion with Eric Simple?
12 　　A.　Right.
13 　　Q.　This is an additional document that provides
14 for a form of disciplinary action against you by
15 Mr. Palmer that you're signing off on?
16 　　A.　It is disciplinary action, yes.　I don't know
17 who -- I don't know who wrote this statement.
18 　　Q.　But you know who gave it to you?
19 　　A.　Yes.
20 　　Q.　And who told you to sign it?
21 　　A.　Who asked me to sign it.　I was not told to
22 sign it.
23 　　Q.　Let me get that language down pat then.　What
24 did he say?　"Would you please sign this document?"

**78**

1 　　A.　Yes.　"Would you sign this document?"
2 　　Q.　Was that his exact language?
3 　　A.　I don't know his exact language.
4 　　Q.　Was there any witness present for that
5 particular conversation, by the way?
6 　　A.　I don't believe so.
7 　　Q.　And you said, "Why, sure, I'll sign this"?
8 　　A.　Yes.
9 　　Q.　Okay.
10 　　A.　That's your copy.
11 　　Q.　Thanks again.
12 　　　　Was any other disciplinary action taken
13 against you as a result of these comments to Eric Simple
14 in October of '03 other than what might be represented on
15 Turley Exhibit Number 4?
16 　　A.　No.
17 　　Q.　Were you ever given a written reprimand or
18 oral reprimand in any way as a result of that incident?
19 　　A.　I don't believe so.　I mean, there was an oral
20 reprimand at the same time that this was done.
21 　　Q.　Was there anything else Mr. Palmer said to you
22 during that conversation I haven't asked you about?
23 　　A.　Not that I can recall.
24 　　Q.　What was the oral reprimand?

79

1    A.  Basically restating what's in here, that it
2  was not something I should have done.
3    Q.  Tell me what he said.
4    A.  I don't know the exact conversation.  I know
5  the gist of it was that I should not have offered opinion
6  because it wasn't my place to offer opinion to Eric.
7    Q.  Was there anything else said?
8    A.  Not that I recall, no.
9    Q.  So, you took that as an oral reprimand?
10    A.  Yes.
11    Q.  Did it result in any tangible loss of job
12  benefits to you?
13    A.  No.
14    Q.  Was there any written record made in your
15  personnel file or any other file regarding that incident
16  other than what you've told me?
17    A.  I don't know.
18    MR. WILLIAMSON:  This will be 5.
19    (Whereupon, a recess was taken.)
20    (Whereupon, Turley Exhibit Number 5 was marked
21  for identification.)
22  BY MR. WILLIAMSON:
23    Q.  Go ahead and glance at that if you want to.
24    (A pause was had in the record.)

80

1  BY MR. WILLIAMSON:
2    Q.  With respect to Turley Exhibit Number 5 which
3  I had earlier shown you, have you seen that document prior
4  to today?
5    A.  On Monday.
6    Q.  And what is that document that you understand?
7    A.  It's a case report, Case Inquiry Report.
8    Q.  And who is it done by?
9    A.  Martise Scott.
10    Q.  That was the gentleman that conducted the
11  interview you've described?
12    A.  Yes.
13    Q.  The report indicates in the body of it that a
14  statement was taken from you and other people, and I just
15  want to make sure that the statement that report is
16  referencing is Turley Exhibit Number 3.
17    MR. SMITH:  Can you refer her to, in Exhibit
18  Number 5, where it says the statement -- that her
19  statement was taken?
20  BY MR. WILLIAMSON:
21    Q.  That isn't the language.  I'm saying that the
22  exhibit refers -- I think it refers to "S" by names,
23  meaning statements.  I don't mean to put words in your
24  mouth.

