E-FILED
Friday, 28 ... 2007 PM
Clerk, U.S. District ..., ILCD
11/30/2005
Michael Palmer

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

ERIC D. SIMPLE,                    )
                                   )
            Plaintiff,             )
                                   )
     -vs-                          ) Case No. 04-1305
                                   )
WALGREEN COMPANY, an Illinois      )
Corporation,                       )
                                   )
            Defendant.             )

**COPY**

     THE DEPOSITION of MICHAEL PALMER, a witness herein,

called by the Plaintiff for examination in the

above-entitled cause, pursuant to the provisions of the

Federal Rules of Civil Procedure and the Rules of the

Supreme Court thereof, taken before Jennifer E. Johnson,

CSR, RMR, CRR, License No. 084-003039, a Notary Public in

and for the State of Illinois, at 411 Hamilton Boulevard,

Suite 1926, in the City of Peoria, County of Peoria, and

State of Illinois, on the 30th day of November, A.D. 2005,

commencing at 1:16 p.m.

Eric Simple v. Walgreen Co.                    Michael Palmer
                                               11/30/2005

2

1    APPEARANCES:

2

3        NILE J. WILLIAMSON, ESQUIRE
         Attorney at Law
         411 Hamilton Boulevard, Suite 1926
4        Peoria, Illinois  61602
         (309) 677-5950
5            On Behalf of the Plaintiff.

6

7        HINSHAW & CULBERTSON, L.L.P.
         BY:  L. LEE SMITH, ESQUIRE
         Attorney at Law
8        456 Fulton Street, Suite 298
         Peoria, Illinois  61602
9        (309) 674-1025
             On Behalf of the Defendant.

10

11   ALSO PRESENT:

12

13       RACHEL B. ABLIN, ESQUIRE
         Senior Attorney
         Walgreen Company
14
         Eric Simple
15
         Jennifer Simple
16

17

18

19

20

21

22

23

24

**Page 3**

INDEX
                                    PAGE
WITNESS:

MICHAEL PALMER

Direct Examination by Mr. Williamson      4
Cross-Examination by Mr. Smith          105
Redirect Examination by Mr. Williamson  114

EXHIBITS:

PALMER 1                                 11
(Answers to Plaintiff's Interrogatories)
PALMER 2                                 46
(Demographic data for Illinois North)
PALMER 3                                 49
(District Sales Report)
PALMER 4                                 50
(District Sales Report)
PALMER 5                                 53
(Walgreen Company's Privilege Log)
PALMER 6                                 54
(Rating Histories)
PALMER 7                                 57
(Listing of Current EXAs)
PALMER 8                                 58
(Listing of EXAs promoted to Manager)
PALMER 9                                 59
(Listing of Current EXAs)
PALMER 10                                60
(HR Planning 2003)
PALMER 11                                69
(9/3/04 Supervision Visit Notes)
PALMER 12                                76
(4/30/04 Supervision Visit Notes)
PALMER 13                               106
(Group of e-mails)
PALMER 14                               112
(3/18/04 letter to L. Rodriguez
from R. Ablin)

**Page 4**

1        (Witness sworn.)
2        MR. WILLIAMSON: Same stipulation, and you
3    want to waive -- I mean you don't want to waive signature.
4        MR. SMITH: Right. Reserve signature. We
5    stipulate as to the court reporter.
6        MICHAEL PALMER,
7    called as a witness, after being first duly sworn, was
8    examined and testified upon his oath as follows:
9        DIRECT EXAMINATION
10   BY MR. WILLIAMSON:
11       Q.  Can you state your name, age -- or date of
12   birth and address, please?
13       A.  Michael A. Palmer.  50 years old.  5/9/55.
14       Q.  Mr. Palmer, as you've heard before, please
15   give me a brief description of your educational
16   background.
17       A.  High school graduate, 1973, Tipton, Iowa.
18   1979, Bachelor of Science degree, Pharmacy, University of
19   Iowa.
20       Q.  Tell me then your professional background
21   since you left undergraduate school.
22       A.  Immediately upon graduation, I was hired by
23   Walgreens Drug Stores as a staff pharmacist.  At that
24   time -- and was immediately interested in store management

**Page 5**

1    in addition to pharmacy responsibilities, and did both --
2    practiced both pharmacy and management training with
3    Walgreens for approximately three years until I was
4    assigned as a store manager in Madison, Wisconsin.
5        I was a store manager in Madison, Wisconsin,
6    in a number of operations for about 7-1/2 years.  At that
7    time, I was offered the opportunity as a district manager.
8        Q.  That would have been approximately what year?
9        A.  1988.  Offered an opportunity as a district
10   manager and was assigned to what was then the Illinois
11   district, here in Central Illinois.
12       Q.  So, it was Central Illinois, but it was called
13   the Illinois district?
14       A.  Correct.
15       Q.  The boundaries, were they the same as the
16   North Illinois district is now?
17       A.  No.
18       Q.  How did they change?  And that's generally you
19   can tell me.  We don't --
20       A.  In 1988, the boundaries went down as far as
21   Springfield, Jacksonville, Mattoon, Charleston, Decatur,
22   and Danville as well as Peoria, Bloomington, Pekin,
23   Canton, Galesburg, Macomb, Joliet, Kankakee, Bourbonnais.
24       Q.  When did the district name and boundaries

**Page 6**

1    change?
2        A.  Approximately 1992 when it became Illinois
3    North district and Illinois South.  Illinois South
4    district was Jacksonville, Springfield, Decatur, Mattoon,
5    Charleston, Danville and Champaign.  The other markets I
6    mentioned were then Illinois North.
7        Q.  What's the district above Illinois North
8    that's really the northern part of Illinois?  What do they
9    call that?
10       A.  Well, there's now a Joliet district because
11   that market also expanded to the point where it could
12   stand alone, and then you get into the Chicago suburban
13   districts.  There's a number of those.
14       Q.  How about Rockford?
15       A.  That's in one of the Chicago suburban
16   districts.
17       Q.  Okay.  Did I understand then that you're -- I
18   mean, you've worked for Walgreen since you left
19   undergraduate school?
20       A.  Correct.
21       Q.  After you got out of school, have you taken
22   any professional courses or seminars that may or may not
23   have led to some type of certification?
24       A.  No.

Eric Simple v. Walgreen Co.

7

1    Q.  But you have taken professional courses and
2    seminars?
3    A.  I don't believe professional courses. I've
4    attended a number of seminars over the years.
5    Q.  And what were those subjects dealing with?
6    A.  They were all Walgreens-sponsored seminars,
7    dealing with anything inside store operations, everything
8    from sales, profit, training and development, investment
9    management, et cetera.
10   Q.  What do your duties as district manager
11   entail?
12   A.  Job description is rather all-inclusive, but
13   primarily my job is to assist the store managers in
14   maximizing the sales and profits of each operation.
15   Q.  There's been discussion this morning about how
16   the store manager is picked at Walgreens at the present
17   time and for the past 10 years. Who is the individual
18   responsible for picking a store manager?
19   A.  The district manager.
20   Q.  Yourself?
21   A.  Yes.
22   Q.  And does that mean that the store managers
23   have no input?
24   A.  No, they do not have any input.

8

1    Q.  So when you determine to fill a position --
2    Pekin, Peoria, Bloomington -- you make that decision
3    alone?
4    A.  Yes.
5    Q.  Who was the Ops senior vice president referred
6    to?
7    A.  That would be my immediate supervisor.
8    MR. SMITH:  What time frame are we talking?
9    MR. WILLIAMSON:  You know, if he wants to
10   qualify the time frame, he can. I'm basically talking
11   about the 90's and up until now.
12   A.  Then I would need to -- the Operations vice
13   presidents I've worked in, starting back in the early '90s
14   and up, the first would be Barry Markle. The second would
15   be Kevin Walgreen.
16   Q.  Really?
17   A.  Yes. The third would be Mark Wagner. The
18   fourth would be Dave Gloudemans. And presently, John
19   Spena.
20   Q.  And do those individuals have an input into
21   picking store managers then?
22   A.  Not a direct input, although the final
23   decision does require their approval.
24   Q.  They sign off on it?

9

1    A.  Correct. Or they may give me feedback if they
2    had seen something in an operation that they wanted to
3    discuss or review or thought that might -- would want me
4    to maybe take pause or re-evaluate my decision.
5    Q.  Did any of your picks for store manager ever
6    get overturned by the vice president --
7    What does Ops mean?
8    A.  Operations.
9    Q.  Operations. Okay. Did they -- any ever get
10   overturned since you've been a district manager?
11   A.  Yes.
12   Q.  How many?
13   A.  I don't think I can quantify, and I might just
14   want to stipulate that we -- I actually present a plan to
15   them because it involves often a number of operations; and
16   so the plan's modified before it's finalized, but I guess
17   maybe six or eight times.
18   MR. WILLIAMSON:  Would you mark this as --
19   (A discussion was held off the record, and
20   Palmer Exhibit Number 1 was marked for identification.)
21   MR. WILLIAMSON:  Before I go into that, I want
22   to have an on-the-record discussion with Mr. Smith. I had
23   previously sent you a letter regarding the interrogatory
24   answers, and I believe it was 17 and 18. Again, I don't

10

1    have a copy.
2    MR. SMITH:  Yes.
3    MR. WILLIAMSON:  And I was under the
4    impression that the company was going to amend those
5    answers prior to Mr. Palmer's deposition, and you have not
6    done so.
7    MR. SMITH:  We have not. Our answer is
8    essentially going to be -- and I think you heard the
9    answer from Ms. Turley this morning. And we can look at
10   18 and 19, whatever they are.
11   MR. WILLIAMSON:  I don't want to do it without
12   the normal process and written response. I'm saying at
13   this point that if the delay in providing those amended
14   answers prejudices us in taking Mr. Palmer's deposition,
15   we'll need to retake the subject matter of that particular
16   portion of it.
17   Now, secondly, the investigative report that
18   was marked as Exhibit 6 this morning during the course of
19   Ms. Turley's deposition specifically refers to statements
20   of Jessica Culbertson and Jackie Hadley. That's
21   H-a-d-l-e-y. Those have not been produced in discovery.
22   MR. SMITH:  I believe that is correct. And we
23   are going to -- you first made me aware of that yesterday,
24   and we will endeavor to locate those statements and

# Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

**11**

1  provide them to you.
2      MR. WILLIAMSON:  And, you know, I would like
3  those as soon as you can.  It's prejudicing my ability to
4  assess the case without, without seeing the statements of
5  material witnesses.
6      And, of course, you understood that I had to
7  take Ms. Turley's deposition, and I think that those
8  statements cover portions of denials she had this morning,
9  and that's just my speculation at this point.
10      MR. SMITH: I understand your position.  As I
11  said, we will attempt to locate them; and if we can locate
12  them, we will be responding.
13  BY MR. WILLIAMSON:
14      Q.  So, Mr. Palmer, is that a true and correct
15  copy of your answers to interrogatories in this case which
16  you reviewed and signed, I take it, with counsel?
17      A.  Yes.
18      Q.  Is there anything you would like to add or
19  detract from those answers at this point because
20  obviously, they were done at a particular point in time,
21  and you may have different information or different
22  interpretations at this time.
23      A.  Not that I'm aware at this time.
24      Q.  All right.  On the back, as an attachment,

---

**12**

1  there is a harassment policy.
2      A.  Yes.
3      Q.  And why did you attach that policy?
4      A.  I don't recall attaching this policy.
5      Q.  Do you see where it's an attachment?
6      A.  Yes.
7      Q.  There's a little --
8      A.  The tab?
9      Q.  Yes, tab, exactly.  All right.
10      Do you recognize the policy?
11      A.  Yes.
12      Q.  And how do you recognize it?
13      A.  I'm familiar with it as it's on our -- it's a
14  posted policy on our store website.
15      Q.  "Store website."  I mean, you've got thousands
16  of stores throughout the country.  So, "store website"
17  means the primary website for Walgreens?
18      A.  It's an intracompany website for the stores to
19  access policy information, sales information, et cetera.
20      Q.  So, the public could not access that policy --
21      A.  Correct.
22      Q.  -- we're looking at, but employees of
23  Walgreens could?
24      A.  Correct.

---

**13**

1      Q.  And does that govern the behavior of Walgreens
2  employees insofar as it states reference to behavior?
3      A.  Yes.
4      Q.  When was this policy enacted?
5      A.  I don't know.  It's noted at the bottom as 9
6  of '02.
7      Q.  Possibly the print date or -- is that your
8  recollection?
9      A.  I recall direction regarding harassment and
10  discrimination preceding '02 in my career.
11      Q.  But in terms of written policies?
12      A.  I don't know.
13      MR. WILLIAMSON:  Do you have another copy of
14  that one quickly?  I had a separate one.
15      MR. SMITH:  No, I don't think I have that --
16      MR. WILLIAMSON:  All right.
17      MR. SMITH:  -- copy.
18      MR. WILLIAMSON:  Let me find it again in my
19  packet.  I probably have it available.  All right.  Let me
20  go grab it out of my other -- I don't want to keep handing
21  it back.
22  BY MR. WILLIAMSON:
23      Q.  Go ahead and glance through those answers
24  again.  I'll have to take some more time to find a

---

**14**

1  different area where I have these.
2      MR. SMITH:  Do you need the policy or --
3      MR. WILLIAMSON:  No, no, I want the
4  interrogatory answers.
5      MR. SMITH:  Oh, here, do you want to make a
6  copy of it?
7      MR. WILLIAMSON:  Do you have a copy there?  I
8  just don't want to keep handing it back and forth.
9      MR. SMITH:  Well, I don't have my own -- have
10  another copy, at least I don't think.  Maybe I do.
11      MR. SIMPLE:  I have a copy.
12      MR. WILLIAMSON:  With you?  Good.  Because
13  I'll wreck this again if I open it.
14  BY MR. WILLIAMSON:
15      Q.  In answer number one, you indicate that you
16  did not answer number 17 and 20, is that correct, because
17  other people did?  Of course, 17 was actually objected to,
18  but that's still the answer.
19      A.  That's correct, I did not answer those.
20      Q.  And actually, interrogatory number 20 is the
21  one that references the harassment policy, which is
22  attached.  Is that the way you're understanding it?
23      A.  Correct.  There was an answer in there at the
24  time I received the interrogatory, and I thought that that

---

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

**15**

1  was the answer that Walgreens was providing so I didn't
2  add anything additional.
3       Q.  Okay.  As district manager, are you
4  responsible to understand and implement the harassment --
5  anti-harassment and discrimination policy of Walgreens?
6       A.  Yes.
7       Q.  So, you have to be familiar with it?
8       A.  Yes.
9       Q.  And it does cover all types of discrimination
10 and sexual harassment, as I can see by looking at the
11 document.  Again, this is the one attached to the answer?
12      A.  Yes.
13      Q.  Is that also what you understand?
14      A.  Yes.
15      Q.  Is this a disciplinary policy then relating to
16 management as well, so long as harassment or
17 discrimination is involved?
18      A.  If there is a violation of this policy, yes,
19 disciplinary action would be appropriate.
20      Q.  Because it says, Management Responsibilities:
21 Any manager who ignores and/or knowingly conceals concerns
22 of discrimination and/or harassment in violation of this
23 policy will be subject to serious disciplinary action, up
24 to and including termination of employment."

**16**

1       So, that part of it entails disciplinary
2  action?
3       A.  Yes.
4       Q.  There is also a prohibition against
5  retaliation for anyone who would file a charge of
6  discrimination; is that correct?
7       A.  Yes.
8       Q.  And do you enforce that policy?
9       A.  Yes.
10      Q.  When did Miss Turley become aware of the fact
11 that Mr. Simple had filed a charge of discrimination?
12      A.  To my knowledge, it would not have been until
13 I informed her that she was going to be requested to be
14 present for a deposition.
15      Q.  When did you become aware of the fact he had
16 filed a charge of discrimination?
17      A.  Sometime prior to --
18      MR. SMITH:  Just so we're clear, when you say
19 "charge of discrimination," are you speaking of the formal
20 EEOC charge or some other allegation, a more informal
21 sense of charge?
22      MR. WILLIAMSON:  It wouldn't have occurred to
23 me you would have any confusion.
24      MR. SMITH:  I think I understand, but I just

**17**

1  want to make sure that the witness understands.
2       MR. WILLIAMSON:  I think he can tell me if he
3  didn't.  There's only one charge of discrimination in this
4  case.
5       MR. SMITH:  Well, there's a formal charge of
6  discrimination, and then there might be something that --
7       MR. WILLIAMSON:  Well, is there an informal
8  charge that I'm not aware of?
9       MR. SMITH:  A layperson might consider an
10 allegation to be a charge.
11      MR. WILLIAMSON:  Well, news to me, but I'm
12 going to ask the question the same way.
13 BY MR. WILLIAMSON:
14      Q.  When did you become aware of the fact that
15 Mr. Simple had filed a charge of discrimination?
16      A.  I do not recall the exact date, but it was a
17 considerable amount of time prior to current.  It's been
18 like a year, approximately a year.
19      Q.  In '04?
20      A.  Yes.
21      Q.  A year would only take you back to November of
22 '04.
23      A.  I'm approximating, but it has been a period of
24 time.  In excess of six months.