81

1    A.  Yeah, I'm --
2    Q.  Just look at the --
3    A.  I believe this is about the entire -- yes, the
4  statements that I made.
5    Q.  And that's my point in handing you that
6  exhibit then --
7    A.  Uh-huh.
8    Q.  -- to make certain that we both understand
9  that the exhibit that's been referred to as Turley Exhibit
10  Number 3 was done for purposes of compilation of that
11  investigatory report which is now Turley Exhibit Number 5.
12    A.  It appears that in Number 5 there are also
13  more --
14    Q.  More statements?
15    A.  -- more statements.  Uh-huh.
16    Q.  And I agree with you.  But do you have any
17  reason to suggest otherwise, that Turley Exhibit Number 3
18  was done for purposes of preparing the investigative
19  report that is now marked as Turley Exhibit Number 5?
20    A.  No.
21    Q.  Can I see that again for a second?
22    Is it your recollection that Martise Scott did
23  contact you on August 25th, 2004?
24    A.  He did contact me.  Like I said, it was

82

1  sometime around that time.  I don't know the date.  He and
2  Ryan Harris both came in and discussed the comments that I
3  had made with me.  That's when I had written the
4  statement.
5    Q.  And as I'm interpreting this report, Mr. Scott
6  was not the one who asked you to do any additional
7  statement after you completed Turley Exhibit Number 3; is
8  that correct?
9    A.  Correct.  Correct.
10    Q.  Who's the LPRM, if you know?  It's Ryan Harris
11  listed in this report.
12    A.  Okay.
13    Q.  I'm wondering what that acronym refers to.
14    A.  Loss Prevention Regional Manager perhaps.
15    Q.  Yes, I was going to say, did you have any
16  contact with Mr. Harris as a result of this investigation?
17    A.  He was there when I spoke with him.  I have
18  not spoken to him since, no.
19    Q.  Okay.  So, Martise Scott and Mr. Harris were
20  both present when they spoke with you on or about
21  August 25th, 2004?
22    A.  Correct.
23    Q.  Loss Prevention -- I mean LPRM --
24    A.  I'm guessing regional manager or something.

Eric Simple v. Walgreen Co.

83

1 but that's a guess on my part. I don't know what the --
2    Q. What is LP?
3    A. LP is Loss Prevention.
4    Q. Right. That's probably right. LP Regional
5 Manager.
6       MR. WILLIAMSON: This will be 6.
7       (Whereupon, Turley Exhibit Number 6 was marked
8 for identification.)
9 BY MR. WILLIAMSON:
10    Q. Handing you what's been marked Turley Exhibit
11 Number 6 which, I believe, consists of four pages. Do you
12 recognize that document?
13    A. No.
14    Q. What does it say?
15    A. District Managers Report of EXA, MGT and AMN
16 Ratings Submitted By Store Managers.
17    Q. And have you seen that document before?
18    A. No.
19    Q. Go ahead and take a minute to review it.
20       Can you decipher what the exhibit shows as the
21 store manager's ratings on the EXAs?
22    A. Yes.
23    Q. Do you see where those are?
24    A. Yes.

84

1    Q. Are those -- some of them are numerical, as I
2 saw it?
3    A. Uh-huh.
4    Q. That's a yes?
5    A. Yes.
6    Q. And on the evaluations that we earlier
7 referenced, Turley Exhibits 1 and 2, I didn't see any
8 numerical references on that evaluation. Am I correct?
9       And go ahead and look at them again if you
10 want to.
11    A. Correct.
12    Q. Does that mean that the store managers give
13 the district manager a numerical evaluation of EXAs?
14    A. It appears to me that, like on the evaluation,
15 they list ratings -- outstanding, above average, meets
16 expectations, needs improvement, unacceptable -- which
17 would be five numbers. It appears to me that they
18 translate each of those into a number on this report.
19    Q. Okay. So, the number on the report correlates
20 to what the evaluation number would be if you're looking
21 at those?
22    A. At each category?
23    Q. Yes.
24    A. Correct.