**18**

1       Q.  I mean, the charge was filed in February of
2  '04.
3       A.  I believe I became aware approximately July of
4  '04.
5       Q.  And how did you become aware at that time?
6       A.  The way I'm piecing it together is when I
7  received a letter from Mr. Simple, and in my follow-up
8  with our employee relations department, that's when I
9  became aware that there was a formal charge.
10      Q.  You received a letter from Mr. Simple that
11 said what?
12      A.  I do not recall exactly.
13      Q.  Did it refer to the charge of discrimination?
14      A.  Yes, I believe so.  I believe that's what
15 prompted me to call my corporate office.
16      Q.  That was July of '04?
17      A.  I believe so.
18      Q.  So, in response to that letter, you called
19 corporate offices to seek advice?
20      A.  Yes.
21      Q.  What advice were you given?
22      A.  To mail --
23      MR. SMITH:  Excuse me, objection, any comment
24 about -- any conversations he may have had with counsel.

19

1    MR. WILLIAMSON: He didn't say it was with
2   counsel.
3    MR. SMITH: I just want to make sure he
4   understands.
5    MR. WILLIAMSON: I knew you were going to
6   inject that. You've already made your objections on the
7   privilege log, and that wasn't included.
8    MR. SMITH: I don't think there's been any
9   question -- I'm going to instruct him not to respond to
10   any questions which relate to any communications he's had
11   with counsel.
12    MR. WILLIAMSON: Even if it violates the
13   privilege log you've already sent us?
14    MR. SMITH: I don't believe there's any
15   waiver.
16    MR. WILLIAMSON: There's no reference to
17   Mr. Palmer in the privilege log.
18    MR. SMITH: Well --
19    MR. WILLIAMSON: I shouldn't say that. There
20   might be one memo from Ms. Ablin to him, and that's not
21   the same time frame.
22    MR. SMITH: Well, we're not waiving any
23   privileged communications.
24   BY MR. WILLIAMSON:

20

1    Q. In any event, Mike, do you remember my
2   question?
3    A. No. Could you repeat it, please?
4    COURT REPORTER: So, in response to that
5   letter, you called corporate offices to seek advice?
6    Answer: Yes.
7    Question: What advice were you given?
8    Answer: To mail --
9    MR. SMITH: Again, I would instruct the
10   witness not to answer any questions which are in regard to
11   communications he may have had with, with internal counsel
12   at Walgreens.
13   BY MR. WILLIAMSON:
14    Q. You can answer the question.
15    MR. SMITH: No, he can't.
16    MR. WILLIAMSON: He hasn't said yet that it
17   was with internal counsel at Walgreens.
18    MR. SMITH: All right. If you want to ask
19   that question, as far as who the --
20    MR. WILLIAMSON: I can't even ask the question
21   because he hasn't told me what advice he was given and by
22   whom.
23    MR. SMITH: Well, I would ask the question be
24   first who he had communications with.

21

1   BY MR. WILLIAMSON:
2    Q. You can answer Mr. Smith's question.
3    A. I had communication with employee relations
4   department in our corporate office in Deerfield.
5    Q. What individuals?
6    A. I do not recall.
7    Q. And do you recall the substance of the
8   communication from that office?
9    A. Yes.
10    Q. Was it a male or female person who gave you
11   the communication?
12    A. I do not recall.
13    Q. So, you don't know that it was Miss Ablin?
14    A. I do not.
15    MR. WILLIAMSON: Am I pronouncing that right.
16    MS. ABLIN: No.
17    MR. WILLIAMSON: How is it?
18    MS. ABLIN: Ablin.
19    MR. WILLIAMSON: I'm sorry. There's nothing
20   more irritating.
21   BY MR. WILLIAMSON:
22    Q. Ablin. So, you don't recall that the
23   communication was with Ms. Ablin?
24    A. I just don't recall.

22

1    Q. Okay. What was the substance of the response
2   then?
3    MR. SMITH: Well, again, if it is -- even if
4   he does not recall the specific person, if he believes it
5   was with an attorney --
6    MR. WILLIAMSON: He didn't say --
7    MR. SMITH: Well, he didn't recall, but, I
8   mean, he didn't say it was with Miss Ablin or not.
9    MR. WILLIAMSON: If you're going to tell him
10   not to answer based on this vague background, just do it;
11   and we'll have to move on to a motion which is not what I
12   want to do.
13    MR. SMITH: I'm trying to -- could I have a --
14    MR. WILLIAMSON: I'm entitled to ask him these
15   things.
16    MR. SMITH: Could I have a moment with him
17   here to see if it is covered by the privilege?
18    MR. WILLIAMSON: After you get done
19   instructing him, it may well be.
20    MR. SMITH: Well, I don't know what --
21    MR. WILLIAMSON: He's already said under oath
22   he doesn't know.
23    MR. SMITH: He doesn't know who specifically.
24   I mean, let me -- can I ask him this question: Do you

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

23

1  recall who the type of person was -- I mean who -- the
2  status or position of the person was with whom you had the
3  conversation?
4      THE WITNESS: Yes, I do.
5      MR. SMITH: What was the status?
6      THE WITNESS: It was legal counsel in the
7  employee relations department.
8      MR. SMITH: Then I would object.
9  BY MR. WILLIAMSON:
10     Q. How did you know that?
11     A. Because that's where -- when I called the
12  department, that's what I would -- what I would request,
13  one of the members -- one of the lawyers in the employee
14  relations department for direction.
15     Q. And is that the only person you talked to
16  about the response you should give Mr. Simple's letter?
17     A. Yes.
18     Q. And did you only talk to that person once?
19     A. I am not certain.
20     Q. Do you believe that all of the discussions you
21  had with that department involved members of the legal
22  staff?
23     A. Yes.
24     Q. Specifically attorneys?

24

1      A. Yes.
2      Q. So, you obtained the discussion or advice from
3  the legal staff. Did you respond to Mr. Simple at that
4  point?
5      A. No.
6      Q. When Miss Ablin made a response to EEOC
7  regarding the charge of discrimination, did you provide
8  her with input as to the response?
9      A. No.
10     Q. And she did not contact you for that purpose?
11     A. I've spoken to Ms. Ablin a number of times,
12  and I don't recall if it was in specific relation to what
13  your question is.
14     Q. I mean, have you spoken to her about other
15  employees other than Mr. Simple? Is that what you're
16  saying?
17     A. Oh, yes.
18     Q. So, you don't know if you provided input in
19  her response to the Equal Opportunity Employment (sic)
20  Commission?
21     A. Correct.
22     Q. You don't have anything in writing certainly
23  that would indicate a written response, e-mail or
24  otherwise, because we have -- that was not produced

25

1  either.
2      A. Not that I recall.
3      Q. I'm sort of jumping around in the subject, but
4  it comes to my mind, was -- Miss Turley was not
5  reprimanded in any way then for the incident in October
6  of 2003 as to what she said about the Pontiac job to Eric
7  Simple?
8      A. I met with Ms. Turley and reviewed the
9  circumstances. Once I -- the content of Mr. Simple's
10  letter prompted me to have -- direct the Loss Prevention
11  supervisor to collect a statement, which was reviewed
12  earlier this morning, and I had him collect that
13  statement.
14         Following my reading of that statement that he
15  provided to me, I felt it necessary, as his immediate
16  supervisor, to counsel her and coach her and, I guess,
17  possibly reprimand as to what -- as to what had happened.
18     Q. You say "possibly." I mean, was there a doubt
19  in your mind as to what you were doing?
20     A. No, I was firm on what I was doing.
21     Q. You were reprimanding her?
22     A. Yes.
23     Q. Orally?
24     A. Yes, orally.

26

1      Q. Was that what that one paragraph referred to
2  in Deposition Exhibit Number 4 this morning then?
3         We can have you look at it again if you like.
4      A. Please, I'd like to see that.
5      MR. WILLIAMSON: That's 4 from Turley. I
6  think I have them numbered right.
7  BY MR. WILLIAMSON:
8      Q. Is that a synopsis of the oral reprimand?
9      A. Yes, it is.
10     Q. And that was prepared by you?
11     A. Yes.
12     Q. In advance of your meeting?
13     A. Yes.
14     Q. Was there any consequence to Ms. Turley as a
15  result of the oral reprimand?
16     A. No, I -- in terms of consequence, in the
17  course of my discussion with her, I wanted to be sure that
18  these points were very clear to her. And at that time I
19  did explain to her that I thought she used extremely poor
20  judgment, and that if there was anything of a similar
21  nature in the future that there could possibly be further
22  disciplinary action, written discipline, not exclusive of
23  termination of employment.
24     Q. Were you familiar then with the incident

**Eric Simple v. Walgreen Co.**

Michael Palmer
11/30/2005

27

1  involving Melissa Jonland -- again, excuse my
2  pronunciation -- that you heard about this morning where
3  she called a co-employee at least a bitch?
4      A.  I was aware of that incident, yes.
5      Q.  And how did you become aware of that
6  particular problem?
7      A.  I am not certain.  I -- it's highly probable
8  that I also got it in terms of a statement feedback from
9  the Loss Prevention supervisor.
10     Q.  Do you know when that incident occurred?
11     A.  No, I do not.
12     Q.  And do you know the exact language used by her
13  with respect to the co-employee?
14     A.  I was not aware of the exact language except
15  when I overheard you this morning when you repeated it.
16     Q.  What was your recollection of the language?
17     A.  From this morning?
18     Q.  No.  Before this morning, what did --
19     A.  My recollection was, was that Ms. Jonland had
20  used vulgar language towards another employee.
21     Q.  Of an ethnic or racial nature?
22     A.  I don't recall if it was ethnic or racial.  I
23  knew it was vulgar.
24     Q.  If she just used the word bitch, I guess one

28

1  would consider that vulgar but not ethnic or racial.  Am I
2  understanding your interpretation correctly?
3      A.  Yes.
4      Q.  So, up until this morning, you didn't have any
5  reference to the use of the word foreign bitch or the
6  other word I used?
7      A.  I don't recall that language, no.
8      Q.  In interrogatory answer number three, you
9  described the jobs that Walgreens offered Mr. Simple.  You
10  have only referenced the Kankakee job once as of November
11  of 2001.  Is there a reason for that?
12     A.  No, the record that I had that I used to
13  prepare my answers to the interrogatories was complete to
14  the best of my knowledge at the time.
15     Q.  Do you want to supplement your answer now?
16     MR. SMITH:  Well, we would be the ones who
17  would be involved in supplementing the answer.
18     MR. WILLIAMSON:  Just asking him.  I mean,
19  he's here.
20     A.  No, I guess I do not wish to supplement it.
21     Q.  All right.  Now, you indicate that in November
22  of 2002 you offered the store manager's job to Mr. Simple
23  at the Western Avenue store, at 600 South Western Avenue,
24  Peoria, Illinois, correct?

29

1      A.  Yes.
2      Q.  How did you do that?
3      A.  I don't recall the exact scenario.  I
4  probably -- I would have either met with Mr. Simple
5  specifically or discussed it with him by phone.
6      Q.  And when you say offered the job to him, you
7  offered him the position at a specific salary with the
8  normal bonus a store manager would receive for the volume
9  of that store?
10     A.  Yes.
11     Q.  Was there anything else involved in the offer?
12     A.  This may have been -- there was -- there's a
13  number of times, as you can see, that I offered Mr. Simple
14  an opportunity for a store manager.  At one point, I
15  offered him relocation consideration so that he could be
16  closer to the store.  That may have been with that store.
17     Q.  I'm just asking about this particular
18  situation, though.  In that particular time frame, with
19  that particular store, was there anything else to the
20  offer other than what I've described?
21     A.  Nothing in addition to what I just described
22  which may have occurred with the Western Avenue store or
23  with the Main Street store.  I'm uncertain.
24     Q.  You don't know?

30

1      A.  I'm not certain.  They were right at the same
2  time period.
3      Q.  The relocation offer was what then?
4      A.  To assist Mr. Simple in relocating at a mid
5  point between the Bloomington and the Peoria market so
6  that it would accommodate both a concern he had regarding
7  his wife's commute and his commute.
8      Q.  What does that mean, relocation consideration?
9  You were going to pay him money for moving expenses?  You
10  were going to pay a down payment on a house?  What are you
11  talking about?
12     A.  Moving expenses.
13     Q.  Was there a limit on the amount of moving
14  expenses?
15     A.  That was never negotiated as it was discounted
16  before it was -- before it got to that point.
17     Q.  But that's what you meant by relocation
18  consideration?
19     A.  Yes, assistance in moving his home from the
20  Bloomington-Normal area to some point closer to Peoria.
21     Q.  Was that a requirement of that job offer in
22  November of 2002?
23     A.  No, it was not.
24     Q.  So, he could have stayed at his home and

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

31

1 driven back and forth as part of the job offer?
2     A. Yes.
3     Q. Was that also true of the job offer in
4 December of 2002 to the West Main store?
5     A. Yes.
6     Q. And am I covering the offer of base salary
7 plus bonus, plus relocation consideration, was it the same
8 as the Western Avenue offer?
9     A. Yes.
10     Q. But you haven't offered Mr. Simple any other
11 jobs other than these three as indicated in your
12 interrogatory answers?
13     A. Not that I recall, no.
14     Q. Now, up till now, is there a process or
15 procedure whereby Walgreens picks their store managers?
16     A. No, the selection of store managers is done by
17 the district manager.
18     Q. And that's been true throughout the time
19 you've been a district manager?
20     A. Yes.
21     Q. And there is no written or oral policy as to
22 how that's done?
23     A. Not to my knowledge.
24     Q. And it's in the complete discretion then of

32

1 the district manager to make those selections?
2     A. Yes.
3     Q. Subject to the approval of the vice president
4 you've talked about?
5     A. Yes.
6     Q. Is there subject to anybody else's approval?
7     A. Senior Operations vice president.
8     Q. Above the Operations vice president?
9     A. Correct.
10     Q. So, two individuals may have to approve the
11 selection, but otherwise it's in the complete discretion
12 of the district manager?
13     A. Correct.
14     Q. Does Walgreens have or has it had in the past
15 any type of affirmative action plan for picking store
16 managers?
17     A. No.
18     Q. So, in your region, which I assume is the one
19 you're familiar with, there is no direction from any
20 management official at Walgreens that you need to have a
21 certain number of women, certain number of
22 African-Americans or any other ethnic minority to fill the
23 total number of stores in your district?
24     A. No.

33

1     MR. SMITH: You mean a quota?
2     MR. WILLIAMSON: I didn't use that word yet,
3 but I will.
4 BY MR. WILLIAMSON:
5     Q. There is no quota then for Walgreens?
6     A. No.
7     Q. But I didn't say quota because I didn't mean
8 that. What I meant was an affirmative action plan. There
9 is no such affirmative action plan either, as I understand
10 your testimony?
11     A. Correct.
12     Q. Now, in interrogatory answer four you state,
13 "For the store manager positions offered to Mr. Simple, he
14 was the best qualified because of his experience and work
15 performance as executive assistant manager."
16     What did you mean by that answer?
17     A. It meant that of the candidates I had
18 available to consider to promote to store manager,
19 Mr. Simple had the highest qualifications as based on his
20 experience and his specific work performance in different
21 operations he had been involved in as an executive
22 assistant manager.
23     Q. Was that because of the type of store you were
24 offering him?