85

1    Q. Is there any difference other than that when
2 you look at the manager's recommendation on Exhibit
3 Number 5?
4    A. You mean Number 6?
5    Q. 6.
6    A. Not that I can see. It's just each, each of
7 these categories --
8    Q. Okay.
9    A. -- and then the final.
10    Q. Now, would it be fair to say then that the
11 district manager only uses, as an objective basis, the
12 quantification given by the store manager to the
13 performance of each EXA under that store manager's
14 jurisdiction in making up that report as you're looking at
15 it?
16    A. I don't know. It appears to me that this is
17 just data entered from one report to the next.
18    Q. And that's what I wanted you to answer. Is
19 there any additional information or input by anyone else
20 other than the store manager reflected on Exhibit Number 6
21 which represents the district manager's report?
22    A. Does not appear to be.
23    Q. Now, I know you didn't do that report because
24 it's a district manager's report.

86

1    A. Right.
2    Q. Does it represent all the stores in the North
3 Illinois division for a particular time frame?
4       MR. SMITH: This document? As far as stores,
5 I don't see anything --
6 BY MR. WILLIAMSON:
7    Q. Well, I do mean stores because each EXA is
8 working in a store.
9    A. It appears to have all of them in the
10 district. They're not listed by store number, so it's
11 hard for me to --
12    Q. They're listed by EXA, right?
13    A. They're listed by position title, yes. And
14 then I don't know how they break it down after that.
15    Q. And what I was asking is, the individuals are
16 listed, but do they represent persons in all the stores in
17 the Northern Illinois district for the time period the
18 report is made?
19    A. It appears to.
20       MR. SMITH: For the record, I think that's not
21 a -- do you have other pages?
22       THE WITNESS: I have --
23       MR. SMITH: All right. Good.
24       MR. WILLIAMSON: Do you want to show them to

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

---

87

1  Mr. Smith?
2      MR. SMITH:  Yes, I didn't see them.
3      MR. WILLIAMSON:  I said Page 1 through 3, 4, I
4  thought, at the top.
5      THE WITNESS:  Starts at 64, goes to 67.
6      MR. SMITH:  All right.
7      MR. WILLIAMSON:  Do we have an agreement on
8  that, that it's the full report for that particular time
9  frame?
10     MR. SMITH:  Yes, it does appear to be, yes.
11 BY MR. WILLIAMSON:
12     Q.  Now, Miss Turley --
13     A.  Uh-huh.
14     Q.  -- did your second evaluation of Mr. Simple
15 restrict his ability to obtain a manager's job in any way?
16     A.  No, sir.
17     Q.  Had your recommendation as to his managerial
18 capabilities been altered at any -- in any way between the
19 first and second evaluations?
20         That's Turley Exhibit 1 and 2.
21     A.  No, I said he was still listed as exceptional
22 or above average.
23     Q.  We've talked about the Kewanee (sic) job in
24 November of 2003 --

---

88

1      A.  I'm sorry?
2      Q.  -- the Pontiac job in October of 2003 and your
3  second evaluation, I think, terminated in March of 2003.
4          Were there any other manager's jobs that came
5  up in the same district between March of 2003 and October
6  of 2003 that you can recall?
7      A.  I, I have no idea.
8      Q.  Had Mr. Simple been considered for any other
9  jobs prior to March of 2003, to your knowledge?
10     A.  Prior to March of 2003?
11     Q.  Yes, ma'am.
12     A.  I believe so.
13     Q.  Which ones?
14     A.  I believe he interviewed for a job in Peoria.
15     Q.  Which store in Peoria?
16     A.  I believe Western Avenue and --
17     Q.  The old Western Avenue store?
18     A.  The old Western Avenue store.
19     Q.  600 South Western?
20     A.  Yes.
21     Q.  Was that done before he was working as an EXA
22 in your store?
23     A.  I believe so.
24     Q.  How were you aware of that?