34

1     A. No, my -- when I say work performance, I'm
2 relating to his ability to build sales and profit and
3 training and manage investment and so on, so forth,
4 operational skills.
5     Q. Were there other African-American candidates
6 considered for the store manager's position at 1700 East
7 Court Street in November of 2001?
8     A. I don't recall without review.
9     Q. Would that be true of both the Western Avenue
10 store and the Main Street store that occurred in November
11 and December of 2002 as well?
12     A. Without review, I would say — I would state
13 that I do not believe there were any other
14 African-American candidates at that time.
15     Q. So, any other persons you were considering for
16 these three jobs were Caucasian, whether they be male or
17 female?
18     A. Either Caucasian or Asian, as Caucasian-Asian
19 and Afro-American. I don't believe I have any Indian
20 EXAs.
21     Q. Who was the Asian or Asians considered for any
22 one of those three jobs?
23     A. In 2001 or —
24     Q. And in 2002.

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

35

1    A.  Michael Phung would have been one.  I have a
2  number.
3    Q.  Can you spell the last name?
4    A.  P-h-u-n-g.  I don't recall.  I have about 35
5  executive assistant managers in my area so I would have to
6  look at a roster from that time period.
7    Q.  Can you remember anyone else other than
8  Michael Phung?
9    A.  No.
10    Q.  So, anybody else considered for those three
11  jobs was Caucasian?
12    A.  I'm not certain.
13    Q.  Now, when you offered the two Peoria jobs in
14  November and December of 2002, did you know that the
15  stores were going to be closed?
16    A.  Yes.
17    Q.  And did you tell Mr. Simple that?
18    A.  No, it was not -- I did not deem it to be
19  important.
20    Q.  When did you know the stores were going to be
21  closed?
22       I'm not saying that correctly.  You made the
23  job offer in November and December of 2002 when you knew
24  the stores were going to be closed.  How long did you know

36

1  they had to be in existence at the time you made the
2  offers?
3    A.  Please repeat the question.  I got --
4    Q.  I mean, you had information in November
5  of 2002 that the Western Avenue store was going to be
6  closed.  In November of 2002, when did you know it was
7  going to be closed, at what point in time?  Was it going
8  to be three months, six months?
9    A.  I would not have known, but I would have
10  estimated it at about 24 months.
11    Q.  Because you knew that Walgreens was building a
12  new store to consolidate both of those?
13    A.  Yes.  That was my effort at that time, was to
14  do that.  It wasn't completed, but it was well on its way.
15    Q.  The same thing was true of the Main Street
16  store?
17    A.  Correct.
18    Q.  Now, when I reviewed interrogatory answer
19  number five, I thought that the question was asking and
20  you were responding with respect to your answer to
21  interrogatory number three.  Is that what you thought?
22    A.  Not specifically.  My point of reference there
23  were my EXAs that were qualified from a performance
24  standpoint to be considered for a promotion to store

37

1  manager.
2    Q.  But it says, Please identify other EXAs
3  considered for store management positions offered to
4  Plaintiff, and then it asks you to state the specific
5  reference.  And the only stores that you indicated that
6  were offered to Plaintiff were in interrogatory answer
7  number three; isn't that correct?
8    A.  Yes, that's correct.
9    Q.  Michael Phung isn't in this answer?
10    A.  No, he is not.
11    Q.  So, he wasn't one of the EXAs considered for
12  those three jobs?
13    A.  That's correct.
14    Q.  Why did you say earlier that he was one of the
15  EXAs considered for those three jobs?
16    A.  The reason was because I was not aware that
17  this was in reference to interrogatory question number
18  three.  All of the EXAs in my district are considered for
19  store management opportunities, but not specific for a
20  location.
21    Q.  But I asked you specifically the question
22  about the three stores offered to Mr. Simple, and what I
23  said was any non-Caucasian offered that job.  You said
24  Mr. Phung, which you did not say in your answer.

38

1       MR. SMITH:  We would have to go back and look
2  at the question and answer.
3       MR. WILLIAMSON:  I know you want to redo the
4  answer and everything, but he's a district manager, and I
5  know that he can handle things himself.
6       MR. SMITH:  I have no doubt about it.  Your
7  question before was who were the whole universe of EXAs
8  that were considered or that were available for it.
9       MR. WILLIAMSON:  I said were considered for
10  those three jobs.  I was very specific.
11       MR. SMITH:  Well, whatever --
12       MR. WILLIAMSON:  If he misunderstood it, he
13  can say that.
14       MR. SMITH:  What's the question?
15  BY MR. WILLIAMSON:
16    Q.  In any event, according to your interrogatory
17  answer, Mr. Phung was not considered for any of the three
18  jobs listed in answer to interrogatory number three; is
19  that correct?
20    A.  Correct.
21    Q.  Now, there was no answer given to this
22  question as it was asked -- for instance, their race and
23  national origin or even their gender, but as I'm looking
24  at this list, I'm guessing there is no non-Caucasian

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

39

1  person listed that was considered for the three jobs in
2  answer to interrogatory number three. Is that also
3  correct?
4      A. That's correct.
5      Q. So, you have one African-American male that
6  was considered for those three jobs and all Caucasian male
7  or females that were also considered; is that correct?
8      A. Correct.
9      Q. When do you determine whether to interview or
10 not interview for the store manager's position?
11     A. When I'm not certain in my mind who my top
12 candidate is and I'm trying to ascertain who has the
13 strengths or that will best complement the store that I'm
14 needing a manager for.
15     Q. The determination to promote an EXA to store
16 manager, as I understand it, is made in terms of written
17 documentation solely upon the evaluation of the store
18 managers of that EXA; is that correct?
19     A. That's incorrect.
20     Q. What other written documentation is considered
21 by you in determining that a store manager -- EXA should
22 be promoted to store manager?
23     A. First, I do not use written documentation to
24 determine the store managers for a store.

40

1      Q. So, you don't consider the evaluations of the
2  EXAs when you consider promoting to store manager?
3      A. No, the performance evaluations of the EXA are
4  done by the store managers under which they worked.
5      Q. And you don't consider those?
6      A. No, I do not.
7      Q. They don't play any part in your decision to
8  promote somebody to store manager then?
9      A. No, they do not.
10     Q. So, is there any other written documentation
11 that's used and considered by you to promote an EXA to
12 store manager?
13     A. No.
14     Q. So, it's totally subjective, without any
15 written documentation?
16     A. That's correct.
17     Q. Does the fact that an EXA may or may not have
18 an undergraduate degree come into play in determining
19 whether that person's going to be promoted to store
20 manager?
21     A. No.
22     Q. Is that true today as well as in the past?
23     A. That is true today.
24     Q. In interrogatory answer number 15, the

41

1  question relates to how many EXAs who are African-American
2  you promoted to store manager, and you identify one
3  person. Is that still correct today?
4      A. Yes.
5      Q. How many times would you believe you have
6  filled store manager positions during the time you've been
7  a district manager for Walgreens?
8      A. 50 to 75.
9      Q. You can't -- I mean, you have to give that
10 large a range?
11     A. With just a little bit more time, I can
12 probably narrow it down a little better.
13     Q. In interrogatory number 21, you refer to the
14 fact that the store manager at South Western was promoted
15 to a higher sales profit store. What did you mean by
16 that?
17     A. He was promoted from the 600 South Western
18 Avenue store in Peoria to, I believe, Store 2165 on Main
19 Street in Canton, and that store has higher self-service
20 and pharmacy sales and generates a higher level of net
21 profit than the Western Avenue store.
22     Q. As a layperson, I think I understand what
23 higher sales/profit store means; more gross sales, higher
24 net profit. Is that what you're saying in that answer?

42

1      A. Yes.
2      Q. And does Walgreens keep track of the amount of
3  sales and net profit for all of its stores in your
4  district?
5      A. Yes.
6      Q. And have they done that throughout the time
7  you've been a district manager?
8      A. Yes.
9      Q. And is the volume of sales in a store and the
10 net profit something taken into consideration in picking a
11 new store manager?
12     A. Yes, it is.
13     Q. And to what extent?
14     A. Most typically, we assign a new Walgreens
15 store manager promoted from the ranks of executive
16 assistant manager into a reasonably lower sales and profit
17 store so as to minimize the risk of loss should the
18 performance not be what we expect it could be -- or should
19 be, rather.
20     Q. Do you know of any exceptions to that policy
21 during your tenure?
22     A. I'm certain there are exceptions, although I
23 don't recall specific.
24     Q. Jim Hudson is an exception, isn't he?

43

1    A.   I don't recall Mr. Hudson being an exception,
2    no.
3    Q.   You mean you think that he was sent to a lower
4    volume, lower profit store when he first became a store
5    manager?
6    A.   Yes.
7    Q.   Which one was that?
8    A.   1700 East Court Street in Kankakee.
9    Q.   And Mr. Hudson is a white male, isn't he?
10   A.   Yes.
11   Q.   Well, that would be true because all the
12   managers during your tenure have either been white males
13   or white females.  Of the 75 you've talked about, there's
14   only one that hasn't been; is that correct?
15   A.   No, I'm sorry, that is not correct.  I thought
16   your reference was in relation to my district today,
17   Illinois North district, my responsibilities today.  But
18   not over the course of my career as a district manager.
19   Q.   You said you have made 75 appointments, 50 to
20   75?
21   A.   Yes, sir.
22   Q.   So, there's more than Mr. Dones who's been
23   appointed to store manager who's not a white male or
24   female?

44

1    A.   That's correct.
2    Q.   Who else would that be?
3    A.   Alicia Shaner, Hispanic female.
4    Q.   When was she appointed?
5    A.   First would have been in early 90's.  I do not
6    recall her first location assignment, although I believe
7    it was 600 South Western in Peoria.
8    Q.   And do you know her ethnic background?
9    A.   Hispanic.
10   Q.   Any others?
11   A.   Gus Batista, Hispanic male.  Location I don't
12   recall, in Joliet, Illinois.
13   Q.   When was that?
14   A.   Approximately that same time, early to mid
15   90's.
16   Q.   Were those two individuals sent to stores that
17   had primarily Hispanic customer bases?
18   A.   No.
19   Q.   Does Walgreens keep track of its customer base
20   to that extent that they can identify ethnic customer
21   bases?
22   A.   Yes, we have census data for every store.
23   Q.   And the census data shows what?
24   A.   Percentage breakdown African-American, white,

45

1    Hispanic, Asian, and age.
2    Q.   How do you do that?  When I go to Walgreens
3    stores, they don't ask me what my ethnic background is.
4    So, how do you do that?
5    A.   Census data.
6    Q.   You simply take a -- the census data provided
7    by the government as to the area of location of the store?
8    A.   That's correct.  The trade area of the store.
9    Q.   How do you determine the trade area?
10   A.   That's outside of my scope.  We have a market
11   research department that takes into account geographical
12   barriers and traffic flow and access toward -- to the
13   store and that type of thing, but it's out of my area of
14   expertise.
15   Q.   Now, going back to the harassment policy which
16   was attached to the interrogatory answers, not by you but
17   a co-employee, is it fair to state that this policy
18   prevents discrimination amongst Walgreens employees but
19   doesn't have any policy which says Walgreens will try and
20   establish in an affirmative manner that particular groups
21   of individuals will be hired or promoted within the ranks?
22   A.   I apologize.  I lost my train of thought.
23   Would you repeat the question, please?
24        COURT REPORTER:  Now, going back to the

46

1    harassment policy which was attached to the interrogatory
2    answers, not by you but a co-employee, is it fair to state
3    that this policy prevents discrimination amongst Walgreens
4    employees but doesn't have any policy which says Walgreens
5    will try and establish in an affirmative manner that
6    particular groups of individuals will be hired or promoted
7    within the ranks?
8    A.   No, I don't see anything within the policy
9    that states anything about an affirmative action policy.
10        MR. WILLIAMSON:  2.  And hand it to Mr. Smith.
11        (Whereupon, Palmer Exhibit Number 2 was marked
12   for identification.)
13        MR. SMITH:  Do you want me to give it to him?
14        MR. WILLIAMSON:  Yes.
15        MR. SMITH:  Is this a document -- we haven't
16   been provided with this or it's not our document, is it?
17        MR. WILLIAMSON:  It's your document, of
18   course.
19        MR. SMITH:  Well, it has Walgreens, but it
20   doesn't have a Bates stamp number on it.
21        MR. WILLIAMSON:  That may be, but it's still
22   generated by your client.
23        MR. SMITH:  Well, it may be generated, but --
24   yes.

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

47

1       MR. WILLIAMSON: I didn't say it was provided
2   in discovery.
3       MR. SMITH: Okay.
4       MR. WILLIAMSON: There are a lot of things
5   that weren't provided in discovery.
6   BY MR. WILLIAMSON:
7       Q.  What is that document, sir?
8       A.  Looks like demographic -- I don't know that
9   I've ever looked at this specific document before, but it
10  looks like demographic data for each location -- I'm
11  assuming is each location in the Illinois North district.
12      Q.  Do you know who produced that report?
13      A.  No.
14      Q.  Are you saying today is the first time you've
15  seen it?
16      A.  I've seen this data before, this information
17  before, but I don't know who produced this document.  I
18  would know where to access it.
19      Q.  Let me just look at it a second, make sure I'm
20  not duplicating the next exhibit.
21          Where have you seen that document before?
22      A.  It's available on the intranet, our,
23  our within-company database.
24      Q.  And what does it indicate to you specifically

48

1   on the right-hand side?
2       A.  For instance, on Store 2100, the top store
3   there at 1021 Court Street in Pekin, I interpret this to
4   an income level category that this is deemed to be a
5   low-income area with less than $40,000 earned per
6   household and that the ethnicity in that trade area is --
7   for this store, white greater than 80 percent.
8       Q.  When it says African-American greater than
9   40 percent, that obviously means an African-American
10  customer base greater than 40 percent?
11      A.  That's how I would interpret it, yes.
12      Q.  Have you ever used that document in a
13  selections process for store managers?
14      A.  No, I have not.
15      Q.  When you referred earlier to your putting new
16  managers in low-volume stores, that -- was that correlated
17  with the percentage of African-American customer base
18  versus white customer base?
19      A.  No, I'm not aware of a correlation.
20      Q.  So, you're saying that if a store has a higher
21  African-American customer base, there's no correlation
22  between the amount of total sales and net profit?
23      A.  No.
24      Q.  What are you saying then?

49

1       A.  Repeat the question, please.
2           COURT REPORTER: So, you're saying that if a
3   store has a higher African-American customer base, there's
4   no correlation between the amount of total sales and net
5   profit?
6       A.  Correct.
7       Q.  Nor did you ever take into consideration that
8   type of data?
9       A.  No.
10          MR. WILLIAMSON: This will be 3.
11          (Whereupon, Palmer Exhibit Number 3 was marked
12  for identification.)
13  BY MR. WILLIAMSON:
14      Q.  And what is Exhibit Number 3?
15      A.  It's a 21-day sales report for the Illinois
16  North district.
17      Q.  For what period of time?
18      A.  October 1st through the 21st of -- I'm
19  uncertain.  I'm guessing by the date stamp at the top that
20  it was from October of '04.
21      Q.  Have you ever seen that document before?
22      A.  Yes.
23      Q.  Who generates that document?
24      A.  My administrative assistant.