---

89

1      A.  He told somebody that told me.  I don't know
2  who.
3      Q.  Any other jobs?
4      A.  I believe the Main Street store in Peoria.
5      Q.  When was that?
6      A.  I don't know.  Again, that's --
7      Q.  But the year?
8      A.  I don't know at all.  And I know that he had
9  been offered, I believe, the -- shouldn't say I know.  I
10 believe he was offered the store in Kankakee at some time,
11 but I can't remember if it was when he worked for me or --
12     Q.  Was that in November of '03?
13     A.  I believe that -- I don't know if that was
14 then or if there was an earlier time as well.
15     Q.  Who was picked for the job in Kankakee in
16 November of '03?
17     A.  Believe that would be Mr. Dave Siegrist.
18     Q.  And where had Mr. Siegrist been before
19 December of '03?
20     A.  I believe Peoria.
21     Q.  Was he a store manager in Peoria?
22     A.  No, he was an EXA.
23     Q.  Is he a white male?
24     A.  Yes.

---

90

1      Q.  And you indicated, if I recall earlier, you
2  didn't know if there was an interview process for the
3  Kankakee job in November of '03?
4      A.  Correct.
5      Q.  So, you don't know whether Mr. Siegrist was
6  interviewed or not by Mr. Palmer?
7      A.  Correct.
8      Q.  Do you know of any other jobs prior to March
9  of 2003 that Mr. Simple may have been considered for or
10 sought in the manager's position at Walgreens other than
11 what you've told me about?
12     A.  No.
13     Q.  I take it during the time that Mr. Simple
14 worked as an EXA for you he made it clear to you that he
15 wanted to be a manager at Walgreens?
16     A.  Yes.
17     Q.  And he did that on many occasions?
18     A.  It was known.  I, I don't know if it's on --
19 "many occasions" is a subjective term.
20     Q.  Did he ask or solicit your advice and help in
21 obtaining a manager's job while he worked under you as an
22 EXA?
23     A.  In terms of performance?  I mean, that's part
24 of my job, is making sure he performs in a way that he can

---

Knight Reporting Service, Ltd.
309-637-0700

Eric Simple v. Walgreen Co.

**91**

1  be considered for a management job.
2      Q.  No, I was thinking more of did he come to you
3  and ask you to help him in terms of a recommendation, in
4  terms of advising him as to what he should do to obtain a
5  manager's job?
6      A.  Not that I recall.
7      Q.  So, he simply told you he wanted to be a
8  manager?
9      A.  Like I said, it was more of in terms of
10  performance to be considered for management jobs. It
11  wasn't a matter of --
12      Q.  Well, what did he say to you about wanting to
13  be a manager?
14      A.  That he wanted to be promoted. I mean --
15      Q.  And when he said that to you, did he indicate
16  that he would restrict himself to which stores he'd be
17  promoted to?
18      A.  I know -- and I, I cannot give you any sort of
19  dates on this at all because I just -- I know at one point
20  he did not want to move to Kankakee. I know that.
21      Q.  Was that November of '03?
22      A.  I don't know. That's what I just said, I
23  don't know which dates it was discussed, if it was prior
24  to that or at that time. I know that he did not really

**92**

1  want to leave the Bloomington area, and that's all I can
2  recall.
3      Q.  So, other than location, do you recall him
4  indicating a restriction in any way of the stores he would
5  take as manager?
6      A.  No.
7      Q.  Kankakee was the only one that you recall?
8      A.  And Peoria.
9      Q.  And Peoria?
10      A.  Yes.
11      Q.  When, when did that happen?
12      A.  I don't know. As I said, I don't -- I recall
13  him not wanting to go to Kankakee or Peoria.
14      Q.  And did he tell you those things?
15      A.  I don't -- I don't know if he told me or if he
16  told others, and they said something to me. I know at one
17  point he did tell me in regards to Kankakee, I remember it
18  opening up and him saying, Oh no -- something to the
19  effect of, Oh, no. Mr. Palmer's probably going to offer
20  it to me again, and I'm going to have to turn it down
21  again.
22      Q.  And you don't know when that was?
23      A.  No, I do not.
24      Q.  Was anyone else present when he said that?