50

1       Q.  At your direction?
2       A.  Yes.
3       Q.  What is the document intended to convey?
4       A.  Conveys to me the sales and the number of
5   prescriptions filled by each store for a 21-day period.
6       Q.  Is the document complete in the format it's
7   given to you?  In other words, does it have the correct
8   number of pages?
9       A.  Yes.
10      Q.  I think it says page two at the top, but there
11  was a cover letter, I'm suggesting to you?
12      A.  No, it's complete.
13      Q.  That document is complete?
14      A.  Yes.
15          MR. WILLIAMSON: This will be 4, right?
16          COURT REPORTER: Yes.
17          (Whereupon, Palmer Exhibit Number 4 was marked
18  for identification.)
19          MR. SMITH: Let me see that.
20  BY MR. WILLIAMSON:
21      Q.  What is that document, sir?
22      A.  Exhibit Number 4?
23      Q.  Yes.
24      A.  It's the same document.  It's a district sales

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

51

1 report for the three-week period of December 1st through
2 the 21st. And again, I'm assuming it's for December of
3 '04 because it's dated at the top as '04 although that's
4 not part of the report.
5     Q. And is it the same document I just handed you
6 in the prior exhibit?
7     A. Yes. Not the same content, but --
8     Q. Not the same -- exactly. Not the same time
9 frame, but the same format of document?
10    A. Yes, it is.
11    Q. Again, what is it intended to convey?
12    A. It conveys what the sales were for each
13 specific operation in both self-service and pharmacy as
14 well as the investment level in self-service inventory and
15 pharmacy inventory.
16    Q. Of all the stores in the North Illinois
17 district for the time frame it's referencing?
18    A. Yes.
19    Q. What is the -- who generates that document?
20    A. My administrative assistant.
21    Q. At your direction?
22    A. Yes.
23    Q. And that's a document that's used on a
24 ritualized basis by Walgreens, monthly or patterned time

52

1 frames?
2     A. It's generated every seven days. 7, 14, 21,
3 and then not again until the end of the month.
4     Q. So, they only -- the longest gap you have is
5 between 21 and 31 of a 31-day month?
6     A. Correct.
7     Q. And that's been done throughout the time
8 you've been at Walgreens?
9     A. Yes.
10    Q. Readily available to yourself and to other
11 Walgreens employees?
12    A. Yes.
13    Q. In management?
14    A. Yes.
15    Q. And used as a tool to define performance of
16 stores and employees?
17    A. No.
18    Q. It's not?
19    A. It doesn't define performance. It reports
20 what the sales were that were generated in their inventory
21 level.
22    Q. When you're selling something, I thought that
23 would have defined performance.
24    A. In a simplistic form, yes, but there could be

53

1 a number of factors that mitigate why a store may or may
2 not be performing well based on these numbers.
3     Q. Okay.
4         MR. WILLIAMSON: Is this 5 or 6?
5         COURT REPORTER: 5.
6         (Whereupon, Palmer Exhibit Number 5 was marked
7 for identification.)
8 BY MR. WILLIAMSON:
9     Q. I'm handing you this document which you
10 probably haven't seen before. That's what's called a
11 Privilege Log provided by your company's counsel during
12 the course of this litigation, and it indicates the
13 documentation that the company counsel claims is not
14 discoverable because it either contains the work product
15 or the advice of the company attorney to employees.
16        There is a reference that's undated on that
17 where Miss Ablin was giving you advice and/or discussion
18 regarding Eric Simple, and she's referencing -- the
19 document's referencing her handwritten notes.
20        Is that possibly the discussion you were
21 referencing earlier as to calling Deerfield for advice
22 after Mr. Simple wrote a letter indicating he had filed a
23 charge of discrimination?
24        MR. SMITH: I'm going --

54

1         MR. WILLIAMSON: I understand it's not a
2 document you produced.
3     A. It is possible.
4     Q. And that was the only time you did that?
5     A. The only time that I've spoken with Rachel
6 Ablin?
7     Q. No, the only time you had a telephone
8 conversation with Rachel Ablin regarding Eric Simple's
9 charge of discrimination in the year 2004.
10    A. I can't be certain. I don't recall.
11    Q. All right. The next packet of documents is a
12 group exhibit, and it refers to various employees.
13        MR. WILLIAMSON: This will be Group 6, right?
14        COURT REPORTER: Yes.
15        (Whereupon, Palmer Group Exhibit Number 6 was
16 marked for identification.)
17 BY MR. WILLIAMSON:
18    Q. Take some time to glance through those.
19        Now, what relationship between a -- do you see
20 between the names in that group exhibit and Eric Simple's
21 lawsuit?
22    A. I don't know that I see a relationship, but I
23 view this as being the performance evaluation scores for
24 members of management in this district over a period of

Eric Simple v. Walgreen Co.

55

1    time, ranging from four to six years -- less than that,
2    three -- three to six years, maybe their entire time
3    they've either been an MGT or an EXA. I'm not familiar
4    with this format, but that's what it appears to be.
5        Q.    What -- who generates that format?
6        A.    I don't know.
7        Q.    Was this the first time you've seen those
8    documents?
9        A.    Yes, it is.
10       Q.    Okay. Can I have -- just look at those a
11   second?
12          Have you ever used documents like this when
13   considering promotion to a store manager's job?
14       A.    No.
15       Q.    Can you interpret what the ratings mean on one
16   of these documents as I hand it back to you? Underneath
17   the word Rating, can you see numbers and letters?
18       A.    Yes.
19       Q.    Can you interpret those for me?
20       A.    Yes.
21       Q.    Tell me what, just in the first -- who's the
22   first person listed?
23       A.    Dawn Barnwell.
24       Q.    And what are Ms. Barnwell's ratings as shown

56

1    on that document?
2        A.    The first is an 81 which is a numerical score
3    that was assigned as her overall performance rating.
4        Q.    On an evaluation by the store manager?
5        A.    Yes, for the year -- for the period ending
6    June 1st, looks like, '97.
7        Q.    And then what?
8        A.    There's a coding of H.
9        Q.    Which means?
10       A.    I'm not clear. The last column I am, but the
11   middle column I'm not.
12       Q.    What is the last column?
13       A.    The M in the top line would mean Meets
14   Expectations, indicating that she meets the performance
15   expectations of an assistant manager. That's the overall
16   evaluation.
17       Q.    What is the next line down?
18       A.    The next line, 82 is a performance rating.
19       Q.    Which would mean for a different time frame?
20       A.    Yes, looks like it's for the next year, 1998.
21       Q.    Then across?
22       A.    The middle column, the F, I'm not -- I'm not
23   clear. And then the last column where she has an E means
24   Exceeds Expectations.

57

1        Q.    So, the only column you're not clear on is the
2    middle column, and that would be true of all the
3    packets -- all of the pages in that exhibit, I take it?
4        A.    Yes, that's true.
5            MR. WILLIAMSON: 7.
6            (Whereupon, Palmer Exhibit Number 7 was marked
7    for identification.)
8            MR. WILLIAMSON: If I get the number wrong,
9    you have to tell me.
10           COURT REPORTER: All right.
11           (Ms. Ablin departed the room.)
12   BY MR. WILLIAMSON:
13       Q.    What is Exhibit Number 7?
14       A.    It's a partial listing of executive assistant
15   managers in the Illinois North district prepared on
16   March 9th of '04 by the Human Resource Center.
17       Q.    And what is the purpose of the document?
18       A.    Provides the member of management's name,
19   their race, their company start date, their position start
20   date, and the store number to which I'm assuming they're
21   currently assigned.
22       Q.    Do you use that document in any manner in your
23   work?
24       A.    No.

58

1            (Whereupon, Palmer Exhibit Number 8 was marked
2    for identification.)
3    BY MR. WILLIAMSON:
4        Q.    Handing you Exhibit 8, what is that document?
5        A.    It's titled as a listing of EXAs promoted to
6    store manager position in Illinois North district since
7    January 1st of '01, prepared, again, on March 9th of '04
8    by the Human Resource area of our company. Provides the
9    EXA's name, their race, the store number assigned, their
10   company start date, their position start date. And then
11   there's a column for company termination date if they'd
12   been terminated. And then there's handwriting as to what
13   market those stores are in.
14       Q.    Is that document correctly listing the data it
15   purports to list?
16       A.    It appears to be accurate. I don't have
17   perfect recall of all these people, but it appears to be
18   accurate.
19       Q.    Is that a document maintained in the regular
20   and ordinary course of business by the Human Resource
21   Information Center of Walgreens?
22       A.    I don't know.
23       Q.    Do you see the date on it?
24       A.    March 9th, '04.

# Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

59

1    Q.   Which is well before the lawsuit?
2    A.   Yes.
3    Q.   So, I'm assuming that that department prepares
4    that document for reasons other than the lawsuit?
5    A.   I wouldn't be able to speculate to that.
6        MR. WILLIAMSON:  Next exhibit.
7        (Whereupon, Palmer Exhibit Number 9 was marked
8    for identification.)
9    BY MR. WILLIAMSON:
10    Q.   What is that document?
11    A.   It's the same as the document we just
12   discussed, Exhibit Number 8, only that it has a listing of
13   the current EXAs in the Illinois North district, prepared
14   on March 9th of '04.
15    Q.   So, your answers to the questions would be the
16   same other than the fact it has somewhat different data on
17   it?
18    A.   Yes.
19    Q.   Is that a document, again, used in the normal
20   and ordinary course of business by Walgreens to your
21   knowledge?
22    A.   Not to my knowledge, no.
23    Q.   Again, do you see the date it was prepared at
24   the top?

---

60

1    A.   Yes.
2    Q.   3-9-04, correct?
3    A.   Yes.
4    Q.   Prior to the lawsuit being filed by
5    Mr. Simple?
6    A.   Yes.
7    Q.   Do you know of any reason -- do you know why
8    the document was prepared by that particular department?
9    A.   No.
10        MR. WILLIAMSON:  Group.
11        (Whereupon, Palmer Group Exhibit Number 10 was
12   marked for identification.)
13    BY MR. WILLIAMSON:
14    Q.   Do you recognize that document?
15    A.   Yes.
16    Q.   What is that?
17    A.   It's a summary of the performance evaluations
18   and forward manpower planning, support document for
19   forward manpower planning for the fiscal year of 2003, it
20   appears, for the Illinois North district.
21    Q.   Who generates that document?
22    A.   Generated by the human resource department.
23    Q.   Is that a document used by you in performance
24   of your job as district manager?

---

61

1    A.   Yes, it is.
2    Q.   In what respect?
3    A.   In recap of the managers' -- store managers'
4    annual performance reviews.
5    Q.   I don't understand.  In recap?  Your recap?
6    Whose recap?
7    A.   I do an individual performance review on each
8    store manager, a formal performance review, such as those
9    we looked at this morning for executive assistant
10   managers, and --
11    Q.   You do one for the store managers?
12    A.   Correct.  And a summary of that information
13   for each manager in my district is on the first page of
14   this recap and the second page, and then following that is
15   a recap of the store managers' evaluations of their
16   subordinates, specifically EXAs, AMNs and MGTs.
17    Q.   And you use that document how in your job?
18    A.   I use this document to make forward manpower
19   plans should I need to make changes in the store manager
20   of an operation.
21        (Ms. Ablin entered the room.)
22    Q.   Forward manpower plans should you need to make
23   changes in the operation of a store.  That would mean if
24   you need to change a store manager, you'd use that

---

62

1    document?
2    A.   I would use this document as one of the tools
3    that I would review before I would consider the
4    replacement for the manager that's leaving.
5    Q.   Which contradicts what you earlier said, that
6    you use no written objective evidence in picking store
7    managers.  Do you agree?
8    A.   Yes, I agree, it would contradict that.
9    Q.   Did you use this document in the year 2003 to
10   select or consider selecting Eric Simple in any job
11   involving a store manager in the North Illinois district?
12    A.   I don't recall.
13    Q.   Did you use that document to select any store
14   manager in the North Illinois district in 2003?
15    A.   I -- again, I don't recall.
16    Q.   So, what you earlier said about using that
17   document as a tool does not apply to the year 2003 in
18   selecting store managers?
19    A.   It may or may not have been paid -- played a
20   part in my selection for a store manager of any of those
21   positions in 2003.
22    Q.   What does that document indicate as to
23   performance of the EXAs that would be a tool to you in
24   selecting a store manager?

---

Eric Simple v. Walgreen Co.

---

63

1    MR. SMITH: I'm sorry. Are we on -- I'm not
2 sure we're on the same -- if I'm on the right one I have.
3 Okay. You're talking about the subsequent date.
4    MR. WILLIAMSON: Well, includes both the store
5 managers and the EXAs, as he's already testified.
6    MR. SMITH: Right.
7 BY MR. WILLIAMSON:
8    Q. Do you remember my question?
9    A. Yes. It would provide me with information as
10 to where the EXA is assigned, provide me with -- I would
11 know then the store manager that they worked with and what
12 that store manager's perception of that employee's
13 performance was for the previous period.
14    Q. So, the tool that that exhibit represents is
15 the input of a store manager as to the performance of the
16 EXA when you determine which of the EXAs to pick for a
17 store manager's vacant position; is that correct?
18    A. In part it is correct.
19    Q. Then the numerical score allocated to an EXA
20 by the store manager would be crucial to you in
21 determining who to pick for a vacant store manager's
22 position?
23    A. No, it would not be crucial.
24    Q. It would only be a tool?

---

64

1    A. That's correct.
2    Q. It would play some part then in the selection
3 process for you to pick an EXA to a vacant store manager's
4 position?
5    A. Possibly, depending on the amount of validity
6 that I would give the score that the manager gave to the
7 EXA.
8    Q. Did you refer to that document then in
9 selecting Melissa Jonland for the Pontiac store in October
10 of 2003?
11    A. No.
12    Q. Did you refer to that document in considering
13 Eric Simple for the Kankakee store in November of 2003, if
14 you considered him for that position?
15    A. No, I did not use this document.
16    Q. Did you consider Mr. Simple for the position
17 of the Kankakee store in November of 2003?
18    A. I don't recall.
19    Q. Did you tell Leanne Turley that he was -- she
20 was to make a verbal offer to Eric Simple of the Kankakee
21 store in November of 2003?
22    A. No, I do not recall.
23    Q. So, you could have, but you don't remember?
24    A. I -- first, I do not remember. But to

---

65

1 communicate a promotional opportunity to a Walgreen
2 employee via another person by telephone would not be in
3 keeping with my practice.
4    Q. I didn't say you did it by telephone. You're
5 now saying you never did that, so what difference would it
6 make whether it was by telephone or not?
7    A. When you referenced through Leanne Turley,
8 Leanne Turley works in Bloomington, Illinois. I would
9 have communicated by telephone.
10    Q. Or by e-mail --
11    A. Or by e-mail.
12    Q. -- like you did most of the time. You're
13 saying you did not do that in the year 2003?
14    A. Correct.
15    Q. You didn't tell Leanne Turley or any other
16 Walgreens employees to communicate an oral offer to Eric
17 Simple as to the vacancy in the Kankakee store --
18    A. No, I did not.
19    Q. -- for store manager?
20    A. No, I did not.
21    Q. And you've never done that; that's not your
22 practice. You don't have store managers make a job offer
23 to an EXA?
24    A. No.

---

66

1    Q. No, meaning that's not your practice?
2    A. No, meaning I do not make job offers to an EXA
3 through a store manager.
4    Q. Is the Pontiac store a lower-volume store in
5 terms of gross sales and net profit?
6    A. Yes.
7    MR. SMITH: Okay.
8    MR. WILLIAMSON: And you wanted to say
9 something?
10    MR. SMITH: Lower than what? Lower than --
11    MR. WILLIAMSON: Well, he's got 28 stores.
12 Obviously compared to the other 27.
13 BY MR. WILLIAMSON:
14    Q. And of the 28 stores, are you saying it's in
15 the lower third, lower half; what?
16    A. Lower third.
17    Q. And is the lower-volume store because of the
18 ethnic customer base in Pontiac?
19    A. No.
20    Q. It's just a lower-volume store?
21    A. Correct.
22    Q. During the time frame from 2000 to 2005, did
23 you believe Eric Simple was qualified to assume a store
24 manager position within the North Illinois district?

---

Eric Simple v. Walgreen Co.

**67**

1  A. Yes.
2  Q. Did any event or occurrence transpire during
3  that time frame to make you alter or change your mind in
4  that judgment?
5  A. Yes.
6  Q. What was that?
7  A. Following -- the specific dates are in the
8  interrogatory answers, but when I made offers for
9  promotional opportunities in Peoria and Kankakee, and
10  Mr. Simple expressed that he wasn't interested in -- his
11  reasons for not wanting to was because he was not willing
12  to relocate to those areas. Following some of those
13  decisions, his performance in the store began to slip.
14  Q. In what respect?
15  A. His performance in terms of his personal
16  drive, his personal productivity, store condition, those
17  areas in the operations when he was associated declined
18  from a previous level.
19  Q. When you say productivity, what do you mean?
20  A. Personal productivity.
21  Q. And what was that?
22  A. Personal productivity in terms of personal
23  time management, the length of time it would take to
24  complete a task.