**93**

1      A.  I have no idea.
2      Q.  Let me ask you a few questions. I don't want
3  you to be offended by them; I ask every witness.
4          Have you ever been a party to a lawsuit?
5      A.  No.
6      Q.  Ever been charged with any type of criminal
7  act involving a felony or malfeasance in any way?
8      A.  No.
9      Q.  During the course of the time you've been at
10  Walgreens, have you ever sought or received any type of
11  treatment for alcohol or drug abuse?
12      A.  No.
13      Q.  Does Walgreens have such programs?
14      A.  Yes.
15      Q.  Now, I think you indicated that you talked to
16  Mr. Smith, Ms. Ablin in the past week. You gave a
17  statement that was marked as Turley Exhibit Number 3.
18          Have you ever had a conversation wherein you
19  discussed Mr. Simple's circumstance at Walgreens with
20  anyone else other than on those occasions?
21      A.  His circumstance. Could you be more specific?
22      Q.  His employment relationship.
23      A.  No.
24      Q.  So, you haven't given any other written

**94**

1  statements of any kind?
2      A.  Not that I recall.
3      Q.  You haven't had any statements recorded by
4  anyone?
5      A.  No.
6      Q.  Did you ever have occasion to take any
7  disciplinary action against Mr. Simple?
8      A.  No.
9      Q.  And I somewhat hesitate to ask, but does
10  Walgreens have any oral or written policy regarding
11  disciplinary actions against managers -- management, that
12  would be management trainees, EXAs, and/or store managers?
13      A.  Do we have those things in place?
14      Q.  Any oral or written policies regarding
15  discipline.
16      A.  I mean, there are disciplinary actions taken,
17  yes.
18      Q.  I understand that, but is there any type of --
19  is there any way one would know by going on the website or
20  getting a booklet to understand how that process takes
21  place?
22      A.  I don't know if outside of the company you can
23  understand it. Within the company, yes, there are, under
24  the rules and regulations, under the policies and

Eric Simple v. Walgreen Co.

95

1  procedures, and --
2      Q.  If I were an EXA and I wanted to know how
3  disciplinary action would be taken against me today, how
4  would I find that?
5      A.  How it would be taken against you?
6      Q.  Yes.
7      A.  I'm not sure how you'd find that.
8      Q.  There's no website to go to; there's no
9  booklet that I could call somebody to get?
10     A.  When you are an EXA, part of your training as
11 an EXA is learning how to deliver the disciplinary.  I
12 don't know how --
13     Q.  I'm not concerned about that.
14     A.  I know.  That's what I'm saying, I don't know
15 how you'd -- I've never had the opportunity to look.
16     Q.  And that also would be true then of a store
17 manager?
18     A.  There may -- like I said, there may be a
19 website or a booklet.  I've never investigated it.
20     Q.  If Mr. Palmer called you next week and said,
21 "You're on probation," would you have any way of going to
22 a document to see what that meant?
23     A.  Not that I know of, but --
24     Q.  So, it would all just sort of be --

96

1      A.  It may be well -- it may be out there.  I
2  don't know of it.  I've never looked for it.
3      Q.  During the course of your employment with
4  Walgreens, have you ever attended courses regarding
5  affirmative action matters in the workplace?
6      A.  No, I don't believe so.
7      Q.  Have they ever been offered, to your
8  knowledge?
9      A.  I don't believe so.
10     Q.  Have you ever attended courses regarding
11 sexual harassment in the workplace?
12     A.  I wouldn't say courses, but there have been --
13     Q.  Seminars?
14     A.  -- seminars or, or speakers, yes.
15     Q.  Seminars was the word I should have used in
16 the first question as well.
17     A.  I don't recall ever seminars on, on --
18     Q.  Affirmative action?
19     A.  -- affirmative action.  There have been
20 seminars on --
21     Q.  Or discrimination problems?
22     A.  Correct.
23     Q.  What is correct?  You don't recall any?
24     A.  I don't recall there being any seminars on