**68**

1  Q. I don't see that measured by any document
2  we've had in this lawsuit by Walgreens, you or anyone
3  else. I don't see any reference to your ability to know
4  his personal productivity at a particular point in time.
5  Tell me how you arrived at that conclusion.
6  A. I arrived at that conclusion through the -- my
7  onsite supervision in the stores and the division of
8  responsibilities within a store among the different
9  members of management in the store, and how -- what the
10  performance level is to those tasks versus their peers.
11  Q. And how much onsite inspection or observance
12  did you do of Eric Simple after 2001?
13  A. I wouldn't be able to quantify that.
14  Q. Well, can you give us months even?
15  A. Approximately six times a year.
16  Q. For how long each time?
17  A. Three to four hours.
18  Q. Do you have a record that's maintained of that
19  personal observance?
20  A. No.
21  Q. Do you have a daily schedule that's kept with
22  your secretary that would indicate you'd be in Eric
23  Simple's store at particular points in time?
24  A. Not necessarily, no.

**69**

1  Q. I don't understand when you say "not
2  necessarily."
3  A. I don't necessarily have a formal agenda with
4  my administrative assistant.
5  Q. So, there's no record made of your observance?
6  A. No.
7  Q. It's all kept in your head then?
8  A. That's correct.
9  Q. And there's no notes made of your observance?
10  A. Sometimes notes will be made, supervision
11  notes. Sometimes they will not.
12  Q. Were there supervision notes ever made of Eric
13  Simple between 2001 and 2005?
14  A. I don't know.
15  Q. Well, you did have the supervision note on 9/3
16  of '04 when you allegedly made a job offer, didn't you?
17  A. If the 9/3/04 supervision note is the one we
18  referenced yesterday, yes.
19  (Whereupon, Palmer Exhibit Number 11 was
20  marked for identification.)
21  BY MR. WILLIAMSON:
22  Q. That would be Exhibit Number 11, would it not?
23  A. Yes.
24  Q. Is that the only supervision note you have

**70**

1  regarding Eric Simple as an employee of Walgreens between
2  2001 and 2005?
3  A. I don't know.
4  Q. None others were produced, I can tell you.
5  A. Then that would be all that would be
6  available.
7  Q. Does that mean there are such notes that
8  aren't available?
9  A. No, it would mean there are no other notes
10  available to produce.
11  Q. Did someone from Walgreens ask you to go
12  through your files and provide all supervision notes for
13  Eric Simple at some point in time?
14  A. I believe at some point I was asked to produce
15  anything that -- in relation to any information
16  whatsoever, and I did so. Everything that I had.
17  Q. And you produced supervisor's note, which is
18  Exhibit 11?
19  A. Yes, I did.
20  Q. And that's the only one you produced that
21  relates to your notes of Eric Simple during the time frame
22  between 2001 and 2005?
23  A. Yes.
24  Q. Because it's the only one that exists?

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

71

1    A.  Yes.
2    Q.  Because you're not suggesting you're hiding
3  notes, are you?
4    A.  No, I am not.
5    Q.  Why did you do a supervisor's note for that
6  particular occasion?
7    A.  Because I felt it was important to document
8  Mr. Simple's refusal for this promotional opportunity.
9    Q.  What date was that?
10   A.  September 2nd, '04.
11   Q.  That was after the EEOC charge had been filed?
12   A.  Yes.
13   Q.  After you knew the EEOC charge had been filed?
14   A.  Yes.
15   Q.  I won't ask you if that was done at the
16  direction of counsel.  Apparently it was done because you
17  felt it was necessary; is that correct?
18   A.  Yes.
19   Q.  And you brought a witness with you?
20   A.  Yes, I did.
21   Q.  Who was that?
22   A.  Kerry King, store manager of that store.
23   Q.  Was that your idea?
24   A.  Yes, it was.

72

1    Q.  You didn't have Mr. King make notes, did you?
2    A.  No, I did not.
3    Q.  Didn't record the conversation, did you?
4    A.  No.
5    Q.  Didn't get notes from Mr. Simple, did you?
6    A.  No.
7    Q.  Didn't have any other witness there who was
8  non-management; is that correct?
9    A.  I believe on this same date that the Loss
10  Prevention supervisor -- oh, LPS Scott was present.
11   Q.  And did Mr. Scott prepare notes?
12   A.  No.
13   Q.  So, the only notes of the situation are what
14  we're looking at as Exhibit Number 11?
15   A.  Yes.
16   Q.  And I had trouble reading it.  Tell me what it
17  says.
18   A.  The top paragraph begins, Mr. King and DM
19  Palmer reviewed Mr. Simple's inquiry regarding overnight
20  management trainee compensation presently set at 15.20 per
21  hour.  Will advise Mr. Simple of any opening in the
22  market.  Mr. Simple stated that he wanted an overnight MGT
23  position as soon as possible.
24       Reviewed Manager Turley LPS statement

73

1  regarding why Mr. Simple was not promoted to manager in
2  Pontiac with LPS Scott present.  Mr. Simple satisfied that
3  Ms. Turley coached and not offering unfounded opinion
4  regarding manager promotions.
5       Then it's signed by Kerry King and myself and
6  dated 9/2/04.
7    Q.  You said Mr. Simple was satisfied.  Why didn't
8  you have Mr. Simple sign this note?
9    A.  I asked Mr. Simple if he would -- wished to
10  sign that note. He said he did not wish to sign it.
11   Q.  Yet you wrote down he was satisfied?
12   A.  Yes.
13   Q.  He wasn't satisfied enough to sign the note,
14  though?
15   A.  Evidently not, no.
16   Q.  And what was he satisfied about?
17   A.  That -- the direction that had been taken with
18  regards to Ms. Turley and Ms. Turley's comments regarding
19  why Mr. Simple had not been promoted to store manager were
20  handled and reviewed by LPS Scott and myself in a
21  satisfactory manner.
22   Q.  You mean he was satisfied he wasn't picked for
23  the Pontiac job?
24   A.  No, that is not what I'm saying.

74

1    Q.  Then what was he satisfied about?
2    A.  He was satisfied with the action that District
3  supervision and the Loss Prevention supervisor took in, in
4  reviewing the statement that Ms. Turley had made regarding
5  her direction as to why Mr. Simple was not promoted to
6  store manager in Pontiac.
7    Q.  And during this meeting, did you tell
8  Mr. Simple about the contents of Turley Exhibit Number 4
9  that you had prepared?
10   A.  No, I did not.
11   Q.  Then how could he know that you had done
12  anything to Miss Turley regarding the incident?
13   A.  As I recall, the conversation when Mr. Simple
14  and I -- myself and Mr. King were present was that this
15  was the course of action that was to be taken, and --
16   Q.  What course of action?
17   A.  That she would be coached and reprimanded as a
18  result of lending her opinion --
19   Q.  Your notes don't say reprimanded, do they?
20   A.  No, they don't.
21   Q.  What else have you left out of the notes of
22  that particular meeting?
23   A.  None that I recall.
24   Q.  So, you didn't show Mr. Simple Exhibit

Knight Reporting Service, Ltd.
309-637-0700

75

1 Number 4; you didn't tell Mr. Simple that Miss Turley had
2 been reprimanded, yet you wrote down afterwards that
3 Mr. Simple was satisfied with how Ms. Turley had been
4 coached regarding the incident. Is that a proper
5 assessment of this meeting?
6     A.  No, it's not.
7     Q.  What would you like to add to it?
8     A.  The timeline of events is, is different than
9 what you just described.
10     Q.  I didn't describe a timeline.
11     A.  To clarify --
12     Q.  You tell me.
13     MR. SMITH:  Well, this is being argumentative.
14 I mean, you asked him the question, and now you want to
15 ask him to supplement it.
16     MR. WILLIAMSON:  I'm asking him questions, not
17 arguing with him.
18     MR. SMITH:  That's an argumentative question.
19 BY MR. WILLIAMSON:
20     Q.  If you want to clarify it, that's fine with
21 me, sir.
22     A.  No, it's not necessary.
23     Q.  Now, on 4/3/04 (sic) you again made supervisor
24 visit notes, correct?

76

1     A.  I don't recall.
2     (Whereupon, Palmer Exhibit Number 12 was
3 marked for identification.)
4 BY MR. WILLIAMSON:
5     Q.  Handing you Exhibit Number 12, is that again
6 supervisor's visit notes made by yourself?
7     A.  Yes, it is.
8     Q.  So, what you earlier said is inoperative
9 because there was a second set of visit supervisor's
10 notes, correct?
11     A.  It is another set of supervision notes, yes.
12     Q.  And that -- anyone could forget another
13 document like that, not suggesting otherwise. But this
14 is, in fact, a second set of supervisor's notes that you
15 made with respect to Eric Simple?
16     A.  Yes, that's my writing and that date is
17 accurate.
18     Q.  And you wrote that document on that date?
19     A.  Yes, I did.
20     Q.  Again, what is the date?
21     A.  April 30th, '04.
22     Q.  Again, after the EEOC charge was filed,
23 correct?
24     A.  Yes.

77

1     Q.  Why did you make those notes on that date for
2 that situation?
3     A.  At this time, it appears that I offered a
4 promotional opportunity to Mr. Simple as a manager at 600
5 South Western in Peoria, and I was documenting his
6 declining a promotional opportunity.
7     Q.  Why are you treating Mr. Simple differently
8 than everyone else when you make these offers of jobs in
9 terms of making notes about supervisor's visits?
10     A.  I am not treating Mr. Simple differently than
11 I treat anyone else.
12     Q.  So, you have supervisor's notes about every
13 offer you made between 2001 and 2005 for store managers in
14 your district to all other Walgreens employees?
15     A.  No, I do not for that time.
16     Q.  None of those were produced as well. So, the
17 only two supervisor's notes that were produced relating to
18 you are for Eric Simple. That's why I said, Why are you
19 treating him differently? Why are you making supervisor's
20 notes about proposed job actions when you don't do it for
21 any other Walgreens EXA or management person?
22     A.  I documented the refusal for a promotional
23 opportunity.
24     Q.  For Eric Simple?

78

1     A.  Yes.
2     Q.  Why?
3     A.  Because I document refusals for promotional
4 opportunities.
5     Q.  Why weren't they produced?
6     A.  I don't have any others to produce.
7     Q.  Did you destroy the others?
8     A.  No, sir.
9     Q.  Why weren't they produced?
10     A.  I don't know that any -- I don't believe any
11 others exist.
12     Q.  I'm not understanding you. You told me you
13 document in writing, there's a supervisor's note for all
14 other employees, yet they haven't been produced, and
15 you've only given us the two relating to Eric Simple.
16     A.  No, what I meant to communicate was that I
17 document the refusal of a promotional opportunity for an
18 EXA to a store manager.
19     Q.  In ways different than this then?
20     A.  Yes, I do.
21     Q.  But this is the only employee throughout a
22 four-year period of time where you've documented in this
23 manner; is that correct?
24     A.  Yes, that's correct.

Eric Simple v. Walgreen Co.

79

1    Q.  Why did Eric Simple come up in the Plainfield
2  store vacancy discussion?
3    A.  The Plainfield store was in -- was in the
4  Joliet district.  The district manager was soliciting
5  additional qualified manpower to interview for an opening
6  he had in his district that he was unable to fulfill
7  within his own district.
8    Q.  Was the job eventually fulfilled by somebody
9  in the Joliet district?
10    A.  I don't know.
11    Q.  How many employees in your district did you
12  offer up to the Joliet manager to fill the Plainfield job?
13    A.  I believe three.
14    Q.  And those would be?
15    A.  Well, that were actually interviewed --
16  Mr. Simple declined to interview; he was offered that
17  opportunity.  Troy Kaufman and one other EXA, and I don't
18  recall who it was.
19    Q.  Dawn Barnwell?
20    A.  That's possible.
21    Q.  Jennifer Bond?
22    A.  That's also possible.
23    Q.  Is it normal procedure to have EXAs from one
24  district apply for and receive store managers' positions

80

1  in another district?
2    A.  Yes.
3    Q.  How many times has that been done during the
4  time you've been district manager?
5    A.  In my particular district or in the Walgreen
6  Company?
7    Q.  In your district.
8    A.  In my district, none, as I have a strong
9  complement of executive assistant managers.
10    Q.  Now, you earlier stated that after Mr. Simple
11  turned down the Peoria Main Street store, his job
12  performance fell?
13    A.  Some areas in his performance deteriorated.
14    Q.  When did that occur again?
15    A.  Following his refusal of the promotional
16  opportunities or not willing to be promoted to both the
17  Western Avenue and Main Street stores in Peoria.
18    Q.  So, that was December of '02?
19    A.  It was November, December of '02 as I recall.
20    Q.  The last job offer that you've talked about
21  was December of '02?
22    A.  Okay.  Then that would be accurate, December
23  of '02.
24    Q.  So, his job performance started declining

81

1  after that?
2    A.  Yes.
3    Q.  And you observed that in your personal visits
4  to the store?
5    A.  Yes.
6    Q.  Yet you told the Joliet manager that
7  Mr. Simple was one of the three people you were going to
8  pick out of your entire district when he was qualified to be
9  the manager at the Joliet store in the fall of 2004; is
10  that correct?
11    A.  Yes.  I stated he was qualified to be
12  interviewed for the position.
13    Q.  Does that mean that his performance had gotten
14  better then in the time frame you said it fell off?
15    A.  I don't know.  The district manager for that
16  area asked that I solicit qualified executive assistant
17  managers for him to assess.
18    Q.  But my question was, Had your observance of
19  Mr. Simple's work performance changed then in the time
20  frame that you said he fell off?
21    A.  Not that I recall.  It may have improved
22  slightly or it may have been the same or it may have
23  deteriorated slightly.  I don't recall.
24    Q.  And I want to get clear on the Kankakee job.

82

1  How many times was that offered to him?
2    A.  I believe it was offered once in '01, and that
3  may have been the only time it was offered to him.
4    Q.  So, the discussion that took place in November
5  of '03, I mean, the suggestion that Leanne Turley said
6  that to him is just inoperable in your mind?  She didn't
7  say that, she wasn't told to say that, and no one
8  discussed the Kankakee job with Eric Simple in, in October
9  or November of 2003; is that correct?
10    A.  It is inoperable in my mind, but whether
11  someone else discussed it with him I don't know.
12    Q.  You didn't?
13    A.  I did not.
14    Q.  And you didn't tell anybody to discuss it with
15  him?
16    A.  That's correct.
17    Q.  When he asked for the higher rate of pay upon
18  transfer to his present position, what was your reasoning
19  process for not allowing the higher rate of pay -- not the
20  higher rate of pay -- the same rate of pay?
21    A.  His salary was reduced, and the logic behind
22  that was that he had reduced responsibilities as an MGT
23  versus that as an EXA.
24    Q.  And had he expressed to you at some point in

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

83

1  time that he was significantly disappointed with not being
2  appointed a store manager so that he wanted to take a
3  lower-paying job?
4      A.  No, I don't recall that -- I do not recall
5  that statement.
6      Q.  Did he ever express to you, either orally or
7  by e-mail, that he was no longer interested in being a
8  store manager at Walgreens?
9      A.  He did communicate to me that he was no longer
10  interested in being a store manager with Walgreens.  I
11  don't recall if it was by phone or by e-mail or by
12  face-to-face discussion.
13     Q.  When did he do that?
14     A.  When he requested his -- when he expressed his
15  interest in taking an overnight MGT position in
16  Bloomington.
17     Q.  And when was that?
18     A.  That would have been November, approximately
19  November '04.
20     Q.  And were you surprised at his statement about
21  not wanting a store manager's position at that time?
22     A.  Yes, somewhat.
23     Q.  Why?
24     A.  Because I have always felt that Eric has the

---

84

1  potential and the drive to be a very successful Walgreens
2  store manager.
3      Q.  You've always felt that?
4      A.  Well, I meant recent assessments.  In total
5  over the last number of years, he had exhibited
6  performance that said that he could be success-- that I
7  felt he could be successful; thus, I offered him
8  promotional opportunities.  I didn't want him to throw
9  that away.
10     Q.  At some point in time, Mr. Simple indicated to
11  you that he wanted to restrict the jobs he would consider
12  as store manager in terms of distance from his home in
13  Bloomington, did he not?
14     A.  Yes.
15     Q.  When did he do that?
16     A.  I don't recall exactly.
17     Q.  And was that understandable?
18     A.  Unusual, but understandable.  He was very
19  clear about his logic as to why.
20     Q.  And surely other EXAs have said that to you in
21  the past?
22     A.  Yes.  Yes.
23     Q.  Black and white?  Well, not black because
24  you've only had one other EXA that was ever promoted to