97

1  that.
2      Q.  But there were seminars on sexual harassment?
3      A.  Yes.
4      Q.  Who were those seminars given by?
5      A.  Oh, a variety of people.  I've --
6      Q.  Were they in-house employees or law firms
7  hired?
8      A.  I believe they were always in-house employees.
9      Q.  Would you travel someplace to attend them?
10     A.  They gave one at one of our national
11 management meetings, but that was part of -- you know, we
12 didn't travel there specifically for that.  They have
13 given them in our district meetings, but nothing that
14 we've ever traveled specifically for something on
15 harassment.
16     Q.  And at those seminars, would they hand out
17 written material regarding the sexual harassment subject?
18     A.  Yes, I believe so.
19     Q.  Did you retain any of that?
20     A.  I believe it's on file in the district office.
21     Q.  Where would that be?
22     A.  In Peoria, in Mt. Hawley Plaza.
23     Q.  So, the district office for the North Illinois
24 region is in Peoria on --

98

1      A.  In Mt. Hawley Plaza.
2      Q.  That's where Mr. Palmer's office is?
3      A.  Uh-huh.
4      Q.  That's a yes?
5      A.  Yes.
6      Q.  Who else is employed there other than
7  secretarial and clerical help?
8      A.  The district training supervisor works out of
9  that office.  The district pharmacy supervisor works out
10 of the office.  The loss prevention supervisor works out
11 of the office.  I believe a pharmacy technician, district
12 pharmacy technician, kind of a coordinator, works out of
13 that office as well.
14     Q.  Going back, you mentioned the pharmacy a few
15 times.
16     A.  Uh-huh.
17     Q.  If Mr. Simple had been picked for the Pontiac
18 job, would he simply have then started the pharmacy course
19 you've talked about as all managers are required to do?
20         In other words, would he have had to complete
21 that pharmacy course before being picked for the Pontiac
22 job even though it was after 1998?
23     A.  Yes.  As, as of right now, when you go to EXA
24 classes -- when you're picked to attend EXA classes you,

99

1  at that point, take the certification test.
2      Q. But that's because it's after 1998?
3      A. Yeah.
4      Q. What about the people that are caught up --
5      A. I believe beforehand it used to be MGTs took
6  it before they could even attend EXA classes. So, I
7  believe Mr. Simple's already certified and was at that
8  time.
9      Q. So, they gave those classes long before 1998
10  to EXA trainees or management trainees?
11      A. They started with managers in -- around that
12  time, and then they've -- then they extended it further.
13      Q. Well, let me just get right to the question.
14  If one wants to be picked for a manager now, do they have
15  to have completed that pharmacy certification you have
16  talked about?
17      A. To be an EXA, you have to have completed that
18  now, and so yes.
19      Q. Okay.
20      A. All of our EXAs --
21      Q. Is there any other course or certification you
22  have to complete before becoming a manager at Walgreens?
23      A. I don't believe so.
24      Q. And then I wanted to ask you, Is there any

100

1  ability of a non-Walgreens person to be employed directly
2  as a manager?
3      A. No.
4      Q. You have to start off in the company and work
5  your way up?
6      A. Yes. In store operations, yes.
7      Q. And the only objective written data on that
8  way up is provided by the store manager in terms of
9  evaluation; is that correct?
10      A. To the best of my knowledge.
11      Q. There isn't anybody else on the radar screen
12  who's doing something we haven't talked about --
13      A. Not that I --
14      Q. -- that would affect somebody's career path as
15  an EXA?
16      A. Not that I know of.
17      MR. WILLIAMSON: I think that's all I have.
18      MR. SMITH: Have a couple minutes here.
19      (Whereupon, a recess was taken.)
20      MR. SMITH: We have no questions of
21  Miss Turley.
22      (Whereupon, the deposition was concluded at
23  12:12 p.m.)
24