---

85

1  store manager.  But white EXAs expressed that to you in
2  the past?
3      A.  Well, I won't attest to the ethnicity, but I
4  have had a number of EXAs request to remain in a certain
5  geographic area.
6      Q.  So, that wasn't a surprise to you that an EXA
7  would say that to you?
8      A.  No.
9      Q.  And I take it that Walgreens does whatever
10  they can to fulfill that type of wish of an EXA if for no
11  other reason to maintain a happy family life with the EXA
12  when they become a store manager?
13     A.  Yes, that's correct.
14     Q.  Because that benefits Walgreens, does it not?
15     A.  Yes.
16     Q.  Now, other than that reservation, did
17  Mr. Simple ever give you any restriction on any store he
18  would take as store manager between 2001 and 2005?
19     A.  What was that?
20     Q.  I believe on -- following the initial -- and
21  I'm going from recall here -- the initial offer for the
22  600 South Western store in Peoria, that coincidentally was
23  followed by an opening almost less than 30 days later at

---

86

1  the Main Street store, and that was --
2          MR. SMITH:  Main Street, which?
3      A.  Main Street in Peoria.
4      Q.  Peoria?
5      A.  Yeah, Main Street in Peoria.  At that point,
6  he expressed to me that he was disappointed that those
7  were the only options he was being offered.
8      Q.  Did he say why?
9      A.  No, he did not say why.
10     Q.  Did you perceive why?
11     A.  Yes, I asked, but did not ever get
12  clarification.
13     Q.  You asked him, and your perception was they
14  were low gross, low profit stores, high shrink rate?
15     A.  No, that was not my perception.
16     Q.  What did you think he was talking about?
17     A.  I did not know.  I queried him but did not get
18  an answer.
19     Q.  Surely that couldn't have been a complete
20  surprise to you, being the district manager, knowing all
21  the sales figures for all the stores, could it?
22     A.  Not a surprise, except that that's -- those
23  are what I consider stores where I start my new store
24  managers in my district.  There's a number of stores that

---

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

87

1  fall into that group, the lower third that you referenced
2  before. Stores in that group is where I start new store
3  managers, and Mr. Simple would have been aware of that,
4  that those opportunities would come up as a first store
5  opportunity.
6       Q.  The store on Knoxville in Peoria, when did
7  that job come up?
8       A.  Most recently, when did that job come up?
9       Q.  No, during the period of 2001 to 2005.
10      A.  Oh, geez.  I probably had three managers in
11 it -- two managers in that store since that date, but I'm
12 not certain.
13      Q.  When was the first time after 2001?
14      A.  I don't recall the exact date.  The manager
15 would have been Vicky Eggers.
16      Q.  Would that have been 2002?
17      A.  I would have to check records.
18      Q.  Did you offer or consider Mr. Simple for that
19 store?
20      A.  No.
21      Q.  Why not?
22      A.  That was a store that I promoted a store
23 manager, a first store -- it was a second-jump promotion,
24 Miss Eggers received --

---

88

1       Q.  From Canton?
2       A.  She may have been assigned to Canton prior to
3  that, yes.
4       Q.  So, you promoted her from Canton to the
5  Knoxville store?
6       A.  Excuse me.  I want to correct myself.  I
7  believe she was in Pekin and then went to Knoxville.
8       Q.  White female?
9       A.  Yes.  Following her, that's when the manager
10 from -- I think where your point of reference is from
11 Canton was promoted into Knoxville.
12      Q.  When did the Pekin manager get transferred to
13 Knoxville?
14      A.  I don't know the date.
15      Q.  You don't know the year either?
16      A.  No.  It's easily attainable.  I just don't
17 recall it.
18      Q.  And when then did the second change occur?
19      A.  Sometime here in the last three years.
20      Q.  Did you consider Mr. Simple when the second
21 occasion came up to appoint a manager for the Knoxville
22 job?
23      A.  No.
24      Q.  Why not?

---

89

1       A.  Because it was a promotional opportunity for
2  an existing store manager in a lower sales and profit
3  store that had proved themselves worthy of the opportunity
4  to manage a higher sales and profit operation.
5       Q.  So, Knoxville was higher than both Western and
6  Main Street in Peoria?
7       A.  Yes.
8       Q.  And always had been?
9       A.  I don't know that it always has been.
10      Q.  Did Mr. Simple ever express any preference for
11 going to the Knoxville store?
12      A.  I don't recall.
13      Q.  Did he ever know that the Knoxville openings
14 existed?
15      A.  He would not necessarily have known.
16      Q.  Because you wouldn't tell him, and there was
17 no way of knowing intracompany that the, the opportunity
18 was coming up?
19      A.  No, there would not be.  If he would have
20 gotten that information, it would have just simply been --
21      Q.  Word of mouth?
22      A.  Yes, that's correct.
23      Q.  As of April 1st of 2004, there's a new
24 procedure for appointing store managers at Walgreens; is

---

90

1  that correct?
2       A.  Not that I'm aware of.
3       Q.  No interview procedure?
4       A.  I'm not aware of a formal procedure.
5       Q.  I didn't say formal.  New procedure?
6       A.  No, I'm not aware of a procedure.
7       Q.  So, you don't interview any more now than you
8  ever did in the past?
9       A.  No.
10      Q.  Do you post the jobs now?
11      A.  No.
12      Q.  And never have in the past?
13      A.  No.
14      Q.  Nothing happened in 2004 then with respect to
15 changing the procedure by Walgreens to pick a store
16 manager?
17      A.  Not to my knowledge, no.
18      Q.  And you would know as a district manager?
19      A.  I definitely should know, yes.
20      Q.  Now, your perception of Eric Simple today in
21 terms of his ability to be a store manager is what?
22      A.  Mr. Simple's not eligible for consideration as
23 a store manager today.
24      Q.  Because he's taken the job as marketing

---

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

**91**

1  assistant?
2    A. He's taken a position code as a management
3  trainee.
4    Q. Which does not allow him to be a store
5  manager?
6    A. Right. It offers him the opportunity to
7  promote to an executive assistant manager.
8    Q. That he's already been?
9    A. Yes.
10    Q. Did you concur with that job choice by
11  Mr. Simple when he made it?
12    A. Yes, I agreed and concurred with his wishes.
13  Actually, we actually put it on a forward plan because
14  there wasn't an opportunity for the position he desired at
15  the time he made the statement.
16    Q. I may not have phrased that exactly the way I
17  wanted to. You didn't encourage or discourage him from
18  taking the lower position at the time he requested it?
19    A. I discouraged it.
20    Q. In what way?
21    A. In the way I referenced in a previous
22  question, that I felt that he could be a successful store
23  manager, and I didn't want him to go backwards in terms of
24  his responsibility and lose that promotional opportunity.

**92**

1    Q. Were you aware at the time you picked the
2  Pontiac store manager that Mr. Simple desired that job?
3    A. That Mr. Simple desired a manager's
4  position --
5    Q. The Pontiac job.
6    A. -- in Pontiac? I was not aware that he
7  specifically desired that location, no.
8    Q. You were only aware that he desired a store
9  manager position?
10    A. Correct.
11    Q. Was there anything about the prior discussions
12  you had had with Mr. Simple that may have indicated
13  restrictions on his part as to what jobs he would take
14  that indicated to you he would not have taken the Pontiac
15  job?
16    A. Nothing indicated to me that he would have
17  refused a promotion to Pontiac.
18    Q. So, if you would have offered him the job, you
19  believe that he would have taken it?
20    A. I don't know if he would have taken it.
21    Q. Do you have any reason to believe he would not
22  have?
23    A. He had reasons for not wanting -- unless they
24  were similar reasons to his reasons for not accepting a

**93**

1  position in Peoria when offered previously, but that could
2  have changed in time.
3    Q. The Pontiac store was producing more volume,
4  more net profit and had a lower shrink rate than either of
5  the two Peoria stores you offered him; isn't that correct?
6    A. I would have to look, but high probability it
7  would have been higher than those two operations.
8    Q. That would also be true including the Kankakee
9  store?
10    A. That's too close for me to call off the top of
11  my head without research, but the Kankakee could have been
12  a higher sales and profit store; most probably was.
13    Q. But again, we'd have to go back to 2001 --
14    A. Right.
15    Q. -- to reference the job offer at Kankakee?
16    A. Right.
17    Q. Because that was the only time that offer was
18  ever made?
19    A. Right. That's why I don't have recall of the
20  profitability of the operation.
21    Q. That was almost a year difference between the
22  Kankakee offers and the offers to the two Peoria stores;
23  isn't that correct?
24    A. Yes.

**94**

1    Q. Now, when did you hear that Miss Turley had
2  made the comment to Eric Simple about the Pontiac store?
3    A. I don't recall the exact date, but it, it got
4  to my office either through possibly an employee calling
5  our hotline -- our privacy hotline that guarantees an
6  anonymous call. It could have been a direct call to my
7  district office.
8       I do recall that I directed the Loss
9  Prevention supervisor to go and collect a statement on the
10  matter so that we could review it, but I do not recall the
11  date.
12    Q. Who was the Loss Prevention supervisor?
13    A. Martise Scott. I've only had two. He's been
14  with me a couple years.
15    Q. This is almost a year after it happened, so
16  that's --
17    A. Yeah.
18    Q. -- when you found out?
19    A. Yes.
20    Q. Just never came up before then?
21    A. It never came to my attention, no.
22    Q. So, he is an employee designated by Walgreens
23  to conduct investigations over matters relating to sexual
24  harassment and/or discrimination?

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

95

1    A. He collects the statement.
2    Q. Does he have any power to recommend
3  disciplinary action?
4    A. No.
5    Q. And he prepares a written report then?
6    A. Yes.
7    Q. For use by whom?
8    A. For review by myself and, if necessary, other
9  areas of the company that may need to offer an opinion.
10    Q. And what was your purpose of ordering the
11  investigation; to determine if it had happened?
12    A. Yes.
13    Q. Did the investigation indicate that it
14  happened?
15    A. I don't recall. I'd have to review the
16  statement.
17    Q. I take it that you did the oral reprimand to
18  Leanne Turley because of your review of the statement?
19    A. I would have to review the statement to know
20  if the two were connected.
21    Q. Why did you do the oral reprimand of Leanne
22  Turley then?
23    A. Like I said, I don't recall the exact time of
24  the events so that's the reason why I would have to review

96

1  the statement first.
2    Q. But what information did you have to cause you
3  to do an oral reprimand of Leanne Turley?
4    A. At some point, either -- it possibly could
5  have been through that report from the LPS that I gathered
6  the information that she made -- that she made a statement
7  to Mr. Simple that was inaccurate and inappropriate. I
8  believe that's where it had come. I was simply saying
9  that I needed to confirm it by looking at the statement,
10  if that's where I got the information. I may have gotten
11  it from the LPS; I may have gotten it through a phone call
12  or a call through my district office.
13    Q. Did you believe that Pontiac wasn't ready for
14  a black male manager?
15    A. No, I do not believe that.
16    Q. That didn't play any part in your decision?
17    A. No.
18    Q. And if I recall, Ms. Jonland did not have a
19  college degree; Eric Simple did?
20    A. That's correct.
21    Q. And it was a job that you knew Mr. Simple
22  sought, there was no reason why he wouldn't seek it, yet
23  you didn't advise him the position was open. And did you
24  interview Miss Jonland at all?

97

1    A. Yes, I did.
2    Q. And was that right at the time you offered her
3  the job?
4    A. Yes, I did.
5    Q. So, you were going to do the interview, and
6  you were going to decide at the end of the interview
7  whether you were going to offer her the job or not?
8    A. That's correct.
9    Q. And she was the only person you interviewed?
10    A. That's correct.
11    Q. But the interview was just to confirm your
12  earlier decision that she was the person for the job
13  anyway?
14    A. That's correct.
15    Q. What would have happened during the interview
16  that would cause you not to hire her?
17    A. Had she -- in the course of the interview that
18  I conducted with her, if she'd have said something that
19  was untoward or made me feel that she was not at that time
20  prepared to be a store manager, or if it brought forward
21  some concern I might have regarding a weakness she might
22  have brought forward, then I would have given the
23  assignment further consideration.
24    Q. Did race play any part in your decision in

98

1  picking the Pontiac job?
2    A. No.
3    Q. Do you think of yourself as a person who's
4  intolerant of race or ethnic background when you're making
5  selections for store managers?
6    A. I make selections for store managers based
7  strictly on performance.
8    Q. And that performance is supplied to you by the
9  store manager who's over the EXA; is that correct?
10    A. No, that's not correct.
11    Q. What are you saying by performance then?
12    A. I evaluate their performance based on what I
13  view in terms of their contribution to the operations
14  they're working in, their responsibilities and how well
15  they execute their responsibilities.
16    Q. And the evaluations of the store manager?
17    A. No, I do not use the evaluations of the store
18  manager in making a store manager selection.
19    Q. What's the purpose of the evaluations by
20  Walgreens if they're not used to consider for promotions?
21    A. The -- Walgreens provides that every employee
22  in Management and Pharmacy receive a formal performance
23  review on an annual basis, done by their immediate
24  supervisor, and that's what -- the performance reviews we

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

99

1  looked at this morning, that's what they do. They satisfy
2  that requirement of the Walgreen Company.
3      Q.  Well, why have the requirement if they're not
4  going to be used?
5      A.  I couldn't speculate as to that.
6      Q.  Are you the only one -- the only district
7  manager at Walgreens who disregards the evaluations when
8  picking store managers?
9      A.  I couldn't speak to that.
10     Q.  Do you know of any other district manager
11  who's told you over the years they don't consider the
12  evaluations when they pick a store manager?
13     A.  I've never had that conversation with a
14  district manager.
15     Q.  So, you don't know one way or the other?
16     A.  No, I don't.
17     Q.  You're sort of in isolation in this district,
18  and you don't know how you compare with the other
19  districts because you've never asked?
20     A.  In relation to whether or not they use store
21  managers' performance evaluations in electing -- in
22  selecting a store manager, no, I do not know.
23     Q.  Is the policy of --
24     MR. SMITH:  Excuse me.  Could we take a

100

1  minute?  We've been at this for a couple hours now.
2      MR. WILLIAMSON:  Sure.
3      (Whereupon, a recess was taken.)
4  BY MR. WILLIAMSON:
5      Q.  At the time that Mr. Simple indicated he
6  wanted to go on third shift, was there discretion on the
7  part of you or any other Walgreen employee to keep him in
8  the EXA classification?
9      A.  No.  There wouldn't be any discretion when you
10  request to take a third-shift position.
11     Q.  Why is that?
12     A.  We don't put EXAs in a third-shift position
13  because they're not able to work with the mainstream of
14  the other store management in the store and continue to
15  grow in the position if they're on the third shift.
16     Q.  There's nothing in writing in terms of policy
17  from Walgreens about that, as I understand it?
18     A.  Not that I'm aware of.
19     Q.  Do you know a Christine Bower in Chicago who's
20  working on third shift as an EXA as we speak?
21     A.  No, I don't know her.
22     Q.  Are there exceptions to that rule then?
23     A.  I don't know.
24     Q.  Not to you, there haven't been exceptions?

101

1      A.  Correct.
2      Q.  Have there been exceptions at Walgreens, I
3  take it?
4      A.  I don't know.
5      Q.  Well, that's all it would take.  The only
6  reason for having the rule is that they're not working
7  around people enough because they're on third shift, so
8  the exception would be you simply allow that person to do
9  it for whatever reason because you think it might be a
10  temporary circumstance; isn't that right?
11     A.  I wouldn't make that assumption.  I don't
12  know.  I don't have that practice in my area.
13     Q.  I'm just saying, it's discretionary whether to
14  designate that person as an EXA even though they're
15  working on the third shift?
16     MR. SMITH:  I think that's been asked, and
17  whether he knows about it --
18     MR. WILLIAMSON:  No, he hasn't said whether
19  it's discretionary or not.
20     MR. SMITH:  Well, whether it's discretionary
21  or not -- talking about discretionary as to him or what?
22     MR. WILLIAMSON:  He can say that.
23     A.  Yes, it is discretionary.
24     Q.  As the district manager?