101

1  STATE OF ILLINOIS :
2                      : SS
3  COUNTY OF TAZEWELL :
4
5      I, Jennifer E. Johnson, CSR, RMR, CRR, and
6  Notary Public in and for the County of Tazewell, State of
7  Illinois, do hereby certify that pursuant to notice, there
8  came before me on the 30th day of November, A.D. 2005, at
9  411 Hamilton Boulevard, Suite 1926, Peoria, Illinois, the
10  following named person, to wit:
11                  LEANNE TURLEY,
12  a witness herein, called by the plaintiff, who was by me
13  first duly sworn to testify to the truth and nothing but
14  the truth of her knowledge touching and concerning the
15  matters in controversy in this cause, and that she was
16  thereupon carefully examined upon her oath, and her
17  examination reduced to shorthand by means of stenotype and
18  thereafter converted to typewriting using computer-aided
19  translation by me.
20      I also certify that the deposition is a true
21  record of the testimony given by the witness, and that the
22  reading and signing of the deposition by the said witness
23  was expressly reserved.
24      I further certify that I am neither attorney or

102

1  counsel for nor related to or employed by any of the
2  parties to the action in which this deposition is taken,
3  and further that I am not a relative or employee of any
4  attorney or counsel employed by the parties hereto or
5  financially interested in the action.
6      In witness whereof, I have hereunto set my hand
7  and affixed my notarial seal this 14th day of December,
8  A.D. 2005.
9
10
11
12
13
14
15  Jennifer E. Johnson, CSR, RMR, CRR
16  Illinois CSR #084-003039
17
18
19
20
21
22
23
24

"OFFICIAL SEAL"
JENNIFER E JOHNSON
COMMISSION EXPIRES 05/08/09

Eric Simple v. Walgreen Co.

Leanne Turley
11/30/2005

103

1   ERIC D. SIMPLE,
2        Plaintiff,
3        vs.          Case No. 04-1305
4   WALGREEN COMPANY,
    an Illinois Corporation,
5
        Defendant.
6
7        I hereby certify that I have read the foregoing
    transcript of my deposition given on 11/30/05, consisting
8   of pages 4 through 100, inclusive, and I do again
    subscribe and make oath that the same is a true, correct,
9   and complete transcript of my deposition so given as
    aforesaid.
10
        Please check one:
11
        _____ I have submitted errata sheet(s).
12
        _____ No corrections were noted.
13
14      _____
15          LEANNE TURLEY
16  SUBSCRIBED AND SWORN TO
    before me this _____ day
17  of _____, A.D. 2005/2006.
18
19  _____
        Notary Public
20
21
22
23
24

104

1          WITNESS ERRATA SHEET
2   ERIC D. SIMPLE,
3        Plaintiff,
4        vs.          Case No. 04-1305
5   WALGREEN COMPANY,
    an Illinois Corporation,
6
        Defendant.
7
    Deposition of LEANNE TURLEY (11/30/05)
8
        I wish to make the following changes for the
9   following reasons:
10  Page  Line
11  _____ _____ CHANGE: _____
        REASON: _____
12
        _____ CHANGE: _____
13  _____ _____ REASON: _____
14  _____ _____ CHANGE: _____
        REASON: _____
15
        _____ CHANGE: _____
16  _____ _____ REASON: _____
17  _____ _____ CHANGE: _____
        REASON: _____
18
        _____ CHANGE: _____
19  _____ _____ REASON: _____
20  _____ _____ CHANGE: _____
        REASON: _____
21
22
23  (Signed) _____
24

Knight Reporting Service, Ltd.
309-637-0700