102

1      A.  Yes.
2      Q.  Are you making that decision, or is the store
3  manager making that decision?
4      A.  I'm making that decision.
5      Q.  So, you had the discretion to allow him to act
6  as an EXA when he went on the third-shift position?
7      A.  Based on my training, I would have felt that I
8  had no discretion.
9      Q.  I don't understand.  You just said you had
10  discretion, and now you're saying based on your training
11  you feel like you had no discretion.  You either do have
12  discretion or you don't.
13     Was there anything in payroll, personnel,
14  human resources, any rule that said you could not have
15  allowed Mr. Simple to continue as an EXA when he took the
16  third-shift position?
17     A.  No.
18     Q.  And you chose to not let him be an EXA even
19  though he asked to be?
20     A.  That's correct.
21     Q.  At what amounted to a pay cut for him as a
22  result of that decision?
23     A.  Yes.
24     Q.  Which also amounted to a situation where he

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

**103**

1  cannot now be a store manager because he's not working as
2  an EXA --
3      A. That's correct.
4      Q. -- even though the individual is totally
5  qualified, has been offered three different store manager
6  positions, and has been an EXA for over five years; is
7  that correct?
8      A. That's correct.
9      Q. I take it you're not too concerned about the
10 personal well-being of Mr. Simple at this point as a
11 district manager?
12     A. I'm concerned about the personal well-being of
13 all the employees I work with.
14     Q. You weren't concerned enough to allow him to
15 be an EXA on the third shift, though?
16     A. My concern for the personnel in the district
17 has nothing to do with Mr. Simple's position code.
18     Q. Well, they're in the position code until you
19 make it. You were the one who made the position code?
20     A. Yes, I did, but it had no relationship to my,
21 my personal regard for Mr. Simple.
22     Q. I'm not understanding you. I mean, your
23 picking that personnel code deprives him of the right to
24 be a store manager, lowers his pay, and doesn't seem to be

---

**104**

1  acting in Mr. Simple's interests, and you're simply saying
2  that has nothing to do with Mr. Simple?
3      MR. SMITH: I'm going to object to the
4  question. It's argumentative.
5  BY MR. WILLIAMSON:
6      Q. You can answer.
7      A. My responsibility is to grow store managers
8  from the position of executive assistant manager. To have
9  an executive assistant manager working the third shift and
10 not gaining the additional knowledge and training to be a
11 successful store manager, in my opinion, is not allowed.
12 Thus, the position code of EXA is not allowed for a
13 third-shift member of management.
14     Q. That's not allowed in your mind?
15     A. That's not allowed in my district.
16     Q. By what rule?
17     A. By my personal decision.
18     Q. Thank you.
19         Now, you heard me ask various questions this
20 morning of all witnesses, and I want to ask you the same
21 ones.
22         Have you ever been a party to a lawsuit?
23     A. No, with the exception of divorce proceedings.
24     Q. You've never been personally sued for any

---

**105**

1  litigation involving a decision involving another
2  employee, I take it?
3          I'm not asking you if you've had to testify on
4  behalf of Walgreens in lawsuits before. I'm asking you if
5  you were ever personally sued in any suit as a result of a
6  decision involving an employee?
7      A. No.
8      Q. Have you ever considered (sic) what you
9  thought was a drug or alcohol problem?
10     A. Repeat the question, please.
11     Q. I said, Have you ever had what you considered
12 to be a drug or alcohol or substance abuse problem?
13     A. No.
14     Q. Have you ever been convicted of a felony or a
15 misdemeanor involving malfeasance or misfeasance of
16 property?
17     A. No.
18         MR. WILLIAMSON: Okay.
19         MR. SMITH: Nothing further?
20         CROSS-EXAMINATION
21 BY MR. SMITH:
22     Q. Just have a few questions; I'll be brief. In
23 regard to the Court Street store in Kankakee, there was
24 some testimony yesterday and there's been further

---

**106**

1  testimony today, was there some communication between
2  yourself and Mr. Simple regarding the store manager's
3  position in that store, Court Street, Kankakee, in 2004?
4      A. I don't recall.
5          MR. SMITH: What's our next number?
6          COURT REPORTER: Next is 13.
7          (Whereupon, Palmer Exhibit Number 13 was
8  marked for identification.)
9  BY MR. SMITH:
10     Q. Let me hand you what I've marked as Palmer
11 Deposition Exhibit Number 13 and ask you to take a look at
12 that and see if that --
13         MR. WILLIAMSON: Can I see it?
14         MR. SMITH: Sure.
15     A. Yes.
16     Q. Okay. Does that refresh your recollection
17 now?
18     A. Yes, it does.
19     Q. Okay. What was the communication or
20 conversation that you had with Mr. Simple about the Court
21 Street store in Kankakee in 2004?
22     A. Okay. This was -- this was an opportunity,
23 2004. The manager that I assigned to that operation was
24 Dave Siegrist ultimately, who is also an EXA. This is a

---

107

1  case where I did not have a store manager that I had
2  confirmed in my mind that I was going to assign to that
3  operation, so I made -- I made it certain that the EXAs in
4  my district were aware that I was considering people who
5  felt that they were qualified for that. The store manager
6  was on vacation at that time, Mr. King.
7      Q. Which store manager?
8      A. Kerry King, Store 2177. I think that's --
9  that's the store that Mr. Simple was assigned to at that
10  time.
11      Q. That's the Oakland Avenue store in
12  Bloomington?
13      A. No. It would be the 1110 North Main store in
14  Bloomington. And so I made -- asked my administrative
15  assistant to advise me which managers were and were not on
16  vacation, and made sure that this note also got forwarded
17  to Mr. Simple, as he was an EXA, along with the other EXAs
18  in the district.
19      And this is Mr. Simple's response to that
20  e-mail.
21      Q. Okay. In the bottom portion of Palmer
22  Deposition Exhibit 13, is that your e-mail to Mr. Simple?
23      A. Yes. Yes. Yes, it is.
24      Q. And the top part, is that Mr. Simple's

108

1  response to you?
2      A. Actually, this is a combined e-mail. The
3  bottom part is a forward. The bottom part is what I sent
4  out across the district to my store managers, but then it
5  only went to the managers' e-mail.
6      And since Mr. King was on vacation, there
7  would have been no access to his e-mail, yet I was
8  requesting responses by 5 p.m. on that date. And,
9  therefore, transmitted it to Mr. Simple at Store 2177.
10  That is what happened.
11      And I only know that because I can tell from
12  the arrows here that this is a copied and forwarded
13  portion of an e-mail.
14      Q. The arrows you're indicating are the arrows on
15  the left-hand side --
16      A. Yes.
17      Q. -- of the lower portion of the writing?
18      A. Yes. I did add the note that says, "I see
19  that Mr. King is on vacation this week and therefore you
20  may not be aware." And then below that is what went out
21  to the store managers' private e-mail addresses.
22      Q. Mr. Williamson had asked you some questions
23  about your use of the performance evaluations in your
24  review of EXAs for store manager positions. And do you

109

1  make absolutely no use at all of the -- of the performance
2  evaluations of the EXAs in deciding how to fill a
3  particular store manager's position?
4      A. I use the store manager's annual performance
5  evaluation if I am uncertain of the EXA who I feel is the
6  top performer and best -- has the best strengths to
7  complement that operation. So, at times I will use it; at
8  times I will not.
9      Q. And what determines whether you look at the
10  performance evaluation or you don't?
11      A. If I'm undecided as to who that EXA that I
12  wish to offer the promotion to is.
13      Q. Mr. Williamson had asked you some questions
14  about EXAs that were promoted to store manager positions
15  and, I think, also about store manager positions and the
16  race or ethnicity of those persons. And I was a little
17  bit unclear as to whether your answer was in regard to
18  current store managers and EXAs or those extended over the
19  period that he referenced at one time, 2001 to 2005.
20      A. Yes.
21      Q. So, I wanted to make sure, you mentioned --
22      MR. WILLIAMSON: Wait a second. You're
23  unclear on something, so you're reforming his answer to
24  cover the period of time that you want to be unclear

110

1  about?
2      MR. SMITH: I'm just asking him --
3      MR. WILLIAMSON: I wasn't unclear at all.
4      MR. SMITH: Well, maybe you were not unclear.
5  Maybe I was -- I want to make sure that we're all on the
6  same --
7      MR. WILLIAMSON: I don't think he was unclear
8  either, Mr. Smith.
9      MR. SMITH: Let me ask if he was.
10  BY MR. SMITH:
11      Q. I heard your answers as far as who were the
12  non-white store managers, and I think you said Alyssa
13  Shaner and Gus Batista?
14      A. Yes.
15      Q. Okay. Now, during the period 2001-2005, have
16  there been other non-white store managers in your
17  district?
18      A. I was recalling from memory -- following my
19  answer to the conversation I remembered Raul Del Rio in
20  Joliet, Hispanic male; and I recalled Twon Win, who was an
21  Asian male, was a manager who opened the Pontiac store.
22      Q. And when was that Pontiac store opened?
23      A. Right about 2001. I'd have to -- I can
24  verify, but I don't have working knowledge of it.

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

**111**

1    Q. Was the -- there was a reference to this
2    verbal altercation that Melissa Jonland had with another
3    employee who was apparently of another nationality. Was
4    that other employee -- first of all, do you remember her
5    name?
6        A. I can't remember her first name. It was
7    either Shashri, and her last name was Mishra.
8        Q. Was she a management employee?
9        A. I was thinking back on that. She may have
10   been in management at one time, and then I believe she
11   voluntarily resigned her position in management and took a
12   part-time position as a -- in a clerk's -- in a clerk
13   position code to pursue school or some other activity at
14   the same time. So, whether or not she was in management
15   at that time, I'm -- I believe she was in management at
16   that time, but I'm not positive.
17       Q. Okay. Show you here a document. It's a
18   letter to Mr. Louis Rodriguez, Equal Employment
19   Opportunity Commission. It's dated March 18, 2004. It's
20   a letter from Ms. Ablin to Mr. Rodriguez.
21       And on the -- at the bottom of the page it
22   shows a blind carbon copy going to Mr. Gloudemans and also
23   to yourself. Would you take a look at that?
24       A. Yes, I recall this letter.

---

**112**

1    Q. Did you receive that?
2        A. Yes, I did.
3        Q. And so that was in -- was that in response to
4    the --
5        MR. WILLIAMSON: Let's mark that.
6        MR. SMITH: Okay. This will be Deposition
7    Exhibit Number 14.
8        (Whereupon, Palmer Exhibit Number 14 was
9    marked for identification.)
10   BY MR. SMITH:
11       Q. So, at that time, were you aware of the charge
12   filed by Mr. Simple with the EEOC?
13       A. I was.
14       Q. If I can see the exhibits you have there,
15   Mr. Palmer?
16       In Exhibit Number 10 which is the document
17   that is entitled HR Planning 2003 and then 028 Illinois
18   North which, I understand, is your district, correct?
19       A. Yes.
20       Q. It's listed the various managers and EXAs for
21   your district, and it has the name of the manager and the
22   Social Security number in the second column, and then the
23   third column has the heading Sales/Scripts. What does
24   that mean?

---

**113**

1    A. I'll need to review it for a moment. What
2    it means -- I can just tell from the data here. What it
3    tells is the total sales, prescription, self-service and
4    cigarette sales for that operation for the year.
5        Why it says "slash Scripts" was probably
6    because there should be data in there as to number of
7    prescriptions filled per day, but that field is not
8    populated. Like on the top line where it says 18.6, that
9    would be $18.6 million in sales for the year -- for that
10   fiscal year.
11       Q. Is that for a particular store --
12       A. Yes.
13       Q. -- or for that manager?
14       A. That top store would be in reference to that
15   manager's store number. It should say 4142 somewhere on
16   here. Actually, no, this is by store manager. So, in
17   other words, this is just communicating to the Walgreen
18   Company that this manager, Jeffrey Thompson, works --
19   worked in a store that generated $18.6 million in sales in
20   that year.
21       Q. And then the store address is another column.
22       A. Yes, there it is.
23       Q. So, for that store, if we looked at that --
24       A. That's what I was looking for, is this here.

---

**114**

1    That's the Kankakee store.
2        Q. And so for Exhibit Number 10 for --
3    Mr. Thompson is the first name on there. His store, which
4    is the Kennedy Drive store in Kankakee, that's $18.6
5    million in total sales?
6        A. Sales, correct.
7        Q. And then the other stores here that are
8    indicated, they're ranked. So, the bottom store would be
9    the store with the lowest amount of sales, gross sales?
10       A. That's correct.
11       Q. Does that same hold true then for the EXAs,
12   that the number they -- that is assigned to the EXA's name
13   is for --
14       A. Yes.
15       Q. -- net store sales?
16       A. They keep the exact same format.
17       MR. SMITH: I have no other questions.
18       REDIRECT EXAMINATION
19   BY MR. WILLIAMSON:
20       Q. Mr. Palmer, I think you'll agree that your
21   testimony has changed somewhat after Mr. Smith asked you
22   some questions, and I need to go through a few more things
23   with you.
24       A. Yes.

---

Knight Reporting Service, Ltd.
309-637-0700

### 115

1    Q. You agree your testimony changed?
2    A. Yes.
3    Q. And that's understandable after all this
4  period of time.
5        You testified when I was asking you the
6  questions that you found out about Mr. Simple's EEOC
7  charge in July of 2004; is that correct?
8    A. Yes.
9    Q. Now having been shown the exhibit which was
10  Miss Ablin's letter to EEOC, you now know that you, in
11  fact, knew about the EEOC charge in March of 2004; is that
12  correct?
13    A. That is correct.
14    Q. Is there anything else that will jog your
15  memory about your knowledge of the EEOC charge at this
16  point in time?
17    A. No, it was a mistake. I did not recall that
18  that letter came in March of '04.
19    Q. Now, had Ms. Ablin consulted you about
20  preparing her response to the EEOC charge?
21    A. I had some information -- I don't remember the
22  date, but where there was at least minimally a telephone
23  call regarding that there was a charge in place, yes.
24    Q. I'm not asking you what your input was at this

### 116

1  point in time, but I do want to know then, that telephone
2  call came before Ms. Ablin wrote the response to EEOC
3  then?
4    A. I'm sorry, I don't know. I, I really -- I
5  honestly do not know when the phone call came or an e-mail
6  correspondence or by whatever means we communicated. We
7  did have communication at some point, but I do not know
8  the time, and I did not make note of it.
9    Q. So, that would mean that the privilege log
10  that referred to Ms. Ablin's handwritten notes are missing
11  at least one conversation with you because you had a
12  conversation with her in March of 2004 regarding the EEOC
13  charge, and then you had another conversation with her in
14  July regarding Mr. Simple's letter to you in that month;
15  is that correct?
16        MR. SMITH: If he understands the question --
17  I'm not sure I'm following.
18        MR. WILLIAMSON: Don't tell him he doesn't
19  understand it because he's the witness. He'll know if he
20  didn't understand it.
21  BY MR. WILLIAMSON:
22    Q. Do you remember when you testified earlier
23  that you had a conversation with Ms. Ablin -- actually,
24  you just knew it was a female attorney --

### 117

1    A. Right.
2    Q. -- in July of 2004 because Mr. Simple sent you
3  a letter and identified the EEOC charge, and you called
4  her to find out what to do?
5    A. I called the --
6    Q. Do you recall that?
7    A. Yes, I do.
8    Q. And I didn't ask you any of the substance of
9  that conversation.
10    A. No.
11    Q. Now, that's one conversation you had with
12  Miss Ablin. Now you're saying now that there was a second
13  conversation which had to be in March of 2004 regarding
14  the actual EEOC charge itself. Is that also true?
15    A. I don't recall if I spoke with Ms. Ablin
16  regarding the letter that I got from Mr. Simple. I
17  recall --
18    Q. You already testified that you did.
19    A. To Miss Ablin?
20    Q. You testified you contacted her -- a female
21  attorney --
22    A. Oh.
23    Q. -- in the department. You didn't say
24  Ms. Ablin.

### 118

1    A. That's correct. I did not say Ms. Ablin
2  because I really do not recall.
3    Q. Is there any other female attorney --
4    A. Oh, yes. Yes.
5    Q. All right.
6    A. Most of the attorneys are female, I believe.
7    Q. Now, the biggest surprise of your new
8  testimony when Mr. Smith asked questions and after he
9  consulted with you in the hall is that you now are
10  considering the EXA evaluations in picking managers for
11  store openings in certain situations; is that correct?
12    A. That has -- that's what I always meant to be
13  my testimony, but I understand I did not communicate that
14  well.
15    Q. My word, big surprise. But you're agreeing
16  with me you didn't say that at all when I was questioning
17  you. Is that a fair statement?
18    A. I thought I had, but I was told that I did not
19  say that.
20    Q. When would you have said that?
21    A. Pardon?
22    Q. When would you have said that? You said over
23  and over and over again that you did not consider the
24  evaluations, in picking a vacant store manager job, of the

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

119

1  EXAs, didn't you?
2      A.  Yes, implying not of itself, I do not use the
3  performance evaluations.
4      Q.  You're now saying that when it's a close race
5  between two or three different EXAs you do look at the
6  evaluations?
7      A.  If I have need in order to form a decision in
8  my mind, I may or may not use the store manager's
9  performance evaluation.  I may or may not review that and
10  consider it.
11      Q.  So far as Eric Simple is concerned, I take it
12  your answer remains the same:  You didn't use his
13  evaluations or Ms. Jonland's evaluations in picking the
14  Pontiac job, did you?
15      A.  No, I was solid on Ms. Jonland as the
16  candidate for that store.
17      Q.  Didn't use Mr. Simple's evaluation or anybody
18  else's evaluation in picking the Kankakee job in November
19  of '03 either, did you?
20      A.  That I don't recall.  I do recall the Pontiac
21  store as it was -- for some reason I do recall that, and I
22  recall the status at the time, probably because I had had
23  a lot of contact with Mr. Simple at that time.
24      Q.  Did you ever use Mr. Simple's evaluations then

120

1  in considering him for any store between 2001 and 2005?
2      A.  I don't recall.
3      Q.  And that answer has changed, as I understand
4  it, because before you said no?
5      MR. SMITH:  Whatever he said.  I mean as far
6  as your characterization of what he said before --
7      MR. WILLIAMSON:  I'm not characterizing.  I'm
8  just repeating what he said.  That's not a
9  characterization.
10      MR. SMITH:  Well, you may not be accurate, is
11  what I'm saying.
12      MR. WILLIAMSON:  Well, if you can tell me that
13  I'm not accurate, that's fine, but it's not a
14  characterization.
15  BY MR. WILLIAMSON:
16      Q.  Did you agree --
17      MR. SMITH:  My objection is it's inaccurate.
18  BY MR. WILLIAMSON:
19      Q.  So, I'll ask you to correct that.  Did you
20  indicate at any point in time before that you ever used
21  Mr. Simple's EXA evaluations in considering any job for
22  him as store manager between 2001 and 2005?
23      A.  I may have reviewed his performance evaluation
24  at that time, although for a period of time I considered

121

1  him the most qualified candidate.
2      Q.  At what time?
3      A.  That I do not recall exactly.
4      Q.  So, we're covering the whole four-year period
5  again?
6      A.  Right.  The whole four-year period.  I may
7  have reviewed his performance evaluation at some point in
8  making a decision as to whether I thought he was a
9  candidate, but I would not have reviewed it for all of the
10  opportunities because I had already formed the position
11  that he was the most qualified EXA to be offered the
12  opportunity.
13      (A discussion was held off the record.)
14  BY MR. WILLIAMSON:
15      Q.  Look again at Exhibit Number 13, if you will.
16      Now, first of all, you started discussing the
17  makeup of this exhibit.  How do you have knowledge of
18  that?
19      A.  I don't understand the question.
20      Q.  You started telling Mr. Smith this is a
21  compilation of two e-mails.  How did you know that?
22      A.  Sometimes when I -- depending on -- I just
23  know from use of the e-mail system that I use that if I
24  copy an e-mail, sometimes rather than having clear text as

122

1  you see at the top, like Mr. Simple's response without
2  anything in the margins, that when I -- when it's been
3  forwarded, there will be that greater-than sign in the
4  left margin.
5      And I also recalled this memo beginning, "I am
6  considering EXA candidates for promotion to store
7  manager," that text, I recall sending that note to my
8  store managers.
9      Q.  Yes.  What I'm concerned about -- so, you're
10  saying these arrows indicate it's been forwarded?
11      A.  Sometimes it does.  It depends on, I think,
12  whether I use the forward key or if I copy and paste
13  something, previous text.  I'm not sure.
14      Q.  That was my next question.  Do you have any
15  knowledge of how this particular exhibit was made up by
16  Walgreens and delivered to me, for instance?  In other
17  words, did somebody copy and paste this exhibit?
18      A.  Oh, no.  I meant copy and paste online, like I
19  could copy a piece of text.
20      Q.  That's all right.  I'm talking about this
21  exhibit.  Do you have any knowledge of that?
22      A.  This looks to me to be just simply a print
23  screen of an e-mail and message from Mr. Simple back to
24  me.

123

1    Q. You don't think this is copied and pasted
2 then?
3    A. Oh, no. I do not think that.
4    Q. Well, that's curious because the top e-mail
5 has To, From, Subject and Sent and the date on it, and the
6 bottom has none; and it had to be done at a different
7 time.
8       How could your computer system delete what is
9 obviously an integral part of the process in the bottom
10 e-mail?
11    A. Because I believe that this text at the bottom
12 of the e-mail, this is -- this is what I copied and sent
13 back to Mr. Simple at Store 2177. This is the format in
14 which it would be displayed to Mr. Simple and myself on
15 our PCs when we view it.
16    Q. I understand all of that. You didn't copy and
17 send this to Mr. Simple at the same time you got his
18 response, did you?
19    A. No.
20    Q. You had to do that before?
21    A. Oh, I'm sorry.
22    Q. So, how is this computer deleting all
23 references to when you did this? To, From, Sent, Subject.
24 That's what I don't understand.

124

1    A. I don't understand that either, I guess.
2    Q. I don't either. You're not saying that
3 anybody took that off of here, are you?
4    A. No, I believe that the body of the letter
5 beginning with, "I am considering EXAs," from there to
6 bottom, it is my feeling -- I'm not an IT expert, but it's
7 my feeling that that had been copied by myself onto the
8 e-mail that I sent to Mr. Simple at 2177, and Mr. Simple
9 simply hit the Reply With History button and typed his
10 reply back to me. And this is what it looks like in its
11 final form.
12    Q. Now, is it -- it may well be then that you
13 sent this or forwarded this e-mail to Mr. Simple after
14 5:00?
15    A. No.
16    Q. You don't know that; none of us can know it
17 because the record is not there. It's been somehow taken
18 off.
19    A. Mr. Simple sent it back to me at 5:13 p.m.
20    Q. I know that. When did you send it to him?
21    A. I don't know. Sometime --
22    Q. You could have sent it after 5:00?
23    A. I don't believe I did since I was asking for a
24 response from my managers by 5:00 that day. That would

125

1 defy logic.
2    Q. The point is there's no record. Well, no, it
3 wouldn't define logic. You could have been making up this
4 e-mail to act as if you were including him in the process
5 for the Kankakee job --
6    A. Oh.
7    Q. -- when you have no intention of doing that.
8 I didn't quite mean to say it that way.
9    A. You mean it could have been manufactured?
10    Q. Well, of course.
11    A. Oh, I'm sorry. I misunderstood your line.
12    Q. I don't want you to get upset.
13    A. Okay.
14    Q. But, of course, I have to ask the witness
15 that.
16    A. I did not manufacture this.
17    Q. But you don't know why we don't have any
18 record of when it was sent?
19    A. No.
20    Q. And the other question I have about the
21 exhibit is -- Miss Ablin is getting tired of my questions;
22 she has to leave. But the sentence and the reference to
23 Mr. Simple, are you saying you only sent that portion to
24 him?

126

1       I understand you're sending below to every
2 store manager. Are the top --
3    A. Yes.
4    Q. -- three lines only sent to Mr. Simple?
5    A. The lines that say, "Mr. Simple, I see that
6 Mr. King is on vacation this week and therefore you may
7 not be aware," I typed that in and sent it to Mr. Simple.
8    Q. Only Mr. Simple?
9    A. Well, I sent it to the store e-mail address,
10 yes.
11    Q. All right. All right. I wanted to make sure
12 I was clear on that, too.
13    A. If my --
14    Q. Is there anything else you want to alter or
15 change about your prior testimony?
16    A. No.
17    Q. Do you know a Greg Pensky, P-e-n-s-k-y?
18    A. I have vague recall. He was an MGT in this
19 district for a period of time.
20    Q. And was that the only position he had, MGT?
21    A. I don't know if he promoted into the position
22 of MGT or if he was hired in the position of MGT.
23    Q. Was he ever a manager?
24    A. No.

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

**127**

1    Q. Ever an EXA?
2    A. I don't recall.
3    Q. Do you have any knowledge about his demotion?
4    A. If referenced I'd recall, but I don't recall
5    it myself.
6    Q. When he was demoted, did he retain the same
7    job code?
8    A. I don't know.
9    Q. What store was he at?
10    A. The name I'm associating either with Kankakee
11    or Bloomington.
12    Q. So, if he did retain the same job code, that
13    would have been the manager of the store's decision and
14    not yours?
15    A. No, it should have been my decision.
16    Q. So, if Mr. Pensky retained the same job code
17    when he was demoted, that was your decision, and that was
18    a time you did exercise your discretion to allow somebody
19    to retain their same pay rate even though they went into a
20    lower job code?
21    A. I don't know what his position code was.
22    Q. Well, my question was, if that happened, you
23    exercised your discretion for Mr. Pensky to do that; is
24    that correct?

---

**128**

1    MR. SMITH: I'm going to object.
2    BY MR. WILLIAMSON:
3    Q. Because you were the person with
4    responsibility for it?
5    MR. SMITH: I'm going to object, calls for
6    speculation. He may answer.
7    MR. WILLIAMSON: Well, obviously, we'll have
8    to present evidence later on, but the witness is here now.
9    BY MR. WILLIAMSON:
10    Q. You were responsible for that decision on Greg
11    Pensky?
12    MR. SMITH: What decision? We haven't
13    established that there was any decision.
14    BY MR. WILLIAMSON:
15    Q. If there was a demotion and he retained the
16    same job code or -- job code, yes.
17    A. I do not know what his job code was. If, if
18    he was a photo clerk or if he was an MGT or if he was an
19    EXA, I don't know. He could have retained -- had a change
20    in his responsibilities and retained his position code.
21    The circumstances would dictate that.
22    Q. And that would have been your discretion to
23    make that decision?
24    A. The store manager also would have been able to

---

**129**

1    put in whatever position code she or he wished.
2    Q. Mr. Pensky's a white male?
3    A. I remember him as a white male, yes.
4    MR. WILLIAMSON: I'm done.
5    MR. SMITH: I have no further questions.
6    (Whereupon, the deposition was concluded at
7    4:06 p.m.)

---

**130**

1    STATE OF ILLINOIS :
2                                : SS
3    COUNTY OF TAZEWELL :
4
5    I, Jennifer E. Johnson, CSR, RMR, CRR, and
6    Notary Public in and for the County of Tazewell, State of
7    Illinois, do hereby certify that pursuant to notice, there
8    came before me on the 30th day of November. A.D. 2005, at
9    411 Hamilton Boulevard, Suite 1926, Peoria. Illinois, the
10    following named person, to wit:
11    MICHAEL PALMER,
12    a witness herein, called by the plaintiff, who was by me
13    first duly sworn to testify to the truth and nothing but
14    the truth of his knowledge touching and concerning the
15    matters in controversy in this cause, and that he was
16    thereupon carefully examined upon his oath, and his
17    examination reduced to shorthand by means of stenotype and
18    thereafter converted to typewriting using computer-aided
19    translation by me.
20    I also certify that the deposition is a true
21    record of the testimony given by the witness, and that the
22    reading and signing of the deposition by the said witness
23    was expressly reserved.
24    I further certify that I am neither attorney or

---

Eric Simple v. Walgreen Co.

Michael Palmer
11/30/2005

---

**131**

1  counsel for nor related to or employed by any of the
2  parties to the action in which this deposition is taken,
3  and further that I am not a relative or employee of any
4  attorney or counsel employed by the parties hereto or
5  financially interested in the action.
6      In witness whereof, I have hereunto set my hand
7  and affixed my notarial seal this 14th day of December,
8  A.D. 2005.
9
10
11
12
13
14  _____
15  Jennifer E. Johnson, CSR, RMR, CRR
16  Illinois CSR #084-005039
17
18
19  "OFFICIAL SEAL"
20  JENNIFER E JOHNSON
21  NOTARY PUBLIC STATE OF ILLINOIS
22  COMMISSION EXPIRES 05/08/09
23
24

---

**132**

1  ERIC D. SIMPLE,
2      Plaintiff,
3      vs.        Case No. 04-1305
4  WALGREEN COMPANY,
   an Illinois Corporation,
5
       Defendant.
6
7      I hereby certify that I have read the foregoing
   transcript of my deposition given on 11/30/05, consisting
8  of pages 4 through 129, inclusive, and I do again
   subscribe and make oath that the same is a true, correct,
9  and complete transcript of my deposition so given as
   aforesaid.
10
       Please check one:
11
       _____ I have submitted errata sheet(s).
12
       _____ No corrections were noted.
13
14  _____
       MICHAEL PALMER
15
16  SUBSCRIBED AND SWORN TO
   before me this _____ day
17  of _____, A.D. 2005/2006.
18
19  _____
       Notary Public
20
21
22
23
24

---

**133**

1      WITNESS ERRATA SHEET
2  ERIC D. SIMPLE,
3      Plaintiff,
4      vs.        Case No. 04-1305
5  WALGREEN COMPANY,
   an Illinois Corporation,
6
       Defendant.
7
   Deposition of MICHAEL PALMER (11/30/05)
8
       I wish to make the following changes for the
9  following reasons:
10  Page  Line
11  _____ CHANGE: _____
       REASON: _____
12
13  _____ CHANGE: _____
       REASON: _____
14  _____ CHANGE: _____
       REASON: _____
15
16  _____ CHANGE: _____
       REASON: _____
17  _____ CHANGE: _____
       REASON: _____
18
19  _____ CHANGE: _____
       REASON: _____
20  _____ CHANGE: _____
       REASON: _____
21
22
23  (Signed) _____
24

---

Knight Reporting Service, Ltd.
309-637-0700

1   ERIC D. SIMPLE,

2          Plaintiff,

3      vs.                        Case No. 04-1305

4   WALGREEN COMPANY,
    an Illinois Corporation,

5

6          Defendant.

7          I hereby certify that I have read the foregoing
    transcript of my deposition given on 11/30/05, consisting

8   of pages 4 through 129, inclusive, and I do again
    subscribe and make oath that the same is a true, correct,

9   and complete transcript of my deposition so given as
    aforesaid.

10

11         Please check one:

12         _____  I have submitted errata sheet(s).

13         ___✓___  No corrections were noted.

14   _____
              MICHAEL PALMER

15

16   SUBSCRIBED AND SWORN TO
     before me this _6th_ day

17   of _January_____, A.D. 2005/2006.

18

19   _____
          Notary Public

20

21                    OFFICIAL SEAL
                     JULIE A HARRISON
22              NOTARY PUBLIC - STATE OF ILLINOIS
                MY COMMISSION EXPIRES:

23

24

```
 1                    WITNESS ERRATA SHEET

 2     ERIC D. SIMPLE,

 3            Plaintiff,

 4            vs.                    Case No. 04-1305

 5     WALGREEN COMPANY,
       an Illinois Corporation,
 6
              Defendant.
 7
       Deposition of MICHAEL PALMER (11/30/05)
 8
              I wish to make the following changes for the
 9     following reasons:

10     Page   Line

11     _____  _____  CHANGE: _____
                     REASON: _____
12
       _____  _____  CHANGE: _____
13                   REASON: _____

14     _____  _____  CHANGE: _____
                     REASON: _____
15
       _____  _____  CHANGE: _____
16                   REASON: _____

17     _____  _____  CHANGE: _____
                     REASON: _____
18
       _____  _____  CHANGE: _____
19                   REASON: _____

20     _____  _____  CHANGE: _____
                     REASON: _____
21

22

23     (Signed)  _____

24
```